# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| BROTHERHOOD OF LOCOMOTIVE ENGINEERS AND TRAINMEN, <br><br> *Plaintiff,* <br><br> v. <br><br> NORFOLK SOUTHERN RAILWAY CO. and NORFOLK SOUTHERN CORP., <br><br> *Defendants.* | Civil Action No. 1:05CV01188 <br> Judge Richard W. Roberts |

## DEFENDANTS' STATEMENT OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S APPLICATION FOR A PRELIMINARY INJUNCTION

Jeffrey S. Berlin (D.C. Bar #200048)
Krista L. Edwards (D.C. Bar #421537)
Mark E. Martin (D.C. Bar #373445)
SIDLEY AUSTIN BROWN & WOOD LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8178
jberlin@sidley.com
kedwards@sidley.com
mmartin@sidley.com

*Attorneys for Defendants Norfolk Southern Railway Company and Norfolk Southern Corporation*

June 29, 2005

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................................. ii

INTRODUCTION AND SUMMARY .................................................................................... 1

STATUTORY PROVISIONS INVOLVED.............................................................................. 5

STATEMENT OF FACTS ...................................................................................................... 6

ARGUMENT:  THE REQUEST FOR A PRELIMINARY INJUNCTION
SHOULD BE DENIED. ......................................................................................................... 9

I.      THE COURT LACKS SUBJECT MATTER JURISDICTION OVER THIS
        CIVIL ACTION, BECAUSE PLAINTIFF LACKS STANDING TO SUE. ..................... 9

II.     IN ANY EVENT, PLAINTIFF HAS NOT DEMONSTRATED THAT IT IS
        ENTITLED TO PRELIMINARY INJUNCTIVE RELIEF............................................. 13

        A.      The Norris-LaGuardia Act Bars The Grant Of A Preliminary
                Injunction Unless The Court Finds That Defendants Have Violated
                The Railway Labor Act.................................................................................. 13

        B.      Defendants' Conduct Of Which BLET Complains Is Not Unlawful
                Under The Railway Labor Act........................................................................ 15

                1.      The National Labor Relations Act Case Law And Legal
                        Principles Relied On By BLET Do Not Apply To NSR. ................ 16

                2.      NSR's No-Solicitation Policy Does Not Violate RLA § 2
                        Third Or Fourth................................................................................ 20

                        (a)     NMB Decisions Establish That An Evenhanded
                                No-Solicitation Policy Applicable To Union Organizing
                                Activities Does Not Constitute Unlawful Carrier
                                Interference. ......................................................................... 20

                        (b)     This Court Should Defer To The NMB. ............................. 22

                        (c)     NSR's No-Solicitation Policy Is Uniform And Is Applied
                                Evenhandedly....................................................................... 27

        C.      BLET Has Not Satisfied The Other Standards For Preliminary
                Injunctive Relief............................................................................................ 32

CONCLUSION....................................................................................................................... 34

## TABLE OF AUTHORITIES

**Page**

<u>CASES</u>

*Adams v. Federal Express Corp.*, 470 F. Supp. 1356 (W.D. Tenn. 1979) ....................................12

\*_Adams v. Federal Express Corp._, 547 F.2d 319 (6th Cir. 1976) ...............................................11, 12

*Air Line Pilots Ass'n v. United Air Lines, Inc.*, 802 F.2d 886 (7th Cir. 1986) ..............................23

\* *Aircraft Mechanics Fraternal Ass'n v. United Airlines, Inc.*,
    406 F. Supp. 492 (N.D. Cal. 1976) ...................................................................................23, 26

\* *American Train Dispatchers Ass'n v. Denver & Rio Grande Western R.R.*, 614 F. Supp.
    543 (D. Colo. 1985) ...........................................................................................................23, 25

*Brotherhood of Railroad Trainmen v. Chicago River & Indiana R.R.*,
    353 U.S. 30 (1957).....................................................................................................................15

*Brotherhood of Railroad Trainmen v. Jacksonville Bulk Terminals*,
    394 U.S. 369 (1969)...................................................................................................................16

*Burlington Northern R.R. v. Brotherhood of Maintenance of Way Employees*,
    481 U.S. 429 (1987)...................................................................................................................15

*District 17, United Mine Workers v. Apogee Coal Co.*, 13 F.3d 134 (4th Cir. 1993) ...................14

*In re District No. 1 -- Pacific Coast District, Marine Engineers' Beneficial Ass'n*, 723
    F.2d 70 (D.C. Cir. 1983).............................................................................................................14

*General Committee of Adjustment v. Missouri-Kansas-Texas R.R.*, 320 U.S. 323 (1943) ...........23

*Held v. Allied Pilots Ass'n*, 13 F. Supp.2d 20 (D.D.C. 1998).........................................................25

*Horizon Air Industries, Inc. v. NMB*, 232 F.3d 1126 (9th Cir. 2000)..............................................23

*Independent Union of Flight Attendants v. Pan American World Airways, Inc.*,
    789 F.2d 139 (2d Cir. 1986)........................................................................................................19

*Jacksonville Bulk Terminals, Inc. v. International Longshoremen's Ass'n*,
    457 U.S. 702 (1982)....................................................................................................................14

*Kenamerican Resources, Inc. v. United Mine Workers*, 911 F. Supp. 19 (D.D.C. 1996) .............14

\* *LSG Lufthansa Services v. NMB*, 116 F. Supp.2d 181 (D.D.C. 2000) .....................................18, 19

\*Authorities chiefly relied upon are marked with an Asterisk.

## TABLE OF AUTHORITIES (Cont'd)

**Page**

### CASES (Cont'd)

*Niagara Hooker Employees Union v. Occidental Chemical Corp.*,
935 F.2d 1370 (2d Cir. 1991)..................................................................14

*Pittsburgh & Lake Erie R.R. v. Railway Labor Executives Ass'n*,
491 U.S. 490 (1989)..........................................................................15

*Ruby v. American Airlines, Inc.*, 323 F.2d 248 (2d Cir. 1963) ................................19, 23

*Scott v. American Airlines, Inc.*, 488 F. Supp. 415 (E.D.N.Y. 1980) ...........................19

* *Switchmen's Union of North America v. NMB*, 320 U.S. 297 (1943)................................16, 17, 23

*Texidor v. Ceresa*, 590 F.2d 357 (1st Cir. 1978) ........................................23

* *Trans World Airlines, Inc. v. Independent Federation of Flight Attendants*,
489 U.S. 426 (1989)........................................................................16, 25

*United Telegraph Workers v. Western Union Corp.*, 771 F.2d 699 (3d Cir. 1985).....................14

* *United Transportation Union v. United States*, 987 F.2d 784 (D.C. Cir. 1993)...........................23

*Washington Metropolitan Area Transit Comm'n v. Holiday Tours*,
559 F.2d 841(D.C. Cir. 1977) ............................................................32, 33

### * NATIONAL MEDIATION BOARD DECISIONS

*American Airlines, Inc.*, 26 NMB 412 (1999) ..............................................18

*Iowa, Chicago & Eastern R.R.*, 32 N.M.B. 53 (2004).........................................12

*Key Airlines*, 16 NMB 296 (1989).........................................................18

*Metro-North Commuter R.R.*, 29 NMB 458 (2002)..............................................21

*Northwest Airlines, Inc.*, 14 NMB 49 (1986).................................................17, 21

*Northwest Airlines, Inc.*, 26 NMB 269 (1999)...............................................21

*Pacific Southwest Airlines*, 14 NMB 303 (1987)..............................................21

*Authorities chiefly relied upon are marked with an Asterisk.

## TABLE OF AUTHORITIES (Cont'd)

**Page**

### NATIONAL MEDIATION BOARD DECISIONS (Cont'd)

*Trans World Airlines*, 24 NMB 141 (1997)..................................................................21

*USAir*, 8 NMB 191 (1980)..................................................................21

*USAir*, 17 NMB 377 (1990)..................................................................21

*United Air Lines, Inc.*, 22 NMB 288 (1995)..................................................................21

### STATUTES AND RULES

National Labor Relations Act, 29 U.S.C. §§ 151 *et seq* ........................................ *passim*

Norris-LaGuardia Act, 29 U.S.C. §§ 101 *et seq* ..........................................................13

    29 U.S.C. § 101 ..................................................................14

    29 U.S.C. § 107 ..................................................................14

    * 29 U.S.C. § 107 (a) ..................................................................14, 32

    29 U.S.C. § 107(b) ..................................................................32

    29 U.S.C. § 107(c) ..................................................................32, 33

    29 U.S.C. § 113(c) ..................................................................14

Railway Labor Act, 45 U.S.C. §§  151 *et seq.* ........................................................ *passim*

    45 U.S.C. § 151a..................................................................34

    45 U.S.C. § 151 Sixth ..................................................................5

    * 45 U.S.C. § 152 Third..................................................................*passim*

    * 45 U.S.C. § 152 Fourth ..................................................................*passim*

    * 45 U.S.C. § 152 Ninth..................................................................6, 11, 16, 17

*Authorities chiefly relied upon are marked with an Asterisk.

## TABLE OF AUTHORITIES (Cont'd)

**Page**

## STATUTES AND RULES (Cont'd)

29 C.F.R. pt. 1206 ................................................................................................................17

Rule 12(b)(1), Fed. R. Civ. P. .........................................................................................9, 10

Rule 12(b)(6), Fed. R. Civ. P. ............................................................................................10

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| BROTHERHOOD OF LOCOMOTIVE ENGINEERS AND TRAINMEN,<br><br>*Plaintiff,*<br><br>v.<br><br>NORFOLK SOUTHERN RAILWAY CO. and NORFOLK SOUTHERN CORP.,<br>  Three Commercial Place<br>  Norfolk, Virginia 23510<br><br>*Defendants.* | Civil Action No. 1:05CV01188<br>Judge Richard W. Roberts |

## DEFENDANTS' STATEMENT OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S APPLICATION FOR A PRELIMINARY INJUNCTION

### INTRODUCTION AND SUMMARY

This case arises out of the campaign of one labor union, plaintiff Brotherhood of Locomotive Engineers and Trainmen ("BLET"), to displace another labor union, the United Transportation Union ("UTU"), as collective bargaining representative of the approximately 8,000 employees of defendant Norfolk Southern Railway Company ("NSR") who work in "train service." Employees in that category include "conductors" and "trainmen." Train service employees and "locomotive engineers" (engineers are in "engine service") comprise the crews that operate NSR's freight trains. NSR's locomotive engineers are already represented, for purposes of collective bargaining, by BLET.

Labor relations in the railroad industry are regulated by the Railway Labor Act ("RLA"), 45 U.S.C. §§ 151 *et seq.*, which guarantees, among other things, the right of railroad employees to organize and bargain collectively through representatives of their choosing. The

process by which employees organize -- or, as in this case, decide whether to substitute one union for another -- is administered by a federal agency, the National Mediation Board ("NMB"), which was created by the RLA. The National Labor Relations Act ("NLRA") does not apply to railroads (or to airlines, which are also "carriers" subject to the RLA). The RLA requires that carriers not interfere with their employees' selection of a bargaining representative; in a contest between rival unions, the NMB enforces that statutory command by requiring carriers to deal with the unions in an evenhanded manner, showing no favoritism to one or the other.

Representation under the RLA is determined for each "craft or class" -- typically defined on a systemwide basis as consisting of all the employees in a traditional job classification. All of NSR's conductors comprise a "craft or class." All of NSR's trainmen comprise a craft or class. And all of NSR's locomotive engineers comprise a craft or class.

The NMB process generally requires a union that is seeking to displace another to obtain authorization cards from a majority of the members of the craft or class it is seeking to represent; after the union submits those cards to the NMB and thereby makes its "showing of interest," the NMB investigates and, typically, calls for an election within the craft or class. Only the employees who are members of that craft or class -- i.e., those who work in the pertinent job classification -- will be eligible to vote in the election. If a majority of the employees cast ballots, and if one union wins a majority of the votes cast, the NMB will certify that union as the RLA representative of the craft or class.

When NSR learned in March 2005 that BLET was apparently beginning a campaign to win the endorsement of the railroad's train service employees, with the apparent goal of bringing about an election under NMB auspices and displacing UTU, the railroad

(together with its parent, Norfolk Southern Corporation, which furnishes the management of the railroad), announced to all affected employees and supervisors its policy requiring absolute neutrality in the contest between BLET and UTU, and prohibiting all union organizing activities, including the solicitation of signatures on union authorization cards, anywhere on NSR's property. NSR has strictly enforced its neutral no-solicitation policy, cautioning employees and, where necessary, taking disciplinary action against employees who violate the policy. NSR has taken these steps because it concluded that the effects of a high-profile, high-stakes contest between two major unions could, if the contest were carried out on the railroad's property, jeopardize the safety of employees and the railroad's operating effectiveness.

BLET has brought this civil action in order to challenge NSR's neutral no-solicitation policy. Its Complaint and its Application for Preliminary Injunctive Relief seek orders barring enforcement of the policy. BLET contends that NSR's policy is an unlawful restraint on the right of employees to organize and select a bargaining representative, and BLET asserts that it is seeking relief on behalf of NSR employees in its capacity as certified RLA bargaining representative of NSR's locomotive engineers.

As we will show, the Court lacks subject matter jurisdiction to consider BLET's challenge. NSR's locomotive engineers, whom BLET represents under the RLA, have no claims of their own to assert regarding NSR's enforcement of its no-solicitation policy, because the engineers are not engaged in the process of organizing or selecting a bargaining representative. And BLET lacks standing to assert claims on behalf of NSR's train service employees, who are the only employees whose RLA rights could be implicated as a result of the BLET-UTU contest for their endorsement. To put it another way, NSR's locomotive engineers have nothing to say about the train service employees' selection of a representative; and only the train service

- 3 -

employees themselves -- and not engineers, or the engineers' union -- can invoke their RLA rights.

Even if it is assumed *arguendo* that BLET can maintain this civil action, the union's claim would have to be rejected on the merits, because NSR's policy is lawful under the RLA. BLET mistakenly relies on case law arising under the NLRA, which does not apply to the railroad industry. In this industry, the NMB sets the standard for deciding what carrier conduct may constitute an infringement of RLA representation rights; and NSR's neutral no-solicitation policy scrupulously adheres to the guidelines that have been established in the NMB's decisions.

As we will explain, by reason of the Norris-LaGuardia Act, the Court cannot grant preliminary injunctive relief unless it specifically concludes that, as a matter of law, NSR's neutral policy violates provisions of the RLA. It would not be sufficient for the Court to find that BLET is "likely to succeed" on the merits of its claim.

BLET's entire argument on the merits reduces to the proposition that as a matter of law, a railroad flatly violates the RLA when it treats competing unions evenhandedly and bars all union organizing activity from its property. That is an insupportable, wrong-headed position. The RLA does not command a railroad to open its property to union organizing activities, and the NMB has not ruled that railroads must do so.

Nor is it possible for BLET to show that NSR's enforcement of its neutral policy constitutes some sort of manifestation of anti-union animus. NSR's reasons for enforcing its policy are explained in our evidence -- the Declaration of Norfolk Southern's Assistant Vice President-Labor Relations Harold R. Mobley. Against this, BLET offers only the conclusory opinions of its staff lawyer, who states in his declaration, as though it were fact, that NS intended by its policy to infringe the RLA rights of its employees. Even if BLET's staff lawyer could be

- 4 -

heard to speak on behalf of NSR's train service employees, who are currently represented by a different union, his statements as to NSR's motivation are not based on personal knowledge, are not true, and are obviously not helpful to the Court.

For the reasons set forth in this Statement of Points and Authorities and the supporting evidence submitted by NSR, and as will be further developed at hearing, BLET's application for preliminary injunctive relief should be denied.

## STATUTORY PROVISIONS INVOLVED

RLA § 1 Sixth, 45 U.S.C. § 151 Sixth:

> The term "representative" means any person or persons, labor union, organization, or corporation designated either by a carrier or group of carriers or by its or their employees, to act for it or them.

RLA § 2 Third, 45 U.S.C. § 152 Third:

> Representatives, for the purposes of this chapter, shall be designated by the respective parties without interference, influence, or coercion by either party over the designation of representatives by the other; and neither party shall in any way interfere with, influence, or coerce the other in its choice of representatives. Representatives of employees for the purposes of this chapter need not be persons in the employ of the carrier, and no carrier shall, by interference, influence, or coercion seek in any manner to prevent the designation by its employees as their representatives of those who or which are not employees of the carrier.

RLA § 2 Fourth, 45 U.S.C. § 152 Fourth:

> Employees shall have the right to organize and bargain collectively through representatives of their own choosing. The majority of any craft or class of employees shall have the right to determine who shall be the representative of the craft or class for purposes of this chapter. No carrier, its officers, or agents shall deny or in any way question the right of its employees to join, organize, or assist in organizing the labor organization of their choice, and it shall be unlawful for any carrier to interfere in any way with the organization of its employees, or to use the funds of the carrier in maintaining or assisting or contributing to any labor organization, labor representative, or other agency of collective bargaining, or in performing any work therefor, or to influence or coerce employees in an

effort to induce them to join or remain or not to join or remain members of any labor organization, . . . .

RLA § 2 Ninth, 45 U.S.C. § 152 Ninth:

> If any dispute shall arise among a carrier's employees as to who are the representatives of such employees designated and authorized in accordance with the requirements of this chapter, it shall be the duty of the [National] Mediation Board, upon request of either party to the dispute, to investigate such dispute and to certify to both parties, in writing, within thirty days after the receipt of the invocation of its services, the name or names of the individuals or organizations that have been designated and authorized to represent the employees involved in the dispute, and certify the same to the carrier. Upon receipt of such certification the carrier shall treat with the representative so certified as the representatives of the craft or class for the purposes of this chapter. In such an investigation, the Mediation Board shall be authorized to take a secret ballot of the employees involved, or to utilize any other appropriate method of ascertaining the names of their duly designated and authorized representatives in such manner as shall insure the choice of representatives by the employees without interference, influence, or coercion exercised by the carrier. . . .

## STATEMENT OF FACTS

The pertinent facts are set forth in the accompanying Declaration of Harold R. Mobley, and are briefly summarized here for the Court's convenience.

NSR's no-solicitation policy, as announced to the competing labor unions and NSR's employees, and to the railroad's management, provides:

> Solicitation of any type, including recruitment and/or union organizing among agreement employees, is prohibited on the private property of NS. Union activities in the work place by agreement employees and their representatives are limited to handling claims and grievances, disciplinary investigations and maintenance of a bulletin board to communicate routine and non-controversial matters, to the extent necessary, and not to interfere with safety or the efficiency of work operations. All operating employees should be governed accordingly.

By it terms, the policy is uniform in coverage and neutral in effect: it prohibits all union solicitation by employees, without regard to which union the employee may support. Mobley Decl. ¶¶ 26, 27 & Exhibit 3.

NSR announced its policy in the face of the impending high-profile campaign by BLET to unseat UTU as the representative of train service employees, who make up more than one-fourth of NSR's workforce. BLET announced its organizing drive several months ago, and the campaign officially began in late May 2005. By that time, NSR had received numerous complaints about organizing activities by employees on both sides of the dispute, with some of the earliest complaints coming from BLET officials and directed at campaign activities by UTU supporters. The organizing campaign may well take many months, and it involves employees throughout NSR's system. Given the size of the workforce involved, the intensity of the rivalry between BLET and UTU, and the direct contact the employees in both camps have with one another on the job, it was virtually assured that such conflicts and confrontations would only multiply. Mobley Decl. ¶¶ 12-17.

From the outset, therefore, it was clear to NSR that if its property became the site for an ongoing organizing campaign of this scale and scope, there would be a negative impact on NSR's operations. At a minimum, on-property solicitation activities would be distracting and disruptive to a workforce that performs the safety-critical task of operating NSR's trains. Mobley Decl. ¶¶ 18-20.

To avoid the risk to its operations, NSR made the decision to enforce its prohibition of all solicitation on its property to cover BLET and UTU campaigning. NSR's overriding goal was to protect its vital interest in the safety and efficiency of its train operations, by minimizing the disruptive effect of on-property solicitation activities. In NSR's judgment, a

strict, uniform solicitation ban was not only the most workable practice, but also the most effective way for NSR to remain neutral in the representation contest between BLET and UTU, rather than becoming entangled in disputes between the unions over the conduct of their campaigns on NSR's property. Mobley Decl. ¶¶ 20-24.

NSR communicated its policy banning on-property solicitation simultaneously to BLET and UTU officials in early March 2005, and notified employees of the policy through bulletins issued in early May 2005 by the superintendents on each of NSR's eleven operating divisions. In explaining its policy to BLET and UTU, NSR reaffirmed its commitment to compliance with the RLA and to "strict neutrality in connection with inter-union representation activities." At the same time, NSR issued instructions to its management officials reiterating NSR's policy of "strict neutrality" in connection with union representation disputes, including specifically the dispute between BLET and UTU. Mobley Decl. ¶¶ 24-26 & Exhibits 1-3.

NSR has enforced its no-solicitation policy evenhandedly and will continue to do so in the future. On numerous occasions, officials of one union have complained to NSR about organization activities being conducted by supporters of the other union. NSR has investigated these allegations and, when appropriate, has warned employees about their failure to comply with NSR's no-solicitation policy. Mobley Decl. ¶¶ 27-29.

NSR has taken the additional step of imposing formal discipline on three employees in connection with organizing activities on NSR's property. One of these employees (an engineer, not a train service employee) was campaigning on behalf of BLET; two were campaigning on behalf of UTU. Mobley Decl. ¶¶ 31-37.

NSR intends to continue to enforce its policy in this evenhanded manner, throughout BLET's organizing drive and any subsequent union campaigning, in accordance with the railroad's ongoing commitment to the maintenance of strict neutrality.

Additional facts are set forth below.

## ARGUMENT

### THE REQUEST FOR A PRELIMINARY INJUNCTION
### SHOULD BE DENIED.

### I.    THE COURT LACKS SUBJECT MATTER JURISDICTION OVER THIS CIVIL ACTION, BECAUSE PLAINTIFF LACKS STANDING TO SUE.

BLET lacks standing to sue to vindicate the asserted rights of NSR's train service employees under RLA §§ 2 Third and Fourth. Accordingly, the Court does not have subject matter jurisdiction over this civil action; and it follows that preliminary injunctive relief must be denied.[1]

BLET contends that in this lawsuit it "is acting in its capacity as statutory bargaining representative for the locomotive engineers of the subsidiaries of Norfolk Southern Corporation, including Norfolk Southern Railway Company . . . ." Application at 1. We agree that BLET is the certified representative, under the RLA, of NSR's employees in the "craft or class" of *locomotive engineers*. But that fact is irrelevant to BLET's ability to maintain this lawsuit, because the matter at hand, in this civil action brought for the purpose of enforcing certain assertedly applicable RLA guarantees, is the extent of NSR's authority to regulate the activities of its employees in connection with the selection of a bargaining representative by NSR's *train service employees*. Employees who work in the craft or class of locomotive engineers (and who,

---

[1]    Defendants will be filing a motion to dismiss this civil action pursuant to Rule 12(b)(1).

while working in that capacity, are represented by BLET) are not train service employees. NSR's locomotive engineers have no role in deciding who will become (or remain) the bargaining representative of the train service employees. The engineers' bargaining representative, BLET, is equally an outsider in that process, having neither a direct nor a derivative claim to the right to bring a civil action to vindicate the RLA rights of train service employees.

BLET's Application for a preliminary injunction, like the union's Complaint, ignores the distinction between locomotive engineers and train service employees. But this distinction is everything. If there were a live RLA issue involving the craft or class of locomotive engineers, for which BLET has been the certified representative since 1989, BLET might have standing to bring a claim in court in that capacity. But there is no union organizing campaign under way that involves NSR's locomotive engineers; no other labor union or would-be representative is seeking to challenge BLET's right to continue in that role. The right of NSR's locomotive engineers to designate a representative, or to organize and bargain collectively, through a representative of their choosing, is nowhere in dispute. So, if in this civil action BLET were to attempt to assert a claim in vindication of the supposed RLA § 2 Third and Fourth rights of locomotive engineers, the claim would be subject to dismissal under Rule 12(b)(1) for lack of justiciability (there being no current dispute involving the engineers' rights under those statutory provisions), or under Rule 12(b)(6).

BLET's actual objective has nothing to do with the locomotive engineers it represents. Rather, BLET is attempting to invoke the Court's jurisdiction in connection with the very real current dispute regarding representation of train service employees. BLET wants to *become* the certified representative of NSR's train service employees in addition to the locomotive engineers. But BLET's strategic objective is of no consequence to the assertion of RLA § 2

Third and Fourth rights by train service employees in connection with the designation of their own RLA bargaining representative. Only train service employees might assert such rights in court; and no such employees are parties to this civil action.

This is not an issue of first impression. More than twenty-eight years ago, the Sixth Circuit held "that the Railway Labor Act confers no implied right of action upon an uncertified union to maintain a suit on behalf of employees it seeks to represent." *Adams v. Federal Express Corp.*, 547 F.2d 319, 322 (6th Cir. 1976) (affirming dismissal of labor union as plaintiff in civil action seeking to assert employees' right to organize and bargain collectively as protected in RLA §§ 2 Third and Fourth). The court found that the provisions of RLA § 2 Fourth, which protect the right of "[e]mployees to organize and bargain collectively through representatives of their own choosing," and of § 2 Ninth, which authorize the NMB to decide who the employees' chosen representatives are, do not empower a labor union that has *not* been certified by the NMB to maintain a civil action on behalf of employees in what would necessarily be a representative capacity.

In the terminology of *Adams*, BLET is an "uncertified union" with respect to NSR's train service employees. The union's certification by the NMB as representative of loco-motive engineers is irrelevant. BLET may well be able to say that some NSR train and engine service employees have voluntarily become members of BLET and that the union is confident those employees will vote for it in an NMB-conducted election. But BLET is not the RLA bargaining representative of any NSR train and engine service employees, and what we are describing is the very sort of relationship between and union and employees that the Sixth Circuit found was insufficient to give a union standing to sue, in the absence of NMB certification. Therefore, under the principle of *Adams*, BLET cannot claim that the RLA confers

on it an implied right of action to bring suit to vindicate the § 2 Third and Fourth rights of train service employees.

BLET does not acknowledge *Adams*. Nor does BLET even suggest that there is a question regarding its standing to sue, much less admit that it has long been accepted that a union cannot bring an RLA suit on behalf of employees as to whom it is *seeking* to be certified as bargaining representative. But this issue has long been treated as a settled matter in the industries that are subject to the RLA. We have found no indication that the Sixth Circuit's holding in *Adams* has ever been questioned at the appellate level; apparently no court has decided the issue differently. BLET and its counsel certainly know about *Adams*: The union that was dismissed from *Adams* was the International Brotherhood of Teamsters, of which BLET is now a part[2]; counsel representing BLET here were also counsel for the Teamsters in *Adams*; and in its Application here (at pages 7-8), BLET cites a subsequent district court decision in the *Adams* litigation, *Adams v. Federal Express Corp.*, 470 F. Supp. 1356 (W.D. Tenn. 1979), which refers to that court's earlier dismissal of the Teamsters' claim on standing grounds, and to the Sixth Circuit's affirmance, *id.* at 1361.[3]

The conclusion that BLET lacks standing to sue is independent of any issue as to whether individual NSR train service employees might potentially be able to invoke federal court jurisdiction to hear claims that their rights under RLA §§ 2 Third and Fourth have been

---

[2]    BLET, once an independent labor union known as the Brotherhood of Locomotive Engineers, is now a "Division" of the "Rail Conference" of the International Brotherhood of Teamsters, *see* www.ble.org.; *Iowa, Chicago & Eastern R.R.*, 32 N.M.B. 53 (2004). The union has chosen, in this civil action, to omit reference to its parent organization.

[3]    BLET is headquartered in Cleveland, Ohio, within the Sixth Circuit, but elected to file its lawsuit in this district, where NSR does not employ a single train service employee. (Defendant NSR reserves its objections as to personal jurisdiction and venue.)

infringed. We assume *arguendo* that individual employees could sue to vindicate their own rights under those RLA sections; indeed, the Sixth Circuit held in *Adams* that those RLA sections do create a private right of action for individual employees. Of course, any individual employee's ability to state a claim would depend on the facts of his or her case. But no NSR employees are plaintiffs in this civil action, so there is no occasion for the Court to consider whether there might actually be anyone who could assert a claim against NSR under §§ 2 Third and Fourth.[4]

## II. IN ANY EVENT, PLAINTIFF HAS NOT DEMONSTRATED THAT IT IS ENTITLED TO PRELIMINARY INJUNCTIVE RELIEF.

### A. The Norris-LaGuardia Act Bars The Grant Of A Preliminary Injunction Unless The Court Finds That Defendants Have Violated The Railway Labor Act.

In order for BLET to obtain a preliminary injunction, the union must show, and the Court must find, *inter alia*, that NSR's challenged no-solicitation policy actually violates the RLA. This is the standard imposed by the Norris-LaGuardia Act, 29 U.S.C. §§ 101 *et seq.* ("NLGA"). It would not be sufficient for BLET merely to show that there is a reasonable likelihood that the policy might be found to violate the RLA.

---

[4]    BLET's Complaint gives the names of two individual NSR employees who have assertedly been affected by NSR actions of which BLET complains, G.A. Myers (¶¶ 14, 16) and T.J. Curran (¶¶ 15, 16). But the Complaint also correctly states that both of these employees are employed by NSR as locomotive engineers -- which means they would not participate in the selection of an RLA representative for NSR's train service employees if an election should be called. As we have explained, NSR's locomotive engineers are already represented by a labor union (BLET), and are not engaged in any self-organization activities that would be assertedly protected by RLA §§ 2 Third and Fourth. Any rights that individual *train service employees* might possess with respect to the right to self-organize and select a bargaining representative under those statutory provisions do not carry over to Mr. Myers, Mr. Curran, or any other NSR locomotive engineers.

The NLGA governs the issuance of an injunction in any "case involving or growing of a labor dispute," 29 U.S.C. § 101. The term "labor dispute" includes "any controversy . . . concerning the association or representation of persons negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment." 29 U.S.C. § 113(c). The Supreme Court has explained that the statute's coverage is intentionally broad, reaching any case in which "the employer-employee relationship [is] the matrix of the controversy." *Jacksonville Bulk Terminals, Inc. v. International Longshoremen's Ass'n*, 457 U.S. 702, 712-13 (1982) (citation omitted). The NLGA applies to a union's request to enjoin employer conduct no less than to an employer's action to enjoin a union. *E.g., Niagara Hooker Employees Union v. Occidental Chemical Corp.*, 935 F.2d 1370, 1375 (2d Cir. 1991); *United Telegraph Workers v. Western Union Corp.*, 771 F.2d 699 (3d Cir. 1985). BLET's claim obviously concerns a "labor dispute," and so comes within the reach of the NLGA.

A federal court lacks jurisdiction to grant an injunction in a labor dispute unless it makes the specific findings required by 29 U.S.C. § 107. *E.g., In re District No. 1 -- Pacific Coast District, Marine Engineers' Beneficial Ass'n*, 723 F.2d 70, 76 (D.C. Cir. 1983); *Kenamerican Resources, Inc. v. United Mine Workers*, 911 F. Supp. 19, 22-23 (D.D.C. 1996) (Oberdorfer, J.). Among other things, a court must find that "unlawful acts have been threatened and will be committed unless restrained or have been committed and will be continued unless restrained . . . ." 29 U.S.C. § 107(a). This showing displaces the traditional standard -- a showing by plaintiff that it is likely to succeed on the merits of its claim -- that pertains to cases that do not involve labor disputes. *See, e.g., District 17, United Mine Workers v. Apogee Coal Co.*, 13 F.3d 134, 136 (4th Cir. 1993) (vacating district court's entry of preliminary injunction because the

court applied only the general standard for obtaining a preliminary injunction rather than the NLGA standard).

BLET asserts that the NLGA does not apply to this case. Complaint ¶ 3 (NLGA "is inapplicable because this action is brought to enforce the statutory protections of the [RLA]"); Application at 6 (NLGA "does not apply"). But the union is wrong, for it is well settled that the NLGA applies to civil actions that seek to enforce the RLA's requirements. *See, e.g., Brotherhood of Railroad Trainmen v. Chicago River & Indiana R.R.*, 353 U.S. 30, 40-42 (1957). In such cases, it is a precondition to the grant of injunctive relief that the court find the defendant's actions are unlawful. *See, e.g., id.; Burlington Northern R.R. v. Brotherhood of Maintenance of Way Employees*, 481 U.S. 429, 445-56 (1987).[5]

## B.    Defendants' Conduct Of Which BLET Complains Is Not Unlawful Under The Railway Labor Act.

NSR's enforcement of its no-solicitation policy does not violate any provision of the Railway Labor Act. This case is not governed by case law and legal principles developed under the National Labor Relations Act, on which BLET exclusively relies. Decisions of the National Labor Relations Board, and of courts reviewing NLRB actions, do not apply here. The RLA imposes its own standards, and the question whether NSR's policy is lawful under the RLA should be decided by reference to the decisions of the National Mediation Board, which regu-

---

[5]    The cases cited by BLET (Application at 6) do not help the union, but, rather, support the conclusion that the union cannot obtain injunctive relief unless it can satisfy the Court that, among other things, NSR's policy violates the RLA. *Pittsburgh & Lake Erie R.R. v. Railway Labor Executives Ass'n*, 491 U.S. 490, 513 (1989), merely affirms the holding of *Chicago River* that the NLGA's general ban on the issuance of an injunction in a labor dispute must yield when there is a violation of a specific command of the RLA. And *Burlington Northern R.R. v. Brotherhood of Maintenance of Way Employees*, 481 U.S. at 445-56, holds that when there is no violation of the RLA, NLGA's prohibition against issuing an injunction in a labor dispute controls.

lates the disposition of representation disputes under this statute. NSR's policy is entirely consistent with principles developed in the NMB case law.

### 1. The National Labor Relations Act Case Law And Legal Principles Relied On By BLET Do Not Apply To NSR.

BLET would have the Court evaluate NSR's actions by reference to the wrong statute. NSR is a railroad, and its relationship with its employees is governed by the RLA, which applies to the rail and airline industries. Although BLET pays lip service to this elementary fact, the union's attack on NSR's no-solicitation policy rests entirely on principles developed by the NLRB for assessing whether an employer's no-solicitation policy unlawfully interferes with the rights to self-organization guaranteed to employees by the National Labor Relations Act ("NLRA"), 29 U.S.C. §§ 151 *et seq.* Application at 7, 9. We see no reason to engage with BLET over the question of what the result might be if NLRA case law and principles applied to NSR's no-solicitation rule. That case law and those principles do not apply, because NSR is covered by the RLA, not the NLRA.

The Supreme Court has long cautioned that "the NLRA 'cannot be imported wholesale into the RLA arena. Even rough analogies must be drawn circumspectly with due regard for the many differences between the statutory schemes.'" *Trans World Airlines, Inc. v. Independent Federation of Flight Attendants*, 489 U.S. 426, 439 (1989) (quoting *Brotherhood of Railroad Trainmen v. Jacksonville Bulk Terminals*, 394 U.S. 369, 383 (1969)). That guidance certainly applies here, because the process into which BLET wants the Court to intrude is unique to the RLA, and owes nothing to the NLRA scheme.

Under the RLA, representation contests between unions, like the one between BLET and UTU, are subject to an elaborate, exclusive administrative scheme overseen by the NMB, a federal agency. *See* RLA § 2 Ninth; *Switchmen's Union of North America v. NMB*, 320

U.S. 297 (1943). The process begins with the union's filing of an application with the NMB that contains a sufficient "showing of interest" that the employees in the craft or class at issue want the union to be their representative -- typically made through the filing of authorization cards ("A-cards") -- and usually culminates in an election under the auspices of the NMB. *See* 29 C.F.R. pt. 1206.

A core aspect of the NMB's statutory responsibility in overseeing representation disputes is protection of the RLA § 2 Third and Fourth right of railroad employees to choose a collective bargaining representative free from interference by the carrier. RLA § 2 Ninth (NMB is authorized and directed to ascertain and designate the representative "in such a manner as shall insure the choice of representatives by the employees without interference, influence, or coercion exercised by the carrier"); *see Switchmen's Union of North America v. NMB*, 320 U.S. at 300-01 (§ 2 Fourth right of employees to select a representative is "protected by § 2, Ninth which gives the Mediation Board the power to resolve controversies concerning it"). The NMB understands this to be its statutory charge. *See, e.g., Northwest Airlines, Inc.*, 14 NMB 49, 52 (1986) ("determination of the issues . . . in representation cases before the Board, is made in cognizance of and consistent with 45 U.S.C. § 152, Third, § 152, Fourth, and § 152, Ninth").

The NMB carries out this duty by investigating allegations of carrier interference that are presented to it in the context of a dispute over the choice of representatives. In evaluating such allegations, the NMB uses the term "laboratory conditions" as a shorthand way of describing the circumstances that are consistent with the RLA's guarantee that employees choose their representative without interference. When laboratory conditions are maintained, the statutory guarantee of unimpeded employee choice has been honored; by contrast, if laboratory conditions are "tainted," then the employees' right to choose free from interference or coercion

has been infringed. *E.g., Key Airlines*, 16 NMB 296, 311 (1989). In conducting its investigation, the NMB will review alleged claims of carrier interference with employee choice that date back to the moment that laboratory conditions attach, which occurs as soon as the carrier becomes aware of a union's organizational activity. *American Airlines, Inc.*, 26 NMB 412, 447 (1999); *Key Airlines*, 16 NMB at 311. Following its investigation, the NMB will issue a decision and, if interference with the employees' choice has been found, may order relief it deems appropriate.

In discharge of this statutory authority, the NMB has developed principles for assessing whether or not conduct by a carrier amounts to interference with employee choice. There is a substantial body of RLA decisional law that sets the standards for judging whether NSR's no-solicitation policy unlawfully interferes with the employees' right to choose that is guaranteed by that statute.

It is unnecessary and inappropriate to look to the different rules that govern employee rights under the inapplicable NLRA. The court reached just such a conclusion in *LSG Lufthansa Services v. NMB*, 116 F. Supp.2d 181, 187 (D.D.C. 2000) (Huvelle, J.). In that case, the carrier sought review of the NMB's rejection of its attempt to set aside an election that had resulted in the certification of a union, on the ground that certain conduct by the union supposedly constituted unlawful interference with employee choice. In the district court, the NMB submitted a declaration from its chief of staff that "explained the reasons for the NMB's determination," *id.* at 186, by stating, among other things, that the carrier's "'first claim was based on case law under the National Labor Relations Act (NLRA), 29 U.S.C. §§ 151-169, and therefore did not state a claim under the Railway Labor Act (RLA), 45 U.S.C. §§ 151-88.'" 116 F. Supp.2d at 186. The court held that there was no basis for disturbing the NMB's decision,

- 18 -

reasoning that the pertinent language of the NLRA and RLA are not the same; that the carrier had "provided only NLRA case law to support the proposition that union-provided legal assistance constitutes election interference"; and that the Supreme Court has made clear that the NLRA "'cannot be imported wholesale into the railway labor arena.'" 116 F. Supp.2d at 187 (citation omitted).[6]

Certainly, BLET does not cite to any RLA case that ignores NMB doctrine and instead imports into the rail or airline industry the NLRA's rules governing employer bans on union solicitation by employees who are covered by the  other statute.[7]  We do not know of any court that has followed such a misconceived course.  Nor are we aware of any court that, in the nearly eight decades since the RLA's enactment, has otherwise held that a no-solicitation policy like NSR's infringes on the rights of employees, under RLA §§ 2 Third and Fourth, to choose a representative free from carrier interference.  In fact, it is BLET that ignores the administrative

---

[6]      See also, e.g., Independent Union of Flight Attendants v. Pan American World Airways, Inc., 789 F.2d 139, 141 (2d Cir. 1986) (rejecting union effort to avoid RLA authority "by urging that its rights be construed with reference to broader judicially cognizable rights created by the" NLRA); Ruby v. American Airlines, Inc., 323 F.2d 248, 255-56 (2d Cir. 1963) (Friendly, J.) (that the result may have been different if the employer had been a bus line subject to the NLRA instead of an airline subject to the RLA is no argument for applying NLRA precepts to an RLA employer).

[7]      BLET (Application at 8) cites to the RLA case of Scott v. American Airlines, Inc., 488 F. Supp. 415 (E.D.N.Y. 1980); that case, however, does not address solicitation activities, but only the narrow issue of the lawfulness of a carrier policy prohibiting the wearing of union pins and insignia.  Most to the point, Scott is fully consistent with the general principle informing the NMB's decisional law which, as we show in the next section, is that carrier action is consistent with the requirements of the RLA if it treats competing unions evenhandedly.  A critical basis for the Scott court's concluding that the carrier's policy constituted unlawful interference was precisely that the policy was not evenhanded:  the carrier permitted employees who were members of the certified, incumbent union to wear union pins, but did not permit employees to wear the pins of the union that was seeking to become their representative.  488 F. Supp. at 420.

scheme and NMB authorities that do apply to railroads, in favor of those authorities that do not apply.

In deciding whether NSR's conduct is consistent with the requirements of the RLA, then, the pertinent question is whether it complies with the standards that have been developed and applied by the NMB in its review of employee complaints of alleged carrier interference during the course of representation campaigns.

2.    **NSR's No-Solicitation Policy Does Not Violate RLA § 2 Third Or Fourth.**

(a)    **NMB Decisions Establish That An Evenhanded No-Solicitation Policy Applicable To Union Organizing Activities Does Not Constitute Unlawful Carrier Interference.**

A comprehensive body of NMB decisions defines the scope of the § 2 Third and Fourth right of employees to choose a representative free from carrier interference. These decisions establish that, when one union is challenging an incumbent union, a railroad's enforcement of a policy that uniformly restricts union organizing activity on its property does not constitute unlawful interference under the RLA. The governing standard is *neutrality as between the competing unions*: a carrier's obligation is to treat the unions uniformly, rather than potentially interfere with employee choice by favoring one union over the other. As long as a railroad evenhandedly restricts organizing activities by employees on its property -- that is, as long as the railroad equally restricts solicitation by employees favoring the incumbent union and those favoring any challenger unions -- there is no infringement of the employees' rights under §§ 2 Third and Fourth.

This standard is reflected in the many decisions in which the NMB has rejected claims that a carrier's no-solicitation policy interfered with the employees' choice of representatives, precisely because the NMB has found that the policy was evenhandedly applied as

- 20 -

between the competing unions. *See, e.g., Metro-North Commuter R.R.*, 29 NMB 458 (2002) (carrier's evenhanded application of its "no-solicitation" policy belies allegation of carrier interference); *Northwest Airlines, Inc.*, 26 NMB 269, 294 (1999) (no interference where "pattern of support" for one of two competing unions was not shown as the "carrier went to great lengths to convey the importance of neutrality" and evenly applied its policy regarding access, solicitation of employees, and distribution of literature); *Trans World Airlines*, 24 NMB 141, 173-76 (1997) (no interference where carrier had made significant efforts to treat both unions equally in its enforcement of a "No Solicitation/No Distribution" policy); *United Air Lines, Inc.*, 22 NMB 288 (1995) (no interference as there was insufficient evidence of a "pattern of carrier support" for one union over the other, even though enforcement of the carrier's policy on issues such as access, solicitation, and distribution varied from station to station); *Pacific Southwest Airlines*, 14 NMB 303, 322 (1987) (no interference as carrier attempted to prohibit both of the competing unions from campaigning on its property or otherwise making use of company facilities such as internal mail); *Northwest Airlines*, 14 NMB 49, 52 (1986) (no interference as there was no "pattern of carrier support for one union over another" or evidence that carrier had permitted one union, but not the other, to use crew lounges for campaign purposes); *USAir*, 8 NMB 191, 197 (1980) (no evidence that carrier committed any acts that showed preference for one union over the other with respect to allowing campaigning on carrier property). These decisions necessarily refute any suggestion that a uniform and evenhandedly applied no-solicitation policy might somehow be unlawful on the theory that such a policy assertedly favors the incumbent union.

By the same token, the neutrality standard is reflected in NMB decisions finding that a carrier *did* interfere with employee choice, because the carrier failed to apply its policy evenhandedly. *E.g., USAir*, 17 NMB 377, 423, 427 (1990) (although carrier's policies were

facially evenhanded, they were applied in a discriminatory manner supporting a finding of carrier interference).

In contrast, we have not found a single NMB decision holding, in the context of a challenge to an incumbent union, that an evenhandedly applied ban on union organizing activity on the carrier's property constitutes unlawful carrier interference.   The neutrality standard embodied in the NMB decisions necessarily rejects that possibility.  Put differently, but to the same effect, the NMB decisions do not support the proposition that the right of employees to organize and select a representative without carrier interference entails an affirmative right to conduct union organizing activity on a carrier's property.

But BLET's challenge to NSR's policy depends on precisely this proposition. The union, importing inapposite NLRA doctrine, asserts that NSR's conduct is deficient for failing to measure up to a supposed blanket requirement that a carrier must open its property (or at least some of it) to employee organizing activity.  The standards developed by the NMB, however, make clear that RLA §§ 2 Third and Fourth do not impose any such requirement on carriers -- and that BLET's claim is therefore misconceived.

### (b)    This Court Should Defer To The NMB.

The NMB's interpretation of the effect of carrier no-solicitation policies on employees' exercise of their § 2 Third and Fourth rights is authoritative and should be deferred to and followed by this Court.  Any contrary result would usurp the role that Congress has entrusted to the NMB.

The RLA vests the NMB with exclusive and plenary jurisdiction over disputes that call for it to determine which of two unions is entitled to represent employees, and the statute directs the Board to ensure that the employees' choice is not the product of carrier

interference or coercion. *Switchmen's Union of North America v. NMB*, 320 U.S. at 305; *General Committee of Adjustment v. Missouri-Kansas-Texas R.R.*, 320 U.S. 323, 336 (1943); *United Transportation Union v. United States*, 987 F.2d 784, 788 (D.C. Cir. 1993). The NMB's authority is so extensive that federal courts are "virtually forbidden" to review the agency's representation determinations, *United Transportation Union v. United States*, 987 F.2d at 789, including the NMB's rulings regarding employer interference, influence, or coercion, *Horizon Air Industries, Inc. v. NMB*, 232 F.3d 1126, 1132 (9th Cir. 2000).

It is "well-established that the NMB's interpretation of those provisions of the RLA over which it has responsibility is entitled to deference." *Air Line Pilots Ass'n v. United Air Lines, Inc.*, 802 F.2d 886, 912 n.8 (7th Cir. 1986) (adhering to definition of "employee" contained in NMB decisions for purposes of applying the RLA § 2 Fourth prohibition against carrier interference with the right of "employees" to organize and select a representative). This reflects that "Congress has recognized the NMB's special expertise to interpret the RLA" in the context of representation disputes. *United Transportation Union v. United States*, 987 F.2d at 789.

If BLET had already filed an application with the NMB seeking an investigation of a representation dispute with respect to NSR's train service employees, the union would be required to pursue its challenge to NSR's no-solicitation policy exclusively in the proceeding before the NMB, and not in this Court. *See, e.g., Texidor v. Ceresa*, 590 F.2d 357, 359-61 (1st Cir. 1978); *Ruby v. American Airlines*, 323 F.2d at 253-57; *American Train Dispatchers Ass'n v. Denver & Rio Grande Western R.R.*, 614 F. Supp. 543, 544-45 (D. Colo. 1985); *Aircraft Mechanics Fraternal Ass'n v. United Airlines, Inc.*, 406 F. Supp. 492, 499-509 (N.D. Cal. 1976).

Although BLET has not yet put its case before the NMB, the RLA scheme dictates that this Court defer to and adopt the standards that the NMB would apply in evaluating BLET's challenge to NSR's no-solicitation policy. The question whether NSR's no-solicitation policy infringes on the § 2 Third and Fourth rights of NSR's train service employees may well ultimately be addressed by the NMB. BLET's goal is to become the representative of those employees, and the union can accomplish this only through the NMB's representation procedures. In the course of resolving the representation contest, the NMB could be called upon to consider whether NSR's policy interferes with the free choice of employees (assuming BLET does not abandon its challenge to NSR's policy).

Most to the point, NSR's no-solicitation policy, as it applies *today* to train service employees, is *already within* the scope of the oversight responsibility that the NMB may someday exercise. As we have explained, when it is presented with a charge of carrier inter-ference, in the context of a representation proceeding, the NMB will evaluate the carrier's conduct from the time that laboratory conditions attached -- in this case, from the date that NSR became aware of BLET's organizational drive some months ago.

Were this Court to adopt the NLRB's rules with respect to no-solicitation policies, as BLET urges, it would set up a conflict with the NMB that would intrude on the agency's statutory responsibilities and frustrate the RLA scheme. The NMB will judge NSR's policy -- in the context of a representation proceeding, once initiated -- under the agency's well-established neutrality standard. We are confident that the NMB would find NSR's policy, which is uniform and evenhandedly applied, to be consistent with the requirements of RLA §§ 2 Third and Fourth. Yet that same very same policy might be judged impermissible if this Court were instead to import the different standards used by the NLRB under the NLRA. Such a perverse result would

- 24 -

turn the RLA's representation scheme on its head. *See American Train Dispatchers Ass'n v. Denver & Rio Grande*, 614 F. Supp. at 545 ("It is up to the Board to determine what level of involvement by the defendant [railroad] would amount to illegal interference, influence, or coercion. I also want to avoid the possibility of conflicting outcomes in this court and before the National Mediation Board. My decision is consistent with the policy of not interfering with or frustrating the National Mediation Board's role of insuring peaceful labor relations.").

Moreover, the NMB's neutrality standard is consistent with the Supreme Court's teaching that RLA §§ 2 Third and Fourth "address[] primarily the precertification rights and freedoms of unorganized employees." *Trans World Airlines, Inc. v. Independent Federation of Flight Attendants*, 489 U.S. at 440. Once employees already have a union, RLA §§ 2 Third and Fourth are aimed largely at carrier conduct that is motivated by "anti-union animus" (or that otherwise constitutes discrimination against the representative). *See, e.g., Held v. Allied Pilots Ass'n*, 13 F. Supp.2d 20, 25-26 (D.D.C. 1998) (Urbina, J.) (citing cases).[8] The NMB's rule implements this understanding: in an already unionized environment (like NSR's), a no-solicitation ban applied evenhandedly with respect to two competing unions is not a manifestation of anti-union animus, but is, rather, a reflection of the carrier's obligation to remain neutral as between the unions so as not to interfere with employee choice.

---

[8]    In *Held*, the court considered a § 2 Third and Fourth challenge to a ban on non-work-related communications in the flight operations area of the defendant carrier, not in connection with a representation contest, but, rather, in the context of the union's campaign to obtain membership ratification of a collective bargaining agreement between the carrier and the union. The court found that the plaintiffs had made out enough of a § 2 Third and Fourth claim to withstand summary judgment, *because* there was evidence that the solicitation ban was a product of the carrier's anti-union animus. In particular, the evidence showed that the ban was targeted at and unevenly applied against only those employees who were opposed to ratification of the contract, which amounted to an unlawful interference in an internal union process. 13 F. Supp.2d at 26-27.

Finally, the reasoning of *Aircraft Mechanics Fraternal Ass'n v. United Airlines* is particularly instructive. There, the challenger union urged the Court to extend a particular rule applied by the NLRB under the NLRA, for the purpose of evaluating whether certain conduct interfered with employee rights to freely choose a representative under the RLA. The union argued that carrier interference was an "unfair labor practice" (a term used only under the NLRA) and, because the NMB does not have jurisdiction to adjudicate such wrongs, the court should step in and do so, assuming the role that the NLRB plays under the NLRA. The court rejected this argument as incompatible with the RLA, explaining, in words that resonate here:

> Given that the NMB has jurisdiction in the area of representation disputes, and is directed to insure that illegal influence does not bear on the outcome of such disputes, it follows that if such a rule [as found in an NLRB decision] is to be promulgated -- the purpose of which is to regulate interference with the employees' choice of representatives -- it is for the National Mediation Board, and not this court to do so. . . . It would be a usurpation of power of the most flagrant sort for this court to make such a rule and in effect force it on the Board, in light of the clear Congressional intendment that its carefully fashioned administrative machinery was to operate in the area of representation disputes without judicial interference.

406 F. Supp. at 506-07.[9]

The NMB has consistently applied its neutrality standard to the evaluation of carrier no-solicitation policies. We do not know of any court that has cast the agency's policy

---

[9]    The court further observed, 406 F. Supp. at 502-03:

While the National Mediation Board is not empowered to remedy "unfair labor practices" as such, Congress has given the Board a great deal of power to regulate such practices indirectly. . . . Where such [coercive or interfering] practices are found by the Board to have tainted the designation or election process certification of the union benefiting from the taint can (and must) be withheld. . . . Certainly it cannot be said that the Board is powerless to act, notwithstanding that the procedure under the National Labor Relations Act may be in some sense more direct.

aside and imported the different rules on solicitation that are applied by the NLRB under the NLRA. This Court should not do that, either. Rather, the Court should defer to the NMB and measure NSR's policy against the standards that have long governed under the RLA.

(c)    NSR's No-Solicitation Policy Is Uniform And Is Applied Evenhandedly.

NSR's no-solicitation policy complies with the NMB's long-established neutrality standard: the policy is uniform in coverage and is enforced evenhandedly.

NSR's policy, as stated in a notice to employees, provides that "Solicitation of any type, including recruitment and/or union organizing among agreement employees, is prohibited on the private property of NS." By its plain terms, the policy equally prohibits all union solicitation by employees, regardless of whether the employees favor BLET or favor UTU. Mobley Decl. ¶¶ 26, 27 & Exhibit 3.

BLET gratuitously contends that NSR enforces its policy for the purpose of inhibiting employees' exercise of the right to self-organization, and, in particular, for the purpose of interfering with BLET's solicitation of A-cards. BLET offers no meaningful evidence, but only conclusory statements, to support this assertion; and the union cannot do better, because the assertion is false. NSR does not articulate or enforce its no-solicitation policy in order to play favorites in the contest between BLET and UTU over the representation of NSR's train service employees or to interfere with its employees' right to select a representative. NSR fully appreciates that it has no role to play in the BLET-UTU contest; NSR's stance, in policy and in fact, is to remain neutral in that dispute in all respects. Mobley Decl. ¶¶ 11-13.

NSR, however, has great concern with the impact that a large-scale, high-profile, heated organizational campaign, like that involving BLET and UTU, would likely have on the safety and efficiency of NSR's train operations, if played out on the railroad's operating

- 27 -

property. Some 8,000 employees, more than one-fourth of NSR's workforce, are train service employees. Given the anticipated scope, intensity, and duration of the BLET and UTU organizing campaigns -- in which passions can be expected to run high, and confrontations to result -- it was clear to NSR from the outset that its operations would be negatively affected if employees were permitted to carry out organizational activity on NSR's property. Indeed, NSR early on received numerous complaints about organizing activities by employees on both sides of the dispute -- with some of the earliest complaints coming from BLET officials objecting to organizing activities by UTU supporters. In NSR's judgment, permitting its property to be the site of such solicitation activities would be incompatible with NSR's vital interests in safe and efficient train operations. Such activity, at minimum, would be distracting and disruptive to both participants and nonparticipants, a concern heightened by the fact that train service employees work in safety-sensitive positions, subject to strict operating rules. NSR therefore announced its bar on all solicitation activities on its property, in order to minimize operational disruptions and protect the safety and efficiency of railroad operations. Mobley Decl. ¶¶ 11-23, 41.

Further, in NSR's view, any attempt to carve out exceptions to a uniform no-solicitation policy, by permitting organizing activity at certain times or places on the railroad's property, would be unworkable, and inconsistent with the ordinary workings of NSR's rules. NSR conducts train operations 24 hours a day, seven days a week, and its business interests can be affected by conduct that occurs anywhere on its property. Accordingly, NSR applies its basic rules of conduct to all employees on NSR property, whether or not they are on duty, and the railroad simply adheres to that practice in this instance. Indeed, a uniform ban on all solicitation is the most effective means by which NSR can avoid becoming embroiled in disputes between UTU and BLET over the conduct of their organizing campaigns. By contrast, NSR's interest in

remaining neutral, as the RLA requires, would be undermined by any attempt to regulate the manner and places in which on-property union organizing activity may be carried out. Mobley Decl. ¶¶ 21-22.[10]

NSR enforces its no-solicitation policy evenhandedly. NSR communicated its policy by letter simultaneously to officials of both BLET and UTU. NSR's letter acknowledged the railroad's commitment to compliance with the RLA and to its policy of "strict neutrality in connection with inter-union representation activities"; restated NSR's pledge to honor the RLA rights of the railroad's employees; and explained that NSR would not allow anyone to use its property for the purpose of engaging in recruitment or organizing activities among agreement employees. Mobley Decl. ¶ 24 & Exhibit 1. NSR specifically reminded its management supervisors of the railroad's policy of "strict neutrality" in connection with inter-union representation activity, and instructed the supervisors that they should not interfere with the unions' legitimate activities and "should not encourage, participate in or allow recruitment activities to occur in the work place." Supervisors were further cautioned to "take care to avoid even the appearance" of interference. Mobley Decl. ¶ 25 & Exhibit 2.

BLET seeks to create the impression that NSR somehow applies its no-solicitation policy only against BLET supporters. This is certainly untrue. NSR enforces its policy

---

[10]    Train service employees report to work at hundreds of different locations across NSR's system, and the facilities at these locations vary widely. Even if NSR could identify places where ongoing union campaign activity would not pose a risk to operations, enforcing such boundaries, and enforcing NSR's standards of conduct within those boundaries, would be very burdensome. As we have noted, NSR has had reports of clashes between employees over the representation dispute, and there is reason to expect more frequent or intense confrontations as the campaigns progress. NSR's obligation to maintain a neutral position would not be served by opening up parts of its system to campaign activities. To the contrary, permitting some organizing activity would seem far more likely to invite complaints from NSR's employees and their labor unions than to resolve or prevent them. Mobley Decl. ¶ 21.

evenhandedly, taking action with respect to supporters of both BLET and UTU when there is cause for doing so. Indeed, two of the three employees who have been brought up on formal disciplinary charges in connection with organizing activities were campaigning on behalf of UTU. Mobley Decl. ¶¶ 27-39.

BLET contends that two BLET-represented locomotive engineers have been disciplined for violating the policy -- one (G.A. Myers) who was actually given a nondisciplinary letter of caution, and another (BLET Local Chairman T.J. Curran) who attended an investigatory hearing at which his alleged misuse of NS' internal e-mail system and violation of the no-solicitation policy were considered. The first charge against Mr. Curran was sustained, while the second (for violating the no-solicitation policy) was dismissed for lack of evidence when the witness did not appear. Because Mr. Curran had a prior violation on his service record (also for misuse of the internal e-mail system), he received a 15-day deferred suspension. Mobley Decl. ¶¶ 31-35 & Exhibit 4.

NSR, however, also charged a UTU local chairman with unauthorized use of the railroad's internal e-mail system for campaign communications. The charged employee signed a waiver of hearing, effectively admitting to the offense and accepting the discipline. Because this employee had no prior citations of any kind, his discipline was limited to a written reprimand. And in a second incident, NSR initiated disciplinary action against another UTU-represented employee for threatening a BLET official in connection with a campaign-related confrontation. A formal investigatory hearing in that case is scheduled for July 6, 2005. Mobley Decl. ¶¶ 17, 36-37 & Exhibit 6.

NSR stands by its handling of these cases in all respects. NSR's actions were

taken for legitimate and lawful purposes.[11]  In all events, there is simply no evidence that NSR has singled out BLET supporters for discipline; and NSR has not, in fact, done so.[12]

The plain fact is that NSR's no-solicitation policy, as enforced by this railroad, is precisely the sort of uniform, evenhanded practice that, under governing NMB doctrine, is fully consistent with the rights of the railroad's employees under RLA §§ 2 Third and Fourth to choose a representative free from carrier interference.

---

[11]    The discipline imposed on Engineer Curran is fully warranted by his conduct and service record. NSR maintains its internal e-mail system for business-related communications, and even BLET does not seem to contend that barring the system's use for campaign activities is unreasonable or unjustified. Mobley Decl. ¶ 34.

Engineer Myers was not disciplined; NSR's handling of his case was certainly proper. Moreover, BLET offers a misleading description of the conduct for which Mr. Myers was given a nondisciplinary caution letter.  BLET asserts (Application at 3) that Mr. Myers was reprimanded simply for "speaking to a fellow employee concerning which union he would support . . . ." In fact, as NSR's caution letter to Mr. Myers recounts, the conductor whom Myers approached considered the discussion unwelcome and complained to management about Myers' conduct, indicating "that he took exception to being questioned in this manner while at work." NS' response -- a nondisciplinary letter that, by its terms, cautions Myers not to engage in further organizing activities on NSR property, encloses a copy of NSR's letter announcing the policy, reminds him that the policy is "equally applicable to all unions," and invites him to contact the Trainmaster who signed the letter if he has any questions -- can hardly be considered an unreasonable response to the employee's conduct. Mobley Decl. ¶ 35 & Exhibit 5.

Moreover, Mr. Curran's and Mr. Meyers' rights to select a bargaining representative are not implicated by BLET's campaign to become the representative of NSR conductors and trainmen. Although both individuals hold seniority as conductors and trainmen in addition to their locomotive engineer seniority, they work as engineers and therefore would not be considered by the NMB to be members of the train service crafts or classes that would be the subjects of the election BLET seeks. Mobley Decl. ¶¶ 32, 34, 35.

[12]    There have been numerous incidents in which either a BLET official complained to an NSR supervisor about organizing activities on the railroad's property by UTU supporters or a UTU official complained to an NSR supervisor about organizing activities on NSR's property by BLET supporters. NSR investigated the allegations, and responded as appropriate, regardless of which union was making the complaint.

### C.     BLET Has Not Satisfied The Other Standards For Preliminary Injunctive Relief.

BLET can satisfy neither the NLGA standards for obtaining injunctive relief in a labor dispute nor the traditional D.C. Circuit standards for a preliminary injunction as set out in *Washington Metropolitan Area Transit Comm'n v. Holiday Tours*, 559 F.2d 841, 843 (D.C. Cir. 1977).

First, BLET does not make, and cannot make, the necessary showing under the NLGA, 29 U.S.C. § 107(a), that NSR's no-solicitation policy violates the RLA, for all of the reasons we have set forth above.

Nor has BLET demonstrated a sufficient need for injunctive relief; specifically, it has not shown that it will be irreparably injured if an injunction is denied. *See Holiday Tours*, 559 F.2d at 843; 29 U.S.C. § 107(b), (c). BLET's claim of irreparable injury (Application at 9) is no more than a restatement of the union's position on the legal merits. BLET takes as its *premise* that NSR's no-solicitation policy violates RLA §§ 2 Third and Fourth. And the union then asserts what amounts to a truism: because it is (supposedly) unlawful to bar employees from engaging in organizing activities on NSR's property, employees' exercise of their § 2 Third and Fourth rights is necessarily chilled when they are barred from engaging in organizing activities on NSR's property. But, as we have shown, BLET's legal position is insupportable: the union's argument rests entirely on inapposite NLRA authority, and the argument fails under the applicable NMB standard. It is, of course, true that NSR's policy has had the effect of keeping the BLET and UTU organizing campaigns off NSR's property. But if that consequence is consistent with the requirements of the RLA, and it is, there is nothing left of BLET's assertion of irreparable injury.

Certainly, BLET makes no attempt to show, as a matter of fact, that individual train service employees have been inhibited in the exercise of their § 2 Third and Fourth rights. BLET does not contend, much less show, that train service employees are unable effectively to engage in self-organizing activities on their own time and without the use of NSR property. Nor does BLET contend, much less show, that alternative means of reaching NSR train service employees -- obvious methods such as off-property meetings, mailings or phone calls to employee homes, internet postings, "chat rooms," and the like -- are somehow unavailable, or ineffective, or inadequate. In short, BLET has made no factual showing of any actual chill or injury, much less an irreparable injury. Mobley Decl. ¶ 43.

By contrast, NSR would be substantially harmed if an injunction were issued; and this fact should defeat the injunction request. *See Holiday Tours*, 559 F.2d at 843; 29 U.S.C. § 107(c). As we have explained, NSR announced its policy in order to prevent the disruptions and potential hazards to its operations that NSR reasonably believed would flow from a divisive organizing campaign played out on its property. NSR considered a blanket prohibition on union solicitation to be the only reasonable approach in the circumstances. Subsequent events have only reinforced NSR's conclusion. Whatever the eventual outcome, it is clear that the dispute between BLET and UTU will be hard-fought. Were an injunction to be entered, NSR would be required (at least in some measure) to host one of the most high-profile and, insofar as rail labor is concerned, consequential disputes in modern railroading history. There is every reason to expect that the ongoing dispute will hold the attention of NSR employees, potentially becoming increasingly contentious as the campaigns progress. NSR's business depends on the ability to move trains safely, efficiently, and on schedule, and almost every rule of conduct that NSR enforces in and around its trains is designed to promote those objectives. Operating craft

employees, in particular, work under strict operating and safety rules and must be able to communicate and work effectively and cooperatively with one another in performing their jobs. Permitting NSR employees to use the railroad's property for solicitation activities can only put those objectives at risk, compromising NSR's interests and the interests of our customers and the shipping public. Mobley Decl. ¶¶ 44-50.

Finally, BLET asserts (Application at 9) that the public interest favors an injunction, as this would give effect to the RLA's protection of the employees' right of self-organization. But, once again, this is just a restatement of BLET's faulty argument on the merits of its legal claim, and therefore carries no independent force. On the other hand, as we have explained, entry of an injunction would substantially risk disruption of NSR's train operations, to the detriment of the public interest in avoiding interruptions in commerce, *see* 45 U.S.C. § 151a.

## CONCLUSION

Plaintiff's application for a preliminary injunction should be denied.

Respectfully submitted,

Jeffrey S. Berlin (D.C. Bar #200048)
Krista L. Edwards (D.C. Bar #421537)
Mark E. Martin (D.C. Bar #373445)
SIDLEY AUSTIN BROWN & WOOD LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8178
jberlin@sidley.com
kedwards@sidley.com
mmartin@sidley.com

*Attorneys for Defendants Norfolk Southern Railway Company and Norfolk Southern Corporation*

June 29, 2005