IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| BROTHERHOOD OF LOCOMOTIVE ENGINEERS AND TRAINMEN, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 1:05CV01188 Judge Richard W. Roberts |
| NORFOLK SOUTHERN RAILWAY CO. and NORFOLK SOUTHERN CORP., | ) ) ) | |
| Defendants. | ) ) ) | |

## DECLARATION OF HAROLD R. MOBLEY

June 29, 2005

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

BROTHERHOOD OF LOCOMOTIVE ENGINEERS )
AND TRAINMEN, )
)
)
                              *Plaintiff,* )
                                              )
v. )       Civil Action No. 1:05CV01188
                                              )       Judge Richard W. Roberts
NORFOLK SOUTHERN RAILWAY CO. )
and NORFOLK SOUTHERN CORP., )
                                              )
                              *Defendants.* )
                                              )

## DECLARATION OF HAROLD R. MOBLEY

HAROLD R. MOBLEY deposes and says:

       1.     I am Assistant Vice President-Labor Relations for defendant Norfolk
Southern Corporation ("NSC"), the corporate parent of defendant Norfolk Southern Railway
Company ("NSR"). My business address is 223 East City Hall Avenue, Norfolk, Virginia
23510.

       2.     NSR is a common carrier by railroad engaged in interstate commerce and
is a "carrier" within the meaning of, and subject to, the Railway Labor Act ("RLA"), 45 U.S.C.
§ 151 First, and the Interstate Commerce Act, 49 U.S.C. § 10101. NSR operates a railroad
system in the Southern, Eastern, and Midwestern United States, and in the Province of Ontario,
Canada. NSC is a transportation holding company that owns all of the common stock of NSR.
Both NSR and NSC are Virginia corporations that maintain their principal offices at Three
Commercial Place, Norfolk, Virginia 23510. As a "person subject to the Railway Labor Act",
NSR is excluded from the coverage of the National Labor Relations Act, 29 U.S.C. § 152(2).

3.    I am submitting this Declaration on behalf of defendants NSR and NSC (sometimes referred to herein collectively as "NS") in opposition to the motion of plaintiff Brotherhood of Locomotive Engineers and Trainmen ("BLET") for a preliminary injunction in this civil action. I understand that BLET challenges NS' policy banning union solicitation on its property and that BLET's motion asks the Court to enter an order that would bar enforcement of our policy pending final judgment. My purpose is to explain the background, objectives, and enforcement of the challenged policy and to refute BLET's assertion that NS' intention in announcing and enforcing its policy is to interfere with its employees' exercise of statutory rights. I also will describe the harm that would be caused to NS by issuance of the requested injunction.

**Background**

4.    NS' workforce, like those of all major American railroads, is highly unionized. We have roughly 29,000 employees, nearly 85 percent of whom work under collective bargaining agreements. Most of NS' current collective bargaining relationships have their roots in decades-old certifications or voluntary recognition by NS' various predecessor railroads, in some cases predating the 1926 enactment of the RLA. Under the RLA, employee representation is determined on a system-wide basis, according to the various "crafts or classes" of railroad employees. Historically, rail labor organizations have tended to organize on a national and international basis along the same lines. For most crafts, there is a single dominant national or international organization, which represents employees on most or all of the nation's large railroads.

5.    The NS Labor Relations Department assists management in, among other functions, negotiating, interpreting and administering collective bargaining agreements; handling

and resolving disputes with employees and labor unions; and developing and applying policies with respect to labor-management relations. The NS Labor Relations Department employs approximately 37 full time labor relations professionals.

6.    I joined NSR (then named Southern Railway Company) in 1971 as management trainee in the Maintenance of Way Department. I later moved into Labor Relations and have been promoted through several positions within the department. In 2000, I was named Assistant Vice President-Labor Relations, with responsibility for NS' relations with the "non-operating" crafts. Effective January 1, 2005, I was assigned responsibility for the "operating" crafts, which include locomotive engineers and conductors and trainmen (conductors and trainmen are collectively referred to as train service employees). I am familiar with NS' employment policies and with the recent events and circumstances surrounding NS' announcement and enforcement of the policy challenged by BLET.

7.    On NSR, locomotive engineers and train service employees have chosen, respectively, to be represented by different labor unions. BLET is the certified representative under the RLA of all NSR employees in the "craft or class" of locomotive engineer. BLET has represented engineers on most of the properties now operated by NSR for decades. In 1989, BLET (then named Brotherhood of Locomotive Engineers) was certified as the system-wide representative of NSR engineers, following an election conducted by the National Mediation Board ("NMB"). All of NSR's conductors and trainmen are represented by another international rail union, the United Transportation Union ("UTU").

8.    Subject to certain requirements of its labor agreements, NSR promotes and trains locomotive engineers from among its train service ranks. An employee who is promoted to locomotive engineer generally maintains his train service qualifications and seniority, making

it possible for an employee in certain circumstances to move back and forth between train service and locomotive engineer positions.

9.      An engineer or a train service employee also has the unique option of maintaining membership in a labor organization other than the one that is the representative under the RLA of employees in his/her craft or class. (Although the RLA permits unions and carriers to enter into agreements requiring the employees to join the union as a condition of continued employment in the craft or class, and our agreements do contain such requirements, a specific RLA provision applicable to train and engine service (45 U.S.C. ¶ 152 Eleventh) allows employees to satisfy such "union shop" provisions by maintaining membership in another national labor organization.) As a consequence, although BLET is the RLA representative of all NSR engineers, numerous NSR employees who are working as engineers are dues-paying members of UTU, and not BLET. Likewise, numerous NSR train service employees are members of BLET, and not UTU.

10.     Until recently, no organization has made a formal challenge to UTU's status as representative of NSR's conductors and trainmen. For several years, however, there have been indications on a national level of growing rivalry between BLET and UTU, with both unions expressing interest in broadening their representation on the major railroads.

11.     The rivalry between BLET and UTU intensified late last year, when UTU reached a letter of intent with a number of railroads, including NSR, establishing a mechanism for UTU to collect "monthly seniority maintenance" fees from employees who are working in the crafts or classes represented by UTU but are not members of UTU. Although the letter of intent makes no reference to BLET, as a practical matter all employees who can be required to pay seniority maintenance fees to UTU are BLET members. The letter of intent went into effect

on November 1, 2004, and UTU officials have since activated the seniority maintenance provisions on most of the UTU seniority districts on NSR's system. (BLET brought a civil action against UTU and the railroad parties, including NSR, challenging the agreement under the RLA. The case is pending in the United States District Court in Philadelphia.)

12.　　Several months ago, BLET announced that it intended to begin a campaign for representation of NSR's train service employees. We learned that BLET was planning to solicit "authorization cards" (also known as "A-cards") from NSR conductors and trainmen. BLET's immediate objective would be to obtain enough signed A-cards to trigger an election. Under the NMB's procedures, an organization may demonstrate the existence of a representation dispute by submitting the requisite number of A-cards signed by members of the targeted craft or class. In a situation in which there is an existing representation and a collective bargaining agreement in force, a challenger ordinarily will be required to submit A-cards signed by more than half (50 percent plus one) of the individuals in the craft or class. Upon such a showing, the NMB ordinarily will order an election in which the challenging union and the incumbent will be listed on the ballot.

### NS' Neutrality and No-Solicitation Policy

13.　　As a carrier subject to the RLA, NSR has no interest or voice in the outcome of the dispute between BLET and UTU. As a matter of policy and in fact, NSR is neutral in the dispute. We recognize that our employees have the right to select their representatives without interference, and we are determined to stay out of the dispute between these unions, avoiding any appearance that we have favored one union over the other.

14.　　Despite our neutrality, I believe, based on my experience in the industry and as a labor relations professional, that NSR's operations could well be affected by on-

property campaigning by the respective unions. BLET's organizing drive is a high-profile, high-stakes matter for both BLET and UTU; both can be expected to invest heavily in the campaign and to use all available avenues and forums to influence the potential voters (NSR train service employees). BLET and UTU both have many members among the ranks of NSR employees, and those employees are in regular and direct contact with one another on the job and on the property. In road operations, for instance, engineers and train service employees work side-by-side in the cabs of locomotives, often for hours at a stretch and on consecutive days. Many of these employees will have an interest in the dispute between BLET and UTU, and some can be expected to have strong views about one or both of the unions. Passions may run deep, and conflicts and confrontations can be anticipated.

15.    Further, the campaign activity may well last for months and to involve employees throughout the NS system. The crafts or classes that comprise train service include approximately 8,000 employees, more than one-fourth of the railroad's workforce.

16.    NS has no interest in the outcome of the dispute, but we have a vital interest in what happens on the railroad. It was clear from the outset -- well before BLET officially launched its A-card drive -- that our operations would be negatively impacted if employees were permitted to use the railroad's property in carrying out their campaigns. According to BLET (Complaint ¶ 21), its organizing campaign officially began on May 26, 2005. By that time, NS already had received numerous complaints about organizing activity by employees on both sides of the dispute. One of the earliest complaints, in fact, was lodged in March 2005 by a BLET official, who complained that UTU members had used the NS MEMO system (a Company-provided electronic message system) to post material opposing BLET's

campaign. Soon thereafter, another BLET official complained to NS that a UTU official was arranging for conductors to engage in organizing activities on company time.

17.    A few complaints have involved potentially harassing or threatening conduct. One of the first complaints involved a verbal altercation between UTU and BLET officials in an NS yard office. In another case, NS initiated disciplinary action against a UTU-represented employee for threatening a BLET official over the representation dispute. (A formal investigatory hearing is scheduled in that case for July 6, 2005.)

18.    Because of the inherent complexities and hazards of a railroad operation, NS has to be much stricter about all manner of workplace conduct than other employers might be, especially when it comes to the front lines of our operations -- the work done in and around trains. Railroading is a network business, meaning that a mistake or delay at one point on the system can adversely affect operations at other locations. Managing the efficient movement of freight across our system requires attentive employees and effective communication and coordination across the network. Conductors and trainmen play a key role, at the ground level, in ensuring that freight moves when and where it is directed. These employees often work in remote locations, away from direct supervision, and must be able to communicate effectively and without distraction.

19.    Our focus on safety is just as vital to NS as is our focus on customer service. Train service employees work in safety-sensitive positions, subject to strict operating rules. To protect their own safety and the safety and security of other employees, property, and freight, these employees are required to be alert and attentive on the job and on the premises. Our employees' unwavering attention to safety, day in and day out, mile after mile has made NS an industry leader in operating safety. This attention is demonstrated by the fact that, in 2005,

NS earned its sixteenth consecutive E. H. Harriman Memorial gold medal, an award bestowed annually on the major railroad with the lowest rate of employee injuries.

20.    In NS' judgment, permitting employees to use NS property for solicitation activities would be incompatible with the railroad's vital interests in its operating safety and efficiency and inconsistent with our longstanding rules of conduct, including Rule GR-5 of NS' General Regulations, which prohibits employees from performing "work of a personal nature for anyone while on duty or on Company property." At a minimum, such activity would be distracting and disruptive, both to participants and nonparticipants. NS is unwilling to assume any risk to its safety and operations by authorizing the use of its property for these purposes.

21.    Nor are we disposed to carve out exceptions to our uniform policy, permitting organizing activity at certain times or places on the property. NS conducts train operations 24 hours a day, seven days a week, and our business interests can be impacted by conduct anywhere on the property. Accordingly, we apply our Code of Ethics and basic rules of conduct to all employees on NS property, whether or not they are on duty.

22.    As far as NS is concerned, our interest in staying out of the dispute between BLET and UTU would almost certainly be undermined by any attempt to regulate the manner and places in which on-property union organizing activity may be carried out. Train service employees report to work at hundreds of different locations across our system, and the facilities at these locations vary widely. Even if NS could identify places where ongoing union campaign activity would not pose a risk to operations, enforcing such boundaries, and enforcing our standards of conduct within those boundaries, would be very burdensome. As I have said, we already have had reports of clashes between employees over the representation dispute, and there is reason to expect more frequent or intense confrontations as the campaigns progress. We

do not see how NS' obligation to maintain a neutral position would be served by opening up parts of our system to campaign activities. To the contrary, authorizing some organizing activity would seem far more likely to invite complaints from our employees and their labor unions than to resolve or prevent them.

23.    In the circumstances, NS is enforcing a complete ban on union solicitation on its property. Our objective, first and foremost, is to protect the safety and efficiency of our operations by minimizing the impact of solicitation activities. We also hope to avoid becoming embroiled in any dispute between UTU and BLET over the conduct of their campaigns.

24.    We made our decision unilaterally and communicated it at the same time and in the same manner to officials of both organizations. Exhibit 1 hereto is a copy of my March 9, 2005 letter addressed to UTU and BLET officials. My letter acknowledged the railroad's commitment to compliance with the RLA and to its policy of "strict neutrality in connection with inter-union representation activities." I restated NS' pledge to honor the RLA rights of the railroad's employees and assured both organizations that NS would, consistently with the RLA and its past practice, continue to permit authorized union activity on the property (including handling of employee claims and grievances). But I explained that NS would not allow anyone to use its property for the purpose of engaging in recruitment or organizing activities among agreement employees.

25.    NS instructed its management officials accordingly. Exhibit 2 hereto is a true and correct copy of a March 10, 2005 memorandum, in which NS Executive Vice President Operations Mark D. Manion outlined the obligations of NS management officials in connection with the dispute between BLET and UTU. The memorandum reiterated the railroad's policy of "strict neutrality" in connection with inter-union representation activity and instructed that

-9-

management officials should not interfere with unions' legitimate activities and "should not encourage, participate in or allow recruitment activities to occur in the work place." Managers and supervisors were cautioned to "take care to avoid even the appearance" of interference.

26.    NS also notified its agreement employees directly of the railroad's no-solicitation policy, through bulletins issued in early May 2005 by the superintendents on each of NS' eleven operating divisions. (Exhibit 3, a true and correct copy of the May 4, 2005 Superintendent's Notice for NS' Central Division, is an example of these notices.) The notices directed compliance with the carrier's no-solicitation policy, as follows:

> Solicitation of any type, including recruitment and/or union organizing among agreement employees, is prohibited on the private property of NS. Union activities in the work place by agreement employees and their representatives are limited to handling claims and grievances, disciplinary investigations and maintenance of a bulletin board to communicate routine and non-controversial matters, to the extent necessary, and not to interfere with safety or the efficiency of work operations. All operating employees should be governed accordingly.

**Enforcement of NS' No-Solicitation Policy**

27.    NS intends to enforce its no-solicitation policy in an even-handed manner, and we have done so. The policy by its terms limits all union solicitation, regardless of the source or conduct, occurring anywhere on the railroad's property. Whether they are advocating for BLET, UTU, or some other organization, employees are not permitted to use our property for these purposes. Moreover, our management officials are prohibited from asking employees about their support for a union or about organizing activities in which they may be involved. They may not take action against an employee based on his/her support or nonsupport for a labor organization and may not otherwise favor one union over another.

28.    Like all rules of conduct, our no-solicitation policy is enforced through local supervision, using disciplinary action as necessary to obtain compliance. Supervisors are

directed to address violations through instructions, counseling, and verbal warnings in the first instance, before resorting to other enforcement measures. In most cases, these approaches appear to have been successful. In response to complaints by UTU, for instance, NS management officials have questioned BLET organizers about on-property activities and, after reminding them about the no-solicitation policy, have seen no further misconduct from the individual employees. Likewise, in response to several complaints by BLET officials, NS management officials have prevailed upon UTU officials to remove campaign material from Company-provided bulletin boards, after reminding them of their obligations under NS' no-solicitation policy.

29.    We hope that these methods will continue to achieve results and that the number and frequency of reported violations will decrease accordingly, as employees become more familiar with the policy and its application. But if the violations persist, NS is prepared to impose discipline. In accordance with NS' progressive discipline policy, increasing levels of discipline may be imposed for subsequent offenses.

30.    Although our rules of conduct themselves are not the subject of bargaining, our labor agreements establish various procedural requirements for the administration of disciplinary actions. NS holds formal investigatory hearings before imposing certain forms of discipline, and disciplinary actions that are sustained at the highest company level may be challenged in arbitration under the RLA.

31.    BLET complains (Complaint ¶¶ 14-15) that two BLET-represented locomotive engineers have been subjected to disciplinary action for violating the policy -- one (G.A. Myers) who was actually given a nondisciplinary letter of caution, and another (BLET Local Chairman T.J. Curran) who was directed to attend an investigatory hearing on June 20,

2005, at which his alleged violation of the policy and misuse of NS' internal e-mail system would be considered.

32.    I should note that neither Mr. Myers nor Mr. Curran would be eligible to vote in the event that the NMB conducts a representation election among train service employees. Although both individuals hold seniority as conductors and trainmen in addition to their locomotive engineer seniority, they work as locomotive engineers and therefore would not be considered members of the crafts or classes that would be the subjects of the election.

33.    NS stands by its handling of these cases in all respects. Mr. Curran was charged with two violations: (1) unauthorized use of NS' electronic message system (the MEMO system) and (2) solicitation of A-cards on NS property in violation of the applicable Superintendent's Notice. A formal investigatory hearing has been held, and NS has notified Mr. Curran of the outcome. (A copy of the June 27, 2005 letter to Mr. Curran is attached as Exhibit 4.) The first charge against Mr. Curran (unauthorized use of the MEMO system) was sustained. The second charge (for violating the no-solicitation policy) was dismissed for lack of evidence when the witness did not appear. Because he had a prior violation for misuse of the MEMO system, Mr. Curran received a 15-day deferred suspension. (If he does not commit a further violation warranting discipline within the next nine months, the suspension will never be activated and Mr. Curran will not lose work time or earnings as a result of this suspension.)

34.    The discipline imposed against Mr. Curran is fully warranted by his conduct and service record. NS maintains its MEMO system for business-related communications, and even BLET does not seem to contend that barring the system's use for campaign activities is unreasonable or unjustified. (Indeed, as I mentioned above, in March 2005, BLET complained to NS that UTU supporters were using the MEMO system to post

messages opposing BLET's campaign.) In any event, as I have said, Mr. Curran's RLA rights to select a bargaining representative are not implicated by the BLET campaign to become the representative of NSR conductors and trainmen, because he would not be considered a member of those crafts or classes by the NMB.

35.    Engineer Myers was not disciplined; NSR's handling of his case was certainly proper. Moreover, BLET's description of the conduct for which Mr. Myers was given a nondisciplinary caution letter is quite misleading. BLET asserts (Application at 3) that Mr. Meyers was reprimanded simply for "speaking to a fellow employee concerning which union he would support . . . ." In fact, as NS' letter of caution (Exhibit 5) recounts, the conductor whom Engineer Myers approached considered the discussion unwelcome and complained to management about the engineer's conduct, indicating "that he took exception to being questioned in this manner while at work." NS' response -- a nondisciplinary letter that, by its terms, cautions Engineer Myers not to engage in further organizing activities on NSR property, encloses a copy of my letter announcing the policy, reminds him that the policy is "equally applicable to all unions," and invites him to contact the Trainmaster who signed the letter if he has any questions -- can hardly be considered an unreasonable response to the employee's conduct. And, in any event, as I have said, Mr. Myers' RLA rights to participate in the selection of a bargaining representative are not implicated by the BLET campaign to become the representative of NSR conductors and trainmen, because he would not be considered a member of those crafts or classes by the NMB and would not join the members of those crafts in the selection of a representative.

36.    Although BLET does not expressly accuse NS of having singled out BLET supporters for discipline, I want to make clear that we have in no way done so. In fact,

two of the three employees who have been brought up on disciplinary charges in connection with organizing activities were campaigning on behalf of UTU. As I mentioned above, one UTU supporter has been charged with threatening a BLET official in connection with a campaign-related confrontation.

37.    On June 8, 2005, NS charged a UTU local chairman with substantially the same offense as BLET Local Chairman Curran -- that is, unauthorized use of the NS MEMO system for campaign communications. A copy of the Notice of Investigation is attached as Exhibit 6. (The exhibit has been redacted to avoid identifying the individual employee.) The charged employee waived his right to a hearing and accepted the discipline. Because this employee had no prior citations of this kind, his discipline was limited to a written reprimand.

38.    In the interests of completeness, I want to acknowledge BLET's reference to a March 8, 2005 letter addressed to UTU officials by UTU International President Paul C. Thompson (Brennan Decl. Exh. 7). I have no information concerning such a letter, beyond what appears on the face of the exhibit and BLET's characterization of it. And it is not clear how or why the letter supposedly supports BLET's application for a preliminary injunction. For the record, I affirm that NS had no part in creating or disseminating UTU's letter and that, to the best of my knowledge, the letter was not sent to or shared with NS officials. If BLET sees the UTU letter as some sort of evidence that NS' policy favors UTU, I strongly disagree; that proposition is false. As I have explained, NS has enforced its policy even-handedly, taking action with respect to supporters of both unions when we have found cause for doing so.

39.    Nothing would prevent BLET from sending a similar letter to its own officials, reminding them to report violations of NS' no-solicitation policy by UTU supporters. Discipline will not be imposed on the basis of such allegations alone, but NS would attempt in

good faith to investigate the incidents, as we have done in response to BLET's and UTU's prior complaints. (By way of illustration, I am attaching as Exhibits 7-9 a set of correspondence between UTU International President Paul C. Thompson and NS Vice President Labor Relations Mark R. MacMahon, relating to reports made by UTU members and officials of alleged violations of NS' no-solicitation policy. As Mr. MacMahon's June 8, 2005 letter (Exhibit 7) reflects, NS has investigated each alleged incident and, based on its findings and the individual employee's prior record, issued a letter of caution or (in the case of Engineer Curran), a deferred suspension). We do not relish our enforcement role in these matters, but we accept it as a necessary cost of maintaining a safe and productive work environment and maintaining our absolute neutrality in the dispute between BLET and UTU.

### What NS "Intends"

40.    I want to respond to various contentions that BLET and its declarant (BLET Staff Counsel Thomas Brennan) make concerning NS's supposed intentions. Mr. Brennan purports to testify on the basis of personal knowledge that NS' actions and policy are "intended to" have a "chilling effect on the representation rights" of NSR employees (Brennan Decl. ¶¶ 8, 13); that NS took disciplinary action against Mr. Myers and Mr. Curran with the "intent" to "chill and interfere with these employees' rights" (*id.* ¶ 11); and that NS' enforcement of its policy was "intended" to "interfere[e]" with BLET's solicitation of A-cards (*id.* ¶ 17). There is no factual basis for Mr. Brennan's assertions, and he is wrong about NS' intentions.

41.    Our aims, as I have explained, are to minimize operational disruption and enforce our policy of strict neutrality in inter-union disputes. We took the challenged actions for legitimate and lawful purposes -- and for no other. I take strong exception to Mr. Brennan's claim that he knows NS' intentions, and I categorically deny that NS intends to "chill" or

interfere in any way with our employees' exercise of rights to self-organization. Mr. Brennan and the union for whom he is staff counsel were not involved in NS' decision-making and would have no basis for purporting to know our intentions, other than as we have explained them. Nothing that NS has said about its policy would support Mr. Brennan's untrue and unfortunate characterization. In fact, NS has been very explicit that it has no such intentions. We have said again and again that we understand that our employees have the statutory right to select their representatives without carrier interference; that we honor this right; and that NS is and intends to remain strictly neutral in the dispute.

42.    Mr. Brennan's contention that NS' policy has in fact chilled and interfered with our employees' exercise of rights seems no more probative or credible. I read his repeated assertions to this effect as nothing more than statements of BLET's legal position that NSR employees have a right to solicit on the railroad's private property. We do not dispute that our policy has moved campaign activities off NS' property, just as it was intended to.

43.    But it is a far different matter to contend that employees' exercise of their rights to select a representative has in fact been chilled. That seems highly doubtful. We believe that our employees are more than capable of engaging in self-organizing activities on their own time and without the use of NS property. BLET does not contend that alternative means of reaching NSR conductors -- *e.g.*, off-property meetings, mailings or calls to employee homes, internet postings and "chat rooms," etc. -- are somehow ineffective or inadequate. Indeed, by the union's own chronology, BLET did not "officially" begin soliciting A-cards from NSR employees until *after* NSR announced its policy and took all of the other actions of which BLET complains.

**Substantial Harm to Other Parties**

44.    Finally, I want to address BLET's request for injunctive relief. BLET urges the Court to bar enforcement of NS' no-solicitation policy and contends that such an order would impose no harm on NS. I strongly disagree.

45.    I have explained above why we announced our policy and why we concluded that a blanket prohibition on union solicitation was the only reasonable approach in the circumstances. Subsequent events have only reinforced our judgment. Whatever the eventual outcome, it is clear that the dispute between BLET and UTU will be hard-fought, with both sides poised to accuse the railroad of having favored the other. Although we have made every attempt to stay above the fray, already BLET has taken the railroad to federal court. For its part, UTU has been threatening legal action, claiming that NS is doing too little to enforce its no-solicitation policy.

46.    If BLET obtains the relief it seeks here, NS will be required to host one of the most high-profile and, insofar as rail labor is concerned, consequential disputes in modern railroading history. There is every reason to expect that the ongoing dispute will hold the attention of NS employees, potentially becoming increasingly contentious as the campaigns progress.

47.    NS has no stake in the outcome, but we have much at stake in the process. NS' business depends on the ability to move trains safely, efficiently, and on schedule, and almost every rule of conduct that we enforce in and around our trains is designed to promote those objectives. Operating craft employees, in particular, work under strict operating and safety rules and must be able to communicate and work effectively and cooperatively with one another in performing their jobs.

48.    Our focus on train operations is particularly critical at this time. NS is handling record volumes of traffic on its system at a time when the demands for on-time performance and customer service have never been greater. With growing traffic levels, we are working to rapidly expand our agreement workforce. We plan to add a record 2,400 train service employees to our ranks this year, recruiting and training more new hires than we have ever done in a single year. Within a few weeks, moreover, we will be moving into the railroad's peak season (late summer through mid-December), when we can expect even higher traffic levels and demands on our operations. Remaining focused on our core objectives -- safe and efficient train operations -- is critical.

49.    Permitting employees to use our property for solicitation activities can only put those objectives at risk, compromising NS' interests and the interests of our customers and the shipping public.

50.    Of course, I cannot warrant to the Court that specific operational or safety problems necessarily will flow from organizing activities or that permitting our employees to engage in union solicitation on NS' property will cause train accidents or employee injuries. But I can say that as a matter of business judgment and responsible corporate citizenship, we are absolutely unwilling to take the risk that such problems will arise. Although the odds of any given failure may be very low, the consequences can be catastrophic. We simply do not take unnecessary risks in and around the railroad.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed this 29th day of June, 2005.

Harold R. Mobley

## EXHIBITS

1. Letter dated March 9, 2005, from H. R. Mobley to W. E. Knight, *et al.*

2. Memorandum dated March 10, 2005 from M. D. Manion to R. Bartle, *et al.*

3. Notice dated May 4, 2005, from P. E. Gibson, Jr.

4. Letter dated June 27, 2005, from M. D. Gooden to T. J. Curran

5. Letter dated March 24, 2005, from C. Hitt to G. A. Myers (without enclosures)

6. Letter dated June 8, 2005, from J. L. Moore to [redacted]

7. Letter dated June 8, 2005, from M. R. MacMahon to P. C. Thompson

8. Letter dated June 1, 2005, from P. C. Thompson to M. R. MacMahon (with enclosures)

9. Letter dated June 7, 2005, from P. C. Thompson to M. R. MacMahon (with enclosures)