**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| BROTHERHOOD OF LOCOMOTIVE ENGINEERS AND TRAINMEN,<br><br>    Plaintiff,<br><br>v.<br><br>NORFOLK SOUTHERN RAILWAY CO. and NORFOLK SOUTHERN CORP.,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)  Civil Action No. 1:05cv01188 (RWR)<br>)<br>)<br>)<br>)<br>)<br>) |

**REPLY TO DEFENDANTS' OPPOSITION TO PLAINTIFF'S**
**APPLICATION FOR PRELIMINARY INJUNCTIVE RELIEF**

**INTRODUCTION**

Sections 2, Third and Fourth of the Railway Labor Act ("the RLA"), 45 U.S.C. § 152, Third and Fourth, were enacted by Congress to establish and protect the absolute right of employees to select a representative and join, organize, or assist in organizing the labor organization of their choice free of carrier interference. Actions by carriers that in any way interfere with the organizational rights of employees guaranteed under these provisions of the RLA are strictly prohibited and may be enjoined by federal courts. See Texas & N.O.R.R. v. Brotherhood of Ry. & S.S. Clerks, 281 U.S. 548, 571 (1930); Arcamuzi v. Continental Air Lines, Inc., 819 F.2d 935, 937 (9th Cir. 1986); Scott v. American Airlines, Inc., 488 F. Supp. 415, 419 (E.D.N.Y. 1980); Adams v. Federal Express Corp., 470 F. Supp. 1356, 1363 (W.D. Tenn. 1979).

Despite the Carrier's efforts to cast the issue before the Court as a representation dispute between the BLET and UTU over who is the representative of Trainmen on the NS, this case is solely about the Carrier's overbroad and unlawful no solicitation policy, as that policy is

currently being applied to BLET-represented Locomotive Engineers. The policy, which unconditionally prohibits any union solicitation, recruitment or organizing activities by employees on NS property, unquestionably interferes with the Section 2, Third and Fourth rights of Locomotive Engineers.

The specific organizational rights of Locomotive Engineers that are being adversely impacted and interfered with by the Carrier's policy are two-fold. First, Locomotive Engineers, as RLA-covered employees of the Carrier, have the right to assist Trainmen in changing their representative. This right flows from the plain language of Section 2, Fourth, which provides:

> Employees shall have the right to organize and bargain collectively through representatives of their own choosing. . . . No carrier, its officers, or agents shall deny or in any way question *the right of its employees to join, organize, or assist in organizing* the labor organization of their choice, and it shall be unlawful for any carrier to interfere in any way with the organization of its employees, . . . or to influence or coerce employees in an effort to induce them to join or remain or not to join or remain members of any labor organization . . . . (emphasis added)

While the assistance that Locomotive Engineers provide to Trainmen in changing their representative may ultimately result in creating a representation dispute within the jurisdiction of the National Mediation Board ("NMB"), it has not progressed to that point and may never. Certainly, interference by the Carrier in the form of a complete ban on all union solicitation during the nascent stages of organizing will ensure that no representation dispute is ever initiated at the National Mediation Board ("NMB").

The second set of organizational rights adversely impacted and interfered with by the Carrier's policy concern the right of Locomotive Engineers to solicit UTU members, whether they are Trainmen or Locomotive Engineers, to change their union affiliation. This right is derived from the unique aspect of the RLA embodied in Section 2, Eleventh (c), 45 U.S.C. §

152, Eleventh (c),[1] which permits operating employees, such as Locomotive Engineers or Trainmen, to maintain membership in a labor organization other than the one that is the designated representative of the particular craft or class to which the employee belongs. Where a carrier enacts rule or policy that interferes with the right of employees under Section 2, Eleventh (c) to change their union affiliation or inhibits employees from joining the labor organization of their choice, that policy must be found unlawful under the explicit language of Section 2, Fourth prohibiting carrier influence or coercion in an effort to induce employees to join or remain or not to join or remain members of any labor organization. Notably, the solicitation of UTU members, whether they are Trainmen or Locomotive Engineers, to drop their UTU membership and become members of the BLET will never result in a representation dispute because this does not entail a change of representative, but rather a change in union affiliation.

## ARGUMENT

I. **THE CARRIER'S BLANKET NO SOLICITATION POLICY UNLAWFULLY INTERFERES WITH ITS LOCOMOTIVE ENGINEER EMPLOYEES' ORGANIZATIONAL RIGHTS GUARANTEED UNDER SECTION 2, THIRD AND FOURTH OF THE RLA.**

In its opposition to the BLET's application for a preliminary injunction, the Carrier argues that its blanket no union solicitation policy does not violate the rights of Locomotive Engineers under Section 2, Third or Fourth of the RLA. On this point, the Carrier spends

---

[1] Section 2, Eleventh (c), provides in pertinent part:

> The requirement of membership in a labor organization in an agreement made pursuant to subparagraph (a) shall be satisfied, as to both a present or future employee in engine, train, yard, or hostling service, that is, an employee engaged in any of the services or capacities covered in section 3, first (h) of this act defining the jurisdictional scope of the first division of the National Railroad Adjustment Board, if said employee shall hold or acquire membership in any one of the labor organizations, national in scope, organized in accordance with this act and admitting to membership employees of a craft or class in any of said services.

3

considerable time attempting to persuade the Court that it should not examine or take notice of the considerable body of federal labor law developed by the Supreme Court under the NLRA that has determined such policies are presumptively unlawful. See Republic Aviation Corp. v. NLRB, 324 U.S. 793, 798-99 (1945); NLRB v. Magnavox Co. of Tennessee, 415 U.S. 322, 324-25 (1974); Eastex, Inc. v. NLRB, 437 U.S. 556, 572-73 (1978); Beth Israel Hospital v. NLRB, 437 U.S. 483, 491 (1978).  Instead, it contends that the instant case presents a "representation contest" between the BLET and the UTU subject to "an elaborate, exclusive administrative scheme overseen by the NMB . . . ." Defs.' Opp. at 16.  The Carrier's contention is without merit, as the Court is not being asked to intervene in a representation dispute,[2] but to protect the organizational rights of the Carrier's Locomotive Engineers that are currently being interfered with by the Carrier's no union solicitation policy.

      **A.**    **The Carrier's No Union Solicitation Policy Interferes With Locomotive Engineers' Right To Assist Trainmen In Changing Their Representative And/Or Select The Labor Organization Of Their Choice.**

On behalf of the Locomotive Engineers its represents, the BLET is asserting two distinct categories of organizational rights guaranteed by Section 2, Third and Fourth of the RLA that are being interfered with by the Carrier.  The first category of organizational rights currently being interfered with by the Carrier's no union solicitation policy is the Section 2, Fourth right of Locomotive Engineer employees of the Carrier to "assist" Trainmen in "organizing the labor organization of their choice."  Exercise of that choice, of course, may result in a change in of representative for the Trainmen's craft or class.  To assist Trainmen in this endeavor, Locomotive Engineers necessarily must be permitted to communicate with Trainmen on the

---

[2] Representational disputes under Section 2, Ninth of the RLA, 45 U.S.C. § 152, Ninth, are disputes over "whether one organization or another was the proper representative of a particular group of employees." Switchmen's Union v. National Mediation Bd., 320 U.S. 297, 302 (1943).

4

Carrier's property about a change in their representative.  The Supreme Court held no less when it stated in Beth Israel Hospital, 437 U.S. at 491, that the right of employees to self-organize without interference or coercion "necessarily encompasses the right effectively to communicate with one another regarding self-organization at the jobsite."

The fact that Beth Israel Hospital and the cases preceding it were decided under the NLRA makes the Supreme Court's analysis of the importance of jobsite communication to self-organization no less applicable to similar situations arising under the RLA.  Indeed, the Court has held that "carefully drawn analogies from the federal common labor law developed under the NLRA may be helpful in deciding cases under the RLA."  Trans World Airlines, Inc. v. Independent Fed'n of Flight Attendants, 489 U.S. 426, 432-34 (1989) (applying NLRA precedents to interpret RLA Section 2, Fourth).  Further, the Court of Appeals for the District of Columbia Circuit has repeatedly held that "the RLA's language prohibiting employer 'influence' of employees, 45 U.S.C. § 152, Third, Fourth, Ninth, while superficially broader than the NLRA's proscription of 'interfering with, restraining or coercing employees,' 29 U.S.C. § 158(a)(1), has been interpreted to mean pretty much the same thing."  US Airways, Inc. v. National Mediation Bd., 177 F.3d 985, 991 (D.C. Cir. 1999); Atlas Air, Inc. v. Air Line Pilots Ass'n, 232 F.3d 218 (D.C. Cir. 2000) (holding that while the RLA and NLRA "are not equivalent, we have interpreted the respective provisions barring undue employer influence of employees as meaning pretty much the same thing").

It therefore makes no sense to ignore sixty years of case law dealing with no solicitation policies under Section 8(a)(1) of the NLRA, including no less than four Supreme Court decisions that unequivocally hold such polices interfere with employees' organizational rights, in determining whether such a policy also interferes with the same substantive rights granted to

5

employees under the RLA. The reality of this case is that Locomotive Engineers have a right under Section 2, Fourth to assist Trainmen in organizing the labor organization of their choice, and that right is designedly interfered with by the Carrier's no solicitation policy.

Of course, if the assistance Locomotive Engineers lend to Trainmen in their organizing effort to change their representative results in a "representation dispute" under Section 2, Ninth of the RLA, the NMB, upon proper application supported by a showing of interest, 29 C.F.R. § 1203.2, will conduct a representation election to determine which organization is authorized to represent the Trainmen for the purpose of collective bargaining. It is important to note, though, that neither the Carrier nor the NMB has the authority to initiate a representation investigation. *See* Railway Labor Executive's Ass'n v. NMB, 29 F.3d 655, 665 (D.C. Cir. 1994). "Congress left no ambiguity in Section 2, Ninth: the Board may investigate a representation dispute *only* upon the request of employees involved in the dispute." Id. Only once the employees involved in a dispute have invoked the services of the NMB, may its mandate under Section 2, Ninth of the RLA to "insure the choice of representatives by the employees without interference, influence or coercion exercised by the carrier," be implicated. Even then, however, the Supreme Court has made clear that the NMB's role under Section 2, Ninth is very narrow. Switchmen's Union, 320 U.S. at 302. In explaining the NMB's narrow role under Section 2, Ninth the Court held:

> The Mediation Board makes no "order." And its only ultimate finding of fact is the certificate. The function of the Board under § 2, Ninth is more the function of a referee. To this decision of the referee Congress has added a command enforceable by judicial decree. But the "command" is that "of the statute, not of the Board." . . . Under this Act Congress did not give the Board discretion to take or withhold action, to grant or deny relief. It gave it no enforcement functions. It was to find the fact and then cease. Congress prescribed the command.

Id. at 305.  Thus, the NMB's role in a representation dispute is limited by Section 2, Ninth to investigating the dispute, administering an election where appropriate, and ensuring that employee free choice has been preserved.

Moreover, the NMB has no authority to adjudicate the violation of Section 2, Third and Fourth that are alleged in this case.  *See* America West Airlines, Inc. v. NMB, 986 F.2d 1252, 1256-57 (9th Cir. 1992).  Indeed, the NMB itself has stated, "in the context of its investigations of representation disputes, the adjudication of violations of Section 2, Fourth is not within the Board's authority conferred under Section 2, Ninth."  Continental Airlines/Continental Express, 21 N.M.B. 229, 252 (1994).  Given the NMB's utter lack of authority to enforce Section 2, Fourth, the issue before the Court is not the NMB's requirement in the context of a representation dispute that a carrier remain neutral as between two competing unions, but the over-breadth of a carrier policy that interferes with the fundamental organizational right of communication between employees at the jobsite protected from carrier interference by the Section 2, Fourth of the RLA.  That is a matter within the jurisdiction of this Court.  *See, e.g.*, Texas & N.O.R.R., 281 U.S. at 571; Arcamuzi, 819 F.2d at 937; Scott, 488 F. Supp. at 419; Adams, 470 F. Supp. at 1363.

While the right of employees to communicate with one another about self-organization at the jobsite is not absolute, the Carrier has not presented any evidence that its blanket prohibition on all union solicitation is necessary to maintain production or discipline.  Instead, the Carrier has speculated that organizing activities *could* lead to problems on its property.  Decl. of Mobley ¶ 50 ("Of course, I cannot warrant to the Court that specific operational or safety problems necessarily will flow from organizing activities or that permitting our employees to engage in union solicitation on NS' property will cause train accidents or employee injuries.").  Mere

7

speculation that problems may arise is grossly insufficient to satisfy the Carrier's obligation to present evidence that its policy is necessary to maintain production or discipline. If such conjecture is held to satisfy a carrier's burden in establishing the lawfulness of a blanket no union solicitation policy, the right of employees to communicate regarding self-organization at the jobsite would be rendered meaningless.

> **B.     The Carrier's No Union Solicitation Policy Interferes With Locomotive Engineers' Right To Solicit UTU Members In The Locomotive Engineer And Trainmen Crafts To Change Their Union Affiliation.**

Under Section 2, Eleventh (c) of the RLA, operating employees on rail carriers, such as Locomotive Engineers and Trainmen, may change union affiliations without changing collective bargaining representatives. All that is necessary for an operating employee to satisfy contractual union-shop provisions is for that employee to maintain membership in any one of the labor organizations national in scope and organized in accordance with the RLA. *See* Pennsylvania R.R. Co. v. Rychlik, 352 U.S. 480, 485-86 (1957). The Supreme Court has identified this provision of the RLA as "an area that the Act leaves open for solicitation by rival organizations," and to which the carrier even by agreement with the employees' representative may not erect barriers that make changes in affiliation burdensome. Felter v. Southern Pacific Co., 359 U.S. 326, 337 (1959). The Supreme Court further explained that organizational efforts to have operating employees change their union affiliations "are attended by persuading the recruit to drop his membership in his present union and terminate any checkoff of his wages in [the rival organization's] favor." Id.

In the Declaration of Harold R. Mobley submitted in support of its opposition to the BLET's Application for Preliminary Injunction, the Carrier explicitly recognized the right of Locomotives Engineers and Trainmen to maintain membership in the BLET or the UTU

8

regardless of which particular organization is their representative, or to or change their affiliation under Section, 2 Eleventh (c).  "As a consequence, although the BLET is the RLA representative of all NSR engineers, numerous NSR employees who are working as engineers are dues-paying members of the UTU, and not BLET.  Likewise, numerous NSR train service employees are members of the BLET, and not UTU."  Decl. of Mobley ¶ 9.  Given this express admission by the Carrier, it is unclear how it may continue to argue in good faith that the unconditional no solicitation policy at issue fails to interfere with Locomotive Engineers' right to solicit UTU members, both Trainmen and fellow Locomotive Engineers, to change their union affiliation in favor of the BLET, as enabled by Section 2, Eleven (c).

Further, the right of Locomotive Engineers to solicit UTU members to change their union affiliation, which is expressly preserved by Section 2, Fourth, will not in and of itself give rise to a representation dispute because it does not involve a change of representative.  Thus, the Carrier's argument that the instant case presents a representation dispute between the BLET and UTU has even less merit in this context than in the situation described above, involving assistance by Locomotive Engineers to Trainmen to change their representative, that could potentially result in a representation investigation by the NMB.

      II.      **AS THE CERTIFIED REPRESENTATIVE OF THE CARRIERS' LOCOMOTIVE ENGINEERS, THE BLET HAS STANDING TO SUE TO ENFORCE THESE EMPLOYEES' ORGANIZATIONAL RIGHTS GUARANTEED BY SECTION 2, THIRD AND FOURTH OF THE RLA.**

Courts have consistently recognized that previously recognized or certified unions have standing to bring actions claiming interference with employees' right to organize under Section 2, Third and Fourth of the RLA.  *See, e.g.*, Texas & New Orleans R.R., 281 U.S. 548 (affirming permanent injunction obtained by existing union forbidding carrier from interfering with

9

represented employees' right to select representative and organize); Atlas Air, 232 F.3d 218 (certified union permitted to pursue Section 2, Third and Fourth claim against airline on behalf of its members); Air Line Pilots Ass'n v. United Air Lines, 802 F.2d 886 (7th Cir. 1987) (same); Railway & Steamship Clerks v. Delpro Co., 549 F. Supp 780 (D. Del. 1982) (holding certified union may not serve as class representative to recover individual damages, but may sue for declaratory and injunctive relief).

In the instant matter, the Carrier does not dispute that the BLET is the certified representative of its Locomotive Engineers. Nor does the Carrier dispute that the BLET has standing to sue on behalf of its Locomotive Engineer employees in its representative capacity. Rather, the Carrier constructs a strawman argument over whether the BLET has standing to sue to enforce the Section 2, Third and Fourth rights of Trainmen represented by the UTU. As explained above, the Carrier's argument profoundly misconstrues the thrust of the BLET's cause of action in this matter. The Complaint clearly alleges that the Carrier's unconditional no union solicitation policy unlawfully interferes with the organizational rights of BLET-represented Locomotive Engineers guaranteed by Section 2, Third and Fourth of the RLA. Of course, a determination that the Carrier's policy is unlawful as applied to its Locomotive Engineers may necessarily lead to the logical conclusion that the policy is equally unlawful as applied to Trainmen since a discriminatory application of that policy is obviously impermissible. Nevertheless, the Court is not being asked to draw that conclusion nor does it in any way diminish or affect the right of the BLET to sue on behalf of the Locomotive Engineers employees of the Carrier that it represents.

In addition, the Carrier's reliance on the holding in Adams v. Federal Express Corp., 547 F.2d 319 (6th Cir. 1976), is misplaced.[3] The Sixth Circuit's decision in Adams is inapposite because the BLET is not seeking to assert the rights of Trainmen it does not represent. On the other hand, as the certified representative of Locomotive Engineers on the NS, the BLET plainly has standing to assert Section 2, Third and Fourth claims on those employees' behalf. Locomotive Engineers are entitled by the express terms of Section 2, Fourth of the RLA to "assist" Trainmen "in organizing the labor organization of their choice," and to be free of influence or coercion in effort "to induce them to join or remain or not to join or remain members of any labor organization."

## CONCLUSION

For the reasons stated above and in its Application for Preliminary Injunction, the BLET requests that the Court issue a preliminary injunction enjoining the Carrier from enforcing its unconditional policy prohibiting all union solicitation, recruitment and organizing activities by employees on its property.

Dated: July 8, 2005.                    Respectfully submitted,


                                        Roland P. Wilder, Jr. (D.C. Bar# 69609)
                                        Joshua D. McInerney (D.C. Bar# 479471)
                                        Baptiste & Wilder, P.C.
                                        1150 Connecticut Ave., N.W., Suite 500
                                        Washington, D.C. 20036
                                        (202) 223-0723
                                        rpwilderjr@bapwild.com
                                        jmcinerney@bapwild.com

                                        Attorneys for Plaintiff BLET

---

[3] The Carrier's research is also incomplete, as there are cases that have adjudicated Section 2, Third and Fourth claims by uncertified unions. See, e.g., Aircraft Mechanics Fraternal Ass'n v. United Air Lines, 406 F. Supp. 492 (N.D. Cal. 1976); Union of Prof'l Airmen v. Alaska Aeronautical Indus., No. A77-41, 1977 U.S. Dist. LEXIS 16173 (D. Alaska April 26, 1977).