IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BROTHERHOOD OF LOCOMOTIVE ENGINEERS AND TRAINMEN,<br><br>       *Plaintiff,*<br>v.<br><br>NORFOLK SOUTHERN RAILWAY CO. and NORFOLK SOUTHERN CORP.,<br><br>       *Defendants.* | Civil Action No. 1:05CV01188<br>Judge Richard W. Roberts |

**DEFENDANTS' SUPPLEMENTAL BRIEF PURSUANT TO
THE COURT'S ORDER OF JULY 8, 2005**

This Supplemental Brief is filed by defendants Norfolk Southern Railway Company ("NSR") and Norfolk Southern Corporation in accordance with the Court's July 8, 2005 Order. The Court posed two questions. In responding to the Court's questions, we must necessarily take into account the positions that plaintiff Brotherhood of Locomotive Engineers and Trainmen ("BLET") advanced for the first time in its reply brief in support of the union's request for preliminary injunctive relief, which was filed after issuance of the Court's order.[1]

**STATEMENT**

The question presented to the Court is still that of subject matter jurisdiction. In view of BLET's wholesale recasting of its case in its reply brief, however, it appears that the specific issue is no longer whether BLET has standing to assert claims belonging to NSR's *train*

---

[1] Under LCvR 7(d), the deadline for BLET's filing of a reply was Thursday, July 7, 2005. The union, however, filed it electronically at 7:28 p.m. on Friday, July 8.

*service employees*, but, instead, whether the RLA confers jurisdiction on this Court to hear the claim that BLET now says it wants to assert on behalf of NSR's *locomotive engineers*.

Notwithstanding the explicit description in its Complaint (and application for preliminary relief) of the campaign that is now under way among NSR's train service employees, involving the solicitation of authorization card signatures that are useful only in a submission to the National Mediation Board as part of a representation application, BLET now denies that its actions with respect to NSR's employees are in furtherance of the designation of a bargaining representative for the train service employees. BLET says it "is not seeking to assert the rights of Trainmen it does not represent." BLET Reply at 11. The union now says that the rights it seeks to vindicate are (1) a supposed RLA § 2 Fourth right of NSR's locomotive engineers to "assist" train service employees in organizing a labor union (*i.e.*, BLET), and (2) a supposed right of the locomotive engineers under RLA § 2 Eleventh (c), 45 U.S.C. § 152 Eleventh (c), to induce train service employees who are members of the United Transportation Union to switch their affiliation and become dues-paying members of BLET -- but *not* for the purpose of designating BLET as their bargaining representative. BLET Reply, *passim*.

Even if the Court were inclined to allow BLET to proceed to a preliminary injunction hearing on the basis of a revised set of claims that were not stated in the union's Complaint but were first described in a last-minute reply brief -- and we submit the Court should not allow this to occur -- BLET's new position does not save the union's case. The RLA provisions now cited by BLET do not confer subject matter jurisdiction on the Court.

## RESPONSES TO THE COURT'S QUESTIONS

1. **"Does a certified union have standing to bring a claim in the capacity as the representative of employees it is certified to represent?"**

It is common for a labor union that is the certified representative of a craft or class of carrier employees to bring a civil action seeking to vindicate rights conferred by the Railway Labor Act ("RLA") on the employees in that craft or class. A certified representative may, for example, seek to enjoin a carrier from changing working conditions in violation of the requirement of RLA § 6, 45 U.S.C. § 156, that the parties maintain the status quo while they are in mediation before the National Mediation Board over the adoption of a new collective bargaining agreement. *See, e.g., Southern Ry. v. Brotherhood of Locomotive Firemen*, 337 F.2d 127 (D.C. Cir. 1964). Or it may seek to compel arbitration of a dispute over the interpretation and application of a labor agreement before an arbitration board established under RLA § 3, 45 U.S.C. § 153, *e.g., Ass'n of Flight Attendants v. United Airlines, Inc.*, 71 F.3d 915 (D.C. Cir. 1995), or seek to enforce an award issued by an RLA § 3 arbitration board, *e.g., Brotherhood of Maintenance of Way Employes v. Terminal R.R. Ass'n of St. Louis*, 307 F.3d 737 (8th Cir. 2002); *Fruit Growers Express Co. v. Brotherhood Railway Carmen*, 1992 U.S. Dist. LEXIS 17431 (D.D.C. 1982) (Parker, J.). Or, a union that is a certified representative may sue to vindicate rights conferred on employees by RLA § 2 Third or Fourth, where the claim is that a carrier's action amounts to an attack on the union's representative role. *E.g., Airline Pilots Ass'n v. Eastern Air Lines*, 863 F.2d 891 (D.C. Cir. 1988) (unions bring (unsuccessful) claim alleging that carrier was attempting to transfer work to a less unionized affiliate so as to weaken or destroy the unions in violation of RLA § 2 Third or Fourth); *Atlas Air, Inc. v. Air Line Pilots Ass'n*, 232 F.3d 218 (D.C. Cir. 2000) (newly certified union prevails in RLA § 2 Third or Fourth claim that carrier's adoption of a facially discriminatory policy that terminated participation in a

profit sharing of the employees who had just unionized, while permitting nonunionized employees to remain in the plan, was a product of anti-union animus); *International Ass'n of Machinists & Aerospace Workers v. Continental Airlines, Inc.*, 754 F. Supp. 892 (D.D.C. 1990) (Gesell, J.) (newly certified union prevails in claim that carrier's post-certification attempt to poll employees to determine if they truly wanted to be represented by the union was "coercive in the sense that it operated to interfere with and adversely influence [the union's] recently certified position as the proper representative, in violation of 45 U.S.C. § 152, Third and Fourth"); *Held v. American Airlines, Inc.*, 13 F. Supp.2d 20 (D.D.C. 1998) (Urbina, J.) (denying carrier's motion for summary judgment as the union -- a certified representative -- provided sufficient evidence that carrier's ban on solicitation activities in flight operation areas, in the context of the union's conduct of a membership ratification vote on a tentative labor agreement, was not implemented evenhandedly, but, rather targeted those who opposed ratification, and therefore may have violated RLA § 2 Third or Fourth).[2]

---

[2]    The D.C. Circuit's decision in *Atlas Air*, referenced in text, is one of the cases BLET cites (Reply at 9-10) to show that certified unions may sue under RLA § 2 Third and Fourth; BLET's other cases fall into the same pattern. *See Texas & New Orleans R.R. v. Brotherhood of Railway & Steamship Clerks*, 281 U.S. 548 (1930) (upholding preliminary injunction issued in favor of union to prevent carrier from attempting to intimidate employees represented by the union to instead join a "company union" and make that union the employees' representative, in violation of an earlier version of RLA § 2 Third); *Air Line Pilots Ass'n v. United Air Lines, Inc.*, 802 F.2d 886, 900 (7th Cir. 1986) (union prevails in claim that policy adopted by carrier for rebidding jobs after strike, which permitted employees who had crossed picket lines to obtain positions ahead of more senior striking employees, violated RLA §§ 2 Third and Fourth in that the rebid procedure was motivated by anti-union animus and was an attempt by the carrier "either to destroy the union or at the very least to discourage union membership"); *Brotherhood of Railway & Steamship Clerks v. Delpro Co.*, 549 F. Supp. 780 (D. Del. 1982) (union could sue for declaratory and injunctive relief (but not as class representative for individual employees claiming individual damages) in connection with alleged bad faith bargaining and unilateral change in working conditions following certification of union by NMB, allegedly motivated by anti-union animus).

No one challenges the standing of a certified representative to bring claims of those sorts. Filing a civil action is part of the assumed function of a certified representative, where the matter in issue is within the scope of the representation and where the represented craft or class actually enjoys an RLA-conferred right that the certified representative seeks to vindicate by means of its lawsuit.[3] In the case at bar, however, the craft or class of locomotive engineers does not possess the supposed statutory rights described by BLET in its reply brief. The RLA, accordingly, does not confer subject matter jurisdiction on this Court to consider BLET's claims.

We discuss, first, the supposed § 2 Eleventh (c) right of locomotive engineers to solicit train service employees to switch their union membership. In the second part of this supplemental brief, we will discuss the engineers' supposed § 2 Fourth right to "assist" train service employees in the organization of a labor union.

As regards RLA § 2 Eleventh (c): BLET's invocation of this provision is an afterthought; a sham; an ineffective effort to resurrect a civil action that BLET had no standing to file in the first place. BLET's Complaint does not mention § 2 Eleventh (c), much less seek to invoke the Court's jurisdiction under that RLA provision. The union's application for preliminary injunctive relief does not mention § 2 Eleventh (c). Nor does the sole piece of "evidence" BLET has submitted in support of its application -- the declaration of BLET's staff lawyer, Mr. Brennan. BLET never intimated that § 2 Eleventh (c) had any relevance to its attempted civil

---

[3]   We showed in our Opposition to the request for preliminary injunctive relief (filed June 29, 2005) that an *uncertified representative* lacks standing to sue. *Adams v. Federal Express Corp.*, 547 F.2d 319 (6th Cir. 1976). BLET now denies any attempt to sue on behalf of employees for whom it is not already the certified RLA bargaining representative.

action against NSR, until after we demonstrated that the civil action, as actually filed, is outside this Court's jurisdiction. And, in fact, § 2 Eleventh (c) has no relevance to this case today.

BLET's lawsuit, as filed, is all about the union's desire to obtain signatures on "authorization cards" as part of the "first stages of an organizing campaign initiated by the BLET and its members seeking to generate a representation dispute among trainmen on the NS," Brennan Decl. ¶ 7. See Complaint ¶¶ 2, 12, 21, 23, 28, 31; Application for Preliminary Injunctive Relief at pp. 3-5; Brennan Decl. ¶¶ 16, 17, 20. We have not seen BLET's authorization cards, but the Court can safely presume that they have been drafted to satisfy the requirements of the NMB: "An authorization card is a card or document signed by the employee which states that the employee desires to be represented by an organization or individual for collective bargaining purposes. Authorization cards must have the name of the organization or individual seeking to represent the craft or class, and must be signed and dated by the employee." NMB Representation FAQ #5, available on-line at http://www.nmb.gov/representation/faqs-ola.html. Authorization cards are relevant to the submission of a representation application to the NMB, and to nothing else. Now, however, BLET asserts that all it is trying to do is sign up NSR train service members as BLET dues-payers, without regard to the NMB representation procedures and without the intention of replacing UTU as the representative of NSR's train service employees. BLET Reply at 2-3, 8-9. That is not a candidly stated position, and the Court should reject it.

In any event, there is no support in the law for BLET's contention that § 2 Eleventh (c) confers on it an enforceable right to solicit NSR train service employees. That provision was added to the RLA in 1951 (long after the enactment of §§ 2 Third and Fourth), as part of an amendment that also would allow union-shop labor contracts in the railroad industry.

It was intended to permit train service and engine service employees to satisfy the newly authorized union-shop provisions in their labor agreements by maintaining membership in any of the national labor organizations already representing employees in one of the pertinent crafts; this accommodation relieved employees of a burden that otherwise would follow from the introduction of union-shop requirements in an industry in which employees routinely moved back and forth between crafts that were represented by different labor unions and subject to different contracts. Just six years later, the Supreme Court made clear that in enacting § 2 Eleventh (c), "the purpose of Congress was not . . . to give employees in the railroad industry any blanket right to join unions other than the authorized bargaining representative, or to help dissident or rising new unions recruit new members." *Pennsylvania R.R. v. Rychlik*, 352 U.S. 480, 488-89 (1957). The Court further held that "*the only purpose of Section 2, Eleventh (c) was a very narrow one*: to prevent compulsory dual unionism or the necessity of changing from one union to another when an employee temporarily changes crafts," and that the provision was not "intended to provide employees with a general right to join unions other than the designated bargaining representative of their craft, except to meet the narrow problem of intercraft mobility." *Id.* at 492 (emphasis added).[4]

---

[4] BLET cites *Pennsylvania R.R. v. Rychlik* (Reply at 8) but does not acknowledge that the case defeats its invocation of federal court jurisdiction. BLET also cites *Felter v. Southern Pacific Co.*, 359 U.S. 326 (1959), in which the Court observed that § 2 Eleventh (c) implicitly contemplates that operating craft unions may attempt to recruit members of other unions. That truism does not help BLET here; *Felter* itself merely ordered relief to prevent the frustration of a different provision, § 2 Eleventh (b), which protects the right of employees to revoke due check-off authorizations. We do not dispute the potential availability of relief for an employee who is fired for failure to comply with a union-shop provision in his labor agreement notwithstanding his satisfaction of the conditions of § 2 Eleventh (c) -- but that, of course, is not our situation, and not the claim that BLET wants to pursue.

*See also Landers v. National Railroad Passenger Corp.*, 485 U.S. 652, 658 (1988) (applying principle of *Pennsylvania R.R. v. Rychlik*; holding that a locomotive engineer who has elected to join UTU rather than BLE (the engineers' RLA bargaining representative) does not have a right under § 2 Eleventh (c) to be represented by UTU at company-level grievance and disciplinary proceedings); *Dempsey v. Atchison, Topeka & Santa Fe Ry.*, 16 F.3d 832, 839-40 (7th Cir. 1994) (rejecting BLE contention that § 2 Eleventh (c) guarantees an engineer the right to continue accruing seniority in his former craft; "What the RLA *does* guarantee, at least with respect to Section 2, Eleventh (c), is that transferred employees will not be forced to join multiple unions." (*id.* at 840, emphasis in original)); *Wightman v. Springfield Terminal Ry.*, 100 F.3d 228, 231 (1st Cir. 1996) (rejecting BLE claim; "Section 152, Eleventh(c) *does not exist to benefit unions by permitting them to recruit members* from the ranks of other established unions, or to provide railroad employees with a general right to join unions other than the designated bargaining representative of their craft, except to meet the narrow problem of intercraft mobility in a union shop"; emphasis added).[5]

2. **"Is there any definition of "organizing" under the Railway Labor Act that excludes the activity that the defendants' employees who also are members of BLET are engaged in?"**

The answer to the Court's question is that the activity in which NSR employees who are BLET members are currently engaged does *not* come within the meaning of the word "organizing" as specifically used in the RLA's statutory enumeration of protected acts. Nor does RLA § 2 Third or Fourth confer protection on any activities (however characterized) that are

---

[5] Nor would there be any foundation for holding that RLA § 2 Third or Fourth protects the right that is conferred by § 2 Eleventh (c). However, the Court does not need to reach this issue, as BLET so clearly lacks any basis for pursuing a claim under § 2 Eleventh (c).

known to be taking place, except with respect to some activities of NSR *train service employees* (whether or not they are BLET members). BLET lacks standing to assert any claims on behalf of train service employees who might enjoy such RLA protection (whether or not any of such employees are already BLET members), and now admits that it does not seek to assert any such claims. BLET Reply at 10-11.[6]

We assume that some NSR employees are engaging in activities that would commonly or colloquially be described as "union organizing activities." But this description does not answer the question whether employees engaged in those activities are protected by the RLA. The RLA provisions that could be pertinent here protect only those activities that have to do with the designation of a bargaining representative for the crafts or classes that comprise *train service*. Only NSR train service employees are entitled to claim RLA protection for those activities. Such protection may not be claimed by individual NSR locomotive engineers, by the craft or class of NSR locomotive engineers as a whole, or by the bargaining representative of the craft or class of locomotive engineers (BLET).

The word "organizing" is used only once in the RLA. Section 2 Fourth, 45 U.S.C. § 2 Fourth, begins:

> Employees shall have the right to organize and bargain collectively through representatives of their own choosing. The majority of any craft or class of employees shall have the right to determine who shall be the representative of the craft or class for the purposes of this chapter. No carrier, its officers, or agents shall deny or in any way question the right of its employees to join, organize, *or assist in organizing the labor*

---

[6] As the certified representative of NSR locomotive engineers, BLET would potentially have standing to assert a variety of RLA § 2 Third and Fourth claims on behalf of engineers, including those who have chosen to be members of UTU rather than BLET as is their right under § 2 Eleventh (c). On the other hand, BLET lacks standing to assert *any* § 2 Third and Fourth claims on behalf of *any* train service employees, including those who have chosen to be members of BLET.

> *organization of their choice*, and it shall be unlawful for any carrier to interfere in any way with the organization of its employees, . . . . (Emphasis added.)

The RLA does not define the word "organizing," but the statute uses the word in a way that does not support BLET's contention that it may assert a claim on behalf of NSR locomotive engineers who are assertedly doing something that the RLA protects in this "assist in organizing" clause.

BLET's July 8, 2005 reply brief makes clear that the union contends its claim arises (at least in part) under the "assist in organizing" clause. BLET asserts that its members who are locomotive engineers, and whose interests are therefore not involved in the designation of a bargaining representative for train service employees, have an RLA-protected right to "assist" train service employees in their "organizing" efforts. BLET Reply at 2-3, 4-6, 11. But BLET's contention is misconceived.

The plain language of the statutory provision defeats BLET's contention. First, the right to "assist" pertains to "organizing *the labor organization*" (emphasis added), not to "organizing" *employees* for the purposes of designating a bargaining representative. None of NSR's train service employees is known to be engaged in "organizing" a labor organization. BLET already exists, enjoys a representative capacity in regard to other NSR employees, and is trying to induce NSR train service employees to designate it as their representative as well. The English language does not tolerate a claim by BLET that what is at stake is an effort by train service employees to organize BLET -- or an effort by BLET-represented locomotive engineers to "assist in organizing" BLET.[7]

---

[7] BLET pays no attention to the actual wording of the "assist in organizing" clause, and we do not believe there is any responsible reading of the clause other than the one we have described in the text. Nevertheless, we should be very clear. The portion of the sentence in which the clause appears should be read as if it were worded: "No carrier, its officers, or agents shall deny or in any way question the right of its employees (1) to join the labor organization of their
(continued ... )

Second, the right to "assist" refers to "organizing the labor organization *of their choice*." (Emphasis added.) The word "their" unquestionably refers, in turn, to the "employees" mentioned in the first sentence of § 2 Fourth and to the employees in the "craft or class" mentioned in the second sentence of § 2 Fourth. We have previously made the point -- which BLET has not disputed -- that for purposes of this case, NSR's locomotive engineers are not encompassed within either the "employees" of the first sentence or the "craft or class" of the second; the engineers are all represented by BLET, and BLET's role as representative is not under challenge. The "labor organization" mentioned in the "assist in organizing" clause would have to be an organization chosen by train service employees; what the locomotive engineers think about train service representation is immaterial.

We do not dispute, of course, that the RLA protects certain "union organizing" activities. NSR made the point very clearly when it published the no-solicitation policy that BLET challenges in this lawsuit, declaring the railroad's recognition of the statutory right of its train service employees to designate a bargaining representative and the correlative requirement

---

( ... continued)
choice, (2) to organize the labor organization of their choice, or (3) to assist in organizing the labor organization of their choice."

In fact, BLET has already agreed with our reading of the clause, paraphrasing it as establishing a "right of Locomotive Engineer employees of the Carrier to 'assist' Trainmen in 'organizing the labor organization of their choice.'" BLET Reply at 4. However, because the Court has directed the union to file another brief on July 12, 2005, it seems prudent to add at this point that there would be no principled basis for reading the sentence as if it were worded: "No carrier, its officers, or agents shall deny or in any way question the right of its employees (1) to join, (2) to organize, or (3) to assist the labor organization of their choice in organizing." Any such reading would deprive the infinitives "to join" and "to organize" of their common object ("the labor organization of their choice") and render the sentence incomplete and inarticulate. Moreover, the announced point of § 2 Fourth is to protect the right of "employees" "to organize and bargain collectively"; under this section it is employees who "organize," not labor organizations.

that the railroad not interfere with the process. And we wrote to the subject in our Opposition to BLET's request for preliminary relief. But this does not suggest that what is going on among NSR's train service employees, or what is described in BLET's Complaint or application for preliminary relief, implicates the RLA's "assist in organizing" clause -- because, as we have said, train service employees are not engaged in "organizing" BLET (or any other "labor organization"), and locomotive engineers cannot be assisting in an activity that is not occurring.

Carriers and unions -- and, to be sure, their lawyers -- commonly use the phrase "union organizing," in a colloquial or non-statutory sense, to include, *inter alia*, any solicitation directed to employees the purpose of which is to induce them to sign authorization cards that express support for the designation of an existing labor union (*e.g.*, BLET) as bargaining representative. NSR's announcement of its no-solicitation policy itself uses the word "organizing," and a locomotive engineer has been disciplined for using NSR's internal e-mail system to distribute "union organizing information," Mobley Decl. Exh. 4. This usage merely describes a form of solicitation, which is in progress today, directed at NSR's train service employees. But this fact does not bring such activities within the reach of the "assist in organizing" clause of § 2 Fourth, because those activities have nothing to do with "organizing a labor organization."[8] Rather, the RLA provisions that are implicated include the statutory purpose of providing "for the complete independence of carriers and of employees *in the matter of self-organization* to carry out the purposes of this chapter," § 1a(3), 45 U.S.C. § 151a(3) (emphasis added); the

---

[8] BLET's July 8, 2005 reply brief, in which the union purports to rely on a right of locomotive engineers to "assist" employees of another craft or class in organizing a union, does not claim there is any case law support for BLET's invocation of the clause. We have found no cases bearing on the question -- a fact that merely confirms that the plain language of the statute does not support the construction BLET would give it, and suggests that no union has previously even attempted the argument BLET proffers here.

definition of the term "representative" as meaning "any person or persons, labor union, organization, or corporation *designated* either by a carrier or group of carriers or *by its or their employees, to act for it or them*," § 1 Sixth, 45 U.S.C. § 151 Sixth (emphasis added); the guarantee that "[r]epresentatives, for the purposes of this chapter, *shall be designated by the respective parties* without interference, influence, or coercion by either party *over the designation of representatives by the other*" and that "neither party shall in any way interfere with, influence, *or coerce the other in its choice of representatives*," 2 Third (emphasis added); and, of course, the guarantee that "[e]mployees shall have the right to organize and bargain collectively through *representatives of their own choosing*," and that *"[t]he majority of any craft or class of employees shall have the right to determine who shall be the representative* of the craft or class for the purposes of this chapter," § 2 Fourth (emphasis added).[9]

NSR's train service employees are now engaged in a process having to do, potentially, with "self-organization" that can lead to the designation of a new collective bargaining representative. Only the train service employees have a voice in this process. Locomotive engineers have no voice in it.[10] The representative of locomotive engineers has no voice in it.

---

[9]   Additionally, the filing of an application with the National Mediation Board will invoke the provisions of RLA § 2 Ninth, which give the NMB exclusive jurisdiction to resolve any "dispute . . . among a carrier's employees as to who are the representatives of such employees designated and authorized in accordance with the requirements of this chapter . . . ."

[10]   The Court should reject any invitation to avoid the specific language of RLA provisions in favor of reference to provisions of the inapplicable National Labor Relations Act or Labor Management Relations Act, which may protect employee activities that the RLA does not. See *Independent Union of Flight Attendants v. Pan American World Airways, Inc.*, 789 F.2d 139, 141 (2d Cir. 1986) (recognizing "the general restriction of the scope of the Railway Labor Act to organizing and representational rights, as opposed to the broader 'concerted activity' rights under the Wagner Act"); *cf. Air Line Pilots Ass'n v. United Air Lines*, 802 F.2d at 914 (while the NLRA broadly prohibits anti-union discrimination with respect to hiring decisions, the RLA does not provide such protection, as RLA §§ 2 Third and Fourth apply only to those who already
(continued ... )

And the labor union that is seeking designation as representative of the train service employees has no voice in it -- unless and until that union acquires a role as contestant in election proceedings administered by the National Mediation Board.

### CONCLUSION

The Court lacks subject matter jurisdiction over BLET's Complaint.

Respectfully submitted,

*[signature]*

Jeffrey S. Berlin (D.C. Bar #200048)
Krista L. Edwards (D.C. Bar #421537)
Mark E. Martin (D.C. Bar #373445)
SIDLEY AUSTIN BROWN & WOOD LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8178
(202) 736-8711 (fax)
jberlin@sidley.com
kedwards@sidley.com
mmartin@sidley.com

*Attorneys for Defendants Norfolk Southern Railway Company and Norfolk Southern Corporation*

July 11, 2005

---

( ... continued)
are "employees" and RLA § 2 Fifth, which would apply to applicants for employment, "specifically defines those acts which are unlawful," and is narrow in its effect).