# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

|  |  |
|---|---|
| BROTHERHOOD OF LOCOMOTIVE ENGINEERS AND TRAINMEN, | ) ) ) ) |
| *Plaintiff,* | ) |
| v. | ) Civil Action No. 1:05CV01188 |
|  | ) Judge Richard W. Roberts |
| NORFOLK SOUTHERN RAILWAY CO. and NORFOLK SOUTHERN CORP., | ) ) ) |
| *Defendants.* | ) ) ) |

_____)

## DEFENDANTS' STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR JUDGMENT ON THE PLEADINGS

Jeffrey S. Berlin (D.C. Bar #200048)
Krista L. Edwards (D.C. Bar #421537)
Mark E. Martin (D.C. Bar #373445)
SIDLEY AUSTIN BROWN & WOOD LLP
1501 K Street, N.W.
Washington, D.C.  20005
(202) 736-8178
jberlin@sidley.com
kedwards@sidley.com
mmartin@sidley.com

*Attorneys for Defendants Norfolk Southern Railway Company and Norfolk Southern Corporation*

August 26, 2005

# <u>TABLE OF CONTENTS</u>

**<u>Page</u>**

TABLE OF AUTHORITIES ..................................................................................................... ii

SUMMARY AND STATEMENT OF THE CASE .........................................................................1

ARGUMENT ...........................................................................................................................7

I.      THE CIVIL ACTION SHOULD BE DISMISSED FOR
LACK OF SUBJECT MATTER JURISDICTION. ............................................................7

       A.     BLET's Representation Of Locomotive Engineers Does Not
Confer On The Union Standing To Assert A Claim Of Carrier
Interference Under RLA § 2 Fourth, Because NSR's Locomotive
Engineers Have No Legally Cognizable Stake In The Current
Representation Campaign And Are Not Engaged In Any Activity
Protected By That Provision. ................................................................................9

       B.     BLET's Invocation Of RLA § 2 Eleventh (c) Does Not Confer
Jurisdiction On The Court.................................................................................13

II.     ALTERNATIVELY, THE COURT SHOULD ENTER JUDGMENT ON
THE PLEADINGS FOR DEFENDANTS, BECAUSE BLET'S
COMPLAINT FAILS TO STATE A CLAIM UPON WHICH RELIEF
CAN BE GRANTED. ......................................................................................................17

       A.     The RLA Does Not Grant Employees An Affirmative Right To
Engage In Union Solicitation On A Carrier's Property.......................................18

       B.     BLET's Allegations Do Not Justify Judicial Intervention Under
The Standards Governing Recognition Of Implied Rights Of
Action Under The RLA. ...................................................................................22

       C.     NLRA Standards On Employee Solicitation May Not Properly Be
Imported Into the RLA.....................................................................................27

       D.     BLET's Invocation Of § 2 Eleventh (c) Does Not Strengthen Its
Claims On The Merits.......................................................................................40

CONCLUSION......................................................................................................................41

# TABLE OF AUTHORITIES

**Page**

## CASES

*Adams v. Federal Express Corp.*, 547 F.2d 319 (6th Cir. 1976) ...........................................7, 8, 14

*Air Lines Pilots Ass'n v. Eastern Air Lines, Inc.*, 863 F.2d 891
(D.C. Cir. 1988) ...................................................................................................................23

\* *Air Line Pilots Ass'n v. Trans World Airlines, Inc.*, 729 F. Supp. 888
(D.D.C. 1989) ................................................................................................................37, 38

*Air Line Pilots Ass'n v. United Air Lines*, 802 F.2d 886 (7th Cir. 1986)................................21, 28

\* *Aircraft Mechanics Fraternal Ass'n v. United Airlines, Inc.*, 406 F. Supp.
492 (N.D. Cal. 1976)...........................................................................................................39

*American Airlines, Inc. v. NMB*, 588 F.2d 866 (2d Cir. 1978).....................................................26

\* *American Train Dispatchers Ass'n v. Denver & Rio Grande Western R.R.*,
614 F. Supp. 543 (D. Colo. 1985).....................................................................................29, 30

*Ass'n of Flight Attendants v. USAIR, Inc.*, 807 F. Supp. 827 (D.D.C. 1992),
*aff'd*, 24 F.3d 1432 (D.C. Cir. 1994)................................................................................23

*Beth Israel Hospital v. NLRB*, 437 U.S. 483 (1978)....................................................................34

*Brotherhood of Locomotive Engineers v. Kansas City Southern Ry.*, 26 F.3d 787
(8th Cir. 1994).................................................................................................................23, 29

*Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101 (7th Cir. 1984).........................................14

*Commonwealth of Pennsylvania v. Pepsico, Inc.*, 836 F.2d 173 (3d Cir. 1988) ..........................14

*Chaulk Services, Inc. v. Massachusetts Commission Against
Discrimination*, 70 F.3d 1361 (1st Cir. 1995).........................................................................33

*Conley v. Gibson*, 355 U.S. 41 (1957) ...........................................................................................17

*Consolidated Rail Corp. v. Railway Labor Executives' Ass'n*,
491 U.S. 299 (1989)..............................................................................................................26

---

*Authorities chiefly relied upon are marked with an asterisk.

# TABLE OF AUTHORITIES (Cont'd)

**Page**

## CASES (Cont'd)

*Cooper Tire & Rubber Co. v. NLRB*, 957 F.2d 1245 (5th Cir. 1992)............................34

\* *Dempsey v. Atchison, Topeka & Santa Fe Ry.*, 16 F.3d 832 (7th Cir. 1994)..........................16, 29

*Felter v. Southern Pacific Co.*, 359 U.S. 326 (1959)........................................17

*Held v. Allied Pilots Ass'n*, 13 F. Supp. 2d 20 (D.D.C. 1998)......................................23

*Horizon Air Industries, Inc. v. NMB*, 232 F.3d 1126 (9th Cir. 2000)............................21

*ITT Industries, Inc. v NLRB*, 413 F.3d 64 (D.C. Cir. 2005)..........................................33

*Independent Union of Flight Attendants v. Pan American World Airways, Inc.*,
    789 F.2d 139 (2d Cir. 1986)................................................................28

*International Brotherhood of Teamsters v. Pan American World Airways, Inc.*,
    716 F. Supp. 726 (E.D.N.Y. 1989) ........................................................39

*Johnson v. Express One International, Inc.*, 944 F.2d 247 (5th Cir. 1991).................................28

\* *LSG Lufthansa Services v. NMB*, 116 F. Supp. 2d 181 (D.D.C. 2000) ........................................30

*Landers v. National Railroad Passenger Corp.*, 485 U.S. 652 (1988)..........................16

*Lechmere, Inc. v. NLRB*, 502 U.S. 527 (1992) ............................................................30

*NLRB v. Curtin Matheson Scientific, Inc.*, 494 U.S. 755 (1990).............................................32

*NLRB v. Daylin, Inc.*, 496 F.2d 484 (6th Cir. 1974)....................................................35

*NLRB v. Transcon Lines*, 599 F.2d 719 (5th Cir. 1979) ..........................................37

*New York New York Hotel v. NLRB*, 313 F.3d 585 (D.C. Cir. 2002) ............................................33

*Pacific Fruit Express v. Union Pacific R.R.*, 826 F.2d 920 (9th Cir. 1987) ..........................38, 39

\* *Pennsylvania R.R. v. Rychlik*, 352 U.S. 480 (1957)....................................................16, 41

*Republic Aviation Corp. v. NLRB*, 324 U.S. 793 (1945) ......................................27,  31, 34, 35

---

*Authorities chiefly relied upon are marked with an asterisk.

## TABLE OF AUTHORITIES (Cont'd)

**Page**

## CASES (Cont'd)

*Ruby v. American Airlines, Inc.*, 323 F.2d 248 (2d Cir. 1963) .......................................30

*San Diego Building Trades Council v. Garmon*, 359 U.S. 236 (1959) .......................................33

*Stanford Hospital & Clinics v. NLRB*, 325 F.3d 334 (D.C. Cir. 2003) ..................................27, 35

\* *Switchmen's Union of North America v. NMB*, 320 U.S. 297 (1943).....................................18, 19

\* *Trans World Airlines, Inc. v. Independent Federation of Flight Attendants*,
   489 U.S. 426 (1989)..........................................................................22, 23, 24, 28

*TRW, Inc. v. NLRB*, 393 F.2d 771 (6th Cir. 1968)........................................................36

*United Parcel Service, Inc. v. International Brotherhood of Teamsters*,
   859 F. Supp. 590 (D.D.C. 1994).........................................................................17

*United Services Automobile Ass'n v. NLRB*, 387 F.3d 908 (D.C. Cir. 2004)...............................35

\* *United Transportation Union v. United States*, 987 F.2d 784 (D.C. Cir. 1993)..........................21

*Wightman v. Springfield Terminal Ry.*, 100 F.3d 228 (1st Cir. 1996) ...................................17, 39

*Woodruff v. DiMario*, 197 F.R.D. 191 (D.D.C. 2000)....................................................14


## ADMINISTRATIVE DECISIONS

*American Airlines, Inc.*, 26 NMB 412 (1999), 1999 WL. 613469 (N.M.B.) ...............................25

*Daylin, Inc. Discount Division*, 198 N.L.R.B. 281 (1972), 1972 WL.
   5039 (N.L.R.B.) ......................................................................................35

*Eastern Airlines, Inc./Continental Airlines, Inc.,* 17 NMB 432 (1990),
   1990 WL. 504773 (N.M.B.)...........................................................................26

*Key Airlines*, 16 NMB 296 (1989), 1989 WL. 428461 (N.M.B.)...........................................19, 25

*Metro-North Commuter R.R.*, 29 NMB 458 (2002), 2002 WL. 31106336
   (N.M.B.).............................................................................................20

---

\*Authorities chiefly relied upon are marked with an asterisk.

### TABLE OF AUTHORITIES (Cont'd)

**Page**

### ADMINISTRATIVE DECISIONS (Cont'd)

*Northwest Airlines, Inc.*, 14 NMB 49 (1986), 1986 WL. 21726 (N.M.B.)..............................19, 20

*Northwest Airlines, Inc.*, 26 NMB 269 (1999), 1999 WL. 356276 (N.M.B.)...............................20

*Our Way*, 268 N.L.R.B. 394 (1983), 1983 WL. 24767 (N.L.R.B.) ...............................................34

*Pacific Southwest Airlines*, 14 NMB 303 (1987), 1987 WL. 267002 (N.M.B.)...........................20

*Peyton Packing Co.*, 49 N.L.R.B. 828 (1943), 1943 WL 10225
    (N.L.R.B.) ...........................................................................................................................34, 35

*Saia Motor Freight*, 333 N.L.R.B. 929 (2001), 2001 WL 376423 (N.L.R.B.)............................37

*Southwest Airlines*, 21 NMB 332 (1994), 1994 WL 451328 (N.M.B.).........................................26

*St. John's Hospital & School of Nursing, Inc.*, 222 N.L.R.B. 1150 (1976),
    1976 WL 7848 (N.L.R.B.) ..................................................................................................35

*Stoddard-Quirk Manufacturing Co.*, 138 N.L.R.B. 615 (1962), 1962 WL
    16389 (NLRB) ...............................................................................................................32, 35

*Stone & Webster Engineering Corp.*, 220 N.L.R.B. 905 (1975),
    1975 WL 6046 (N.L.R.B) ...................................................................................................35

*Transcon Lines*, 235 N.L.R.B. 1163 (1978), 1978 WL 7496 (N.L.R.B.).....................................37

*Trans World Airlines*, 24 NMB 141 (1997), 1997 WL 120095 (N.M.B.).....................................20

*USAir*, 8 NMB 191 (1980), 1980 WL 98999 (N.M.B.)...................................................................20

*USAir*, 17 NMB 377 (1990), 1990 WL 504772 (N.M.B.)...............................................................21

*United Air Lines, Inc.*, 22 NMB 288 (1995), 1995 WL 481031 (N.M.B.)....................................20

*Virgin Atlantic Airways*, 24 NMB 575 (1997), 1997 WL 558373 (N.M.B.).................................25

_____

*Authorities chiefly relied upon are marked with an asterisk.

## TABLE OF AUTHORITIES (Cont'd)

**Page**

**STATUTES AND RULES**

National Labor Relations Act, 29 U.S.C. §§ 151 *et seq* ........................................................ *passim*

    29 U.S.C. § 157 ........................................................................12, 27, 28, 33

Railway Labor Act, 45 U.S.C. §§ 151 *et seq* ........................................................ *passim*

    45 U.S.C. § 151a(3) ........................................................................11

    45 U.S.C. § 151 Sixth ........................................................................12

    45 U.S.C. § 152 Third ........................................................................ *passim*

   * 45 U.S.C. § 152 Fourth ........................................................................ *passim*

    45 U.S.C. § 152 Fifth ........................................................................28

    45 U.S.C. § 152 Ninth ........................................................................18, 19

    45 U.S.C. § 152 Eleventh (b) ........................................................................17

    45 U.S.C. § 152 Eleventh (c) ........................................................................ *passim*

    45 U.S.C. § 153 ........................................................................26, 37

    45 U.S.C. § 153 First (p) ........................................................................22

    45 U.S.C. § 153 First (q) ........................................................................22

29 C.F.R. § 1203.2 ........................................................................25

Rule 12(b)(1), Fed. R. Civ. P. ........................................................................1, 7, 41

Rule 12(b)(6), Fed. R. Civ. P. ........................................................................17

Rule 12(c), Fed. R. Civ. P. ........................................................................1, 6, 7, 41

*Authorities chiefly relied upon are marked with an asterisk.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

BROTHERHOOD OF LOCOMOTIVE ENGINEERS )
AND TRAINMEN,                        )
                                     )
                    *Plaintiff,*     )
              v.                     )    Civil Action No. 1:05CV01188
                                     )    Judge Richard W. Roberts
NORFOLK SOUTHERN RAILWAY CO.         )
and NORFOLK SOUTHERN CORP.,          )
                                     )
                    *Defendants.*    )
_____)


**DEFENDANTS' STATEMENT OF POINTS AND AUTHORITIES
IN SUPPORT OF THEIR MOTION TO DISMISS OR,
IN THE ALTERNATIVE, FOR JUDGMENT ON THE PLEADINGS**

        Defendants Norfolk Southern Railway Company ("NSR") and Norfolk Southern

Corporation have moved the Court, pursuant to Rule 12(b)(1) of the Federal Rules of Civil

Procedure, to dismiss this civil action for lack of subject matter jurisdiction or, in the alternative,

to enter judgment on the pleadings for defendants pursuant to Rule 12(c), for failure to state a

claim upon which relief can be granted.

        Our motion addresses all of the relief plaintiff Brotherhood of Locomotive

Engineers and Trainmen ("BLET") seeks in this civil action and disposes, as a matter of law, of

all the claims asserted in BLET's Complaint.  Accordingly, our arguments in support of the

motion necessarily overlap our arguments in opposition to BLET's pending application for a

preliminary injunction.  We have asked the Court to deny preliminary relief on grounds --

including lack of subject matter jurisdiction -- that dictate disposition of all claims in the case.

We respectfully suggest that the Court rule on the instant motion before or in connection with

issuing its decision on BLET's application for preliminary relief.

## SUMMARY AND STATEMENT OF THE CASE

This case arises out of BLET's efforts to replace another labor union as the representative of NSR's train service employees and, in connection with that campaign, to compel NSR to allow union solicitation activities on the railroad's property. The Complaint seeks declaratory and injunctive relief that would prevent NSR from enforcing its policy barring union solicitation on its property. BLET brings this civil action under the Railway Labor Act ("RLA"), 45 U.S.C. §§ 151 *et seq.*, specifically RLA §§ 2 Third and Fourth, 45 U.S.C. §§ 152 Third and Fourth, which address the rights and obligations of employees and carriers with respect to the selection of collective bargaining representatives. But BLET's claims have no basis in these or any other RLA provisions.

BLET's claims depend on the existence of an affirmative right that has never been recognized under the RLA. In the seventy years since Congress adopted the relevant RLA provisions, no court has ever held that a carrier's employees have a statutory right to engage in campaign activities on its property, much less that such a supposed right can be enforced in federal court. Challenges to other carriers' policies limiting union solicitation activities have been addressed repeatedly by the National Mediation Board ("NMB"), the federal agency with exclusive jurisdiction over representation disputes under the RLA. The NMB has never recognized the right BLET seeks to enforce and, indeed, has implicitly rejected it, focusing instead on the importance of carrier neutrality in disputes between unions. Under the NMB's established precedent, a carrier is free to limit union solicitation on its property, as long as the restrictions are uniform -- that is, not favoring one union over another.

BLET has not even alleged that NSR's policy or its enforcement runs afoul of these established standards. Instead, the union is hoping to end-run the NMB's processes and

standards altogether by invoking principles developed by a different federal agency, the National Labor Relations Board ("NLRB"), under a different statute, the National Labor Relations Act ("NLRA"), 29 U.S.C. §§ 151 *et seq.*, which expresses different policies in different language and establishes a fundamentally different enforcement scheme.  This effort is misguided, and the claims BLET seeks to assert are fatally defective.

Some of the defects are jurisdictional.  BLET has a problem with subject matter jurisdiction, because it lacks standing to assert the claim it wants the Court to decide.  The RLA provisions that BLET seeks to enforce grant rights to employees, not unions.  A union may bring claims to enforce employee rights in some situations, but only as to employees whom it is already authorized under the RLA to represent.  And it is settled law that a union may not enforce RLA § 2 Third and Fourth rights of employees it is only *seeking* to represent.  Yet, when BLET asks the Court to extend NLRA-based standards to the interpretation of RLA §§ 2 Third and Fourth, that is precisely what it is setting out to do.  BLET is asking the Court to condemn NSR's no-solicitation policy on the ground that the policy interferes with the rights of NSR employees to select a union of their choice; but the only NSR employees who are being asked to make such a choice are train service employees, whom BLET does not represent under the RLA.

BLET has conceded the limitation on its standing and has attempted to salvage its Complaint by recasting its claims, both legally and factually.  Without amending its Complaint, BLET now insists that it is seeking relief only on behalf of those NSR employees it is already certified to represent (locomotive engineers), and that locomotive engineers have statutory rights at stake -- namely, a right under RLA § 2 Fourth to "assist" train service employees in selecting a representative and a right under RLA § 2 Eleventh (c), 45 U.S.C. § 152 Eleventh (c), to recruit new members for their union.

BLET's new theories are both legally and factually untenable. The "assist in organizing" provision in RLA § 2 Fourth confers a right only on the employees who are involved in selecting a representative (in this case, train service employees, who are not represented by BLET) and only with regard to a specific activity -- the formation of a new labor organization -- that is not involved in this case. RLA § 2 Eleventh (c) likewise has no bearing here. That provision grants employees certain rights with respect to the enforcement of what are commonly called "union shop" clauses but does not confer on employees or unions the recruiting right that BLET posits. As for the facts, it is nothing short of disingenuous for BLET to pretend that this case is about membership recruiting. The Complaint is all about BLET's campaign to collect authorization cards in an effort to trigger a representation election. And the record firmly and clearly bears that out.

In any event, this is not a case in which judicial intervention would be appropriate, even if subject matter jurisdiction could be found. The RLA by its terms does not provide for judicial enforcement of RLA §§ 2 Third or Fourth, and BLET's Complaint contains no allegations that would bring this case within the narrow standards for allowing an implied right of action under those provisions. Specifically, BLET has not alleged that NSR's no-solicitation policy reflects anti-union animus; that enforcement of the policy would leave NSR employees without a union; or that the challenged policy otherwise fundamentally undermines the RLA's processes.

BLET has brought this case in federal court in a transparent effort to evade RLA processes, not in an attempt to secure them. BLET knows that its claim of carrier interference would be rejected on the merits in an NMB proceeding. So it has come here instead, hoping to persuade the Court to follow NLRA precedent rather than the decisions of the NMB.

The approach is illegitimate for a variety of reasons, beginning with the dispositive fact that the NMB has spoken on the issue. Resort to NLRA precedent is not appropriate as to issues that have been decided under the RLA, and the NMB's interpretation is entitled to particular deference in federal court, by virtue of the agency's special role in enforcing §§ 2 Third and Fourth requirements in the context of representation contests.

Moreover, the difference in the approaches taken under the NLRA and RLA is fully justified by differences in the statutory schemes. The statutory language that underlies the NLRA precedent is significantly broader than the corresponding text in RLA §§ 2 Third and Fourth (particularly the narrow "assist in organizing" clause on which BLET now relies) and bears no relationship to § 2 Eleventh (c), which has no NLRA parallel.

Even more to the point, the NLRA and RLA establish fundamentally different frameworks and procedures for resolving such disputes. Under the NLRA, disputes over employees' rights to engage in union solicitation are adjudicated as unfair labor practice ("ULP") charges by a federal agency, the NLRB, which possesses special expertise in labor-management relations under its authorizing statute. Under the RLA, in contrast, the concept of the administrative ULP charge does not exist. Rather, under the RLA, the NMB discharges its statutory responsibility to protect employee rights under RLA §§ 2 Third and Fourth in the context of the exercise of its exclusive jurisdiction to investigate and resolve disputes over the choice of bargaining representative.

BLET would have the federal district courts step in and adjudicate disputes over employee solicitation on railroad property as though they involved charges of ULPs, and as though the courts were the NLRB. But the courts' assumption of such a role would be in derogation of the special role of the NMB in the RLA scheme, would be incompatible with the

RLA's design of minimizing judicial involvement in labor-management relations, and would be beyond the courts' institutional capacities and proper function. The NLRB has significant resources, including a staff, and elaborate fact-finding procedures that are devoted to investigating and resolving ULP charges. A district court, in contrast, does not have a staff; it does not have decades of experience resolving complicated labor relations matters; it is not an investigative agency; and it is not charged with formulating labor policy. And, while there is one NLRB, whose decisions can apply uniformly across the industries that are subject to its authority, there are 94 district courts.

In the final analysis, this Court could not enjoin NSR's enforcement of its no-solicitation policy without making new law, in disregard of the NMB's decisional law, and without improperly being cast in the role of a labor board, making policy-based determinations about the relative risks and benefits of permitting certain employee activities on railroad property If the case proceeds on the path BLET would set for it, the Court would be asked to second-guess NSR's business judgment and the safety considerations that inform and justify the railroad's no-solicitation policy. Depending on the positions taken in later proceedings, the role BLET would assign the Court could require the development and presentation of evidence concerning the features and configuration of particular facilities at hundreds of separate locations across NSR's extensive rail system.

It is clear as a matter of law, on the basis of the pleadings alone, that BLET's claims are not viable and that defendants are entitled to judgment under Rule 12(c).

The background facts pertinent to defendants' motion to dismiss are set forth in two declarations of Harold R. Mobley, NSR's Assistant Vice President-Labor Relations. Defendants filed the first of these declarations, dated June 29, 2005, in opposition to BLET's

application for a preliminary injunction.  The Second Declaration of Harold R. Mobley, dated

August 24, 2005, is being filed herewith.[1]  Both declarations are cited in Part I of the Argument

section of this brief, in support of defendants' motion for dismissal under Rule 12(b)(1).

Defendants are not asking that the Court consider the Mobley declarations, or any other matters

outside the pleadings, in ruling on their Rule 12(c) motion, which is addressed in Part II of the

Argument.

<u>**ARGUMENT**</u>

## I.    THE CIVIL ACTION SHOULD BE DISMISSED FOR LACK OF SUBJECT MATTER JURISDICTION.

"[T]he Railway Labor Act confers no implied right of action upon an uncertified

union to maintain a suit on behalf of employees it seeks to represent."  *Adams v. Federal Express*

*Corp.*, 547 F.2d 319, 322 (6th Cir. 1976) (affirming dismissal of labor union as plaintiff in civil

action seeking to assert employees' right to organize and bargain collectively as protected in

RLA §§ 2 Third and Fourth).  When an uncertified union purports to bring a claim under RLA

§§ 2 Third and Fourth, alleging that the carrier has interfered with employee rights in a represen-

tation dispute, the claim should be dismissed for lack of standing.

That is precisely the situation here.  Although BLET is the certified representative

of one craft or class of NSR employees (locomotive engineers), that certification does not give it

---

[1]    The facts set forth in the first section of the Second Mobley Declaration (¶¶ 5-22) are offered in support of defendants' motion to dismiss for lack of subject matter jurisdiction. Defendants also intend to offer this declaration in connection with Mr. Mobley's live testimony at the August 30, 2005 continuation of the hearing on BLET's application for a preliminary injunction -- specifically, in rebuttal to positions taken by BLET and its witness Mr. Brennan in BLET's reply brief and at the July 13, 2005 hearing on BLET's application.  Defendants are submitting the entire declaration now for the convenience of the Court, in order to streamline the presentation of evidence on August 30.

standing to assert statutory claims on behalf of train service employees and does not otherwise bring this case within the Court's jurisdiction. BLET's representation of NSR's engineers is no more relevant to this civil action than is the fact that BLET represents employees (including some train service employees) on other railroads. It is NSR's train service employees who are being asked to sign authorization cards and whose selection of a representative is at stake. NSR's locomotive engineers have no role in deciding who will become (or remain) the bargaining representative of the train service employees. The engineers' bargaining representative, BLET, is equally an outsider in that process, having neither a direct nor a derivative claim to the right to bring a civil action to vindicate the RLA rights of train service employees.

BLET apparently concedes the limitation on its standing. When defendants raised the standing issue in opposition to BLET's application for a preliminary injunction, BLET did not take issue with our reading of *Adams* or contend that it has standing to assert claims on behalf of NSR train service employees. Instead, BLET insisted that NSR *locomotive engineers* have enough at stake in the dispute to confer on BLET standing to sue as their certified representative. With no regard for the actual allegations of its Complaint, BLET advanced two new theories: (1) that BLET-represented locomotive engineers have a legally protected interest in assisting train service employees in selecting a new representative, and (2) that NSR's no-solicitation policy interferes with a supposed RLA § 2 Eleventh (c) right of locomotive engineers who are BLET members, by preventing them from soliciting employees to join BLET. See Reply to Defendants' Opposition To Plaintiff's Application For Preliminary Injunctive Relief (filed July 8, 2005), at 3-10 ("BLET 7/8/05 Reply").

We assume that BLET will stick to its new theories in any reply to the instant motion, although neither can be sustained, as we explain in the following sections.

A.    **BLET's Representation Of Locomotive Engineers Does Not Confer On The Union Standing To Assert A Claim Of Carrier Interference Under RLA § 2 Fourth, Because NSR's Locomotive Engineers Have No Legally Cognizable Stake In The Current Representation Campaign And Are Not Engaged In Any Activity Protected By That Provision.**

Having conceded that it has no representative standing as to NSR's train service employees, BLET has walked away from Count I of its Complaint, which purports to state a claim under RLA § 2 Third.  BLET does not even attempt to argue that the employees' right to select a representative that is protected in § 2 Third extends to employees outside the craft or class whose representation is in issue.

But BLET insists that the rights protected by *RLA § 2 Fourth* are broad enough to support a claim on behalf of NSR engineers.   BLET asserts that its members who are locomotive engineers, and whose interests are therefore not involved in the designation of a bargaining representative for train service employees, can nevertheless claim protection under § 2 Fourth on the theory that NSR's policy interferes with their supposed right to "assist" their fellow employees in selecting a new representative.  BLET 7/8/05 Reply at 2-3, 4-6, 11.

BLET's theory rests on little more than wishful thinking.  BLET pretends to find its jurisdictional hook in the "assist in organizing" clause in the third sentence of RLA § 2 Fourth, but it has offered no authority for its expansive reading of that clause.  Indeed, to make the statutory language serve its opportunistic reading, BLET interpolates words and phrases that are not found in the actual text, with the object of making it appear that the provision covers employees outside of the craft or class involved in a representation matter.  *See* BLET 7/11/05 Supp. Br. at 3 (asserting engineers' supposed "right to 'assist' Trainmen on the Carrier in 'organizing the labor organization of their choice'"); 7 (criticizing interpretation of § 2 Fourth that would not grant employees in one craft or class a right to "'assist' fellow employees 'in organizing the labor organization of their choice'"); 7 (contending that engineers "have the right

to 'assist' Trainmen in "organizing the labor organization of their choice'"; 8 (contending that

§ 2 Fourth "protects the 'employees'' right to 'assist' other employees in organizing the labor

organization of their choice'").

> The actual language of § 2 Fourth is this:
>
> Employees shall have the right to organize and bargain collectively through representatives of their own choosing.  The majority of any craft or class of employees shall have the right to determine who shall be the representative of the craft or class for purposes of this chapter.  No carrier, its officers, or agents shall deny or in any way question the right of its employees to join, organize, or *assist in organizing the labor organization of their choice*, and it shall be unlawful for any carrier to interfere in any way with the organization of its employees, or to use the funds of the carrier in maintaining or assisting or contributing to any labor organiza- tion, labor representative, or other agency of collective bargaining, or in performing any work therefor, or to influence or coerce employees in an effort to induce them to join or remain or not to join or remain members of any labor organization, . . . .  (Emphasis added.)

Read in context, the "assist in organizing" clause does not even arguably extend

rights to employees outside the craft or class whose representation is in issue, much less confer

on those outsiders a legally enforceable right to engage in solicitation activities on a railroad's

property in connection with the representation campaign.  As we have explained previously,

representation under the RLA is specific to a craft or class of employees.  Representatives are

designated on a systemwide basis by craft or class, and only members of that craft or class have a

vote or stake in the selection of a representative.  Indeed, the first and second sentences of § 2

Fourth, immediately preceding the one BLET invokes, are the principal source of this established

framework, providing that "[e]mployees shall have the right to organize and bargain collectively

through *representatives of their own choosing*," and that *"[t]he majority of any craft or class of

employees shall have the right to determine who shall be the representative* of the craft or class

for the purposes of this chapter," § 2 Fourth (emphasis added).

The third sentence of § 2 Fourth carries forth this framework in describing the right, on which BLET relies, to "assist in organizing the labor organization of their choice."  The word "their" unquestionably refers, in turn, to the "employees" mentioned in the first sentence of § 2 Fourth and to the employees in the "craft or class" mentioned in the second sentence of § 2 Fourth.  It does not encompass other employees.

BLET would have the Court read this provision differently, but the union's interpretation ignores context.  BLET insists that "employees" in the third sentence must be read to encompass all employees of the carrier, without regard to the RLA's craft or class framework and the language of the immediately preceding sentences.  That is a results-oriented and farfetched interpretation.  Section 2 Fourth is about how the employees in a craft or class self-organize to select a collective bargaining representative, and how their employer is barred from interfering in the process.

Even if the right to "assist in organizing" could be read to extend protection to employees outside the self-organizing craft or class, BLET's reliance on § 2 Fourth should be rejected in this case, because what is protected is "organizing a labor organization," and none of NSR's train service employees is engaged in doing that.  BLET already exists, enjoys a representative capacity in regard to other NSR employees, and is trying to induce NSR train service employees to designate it as their representative as well.  The English language does not tolerate a claim by BLET that what is at stake is an effort by train service employees to "organize" BLET -- or an effort by BLET-represented locomotive engineers to "assist in organizing" BLET.  Having no supporting legal authority, BLET has previously attempted to defend its interpretation largely by criticizing our interpretation as "nonsensical," "narrow," and inconsistent with the "broad freedoms" supposedly conferred by § 2 Fourth.  Name-calling aside, there

is nothing unduly narrow or restrictive about reading the statutory language consistently with the RLA framework and language.[2]  The fact of the matter is that railroad and airline employees -- among the most highly unionized workforces in US industry -- have had no trouble maintaining their collective bargaining rights for more than 70 years without recognition of the broad "assist in organizing" right that BLET urges here.  If NSR's policy were in fact interfering with RLA-mandated processes for employee self-organization, then employees who have a real stake in that process, with or without the support of their RLA representative, could assert those rights in their own name.  The Court need not accept BLET's dubious interpretation of the "assist in organizing" clause in order to safeguard the interests of employees whom BLET contends are being "assisted" by the efforts of BLET-represented engineers.  It is those employees, and only those employees, who are engaged in the process § 2 Fourth is intended to protect.

Locomotive engineers have no voice in the process.  The representative of locomotive engineers has no voice in it.  And the labor union that is seeking designation as representative of the train service employees has no voice in it -- unless and until that union acquires a role as contestant in election proceedings administered by the NMB.

---

[2]  As we address further below (in part II.C, especially pp. 27-28), the rights conferred by the RLA are significantly narrower than corresponding provisions of the inapplicable NLRA, which guarantee employees, among other rights, general rights to "assist a labor organization" and "engage in . . . concerted activities for the purpose of collective bargaining or other mutual aid or protection."  29 U.S.C. §  157.

**B.**    **BLET's Invocation Of RLA § 2 Eleventh (c) Does Not Confer Jurisdiction On The Court.**

BLET's belatedly manufactured reliance on RLA § 2 Eleventh (c) cannot save its civil action, because the Complaint contains no claim concerning that provision and, in any event, the provision does not confer jurisdiction on the Court.[3]

BLET now says it seeks to vindicate a supposed right of locomotive engineers under § 2 Eleventh (c) to induce employees who are members of UTU to switch their affiliation and become dues-paying members of BLET -- independently of any concern to get train service employee to designate BLET as their collective bargaining representative.  And BLET asserts that NSR's no-solicitation policy assertedly infringes on this putative right.

BLET cannot rely on § 2 Eleventh (c) to support jurisdiction, for the fundamental reason that its Complaint does not mention that provision, does not state any claim respecting it, and does not even suggest that BLET's concern is with inducing employees to change union membership, as distinct from precipitating a representation dispute and replacing UTU as the bargaining representative of NSR's train service employees.[4]

Rather, BLET first mentioned RLA § 2 Eleventh only in its reply brief in support of its application for a preliminary injunction -- after we demonstrated that the civil action, as filed, is outside this Court's jurisdiction, because BLET lacks standing to assert claims on behalf

---

[3]    Section 2 Eleventh (c) provides, in pertinent part:  "The requirement of membership in a labor organization in an agreement made pursuant to subparagraph (a) of this paragraph shall be satisfied, as to both a present or future employee in engine, train, yard, or hostling service, . . . if said employee shall hold or acquire membership in any one of the labor organizations, national in scope, organized in accordance with this chapter and admitting to membership employees of a craft or class in any of said services; . . . ."

[4]    BLET's application for preliminary injunctive relief likewise does not mention RLA § 2 Eleventh (c), nor does the declaration of BLET's staff lawyer, Thomas Brennan, which BLET submitted in support of its application ("Brennan Decl.").

- 13 -

of train service employees, *see Adams,* 547 F.2d at 322.  It "is  axiomatic that the complaint may not be amended by the briefs . . .," *Car Carriers, Inc. v. Ford Motor Co.,* 745 F.2d 1101, 1107 (7th Cir. 1984); *accord Commonwealth of Pennsylvania v. Pepsico, Inc.,* 836 F.2d 173, 181 (3d Cir. 1988), and BLET has not otherwise sought leave to amend its Complaint, *cf. Woodruff v. DiMario*, 197 F.R.D. 191, 195 (D.D.C. 2000) (Urbina, J.) (request to amend complaint as part of opposition to motion to dismiss insufficient to constitute a motion to amend; citing cases).  The Court's jurisdiction depends on the claims that were actually brought.

The lawsuit filed by BLET concerns the union's desire to obtain signatures on "authorization cards" as part of the "first stages of an organizing campaign initiated by the BLET and its members seeking to generate a representation dispute among trainmen on the NS," Brennan Decl. ¶ 7.  *See* Complaint ¶¶ 2, 12, 21, 23, 28, 31; Application for Preliminary Injunctive Relief at pp. 3-5; Brennan Decl. ¶¶ 16, 17, 20.  Authorization cards are relevant to the submission of a representation application to the NMB, and to nothing else.  As the NMB has explained:  "An authorization card is a card or document signed by the employee which states that the employee desires to be represented by an organization or individual for collective bargaining purposes.  Authorization cards must have the name of the organization or individual seeking to represent the craft or class, and must be signed and dated by the employee."  NMB Representation FAQ #5, available on-line at http://www.nmb.gov/representation/faqs-ola.html.

BLET now says that all it is trying to do is get UTU members to become BLET dues-payers instead, without regard to the NMB representation procedures or BLET's replacing UTU as the representative of NSR's train service employees.  BLET 7/8/05 Reply at 2-3, 8-9.  This is a false proposition, as Mr. Mobley explains in his Second Declaration.  The dispute over NSR's no-solicitation policy arose in the context of BLET's announced plan to challenge UTU

- 14 -

as the representative of train service employees, and the nature and objective of BLET's effort have been reflected unmistakably in the campaign activities and literature of both UTU and BLET and in the numerous complaints that NSR has logged over the last six months from officials of both unions. Second Mobley Decl. ¶¶ 8-17 & Exh. 10. Tellingly, the very document that BLET is seeking to circulate on NSR's property and have employees sign includes both standard A-card language (*e.g.,* authorizing BLET to initiate a representation case at the NMB) and an "Official Application" for BLET membership that states in underscored large print that it "**Will not be processed until representation election is successfully completed!**" Mobley Decl. Exh. 8; see Second Mobley Decl. Exh. 14 (BLET A-card as posted on BLET Web site). All of this just confirms what BLET's Complaint says -- that this lawsuit is all about BLET's attempt to become the representative of NSR train service employees -- and that BLET's reference to RLA § 2 Eleventh (c) is an afterthought, owing nothing to the Complaint itself or to the actions BLET is seeking to carry out. Second Mobley Decl. ¶¶ 7–22 & Exhs. 10–14.

But even if this civil action had something to do with a campaign to induce NSR train service employees to become BLET dues-payers, which it does not, there is no support in the law for BLET's contention that RLA § 2 Eleventh (c) confers on locomotive engineers an enforceable right to solicit train service employees for that purpose. That provision was added to the RLA in 1951 (long after the enactment of RLA §§ 2 Third and Fourth) as part of an amendment that also would allow union shop labor contracts in the railroad industry (which previously were unlawful). RLA § 2 Eleventh (c) was narrowly targeted to remedy a specific problem that permitting union shop agreements would otherwise cause in an industry in which employees routinely moved back and forth between crafts that were represented by different labor unions and subject to different labor agreements. The provision was intended to permit train service and

engine service employees to satisfy the newly authorized union shop provisions in their labor agreements by maintaining membership in any one of the national labor organizations already representing employees in one of the pertinent crafts.  Without this accommodation, contractual union shop provisions would have forced employees, like those in train and engine service, who shuttled between crafts to join and pay dues to two or more unions (or to switch unions each time they changed crafts).

Just six years after Congress enacted RLA § 2 Eleventh, the Supreme Court held that "*the only purpose of Section 2, Eleventh (c) was a very narrow one*:  to prevent compulsory dual unionism or the necessity of changing from one union to another when an employee temporarily changes crafts," *Pennsylvania R.R. v. Rychlik*, 352 U.S. 480, 492 (1957) (emphasis added).  The provision was not "intended to provide employees with a general right to join unions other than the designated bargaining representative of their craft, except to meet the narrow problem of intercraft mobility" *id.,* or "to help dissident or rising new unions recruit new members," *id.* at 488-89.  *See also Landers v. National Railroad Passenger Corp.*, 485 U.S. 652, 658 (1988) (applying principle of *Pennsylvania R.R. v. Rychlik*; holding that a locomotive engineer who has elected to join UTU rather than BLE (the engineers' RLA bargaining representative) does not have a right under § 2 Eleventh (c) to be represented by UTU at company-level grievance and disciplinary proceedings); *Dempsey v. Atchison, Topeka & Santa Fe Ry.*, 16 F.3d 832, 839-40 (7th Cir. 1994) (rejecting BLE contention that § 2 Eleventh (c) guarantees an engineer the right to continue accruing seniority in his former craft; "What the RLA *does* guarantee, at least with respect to Section 2, Eleventh (c), is that transferred employees will not be forced to join multiple unions."  (*id.* at 840, emphasis in original)).

In short, even if BLET's Complaint contained any allegations concerning RLA § 2 Eleventh (c) (and it does not), jurisdiction would not be conferred on the Court, as that provision "*does not exist to benefit unions by permitting them to recruit members* from the ranks of other established unions, or to provide railroad employees with a general right to join unions other than the designated bargaining representative of their craft, except to meet the narrow problem of intercraft mobility in a union shop." *Wightman v. Springfield Terminal Ry.*, 100 F.3d 228, 231 (1st Cir. 1996) (emphasis added).[5]

## II. ALTERNATIVELY, THE COURT SHOULD ENTER JUDGMENT ON THE PLEADINGS FOR DEFENDANTS, BECAUSE BLET'S COMPLAINT FAILS TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED.

Assuming *arguendo* that it has subject matter jurisdiction over this civil action, the Court should nevertheless enter judgment on the pleadings for defendants. No matter how BLET would have the Court read its Complaint, the union has failed to state a viable claim under the RLA.[6] At bottom, BLET's claims all reduce to the single proposition that, as a matter of law, NSR's policy barring all union solicitation activity from its property violates the RLA. That

---

[5]    In *Felter v. Southern Pacific Co.*, 359 U.S. 326 (1959), the Court observed that RLA § 2 Eleventh (c) implicitly contemplates that operating craft unions may attempt to recruit members of other unions. That truism would not help BLET here. *Felter* itself merely ordered relief to prevent the frustration of a *different* provision, § 2 Eleventh (b), which protects the right of employees to revoke a dues check-off authorization. We do not dispute the potential availability of relief for an employee who is fired for failure to comply with a union-shop provision in his labor agreement notwithstanding his satisfaction of the conditions of RLA § 2 Eleventh (c). But that is not our situation, and it is not the claim that BLET wants to pursue.

[6]    The standard governing a motion for judgment on the pleadings is "'virtually identical'" to that governing a motion to dismiss under Rule 12(b)(6), Fed. R. Civ. P. *United Parcel Service, Inc. v. International Brotherhood of Teamsters*, 859 F. Supp. 590, 592 n.1 (D.D.C. 1994) (Green, J.) (citation omitted). The motion should be granted when "'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitled him to relief.'" *Id.* at 593 (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).

proposition is insupportable.  BLET has made clear that its claims rest entirely on case law and principles governing employee solicitation that were developed by the NLRB under the NLRA. But those principles and that case law do not apply here, because NSR is governed by the RLA and not the NLRA, and they cannot properly be imported into this case.  The RLA imposes its own standards, and it is the body of case law developed *by the NMB* that defines the scope of a railroad's obligations under the RLA as respects employee solicitation.  The NMB's precedents establish that the RLA does not command that a railroad open its property to union solicitation activities by employees; BLET's claim fails for that reason.  Moreover, BLET's claim also fails because its Complaint does not contain the sort of allegations that would justify the Court's implying a cause of action under RLA §§ 2 Third or Fourth.

      **A.**        **The RLA Does Not Grant Employees An Affirmative Right To Engage In Union Solicitation On A Carrier's Property.**

Nothing in the RLA bars NSR's no-solicitation policy.  BLET's contrary claims, in all of their formulations, depend on the existence of an employee right that has never been recognized under this statute:  the affirmative right to engage in solicitation activity on a carrier's property.  No court has ever held that the RLA -- by barring interference with employees' choice of a representative (§ 2 Third), by granting employees the right to organize (§ 2 Fourth), or by any other means -- requires carriers to allow such activities on their property.

Most importantly, no such right has ever been recognized by the NMB, the federal agency with plenary and exclusive jurisdiction over representation disputes under the RLA, *see* RLA § 2 Ninth; *Switchmen's Union of North America v. NMB*, 320 U.S. 297 (1943). A core aspect of the NMB's statutory responsibility is to ensure that the rights of employees

protected by RLA §§ 2 Third and Fourth are not abridged.[7]  The NMB carries out this duty by investigating allegations of carrier interference that are presented to it in the context of a dispute over the choice of employee representative.[8]  In discharge of its statutory authority, the NMB has, on numerous occasions, ruled on claims that carriers have interfered with employees' RLA rights by enforcing policies restricting employee solicitation activity during a representation campaign.  In the process, the NMB has developed a comprehensive body of decisional law addressing the requirements of RLA §§ 2 Third and Fourth in connection with such no-solicitation policies.

The governing standard under these cases is *carrier neutrality*: in a dispute between unions, a carrier's obligation is to treat the competing unions uniformly, showing no favoritism to one or the other.  As long as a railroad evenhandedly restricts employee solicitation activities on its property -- that is, as long as the railroad equally restricts solicitation by employees favoring the incumbent union and solicitation by those favoring any challenger unions -- there is no infringement of the employees' rights under RLA §§ 2 Third and Fourth.

---

[7]  *See, e.g.,* RLA § 2 Ninth (NMB is authorized and directed to ascertain and designate the representative "in such a manner as shall insure the choice of representatives by the employees without interference, influence, or coercion exercised by the carrier"); *Switchmen's Union of North America v. NMB*, 320 U.S. at 300-01 (§ 2 Fourth right of employees to select a representative is "protected by § 2, Ninth which gives the Mediation Board the power to resolve controversies concerning it"); *Northwest Airlines, Inc.*, 14 NMB 49, 52 (1986), 1986 WL 21726 (N.M.B.), at **2 ("determination of the issues . . . in representation cases before the Board, is made in cognizance of and consistent with 45 U.S.C. § 152, Third, § 152, Fourth, and § 152, Ninth").

[8]  The NMB uses the term "laboratory conditions" as a shorthand way of describing the circumstances that are consistent with the RLA's guarantees.  When laboratory conditions are maintained, the statutory guarantee has been honored; by contrast, if laboratory conditions are "tainted," then the employees' right to be free from carrier interference or coercion has been infringed.  *E.g., Key Airlines*, 16 NMB 296, 311 (1989), 1989 WL 428461 (N.M.B.), at **8-9.  Following its investigation, the NMB will issue a decision and, if interference has been found, may order the relief it deems appropriate.

This standard is reflected in the many decisions in which the NMB has rejected claims that a carrier's no-solicitation policy interfered with the employees' choice of representatives, precisely because the NMB has found that the policy was evenhandedly applied as between the supporters of the competing unions. *See, e.g., Metro-North Commuter R.R.*, 29 NMB 458 (2002), 2002 WL 31106336 (N.M.B.) (carrier's evenhanded application of its "no-solicitation" policy belies allegation of carrier interference); *Northwest Airlines, Inc.*, 26 NMB 269, 294 (1999), 1999 WL 356276 (N.M.B.), at **13 (no interference where "pattern of support" for one of two competing unions was not shown as the "carrier went to great lengths to convey the importance of neutrality" and evenly applied its policy regarding access, solicitation of employees, and distribution of literature); *Trans World Airlines*, 24 NMB 141, 173-76 (1997), 1997 WL 120095 (N.M.B.), at **16-18 (no interference where carrier had made significant efforts to treat both unions equally in its enforcement of a "No Solicitation/No Distribution" policy); *United Air Lines, Inc.*, 22 NMB 288 (1995), 1995 WL 481031 (N.M.B.) (no interference as there was insufficient evidence of a "pattern of carrier support" for one union over the other, even though enforcement of the carrier's policy on issues such as access, solicitation, and distribution varied from station to station); *Pacific Southwest Airlines*, 14 NMB 303, 322 (1987), 1987 WL 267002 (N.M.B.), at **11 (no interference as carrier attempted to prohibit both of the competing unions from campaigning on its property or otherwise making use of company facilities such as internal mail); *Northwest Airlines,* 14 NMB at 52, WL op. at **2  (no interference as there was no "pattern of carrier support for one union over another" or evidence that carrier had permitted one union, but not the other, to use crew lounges for campaign purposes); *USAir*, 8 NMB 191, 197 (1980), 1980 WL 98999 (N.M.B.), at **4 (no evidence that carrier committed

any acts that showed preference for one union over the other with respect to allowing campaigning on carrier property).

By the same token, the neutrality standard is reflected in NMB decisions finding that a carrier *did* interfere with employee choice, because the carrier failed to apply its policy evenhandedly. *E.g., USAir*, 17 NMB 377, 423, 427 (1990), 1990 WL 504772 (N.M.B.), at ** 21-22, 23-24 (although carrier's policies were facially evenhanded, they were applied in a discriminatory manner supporting a finding of carrier interference).

In contrast, we are not aware of a single NMB decision holding, in the context of a challenge to an incumbent union, that a blanket ban on all union solicitation activities on a carrier's property constitutes unlawful carrier interference or otherwise violates employee rights under the RLA. The neutrality principle informing the NMB's case law effectively rejects that possibility. NMB precedent, in short, forecloses the theory underlying BLET's claims in this civil action.

Although NMB precedent is not formally binding on the Court, it is "well-established that the NMB's interpretation of those provisions of the RLA over which it has responsibility is entitled to deference," *Air Line Pilots Ass'n v. United Air Lines, Inc.*, 802 F.2d at 912 n.8, in recognition of the agency's "special expertise to interpret the RLA" in the context of representation disputes, *United Transportation Union v. United States*, 987 F.2d 784, 789 (D.C. Cir. 1993).[9]

---

[9]    The NMB's authority is so extensive that federal courts are "virtually forbidden" to review the agency's representation determinations, *United Transportation Union v. United States*, 987 F.2d at 789, including the NMB's rulings regarding employer interference, influence, or coercion, *Horizon Air Industries, Inc. v. NMB*, 232 F.3d 1126, 1132 (9th Cir. 2000).

It is clear enough how BLET will propose to get around this RLA precedent, as BLET has outlined its legal theory in support of its preliminary injunction application. BLET would simply have this Court look to principles developed by the NLRB under the NLRA. We show later in this brief that BLET's attempt to resort to NLRA principles in the face of authoritative RLA precedent is fundamentally misconceived and fails as a matter of law. There is also another, even more basic reason why BLET's proffered claims cannot proceed, which we explain in the next section.

**B.    BLET's Allegations Do Not Justify Judicial Intervention Under The Standards Governing Recognition Of Implied Rights Of Action Under The RLA.**

Even if BLET's claims otherwise had merit (and they do not), the claims do not belong in federal court. By statutory design, courts play a very small role in enforcement of the RLA, and this is not a case in which this Court must or should intervene, even if the allegations of BLET's complaint were true. By its terms, the RLA makes no provision for civil actions (except for actions to enforce or set aside arbitration awards resolving disputes over the interpretation or application of labor agreements, 45 U.S.C. § 153 First (p), (q)). Instead, the RLA channels labor-management disputes into specific nonjudicial forums -- arbitration, negotiations, mediation, or administrative proceedings, depending on the nature of the dispute. Implied rights of action have been recognized under the RLA largely as a means of enforcing the exclusive dispute resolution procedures and, in all events, only in narrow circumstances that BLET has not alleged here.

RLA §§ 2 Third and Fourth "address[] primarily the precertification rights and freedoms of unorganized employees." *Trans World Airlines, Inc. v. Independent Federation of Flight Attendants*, 489 U.S. 426, 440 (1989) ("*TWA v. IFFA*"). Once employees have a union to

promote their interests through collective bargaining, "judicial intervention is available in only limited circumstances," *Held v. Allied Pilots Ass'n*, 13 F. Supp.2d 20, 25 (D.D.C. 1998) (Urbina, J.), where "but for the general jurisdiction of the federal courts there would be no remedy to enforce the statutory commands which Congress had written into the RLA," *TWA v. IFFA*, 489 U.S. at 441 (internal quotations omitted).   Under this standard, courts should intervene only when the RLA affords no other avenue of relief, as where a carrier has acted with "anti-union animus," *ALPA v. Eastern Air Lines, Inc*., 863 F.2d 891, 902 (D.C. Cir. 1988); *Held v. Allied Pilots Ass'n,* 13 F. Supp.2d at 26; or where a carrier has engaged in acts that are "inherently destructive of union or employee activity" and that have "prevented the scheme of the RLA from working," *TWA v. IFFA*, 489 U.S. at 441-42; *see Association of Flight Attendants v. USAIR, Inc.*, 807 F. Supp. 827, 834 (D.D.C. 1992) (Oberdorfer, J.), *aff'd,* 24 F.3d 1432 (D.C. Cir. 1994); or where carrier action strikes a "fundamental blow to union or employer activity and the collective bargaining agreement itself," *TWA v. IFFA*, 489 U.S. at 442.

BLET's Complaint does not even purport to satisfy these narrow standards. BLET does not allege that NSR has acted with anti-union animus or that the no-solicitation policy poses any risk to BLET's labor agreements or to the collective bargaining process.   BLET does not allege that NSR intends to undermine any union or that, in the absence of judicial intervention, NSR's train service employees could be left without a representative.   Taking BLET's factual allegations as true for purposes of this motion, the Court may assume that enforcement of NSR's policy might make it more difficult for BLET to obtain signed authorization cards (A-cards) from NSR train service employees and, accordingly, more difficult for BLET to carry out its campaign to replace UTU as RLA representative of those employees; but even assuming that NSR intended these effects, as BLET alleges, this intention would not

reflect general hostility towards unions or otherwise manifest "anti-union animus." *Cf. Brotherhood of Locomotive Engineers v. Kansas City Southern Ry.*, 26 F.3d 787, 795 (8th Cir. 1994) ("BLE's argument that [the railroad] is favoring one union over another belies any suggestion that [the railroad] harbors hostility toward unions in general," and therefore does not constitute the sort of anti-union animus that is necessary to state a claim under RLA §§ 2 Third and Fourth when employees are already unionized).

BLET's more recent reliance on the "assist in organizing" clause in RLA § 2 Fourth and on RLA § 2 Eleventh (c) only weakens its claim to a judicial forum. Almost by definition, a carrier's interference with the efforts of one group of represented employees to "assist" another group of already-represented employees in selecting a new representative would not strike a "fundamental blow" to the collective bargaining process, *TWA v. IFFA*, 489 U.S. at 442. Again, each group of employees -- locomotive engineers and train service employees -- is already represented by a union, which is positioned to protect employee rights through RLA-mandated procedures. To the extent that the concern relates strictly to union membership, the case for an implied cause of action is weaker still: as we have shown previously (section I.B, above), an employee's decision to join and pay dues to one union rather than another is not a choice about representation under the RLA and has no bearing on collective bargaining.

Nor is this a case in which the Court must step in to ensure compliance with otherwise unenforceable "statutory commands," *TWA v. IFFA*, 489 U.S. at 441. As we have explained, the NMB routinely investigates and adjudicates claims of carrier interference, including challenges to bans on employee solicitation, in the context of representation disputes. Knowing how those cases have been decided -- knowing that the NMB has never recognized an affirmative right of employees to use carrier property for campaign purposes -- BLET cannot be

optimistic about its prospects before the NMB.  But the fact that BLET cannot hope to sustain a

challenge under the NMB's standards only reflects its inability to state a claim on the merits, not

the need for an implied right of action.

BLET predictably may contend that NMB processes are unavailable to it because

the union is not prepared to file an application with the NMB under RLA § 2 Ninth to investigate

a representation dispute.  Although the Complaint is silent on the issue, we assume that BLET

made a tactical decision to file a complaint in federal court rather than seek relief before the

NMB.  The NMB has established standards for determining the existence of a representation

dispute, on the basis of a union's having made a sufficient "showing of interest" through the

submission of A-cards from a specified percentage of the employees in the craft or class for

which the union is seeking to become the representative.  29 C.F.R. § 1203.2.  Although BLET

does not allege as much, it may be the case that BLET had too few A-cards at the time it filed the

Complaint to satisfy the NMB's established standard.

But the union's litigation and campaign tactics do not determine its legal rights.

Even if BLET's A-card campaign has, to date, fallen short of its target, this would not demon-

strate the ultimate unavailability of NMB remedies.  The NMB has made clear that laboratory

conditions attach as soon as a carrier learns of a representation campaign, whether or not any

union has yet made a showing of interest or filed an application.  *E.g., American Airlines, Inc.*,

26 NMB 412, 447 (1999), 1999 WL 613469 (N.M.B.) at **17-18; *Key Airlines*, 16 NMB at 311,

WL op. at **8-9.  And the NMB has resolved claims of carrier interference that are based on

conduct during an A-card solicitation campaign.  *See, e.g.*, *Virgin Atlantic Airways*, 24 NMB

575, 620-21 (1997), 1997 WL 558373 (N.M.B.) at **22-23; *Southwest Airlines*, 21 NMB 332,

346-51 (1994), 1994 WL 451328 (N.M.B.).

Furthermore, nothing in the RLA itself requires the NMB to insist that an applicant union present a certain number of A-cards before seeking the investigation of a claimed representation dispute. The A-card thresholds applied by the NMB are not mandated by statute; moreover, the thresholds specified in the agency's regulations do not apply to the Board's initial investigation after receipt of an application, but only to the determination of whether to conduct an election. Nothing would prevent the NMB from applying a different "showing of interest" standard in particular circumstances if it were persuaded this was an appropriate result.[10] BLET brings its Complaint here in the hope of *avoiding* the NMB's dispute resolution procedure (and, of course, the agency's precedents), not because the RLA offers the union no dispute resolution procedure at all.[11]

---

[10] *See, e.g., Eastern Airlines, Inc./Continental Airlines, Inc.,* 17 NMB 432, 436 (1990), 1990 WL 504773 (N.M.B.) at **3-4 (Board "has broad discretion in determining when a showing of interest has been made"; the showing of interest standards are "neither jurisdictional nor imposed by statute"; the particular percentages set forth in the Board's regulations "are not applicable to the Board's initial investigation following the receipt of an application"); *Southwest Airlines*, 21 NMB at 349, WL op. at *9 (showing of interest standards "are for the Board's administrative purposes"); *American Airlines, Inc. v. NMB*, 588 F.2d 866, 871 (2d Cir. 1978).

[11] To the extent that BLET is complaining about the imposition of discipline against individual BLET-represented employees (Complaint ¶¶ 14-16), it has well-established remedies under RLA § 3, 45 U.S.C. § 153, which prescribes mandatory and exclusive procedures, including final and binding arbitration, for resolving disputes over the "interpretation or application" of existing agreements concerning rates of pay, rules and working conditions. Courts have no jurisdiction over such disputes, known as RLA "minor disputes," *e.g.*, *Consolidated Rail Corp. v. Railway Labor Executives' Ass'n*, 491 U.S. 299, 302 (1989). Although an arbitrator acting under RLA § 3 could not set aside NSR's no-solicitation policy, he could consider challenges to disciplinary action taken pursuant to the policy. Section 3 arbitrators routinely hear claims that disciplinary rules have been applied in a discriminatory manner or that past practices respecting rates of pay, rules, or working conditions have given rise to contractual rights. If BLET contends that NSR is acting unfairly in imposing discipline for violations of its no-solicitation ban, or that BLET-represented employees have a contractual right to engage in certain conduct on the property, the union's claims can and must be pursued exclusively under RLA § 3.

**C.    NLRA Standards On Employee Solicitation May Not Properly Be Imported Into The RLA.**

BLET would have the Court evaluate its claims that NSR's no-solicitation policy violates the rights of NSR employees by using principles developed by the NLRB under the NLRA. But it would be improper for the Court to resort to NLRA precepts, for the fundamental reason that existing NMB precedent already sets the standard for determining whether a carrier's no-solicitation policy is consistent with the rights guaranteed by the RLA. Moreover, far from being a simple matter, easily accomplished, applying NLRA principles relating to solicitation and distribution would impose on the federal courts adjudicatory burdens that are not properly theirs. Importing these NLRA principles into the RLA would force federal courts to assume the fact-finding and policy-making roles that the NLRB performs under the NLRA. Such a result would be inconsistent with the structure of the RLA, which is designed to minimize judicial intrusion into the relationship between carriers and employees, and would be beyond the institutional competence of the courts.

The principles respecting solicitation and distribution that operate under the NLRA reflect the *NLRB's* "working out of an adjustment between" the rights of self-organization protected by NLRA § 7 and the right of employers "to maintain discipline in their establishments," *Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 797-98 (1945) -- that is, between NLRA § 7 rights and "employers' property rights and managerial interests," *Stanford Hospital & Clinics v. NLRB*, 325 F.3d 334, 338 (D.C. Cir. 2003). The "Supreme Court has allowed the [National Labor Relations] Board to implement these section 7 prescriptions by adopting a series of presumptions regarding restrictions on solicitation and distribution activities." *Id.*

The Supreme Court has long cautioned that "the NLRA 'cannot be imported wholesale into the RLA arena. Even rough analogies must be drawn circumspectly with due

regard for the many differences between the statutory schemes.'" *TWA v. IFFA*, 489 U.S. at 439 (citation omitted).

In a case like this one, the differences between the RLA and NLRA schemes are particularly stark, beginning with the underlying statutory language. NLRA § 7, among other things, protects "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157. Though they address related employee interests, RLA § 2 Third and Fourth guarantee a narrower set of rights than does NLRA § 7. There would be no justification for simply imposing the balance struck by the NLRB to implement a broader set of employee rights on the RLA's more limited guarantees (which, in particular, do *not* encompass a general right of employees to "assist labor organizations" or generally to engage in "concerted activities . . . for mutual aid or protection"). The courts recognize that it is inappropriate to ignore the specific language of RLA provisions in favor of the more expansive language of the NLRA. *See, e.g. Independent Union of Flight Attendants v. Pan American World Airways, Inc.*, 789 F.2d 139, 141 (2d Cir. 1986) (recognizing "the general restriction of the scope of the Railway Labor Act to organizing and representational rights, as opposed to the broader 'concerted activity' rights under the Wagner Act"); *Johnson v. Express One International, Inc.*, 944 F.2d 247, 251 (5th Cir. 1991) (same).[12]

---

[12]    *Cf. Air Line Pilots Ass'n v. United Air Lines*, 802 F.2d at 914 (while the NLRA broadly prohibits anti-union discrimination with respect to hiring decisions, the RLA does not provide such protection, as RLA §§ 2 Third and Fourth apply only to those who already are "employees" and RLA § 2 Fifth, which would apply to applicants for employment, "specifically defines those acts which are unlawful," and is narrow in its effect).

Most to the point, the RLA has *its own agency*, the NMB, with expertise respecting the scope of employee rights of self-organization, and carrier interference with those rights. As we have explained (section II.A, above), NMB precedent sets the ground rules for judging whether a carrier's no-solicitation policy unlawfully abridges employee rights under RLA §§ 2 Third and Fourth by establishing that a carrier's obligation is to treat competing unions evenhandedly. The NMB has never recognized a general right of carrier employees to conduct solicitation activities on carrier property, and the NMB's neutrality principle belies any such right. Nor, therefore, has the NMB adopted presumptions to set the boundaries of any such right to solicit on carrier property, or to govern the enforcement of such a right in particular factual contexts. The NMB's decisions reflect that agency's expert judgment as to where the balance between employee and carrier interests is properly struck under the RLA.

It is inappropriate, and unnecessary, to resort to NLRA case law in the face of authoritative precedent under the RLA. *See, e.g., Brotherhood of Locomotive Engineers v. Kansas City Southern Ry.*, 26 F.3d at 795 ("We will not find NLRA precedent persuasive, however, in the face of relevant RLA precedent"); *Dempsey v. Atchison, Topeka & Santa Fe Ry.*, 16 F.3d at 841 (same). Indeed, were this Court to adopt the different NLRB rules, it would set up a conflict with the NMB that would intrude on that agency's statutory responsibilities and frustrate the RLA scheme. *See American Train Dispatchers Ass'n v. Denver & Rio Grande Western R.R.*, 614 F. Supp. 543, 545 (D. Colo. 1985).[13] And, in fact, in the long history of the

---

[13]     As the court there observed: "It is up to the [National Mediation] Board to determine what level of involvement by the defendant [railroad] would amount to illegal interference, influence, or coercion. I also want to avoid the possibility of conflicting outcomes in this court and before the National Mediation Board. My decision is consistent with the policy of not interfering with or frustrating the National Mediation Board's role of insuring peaceful labor

(continued … )

RLA, the courts have not imposed on railroads or airlines the NLRB presumptions respecting solicitation and distribution. Accordingly, leading NLRA cases like *Republic Aviation*, dealing with solicitation by employees, or *Lechmere, Inc. v. NLRB*, 502 U.S. 527 (1992), dealing with solicitation by nonemployees, are rarely even cited in cases arising under the RLA, much less adopted wholesale in the railroad context.

In view of the RLA scheme, Judge Huvelle of this Court had no trouble rejecting a carrier's attempt to upset an NMB certification of a union by invoking NLRA principles governing interference with the choice of representatives. *See LSG Lufthansa Services v. NMB*, 116 F. Supp.2d 181, 187 (D.D.C. 2000). Judge Huvelle noted that the NMB had submitted a declaration from its chief of staff that "explained the reasons for [its] determination" by stating, among other things, that the carrier's "'first claim was based on case law under the National Labor Relations Act (NLRA), 29 U.S.C. §§ 151-169, and therefore did not state a claim under the Railway Labor Act (RLA), 45 U.S.C. §§ 151-88.'" 116 F. Supp.2d at 186. Judge Huvelle held that there was no basis for disturbing the NMB's decision, reasoning that the pertinent language of the NLRA and RLA are not the same; that the carrier had "provided only NLRA case law to support the proposition that union-provided legal assistance constitutes election interference"; and that the Supreme Court has made clear that the NLRA "'cannot be imported wholesale into the railway labor arena.'" *Id.* at 187 (citation omitted).[14]

---

( … continued)
relations." *American Train Dispatchers Ass'n v. Denver & Rio Grande Western R.R.*, 614 F. Supp. at 545.

[14]    *Cf. Ruby v. American Airlines, Inc.*, 323 F.2d 248, 255-56 (2d Cir. 1963) (Friendly, J.) (that the result may have been different if the employer had been a bus line subject to the NLRA instead of an airline subject to the RLA is no argument for applying NLRA precepts to an RLA employer).

Beyond that, it would be improper to import NLRA principles on solicitation and distribution into the RLA for the related but independent reason that the NLRA principles are inextricably linked with that statute's particular administrative fact-finding, enforcement, and policy-making mechanism, which have no parallel under the RLA. Claims of supposed unlawful carrier no-solicitation policies under the NLRA are allegations of "unfair labor practices," which are adjudicated before the NLRB, acting in a quasi-judicial capacity, in administrative proceedings that typically include extensive fact finding conducted in hearings before an administrative law judge ("ALJ"). As the Supreme Court has explained, the NLRA "did not undertake the impossible task of specifying in precise and unmistakable language each incident which would constitute an unfair labor practice." *Republic Aviation v. NLRB*, 324 U.S. at 798. Rather, the NLRA leaves to the NLRB "the work of applying the Act's general prohibitory language in the light of the infinite combinations of events which might be charged as violative of its terms. Thus a 'rigid scheme of remedies' is avoided and administrative flexibility within appropriate statutory limitations obtained . . . ." *Id.* (citation omitted). And the method by which the NLRB carries out its responsibilities is

> to hold a hearing on a complaint . . . . At that hearing the employer has the right to file an answer and give testimony. This testimony, together with that given in support of the complaint, must be reduced to writing and filed with the Board. The Board upon that testimony is directed to make findings of fact and dismiss the complaint or enter appropriate orders to prevent in whole or in part the unfair practices which have been charged. Upon the record so made as to testimony and issues, courts are empowered to enforce, modify, or set aside the Board's orders, subject to the limitation that the findings of the Board as to facts, if supported by evidence, are conclusive.

*Id.* at 799. The NLRB ordinarily uses ALJs as trial examiners to conduct its factual inquiries. This process has generated an elaborate body of administrative law that makes fine distinctions among various solicitation restrictions in various employment contexts -- holding some lawful,

others not, depending on the context.  And this body of law, in turn, is enforced in particular factual contexts through the administrative fact-finding process.

The presumptions on solicitation and distribution developed by the NLRB are themselves a product of this administrative process, and reflect the NLRB's application of its specialized expertise and policy judgments to specific factual situations, to balance the rights of employees protected by the NLRA and the management interests of employers.  As the NLRB itself long ago explained in connection with employer restriction on union solicitation and distribution of union materials, "the formulation of generalized rules in this area must be undertaken with caution for, patently, differing fact situations call for differing accommoda-tions."  *Stoddard-Quirk Manufacturing Co.*, 138 NLRB 615, 617 (1962), 1962 WL 16389 (NLRB).

The RLA does not have a specialized administrative agency that would resolve a dispute over a no-solicitation policy as though it involved a free-standing charge of an unfair labor practice -- that is, separate and apart from the resolution of a representation dispute.  BLET's proposal that the federal courts should perform that function is indefensible.  Such an approach would, in substance, turn the courts into RLA labor boards, and the formulators of labor policy.  The courts would be making policy judgments, in the context of resolving particular disputes, as to whether various types of restrictions on employee solicitation are or are not consistent with the guarantees of the RLA.  But it is not the courts' role to create labor policy.  As the Supreme Court has long emphasized under the NLRA, "the NLRB has primary responsibility for developing and applying national labor policy."  *NLRB v. Curtin Matheson Scientific, Inc.*, 494 U.S. 755, 786 (1990).  The courts give substantial deference to the NLRB's policy judgments precisely so as to honor "the line we must not cross if we are to keep judicial

review separate from the formulation of public policy." *ITT Industries, Inc. v NLRB*, 413 F.3d 64, 76-77 (D.C. Cir. 2005) (discussing NLRB rules on access for off-site employees).[15]  The RLA similarly vests responsibility for formulating labor policy (though by different mechanisms) in particular administrative agencies, including the NMB -- and not in the federal courts.

Further, "when Congress enacted the NLRA, it enacted comprehensive procedural rules and created the NLRB to administer this specially designed regulatory structure.  The result was a complex and interrelated scheme of federal law, remedies and administration designed to achieve uniformity in our national labor policy."  *Chaulk Services, Inc. v. Massachusetts Commission Against Discrimination*, 70 F.3d 1361, 1364 (1st Cir. 1995) (*citing San Diego Building Trades v. Garmon,* 359 U.S. 236, 242 (1959)).  But the advantages of regularity and uniformity that come from having a single administrative agency formulate and enforce labor policy would be lost under the RLA, if each of the 94 federal district courts took on the role of being its own labor board.

Moreover, adopting NLRA principles regarding solicitation and distribution would wrongly draw the courts into the micromanagement of a carrier's labor practices.  Under the NLRA scheme, resolution of any given dispute over the application of the NLRB's presumptions on solicitation and distribution in a particular case requires intensive factual inquiry -- both to determine what the employer's policy is, how it is applied, and whether it runs

---

[15]     *See also, e.g., New York New York Hotel v.* NLRB, 313 F.3d 585, 590 (D.C. Cir. 2002) (it is up to the NLRB, not the court, to resolve open questions respecting the rights of employees of a contractor working on another company's property to engage in solicitation activities on that property, by considering, among other things, the policy implications of an accommodation of the NLRA § 7 rights of the contractor's employees and the rights of the company to manage its business and property; remanding case to the NLRB because the Board had failed to perform that function in rendering its decision).

afoul of a particular presumption, *and* to determine whether the employer may offer an adequate justification for its policy that will rebut the presumption. The factual findings by the ALJ are then subject to review by the NLRB and then only to deferential substantial evidence review by the courts of appeals. The federal courts have no role as finders of fact in the first instance.  But if NLRA principles were imported into the RLA, federal district courts would be forced to assume precisely that role.

        The problem is evident on the face of BLET's claims and its request for relief. BLET asks the Court to declare NSR's blanket no-solicitation policy unlawful and enjoin its application.  BLET evidently objects to NSR's policy because it prevents employee solicitation during supposed "non-working time."  It is established NLRB doctrine that an employer is presumptively entitled to prohibit employees from engaging in any union solicitation activities during "working time," *Peyton Packing Co.,* 49 NLRB 828, 843-44 (1943), 1943 WL 10225 (N.L.R.B.) ("working time is for work") (cited with approval in *Republic Aviation*, 324 U.S. at 803), but not during non-working hours.  Although this formulation "on its face does indeed seem very simple, the term 'working hours' is the progeny of various phrases, which have caused much confusion and controversy . . . ."  *Cooper Tire & Rubber Co. v. NLRB*, 957 F.2d 1245, 1249 (5th Cir. 1992); *cf. Our Way*, 268 NLRB 394 (1983), 1983 WL 24767 (N.L.R.B.).  In this connection, NSR would argue that its restrictions on employee solicitation generally do not reach "nonworking time," because in the unique circumstances of railroad operations, the distinction between nonworking time and working time is not drawn readily, if at all.  Making such a determination is both factually intensive and a matter of labor policy judgment, and is not a task appropriately assigned to the federal district courts.

Furthermore, the NLRB's presumptions are, in the end, just presumptions; they may be rebutted by a proper factual showing. A restriction on employee solicitation may be permissible if the employer shows that "special circumstances make the rule necessary in order to maintain production or discipline." *Peyton Packing Co, 49 NLRB at 843-44; accord Beth Israel Hospital v. NLRB,* 437 U.S. 483, 492-93 (1978); *Republic Aviation*, 324 U.S. at 803 n.10; *see United Services Automobile Ass'n v. NLRB*, 387 F.3d 908, 914 (D.C. Cir. 2004) (employer could justify application of no-solicitation rule by offering evidence before the NLRB "of special business circumstances related to production, efficiency, or discipline"); *Stoddard-Quirk Mfg. Co.*, 138 NLRB at 624 n.4 ("employee solicitation can be forbidden even during non-working hours where the nature of the employer's business requires such a broad limitation"); *cf. Stone & Webster Engineering Corp.*, 220 NLRB 905 (1975), 1975 WL 6046 (N.L.R.B.) (increased restriction on employee discussion of union matters justified by potential disruption associated with organizing efforts). Moreover, the NLRB has adopted *special* presumptions suitable to the distinctive working environments of particular industries. *See, e.g., St. John's Hospital & School of Nursing, Inc.*, 222 NLRB 1150 (1976), 1976 WL 7848 (N.L.R.B.) (hospitals may ban all solicitation in patient areas, even during nonworking time); *Stanford Hospital & Clinics v. NLRB*, 325 F.3d at 338 (reviewing particular application of this rule); *Daylin, Inc. Discount Division*, 198 NLRB 281 (1972), 1972 WL 5039 (N.L.R.B.) (retail establishment may ban solicitation in selling areas during nonworking time), *enforced, NLRB v. Daylin, Inc.,* 496 F.2d 484 (6th Cir. 1974).

BLET's Complaint alleges several times, in words that expressly track NLRA concepts, that in announcing its no-solicitation policy NSR did not cite or offer any "special circumstances or considerations that would make such policy necessary to maintain production

or discipline on the property."  Complaint ¶¶ 11, 17, 19.  On its face, the Complaint seems to be saying that NSR's no-solicitation policy must necessarily be held unlawful, because the railroad did not, when it most recently announced the policy, defend itself by reciting the "special circumstances" that justified the policy.  But BLET does not really mean this; rather, BLET's repeated, explicit incorporation of the NLRB's "special circumstances" standard just underscores that what BLET has in mind is precisely the adoption of NLRB presumptions and adjudicative processes that would, in effect, force federal courts to become RLA labor boards.  Even under the NLRA, an employer is not required to accompany announcement of a no-solicitation policy with the justifications for it.  Rather, the fact of a no-solicitation policy is just a starting point.  A challenge to the policy triggers an administrative unfair labor practice proceeding under the auspices of the NLRB, including an elaborate factual hearing before an ALJ, at which time the employer has the opportunity to offer evidence of special circumstances that justify its policy and rebut any NLRB presumption against it, or any other evidence that shows that the policy comports with NLRB doctrine.

Were this Court to look to NLRA precepts here, BLET's attack on NSR's no-solicitation policy would necessarily generate the same sort of proceedings -- but in the inappropriate forum of a district court.  In response to BLET's challenge, NSR would seek to show that its no-solicitation policy is justified by the special needs of production and discipline on the railroad.[16]  And NSR would further show that the unique nature of twenty-four-hour-a-day railroad operations, including the special safety concerns they create for the public and employees,

---

[16]     In this connection, it is recognized that solicitation for union activity "by its very nature . . . may cause argument and dissension among employees" -- unlike solicitation for welfare and recreation purposes.  *TRW, Inc. v. NLRB*, 393 F.2d 771, 774 (6th Cir. 1968).

justifies a different set of presumptions than would apply to other industries -- a quintessential policy judgment for a labor board, not a federal court.

Moreover, if BLET were somehow to prevail here, and NSR then adopted a different policy that permits some solicitation and distributions in some circumstances, at some locations, new disputes inevitably would arise as to whether the remaining restrictions are unlawful -- and predictably will generate more lawsuits in which courts will be asked to develop fine-graded distinctions akin to those worked out by the NLRB.  This is the sort of thing an administrative agency has the competence and resources to resolve, but not the federal courts.[17]

The infeasibility and inappropriateness of the courts' assuming the role of a labor board is a well-established reason why NLRA principles cannot just be lifted whole and applied under the RLA.  Judge Gesell of this Court reached precisely that conclusion in an analogous context in *Air Line Pilots Ass'n v. Trans World Airlines*, *Inc.,* 729 F. Supp. 888 (D.D.C. 1989). The issue there was whether the RLA required that a carrier disclose to a union its internal management guidelines as to how the carrier administered its attendance policy.  The union had sought this information in an RLA § 3 arbitration proceeding involving the carrier's assessment of discipline against employees who had violated the attendance policy.  The arbitrator had declined to order the carrier to disclose the information.

In district court, the union argued that because the NLRA imposes a broad obligation on employers (and employees) to disclose information, the same obligation to disclose

---

[17]    For example, if NSR adopted a policy allowing distribution of union literature only in nonwork locations, disputes would inevitably arise as to whether a particular room in a particular building at a particular location is or is not a nonwork location.  *Cf. Transcon Lines*, 235 NLRB 1163 (1978), 1978 WL 7496 (N.L.R.B.) (addressing whether a room used by truck drivers to pick up and complete trip documents, but also used for eating, drinking, and relaxing was a work area or not), *enforced in pertinent part*, *sub nom. NLRB v. Transcon Lines*, 599 F.2d 719 (5th Cir. 1979); *Saia Motor Freight*, 333 NLRB 929 (2001), 2001 WL 376423 (N.L.R.B.) (same).

should also be found under the RLA.  Judge Gesell rejected this argument.  First, he noted that as

a general matter the Supreme Court has cautioned against importing NLRA doctrine wholesale

into the RLA.  Then, agreeing with an earlier Ninth Circuit decision, he explained that adoption

of the NLRA disclosure rule would force the courts to assume a role comparable to that of the

NLRB under the NLRA, which would be incompatible with the RLA scheme:

> Accordingly, this Court adopts and will follow the Ninth Circuit's
> conclusion that 'the extensive judicial intervention that court-ordered
> disclosure would require is inconsistent with the history and principles of
> the Railway Labor Act.'  *Pacific Fruit [Express v. Union Pacific R.R.]*,
> 826 F.2d [920, 923 (9th Cir. 1987)] . . . .
>
> Prior opinions on this issue have also noted that disclosure disputes under
> the NLRA are handled by a quasi-judicial panel, the National Labor
> Relations Board, and no comparable mandatory administrative body exists
> for RLA disputes. . . .  If federal courts create and seek to enforce a duty to
> disclose, they will be placed in the untenable position of supervising
> arbitration discovery disputes and becoming enmeshed in a process that
> Congress intended to be left in other hands.
>
> The Court's docket is presently crowded with disputes for injunctive relief
> brought by carriers and unions, who seem increasingly anxious to turn to
> the judiciary to work out the details of their labor disputes.  Congress did
> not so intend.  Judicial control of document production would not only be
> greatly intrusive, it would also serve to tie up unions and carriers in court
> when their efforts should be focused, as the RLA provides, on the
> collective bargaining process.

729 F. Supp. at 890.

The Ninth Circuit decision relied on by Judge Gesell had further elaborated on the

inappropriateness of importing the NLRA rules on disclosure into the RLA universe:  "When the

NLRA requires a party to disclose information, the courts' role in the process is limited to

reviewing NLRB disclosure orders under a deferential standard.  . . .  Under the union's interpre-

tation of the Railway Labor Act, on the other hand, the courts would be solely responsible for

administering and enforcing pre-arbitration disclosure.  In the absence of clear evidence to the

contrary, we are reluctant to assume that Congress intended to impose such a duty on the court."

*Pacific Fruit*, 826 F.2d at 923; *see also International Brotherhood of Teamsters v. Pan American World Airways, Inc.*, 716 F. Supp. 726, 733-36 (E.D.N.Y. 1989) (adopting same reasoning in rejecting claim that RLA requires carrier to disclose information to union in connection with bargaining over a new contract).

A similar conclusion was reached by the court in *Aircraft Mechanics Fraternal Ass'n v. United Airlines, Inc.*, 406 F. Supp. 492 (N.D. Cal. 1976), in dismissing a claim of alleged carrier interference in asserted violation of the RLA. The union argued that the supposed interference was an "unfair labor practice" and that, because the NMB does not have jurisdiction to adjudicate such wrongs independently of a representation investigation, the court should step in and assume the role that the NLRB plays under the NLRA. The court rejected this argument as incompatible with the RLA, explaining:

> Given that the NMB has jurisdiction in the area of representation disputes, and is directed to insure that illegal influence does not bear on the outcome of such disputes, it follows that if such a rule [as found in an NLRB decision] is to be promulgated -- the purpose of which is to regulate interference with the employees' choice of representatives -- it is for the National Mediation Board, and not this court to do so. . . . It would be a usurpation of power of the most flagrant sort for this court to make such a rule and in effect force it on the Board, in light of the clear Congressional intendment that its carefully fashioned administrative machinery was to operate in the area of representation disputes without judicial interference.

406 F. Supp. at 506-07.[18] The same reasoning applies with equal force in this case.

---

[18]    The court further observed, 406 F. Supp. at 502-03:

While the National Mediation Board is not empowered to remedy "unfair labor practices" as such, Congress has given the Board a great deal of power to regulate such practices indirectly. . . . Where such [coercive or interfering] practices are found by the Board to have tainted the designation or election process certification of the union benefiting from the taint can (and must) be withheld. . . . Certainly it cannot be said that the Board is powerless to act, notwithstanding that

(continued … )

**D.      BLET's Invocation Of § 2 Eleventh (c) Does Not Strengthen Its Claims On The Merits.**

BLET's belated reliance on § 2 Eleventh (c) does not salvage its Complaint.  As we have already shown (see section I.B, above), the Complaint in fact contains no claim concerning RLA § 2 Eleventh (c) -- reason enough to reject any reliance on this provision.  In any event, as we have also explained, RLA § 2 Eleventh (c) performs a narrow, specific function that has no application to this case -- allowing employees who move from one craft to another (*e.g.,* from train service to locomotive engineer) to satisfy the requirements of union shop agreements by belonging to only one union.  RLA § 2 Eleventh (c) "does not exist to benefit unions by permitting them to recruit members from the ranks of other established unions," *Wightman v. Springfield Terminal Ry.*, 100 F.3d at 231, and so would be of no help to BLET in stating a claim, even if the Complaint contained any reference to this provision.

Further, to the extent that BLET asserts that NSR's no-solicitation policy interferes with a supposed RLA § 2 Eleventh (c) right of locomotive engineers to induce UTU members to join BLET, and thereby violates RLA § 2 Fourth, the claim also fails for the reasons we have stated above.  As we have shown, the RLA does not give employees the right to solicit on carrier property even for the purpose of choosing a new collective bargaining representative -- a matter at the core of the RLA scheme.  It certainly does not confer any such right to solicit on carrier property in connection with the more limited matter of union membership.[19]

---

( … continued)
      the procedure under the National Labor Relations Act may be in some sense more direct.

[19]      Moreover, BLET's invocation of RLA § 2 Eleventh (c) further highlights the misconceived nature of the union's reliance on NLRA principles to support its claims.  As the Supreme Court long ago observed, RLA § 2 Eleventh (c) addressed a problem as regards union shop agreements "peculiar to the railroad industry."  *Pennsylvania R.R. v. Rychlik*, 352 U.S. at 489-90.
                                                                                                (continued … )

## CONCLUSION

The Court should dismiss the Complaint pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction or, in the alternative, should enter judgment on the pleadings pursuant to Rule 12(c), in favor of defendants.

Respectfully submitted,

*/s/ Jeffrey S. Berlin*
_____
Jeffrey S. Berlin (D.C. Bar #200048)
Krista L. Edwards (D.C. Bar #421537)
Mark E. Martin (D.C. Bar #373445)
SIDLEY AUSTIN BROWN & WOOD LLP
1501 K Street, N.W.
Washington, D.C.  20005
(202) 736-8178
(202) 736-8711 (fax)
jberlin@sidley.com
kedwards@sidley.com
mmartin@sidley.com

*Attorneys for Defendants Norfolk Southern Railway Company and Norfolk Southern Corporation*

August 26, 2005

---

( … continued)
The NLRA "contains no parallel to subsection (c)." *Id.*  Accordingly, looking to the NLRA as the source of a right to solicit on carrier property in connection with conduct assertedly protected by RLA § 2 Eleventh (c) would be particularly inappropriate, even if it otherwise could be justified.