IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                            )
BROTHERHOOD OF LOCOMOTIVE ENGINEERS         )
AND TRAINMEN,                               )
                                            )
                          *Plaintiff,*      )
              v.                            )   Civil Action No. 1:05CV01188
                                            )   Judge Richard W. Roberts
NORFOLK SOUTHERN RAILWAY CO.                )
and NORFOLK SOUTHERN CORP.,                 )
                                            )
                          *Defendants.*     )
_____)

## SECOND DECLARATION OF HAROLD R. MOBLEY

August 24, 2005

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                            )
BROTHERHOOD OF LOCOMOTIVE ENGINEERS         )
AND TRAINMEN,                               )
                                            )
                  *Plaintiff*,              )
         v.                                 )   Civil Action No. 1:05CV01188
                                            )   Judge Richard W. Roberts
NORFOLK SOUTHERN RAILWAY CO.                )
and NORFOLK SOUTHERN CORP.,                 )
                                            )
                  *Defendants*.             )
_____)

## SECOND DECLARATION OF HAROLD R. MOBLEY

HAROLD R. MOBLEY deposes and says:

      1.      I am the same Harold R. Mobley who provided a declaration, dated June 29, 2005, on behalf of defendants Norfolk Southern Railway Company ("NSR") and Norfolk Southern Corporation (sometimes referred to collectively as "NS"). My first declaration set forth certain facts in opposition to the preliminary injunction motion filed by plaintiff Brotherhood of Locomotive Engineers and Trainmen ("BLET").

      2.      I am providing this second declaration in order to address certain issues that BLET raised for the first time in its reply in support of its motion and to rebut the testimony provided by BLET witness and staff counsel Thomas C. Brennan at the July 13, 2005 hearing on BLET's motion.

      3.      Defendants are offering this declaration in support of their motion to dismiss for lack of subject matter jurisdiction and, more generally, in opposition to BLET's motion for a preliminary injunction. Most of the facts pertinent to these pending motions are set

forth in my first declaration. I stand by that testimony in all respects, building on it as necessary in order to respond to BLET's more recent allegations.

4. In preface to this further testimony, I also am providing further detail concerning my background and experience with railroad operations. My first declaration made reference to my 34-year career with the railroad but did not specifically point out my experience in transportation management. I spent more than six years of my railroad career, between January 1975 and July 1981, in the Transportation Department, directly supervising the work of train and engine service employees. I served as Assistant Trainmaster in Macon, Georgia between January and November 1975, when I was promoted to Terminal Trainmaster at Valdosta, Georgia. In October 1977, I was promoted to Road Trainmaster at Manassas, Virginia; I served in this capacity until I moved into Labor Relations in 1981. One of my primary responsibilities in these positions was enforcement of the railroad's operating rules, including disciplining train and engine service employees for rule violations.

**BLET's New Allegations Regarding Membership Recruiting**

5. In my first declaration, I addressed the parties' dispute as I understood it, focusing, as BLET's complaint does, on BLET's campaign to replace United Transportation Union ("UTU") as representative of NSR train service employees and on NSR's enforcement of its no-solicitation policy in connection with campaign activities carried out by supporters and opponents of the two unions. By way of background, I explained the distinction between union membership and representation, making the point that some NSR train service employees are members of BLET, even though UTU is the exclusive representative of NSR train service employees under the Railway Labor Act ("RLA"). Mobley Decl. ¶ 9.

6. Since I provided my first declaration, BLET has attempted to shift the focus of its civil action by changing its description of the parties' underlying dispute. Although its Complaint is addressed to the union's A-card campaign, BLET now insists that it is seeking to enforce the rights of NSR employees under RLA § 2 Eleventh (c), pertaining to the enforcement of union shop provisions. BLET contends that NSR's no-solicitation policy is interfering with its efforts to recruit new members and that it has brought this lawsuit in order to enforce the supposed rights of NSR employees to engage in on-property membership recruiting.

7. BLET's new theory is not true to the facts. As the union well knows, membership recruiting is qualitatively different from the representation campaigning now under way, both in terms of the nature and extent of BLET's efforts and the stakes for employees. With the exception of its outreach to new hires, the union does not appear to have any organized campaign for attracting new members, much less the sort of highly publicized, winner-take-all battle launched over representation. Individual employees also are far more likely to take a stand over representation. Although an individual employee may have strongly-held views about his/her own decision to join one organization rather than another, he/she is all but unaffected by the membership choices of fellow employees. Accordingly, the issue is not likely to be divisive or to give rise to hostility or harassment among employees with differing preferences. With representation, by contrast, the will of the majority binds all employees in the craft or class. Employees naturally will have stronger opinions and more incentive to share their opinions when it comes to selecting a bargaining representative than in connection with the individual choice to pay dues to one organization rather than another.

8. To my knowledge, BLET and NSR have never had a dispute over membership recruiting on NSR property. The dispute in this case arose in the context of BLET's

- 3 -

campaign to obtain A-cards from NSR train service employees, with the objective of replacing UTU as the representative of these employees under the RLA. It was this development, and the obvious implications of on-property campaigning, that occasioned my March 9, 2005 letter (Exhibit 1 to my first declaration) and the corresponding operating bulletins (*e.g.*, Mobley Decl. Exhibit 3), announcing that union solicitation would not be permitted on NSR property.

9. By the time I sent my March 9, 2005 letter, we already had received complaints about on-property campaign activities and a report of at least one altercation between local chairmen for BLET and UTU. These incidents, and the numerous ones that have been reported since my March 9, 2005 memorandum, arose out of the A-card campaign (including UTU's opposition to BLET's campaign).

10. In order to illustrate this pattern, we have prepared a table (attached hereto as Mobley Declaration Exhibit 10) listing the campaign-related complaints and incidents reported to Labor Relations since late February 2005, when we began receiving complaints about BLET and UTU solicitation activities. Exhibit 10 summarizes this information in table format, indicating the location and nature of the alleged incident, and, in most cases, identifying the individuals involved and, as applicable, the union (BLET or UTU) that notified NSR of the complaint. The table is arranged in chronological order based on the date of the initial complaint or report and is current through August 19, 2005. Exhibit 10 was drafted by my staff for use in this case, based on records maintained by NSR in the ordinary course of business (supplemented, in some cases, by personal recollections of the underlying complaint or incident).

11. Exhibit 10 describes 57 separate complaints or incidents, some of which purport to address multiple events. Most of the entries implicated NSR's no-solicitation policy -- that is, they allegedly involved on-property solicitation. The policy was facially inapplicable in a

few cases, because the campaign-related activity was not alleged to have occurred on NSR property or to have involved on-duty employees. Two of the complaints (items 48 and 50), for instance, pertained to solicitation of train service trainees at hotels where they were housed during training programs. In another case (item 43), a train service employee complained about being contacted at home about signing an A-card.

12. In most of the cases, it is clear that the underlying solicitation (or alleged solicitation) either directly mentioned A-cards or otherwise clearly pertained to representation, as opposed to union membership. Again, a possible exception pertains to solicitation of train service trainees. Because the targeted employees were new hires, BLET may well have been seeking to recruit them as members, in addition to seeking signed A-cards.

13. Except where the complaints were obviously insubstantial or provided insufficient information, Labor Relations investigated each complaint or incident and took action as appropriate. In most cases, whether or not we found a violation of NSR policy, the involved employees were counseled about the no-solicitation policy. (I should emphasize that most of the matters described in Exhibit 10 are based on complaints by UTU or BLET; the fact that they are listed should not be taken as indicating NSR's acceptance of the complaining party's version of events.)

14. BLET's focus on A-cards and representation also is apparent in the campaign-related materials we have seen this year. Several of the incidents listed in Exhibit 10 involved the posting of campaign-related messages and signs, either on NSR's electronic mail system or on walls or bulletin boards in NSR facilities. In each case, the content, whether supporting or opposing BLET, clearly related to representation, not membership recruiting. By way of example, I have attached (as Exhibit 11) a copy of a March 7, 2005 facsimile in which a

BLET General Chairman complained to Labor Relations that UTU supporters were using NSR's internal electronic mail system for solicitation purposes; the facsimile included copies of the offending messages, all of which expressly addressed BLET's A-card campaign.

15. In my first declaration (¶¶ 33-34, 37), I explained that two employees – T.J. Curran, the BLET local official mentioned in BLET's Complaint (¶ 15) and a UTU local official – had been disciplined for using NSR's electronic message system for unauthorized purposes. Exhibits 12 and 13 hereto are the electronic messages underlying the respective disciplinary actions. In both cases, the messages specifically pertained to BLET's A-card campaign (respectively supporting and opposing BLET's position).

16. BLET's A-card itself reflects the union's focus on representation, as opposed to membership. As addressed briefly in the July 13, 2005 hearing (at pages 60-61 of the Transcript ("7/13/05 Tr.")), the A-card form that BLET has been circulating to NSR train service employees includes a membership application that is expressly conditional upon BLET's election as representative. One of these forms was included in Exhibit 8 to my first declaration, and the same form was published on BLET's website (www.ble.org) (Exhibit 14 is a copy of the form printed from the website).

17. Other materials on BLET's website likewise confirm the nature and purpose of BLET's current campaign. I looked at BLET's website on July 13, 2005, in preparation for the hearing in this case, and found an entire section of the site (accessed by using the "NS Campaign" link on the home page) devoted to BLET's campaign to replace UTU as representative of NSR train service employees. From the "NS Campaign" page, I followed a link to a website called "NS A-Card.com" (subtitled "Your Source for Information about the A-Card Vote on the Norfolk Southern"), which included further written materials and a bulletin

- 6 -

board, devoted entirely to the representation campaign. Exhibits 15-23 hereto are copies of text and materials printed from these sites on July 12, 2005, with the corresponding Web addresses as shown.

19. Although I deny that this case is about membership recruiting, I do not mean to suggest that we have permitted or will permit employees to recruit union members in the workplace. NSR's no-solicitation policy by its terms does not distinguish among forms or objectives of solicitation; it covers membership recruitment no less than A-card solicitation.

19. As far as I know, we have not had occasion to take specific measures to enforce our no-solicitation policy in connection with membership solicitation. We know that UTU and BLET regularly engage in efforts to recruit new members, but they have never asserted a right to do so on NSR property. Both unions send representatives to McDonough, Georgia, the location of NSR's centralized training center, to meet with and recruit our new hires. But these recruiting efforts have been conducted off of NSR property, typically in local hotels. Until this year, we have not had complaints about union recruiters contacting trainees on NSR property or while the trainees were on duty for the railroad.

20. Of course, I cannot rule out the possibility that less formal, one-on-one recruitment efforts may take place on NSR property, without attracting the attention or concern of local supervision. Given the size and scope of NSR's operations, I do not pretend to have knowledge of all that happens on the railroad, much less the content of one-on-one conversations between employees. But it is my job to know of and address labor-related issues when they arise or can be anticipated to impact our operations. In the case of BLET's A-card drive this year, we were facing a large-scale, high-profile, and controversial union campaign, and there was no

doubt that NSR's interests would be compromised if employees were allowed to engage in A-card solicitation or opposition in the workplace.

21.     BLET does not contend – and could never show – that NSR allows other unions or employees to solicit A-cards on NSR property or that NSR has somehow applied a different standard to BLET than it applies to other unions.  The fact of the matter is that campaigns like BLET's rarely occur.  As I explained in my first declaration (¶ 4), most railroad unions trace their representation to longstanding certifications or voluntary recognition, and incumbent unions rarely face challenges from other unions.

22.     Moreover, the last time we had reason to anticipate a dispute between two unions over the representation of NSR employees, we took the same approach to on-property campaigning as we are taking this year.  Exhibit 24 hereto is a true and complete copy of a May 4, 2000 memorandum from James A. Hixon, then Senior Vice President Employee Relations, to NSR senior management, setting forth NSR's position with respect to a possible representation dispute between UTU and BLET (then named Brotherhood of Locomotive Engineers ("BLE")). At the time, BLET was in the position of incumbent, as exclusive representative of NSR engineers.  UTU, the putative challenger, was engaged in a nationwide campaign (beginning on another railroad) for certification of a single craft or class of train operating employees, as the first step in expanding its representation of railroad employees. Anticipating that the dispute would spread to the NSR system, Mr. Hixon reminded management that NSR would remain strictly neutral in any dispute between the unions and that no NSR resources could be used in connection with union recruitment.  In relevant part, the memorandum also provided:  "No union recruitment efforts will be allowed on Norfolk Southern property or at other locations where Norfolk Southern conducts its business."

**BLET's Attempt to Dismiss NSR's Safety and Operational Concerns**

23. In my first declaration (¶¶ 18-23, 45-50), I explained the reasons for NSR's no-solicitation policy, by reference to the nature of the work performed by train and engine service employees, the railroad's focus on safety, and the risk of catastrophic consequences if train and engine service employees were distracted from their work. In the meantime, UTU has moved to intervene in this case, agreeing with NSR that the solicitation ban promotes safety (but seeking stricter enforcement).

24. BLET is dismissive of our safety concerns, urging the Court to second-guess NSR's judgment because we did not "warrant to the Court that specific operational or safety problems necessarily will flow from organizing activities or that permitting our employees to engage in union solicitation on NSR's property will cause train accidents or employee injuries" (Mobley Decl. ¶ 50). BLET apparently contends that NSR's concerns are not to be credited unless accidents or injuries are a certain result of solicitation – that is, in practical terms, that a ban could only be justified after at least one solicitation-related injury or accident.

25. As BLET well knows, disregarding a risk or exposure until a harm occurs is not the practice in this industry, much less on this railroad. NSR has always considered safety our primary objective, recognizing that even simple mistakes can have catastrophic consequences. Moreover, experience tells us that many railroad accidents and employee injuries are attributable to human error. We are always looking for ways to reduce the rates of accidents and injuries and are especially reluctant to take any action that might increase the risk of human error. Establishing operating standards necessarily requires some balancing of risks and benefits, but it would be irresponsible to wait until after accidents or injuries occur before addressing obvious hazards. In this case, the need to address on-property campaigning was apparent from the outset, given the high-profile and controversial nature of BLET's campaign.

26.     The risk of on-property campaigning is, first and foremost, the risk that employees who are involved in critical and safety-sensitive operations will fail to communicate effectively or lose focus on their work and responsibilities.  This might occur if an employee is engaged in solicitation, the target of solicitation, or a third-party observer of solicitation between other employees, especially in situations in which the employees have differing opinions on the merits.  Any number of hazards is created when train and engine service employees lose focus on their work or permit outside disagreements to affect on-the-job communication.  At the wrong time, a momentary distraction can mean a missed radio transmission, an inadequate safety check, a misaligned switch, a misdirected rail car, or a missed signal, to cite just a few examples.

27.     In addressing such risks, it is not enough that we prohibit employees from engaging in solicitation activities while they are actively performing particular functions, such as operating trains or completing paperwork.  Given the acrimony surrounding the representation dispute, encounters that occur at other times – for instance, as an employee arrives for work on the property – are likely to have spill-over effects on work-related communication and job performance.   A complete ban on solicitation is a reasonable and responsible approach in the circumstances.

28.     I note that BLET has cited the hazard of employee conflict and distraction as a reason for its decision to seek election as representative of train service employees.  One of the items on BLET's "NS A-Card.com" site, a March 10, 2005 letter (Exhibit 16) to all BLET Local Chairmen on one of the union's NSR General Committees, lists, as one of several "Benefits of Craft Unity," the prospect of "put[ting] an end to this infighting" between train and engine service employees.  The letter states:  "Engineers and Trainmen share a common workplace.  It is unfortunate that acrimony surrounding this issue frequently spills over into our

job site. It is an unsafe distraction yet decades of attempt (sic) to peacefully co-exist have been unsuccessful." (I point this out because I find the statement inconsistent with the position BLET takes here about the potential for unsafe distraction in the workplace. NS takes no position on the validity of the quoted assertion.)

29. In fact, the risk of conflict in the workplace is by no means speculative or hypothetical. In addition to threats of harassing or unwelcome solicitation, we have received several complaints of verbal and/or physical threats between employees engaged in campaign-related confrontations, including the two altercations mentioned in my first declaration (¶ 17). (At the time of my first declaration, a disciplinary charge was pending in the second of those two cases, in which a train service employee was charged with threatening a BLET local official over the representation dispute. The investigatory hearing has since been held and the charge sustained, resulting in a disciplinary suspension of the trainman.) In a June 10, 2005 letter (Exhibit 26) addressed to NSR's Central Division Superintendent, a UTU official cited increasing "verbal and physical threats" arising out of BLET's efforts to solicit A-cards on NSR property. The letter urged NSR to provide police coverage at crew reporting locations, warning that employees might begin "taking matters into their own hands" if NSR failed to take action to ensure a safe workplace. No doubt there would have been many more confrontations and altercations if we had permitted on-property solicitation.

**BLET's Allegations Regarding NSR Facilities and "Nonworking" Areas**

30. In his July 13, 2005 testimony (7/13/05 Tr. 23 ll. 14-20), Mr. Brennan stated that he knew of "nonworking areas" on NSR property where "employees interacted with each other." Mr. Brennan acknowledged that the facilities varied by location, but he went on to generalize, stating "there's always parking areas that the employer provides and then you go into

- 11 -

the building or structure, whether it be large or small, where you have lunchrooms and employee locker areas, sign up areas where you get your orders for the day and offices where you communicate with the supervision that's present." 7/13/05 Tr. at 24, ll. 14-21.

31.     By his own account, Mr. Brennan's testimony is based on his experience over a "short period of time" on a relatively small part of NSR's system. 7/13/05 Tr. 23, ll. 15-16. In fact, Mr. Brennan worked for NSR for only eight months, from June 1, 1999, the date when NSR began operating parts of the former Consolidated Rail Corporation ("Conrail") system, until February 2000, when Mr. Brennan became a full-time BLET employee. 7/13/05 Tr. 23, ll. 14-20. As a former Conrail engineer, Mr. Brennan apparently continued reporting at former Conrail locations and would have had few, if any, occasions to enter other NSR facilities. Accordingly, when Mr. Brennan purported to describe the features and configuration of reporting points on NSR property, he was referring to certain former Conrail locations, not describing all or even a representative sampling of NSR's systemwide facilities.

32.     By sponsoring this testimony, BLET apparently intends to convey the impression that NSR's facilities are conducive to on-property organizing activities. But that is not the case.

33.     The work of train and engine service employees requires very little building space, and the railroad has allocated its facilities accordingly. Train crews report for duty and sign off from duty at fixed reporting points, as determined by their assignments. Computer terminals provided at these locations are used to record on- and off-duty times in accordance with federal regulatory requirements and to transmit work instructions and bulletins. Some reporting locations, as I explain further below, also have lockers and washrooms for use by train and engine service employees.

34. Whether they work in yard or road crews, train and engine service employees spend most of their workday in and around trains, not in buildings or structures. Roughly two-thirds of train crews work in road assignments, spending their shifts in the cab of a locomotive. Under most of NSR's labor agreements, road crews are not given specified "breaks" during their shifts. Depending on the demands of the operation, some road crews are permitted to "tie up" their trains en route in order to take a meal break. Otherwise, meals are consumed and breaks taken without leaving the locomotive. Employees on yard assignments generally are allowed a 20-minute meal period during their shifts. These breaks may be taken at the employee's reporting location within the yard.

35. I cannot overemphasize the variation among the hundreds of reporting points on NSR's system. Most of our facilities were built decades ago by one of NSR's predecessor railroads, with no apparent uniform guidelines or specifications. Some reporting points are located in trailers or other temporary structures, and others are within facilities owned and operated by customers. Most are simple and utilitarian, with no dedicated employee lunchrooms or "lounges," as are common in other industries.

36. The lack of uniformity among facilities means that some of our reporting points necessarily would be better suited to non-work activities than others. If we had reason to do so, we might be able to identify particular spots where employees could get together for non-work activities with less risk to our operations or safety. But those hypothetical locations would, by definition, be inaccessible to almost all of our train and engine service employees, who report to work at different places across NSR's 21,300-mile system.

37. In order to illustrate my testimony, I took some photographs of the reporting points and other facilities at NSR's Ernest G. Norris Yard in Birmingham, Alabama,

one of NSR's twelve "hump" yards.  A hump yard is a large facility, typically four to five miles in length, used in the classification of rail cars.  Hump yards take their name from the topography of the facility, which is built around a large, centralized "hump."  In the hump operation, rail cars from inbound trains are uncoupled and rolled into one of several classification tracks, depending on the cars' destinations.  Outbound trains are assembled by operation of automatic coupling devices and the force of gravity as each successive car is rolled down the hump's outbound slope.  In addition to the classification operation, most hump yards also have facilities for repair and maintenance of rail cars and locomotives.

38. I chose to feature Norris Yard in my testimony for several reasons, including the fact that I was scheduled to visit the yard in the regular course of my work.  I took the photographs reproduced as Figures A through M in Exhibit 26 on July 19, 2005.

39. In general, the reporting facilities for train and engine service employees are most extensive at NSR's hump yards and other major yards and terminals, where the largest concentrations of train and engine service employees report and sign-off from duty.  The facilities at Norris Yard are fairly typical of those at NSR's other rail yards.  Built in 1952, Norris Yard is neither the oldest nor the newest in the system.

40. Accordingly, although many of NSR's reporting locations have less extensive facilities, photographs of Norris Yard provide a fair point of reference in this case.  As I will point out below, these images of Norris Yard illustrate certain facts and features not mentioned in Mr. Brennan's description, including the close proximity or overlap of work and "non-work" areas.

41. Norris Yard has three separate reporting locations, used by a total of approximately 128 train and engine service employees each day.  All supervisory employees

work out of a building located at the hump itself, the yard's operational center. This building also is the reporting location for approximately 20 train service employees, working in three shifts. Figures A through D depict the relevant facilities at this location. Figure A shows the crew reporting room, including the computer terminal used for signing in and out at the beginning and the end of a shift or break. The desk and telephone (Figure A) are used for receiving and reviewing work instructions and bulletins. The employee locker room at this location is shown in Figure B.

42. Figures C and D show the outside of the structure where the reporting room and locker room are located and show the proximity of these facilities to the live hump operation. Parking spaces for employees reporting to this location are located immediately adjacent to the structure. No dedicated lunch or break room is provided at this location. Employees working at this location could spend their breaks in the reporting or locker room or outside of the building, in either case in areas where work activities also are performed.

43. Figures E through I show the reporting location for all road crews working out of Norris Yard and for approximately four three-man crews assigned to yard operations. Although these facilities are used by approximately 100 employees on a daily basis, there would rarely be more than a few employees using the facilities at any given time. Yard crews work regular shifts, with fixed start times (three per day) and staggered break times. Most employees on road crews report as called, with start times varying based on train movements. Because they work on road trains, moreover, these employees do not use yard facilities for meals or other breaks during the work day.

44. Figures E and F show computer terminals used by employees to sign on and off from duty and to receive work orders and bulletins. As reflected in Figure F, one of

these terminals is located in the employee locker room. No dedicated break or lunch room is provided at this location. Figures G through I were taken immediately outside the road crew reporting room, showing the proximity of the facilities to a loading ramp and live yard operations. Figures G and I show employee parking spaces immediately adjacent to the structure. A bench and vending machines shown in Figure I may be used by employees on breaks. This area also is used by on-duty road crews who are awaiting taxi to their train and by away-from-home crews awaiting taxi to their hotels.

   45.  Figures J through M show the North End reporting point, used by approximately 6 employees each day, covering three shifts. As shown in Figures K through M, the computer terminal, printer, and facsimile machine used by train service employees are located in the same room with a table and vending machines. No locker room is provided at this location.

   46.  I note that NSR's labor agreements with BLET (and UTU) require NSR to provide lockers and washrooms at certain reporting points. Most yards and terminals have such facilities, although, as in the case of Norris Yard, lockers and washrooms are not provided at all reporting points within the yard. Many NSR train and engine service employees report to locations with no such facilities. Moreover, as at Norris Yard, where such facilities are provided, they are not used exclusively by off-duty employees. Most include or are immediately adjacent to work locations, such as computer work stations, where employees sign in and out and receive bulletins and work orders.

   47.  It is our position that NSR's labor agreements do not entitle employees to engage in solicitation or any other non-work-related activity, either in the bargained-for facilities or elsewhere on NSR property. If BLET disagrees as to the meaning of the labor agreements, the

parties' dispute would be governed by § 3 of the RLA, 45 U.S.C. § 153, which prescribes mandatory and exclusive procedures, including arbitration, for the resolution of disputes over the interpretation or application of labor agreements.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed this 21st day of August, 2005.

_____
Harold R. Mobley

# **EXHIBITS**

10. Complaint/Incident Log, August 2005

11. Facsimile dated March 7, 2005, from R.C. Wallace to S. Budzina

12. Electronic messages dated April 14, 2005 and April 16, 2005, from T.J. Curran

13. Electronic message dated May 24, 2005, from J. Zagarino, Jr.

14. Official Application for Membership, reproduced at www.ble.org/nscampaign

15. Memorandum dated March 8, 2005, from R.C. Wallace, et al. to BLET Local Chairmen, reproduced at www.nsacard.com/info/2005-03-08.shtml

16. Letter dated March 10, 2005. from R.H. Linsey, *et al*. to BLET Local Chairmen, reproduced at www.nsacard.com/info/2005-03010.shtml

17. Letter dated May 30, 2005, from R.K. Cutlip to NS Conductors and Trainmen, reproduced at www.nsacard.com/info/2005-05-30-cutlip.sthml

18. Text of letter dated June 16, 2005, from M. Hahs to NS Conductors and Trainmen, reproduced at www.ble.org/pr/news/pf_newsflash.asp?id+4134

19. NS Campaign Questions and Answers, reproduced at www.ble.org/nscampaign/qa.asp

20. Letter dated June 3, 2005, from M. Hahs to R.H. Linsey, reproduced at www.ble.org/nscampaign/info/info.shtml

21. News, reproduced at www.nsacard.com/news/index.sthml

22. "NS Trainmen Seek BLET Representation," reproduced at www.nsacard.com/news/2005-06-03-ns-trainmen-seek-blet.sthml

23. NS Campaign Town Hall Meetings, reproduced at www.ble.org/nscampaign/town hall.asp

24. Memorandum dated May 4, 2000, from J.A. Hixon to T.L. Ingram, *et al*.

25. Letter dated June 10, 2005 from M. Cook to P. Gibson

26. Photographs of Ernest G. Norris Yard, Birmingham, AL, taken July 19, 2005, by H.R. Mobley