**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

)
)
BROTHERHOOD OF LOCOMOTIVE ENGINEERS )
AND TRAINMEN, )
)
*Plaintiff,* )
v. ) Civil Action No. 1:05CV01188
) Judge Richard W. Roberts
NORFOLK SOUTHERN RAILWAY CO. )
and NORFOLK SOUTHERN CORP., )
)
*Defendants.* )
_____)

## DEFENDANTS' POST-HEARING MEMORANDUM IN OPPOSITION TO PLAINTIFF'S APPLICATION FOR A PRELIMINARY INJUNCTION

Jeffrey S. Berlin (D.C. Bar #200048)
Krista L. Edwards (D.C. Bar #421537)
Mark E. Martin (D.C. Bar #373445)
SIDLEY AUSTIN BROWN & WOOD LLP
1501 K Street, N.W.
Washington, D.C.  20005
(202) 736-8178
jberlin@sidley.com
kedwards@sidley.com
mmartin@sidley.com

*Attorneys for Defendants Norfolk Southern
Railway Company and Norfolk Southern
Corporation*

October 4, 2005

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ........................................................................................... ii

INTRODUCTION ....................................................................................................1

ARGUMENT

THE REQUEST FOR A PRELIMINARY INJUNCTION SHOULD BE DENIED.......................6

I.    The Norris-LaGuardia Act Bars The Grant Of A Preliminary
      Injunction Unless The Court Makes The Findings Enumerated
      In That Statute...........................................................................................6

II.   BLET Has Not Shown That It Will Suffer Irreparable Injury If
      A Preliminary Injunction Is Denied...........................................................9

III.  Issuance of A Preliminary Injunction Would Harm Defendants
      And The Public..........................................................................................19

IV.   BLET Has Not Shown That NSR's No-Solicitation Policy
      Violates The RLA......................................................................................24

CONCLUSION..........................................................................................................30

# TABLE OF AUTHORITIES

**Page**

## CASES

*Abrams v. Communications Workers of America*, 702 F. Supp. 920
(D.D.C. 1988), *aff'd*, 884 F.2d 628 (D.C. Cir. 1989)..............................................7, 9

*Adams v. Federal Express Corp.*, 547 F.2d 319 (6th Cir. 1976) ..................................26

*Air Line Pilots Association v. Trans World Airlines, Inc.*, 729 F. Supp. 888
(D.D.C. 1989) .........................................................................................................28

*American Airlines, Inc. v. NMB*, 588 F.2d 863 (2d Cir. 1978)......................................13

*Anderson v. Nixon*, 444 F. Supp. 1195 (D.D.C. 1978) .................................................14

*Brotherhood of Railroad Trainmen v. Chicago River & Indiana R.R.*,
353 U.S. 30 (1957).................................................................................................8

*Carabillo v. Ullico, Inc. Pension Plan & Trust*, 355 F. Supp. 2d 49 (D.D.C. 2004)................9, 10

*City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750 (1988)......................15

*Cobell v. Norton*, 391 F.3d 251 (D.C. Cir. 2004) .....................................................6, 23

*Del Monte Fresh Produce Co. v. Dole Food Co.*
148 F. Supp. 2d 1322 (S.D. Fla. 2001) ...............................................................14

*District 17, United Mine Workers v. Apogee Coal Co.*, 13 F.3d 134 (4th Cir. 1993) ....................8

*In re District No. 1-Pacific Coast District, Marine Engineers' Beneficial Ass'n*,
723 F.2d 70 (D.C. Cir. 1983)................................................................................7, 8

*Elrod v. Burns*, 427 U.S. 347 (1976) ......................................................................15, 18

*Hospital for Joint Diseases & Medical Center v. Davis*, 1978 U.S. Dist.
LEXIS 19560 (S.D.N.Y. 1978)...............................................................................8

*Hudgens v. NLRB*, 424 U.S. 507 (1976).......................................................................16

*Int'l Brotherhood of Electrical Workers System Council U-4 v. Florida Power &
Light Co.*, 678 F. Supp. 257 (S.D. Fla. 1987) ........................................................8

---

* Authorities chiefly relied upon are marked with an asterisk.

**TABLE OF AUTHORITIES (Cont'd)**

**Page**

**CASES (Cont'd)**

*Int'l Union, UAW v. La Salle Machine Tool, Inc.*,
   696 F.2d 452 (6th Cir. 1982) ................................................................8

*Kalinoski v. Evans*, 377 F. Supp.2d 136 (D.D.C. 2005) ...............................14

*KenAmerican Resources, Inc. v. United Mine Workers*,
   911 F. Supp. 19 (D.D.C. 1996) ...........................................................7, 9

*LeBoeuf, Lamb, Green & Macrae LLP v. Abraham*,
   180 F.Supp.2d 65 (D.D.C. 2001) ...........................................................6

*Mazurek v. Armstrong*, 520 U.S. 968 (1997) ..............................................6

*Mylan Pharmaceuticals, Inc. v. Shalala*, 81 F.Supp.2d 30 (D.D.C. 2000)...................6, 9

*National Football League Players' Ass'n v. National Football League*,
   724 F. Supp. 1027 (D.D.C. 1989) ...........................................................9

*National Treasury Employees Union v. King*, 961 F.2d 240
   (D.C. Cir. 1992) ...........................................................12, 17, 18

*Niagara Hooker Employees Union v. Occidental Chemical Corp.*,
   935 F.2d 1370 (2d Cir. 1991)...............................................................7

*Pacific Fruit Express v. Union Pacific R.R.*, 826 F.2d 920 (9th Cir. 1987) ...................28

*Tejidos de Coamo, Inc. v. International Ladies' Garment Workers' Union*,
   22 F.3d 8 (1st Cir. 1994).....................................................................8

*Trans World Airlines, Inc. v. Independent Federation of Flight Attendants*,
   489 U.S. 226 (1989)...........................................................................29

*Washington Metropolitan Area Transit Commission v. Holiday Tours*,
   559 F.2d 841 (D.C. Cir. 1977) ...........................................................9, 19, 24

*Wisconsin Gas Co. v. FERC*, 758 F.2d 669 (D.C. Cir. 1985)...........................10

_____

* Authorities chiefly relied upon are marked with an asterisk.

**TABLE OF AUTHORITIES (Cont'd)**

**Page**

## ADMINISTRATIVE DECISIONS

*Maine Central R.R.*, 18 NMB 413 (1991), 1991 NMB LEXIS 33 ................................................19

*Wisconsin Central Ltd.*, 21 NMB 431 (1994), 1994 NMB LEXIS 62 .........................................19


## STATUTES AND RULES

National Labor Relations Act, 29 U.S.C. §§ 151 *et seq* ........................................................ passim

*Norris-LaGuardia Act, 29 U.S.C. §§ 101 *et seq*...................................................................6

    29 U.S.C. § 101.................................................................................................................6

    29 U.S.C. § 104.................................................................................................................8

    29 U.S.C. § 107.............................................................................................................7, 8

    29 U.S.C. § 107(a) .......................................................................................................7, 24

    29 U.S.C. § 107(b) .......................................................................................................7, 9

    29 U.S.C. § 107(c) ......................................................................................................7, 19

    29 U.S.C. § 107(d) ...........................................................................................................8

    29 U.S.C. § 107(e) ...........................................................................................................8

Railway Labor Act, 45 U.S.C. §§ 151 *et seq* ..................................................................... passim

    *45 U.S.C. § 152 Fourth.......................................................................................... passim

    45 U.S.C. § 152 Eleventh(c) ..........................................................................................26

5 U.S.C. § 552(b)(4) .......................................................................................................14

29 C.F.R. § 1203.2 ..........................................................................................................12

29 C.F.R. § 1206.3 ..........................................................................................................19

_____

* Authorities chiefly relied upon are marked with an asterisk.

<u>**TABLE OF AUTHORITIES (Cont'd)**</u>

<u>**Page**</u>

<u>**STATUTES AND RULES (Cont'd)**</u>

Rule 12, Fed. R. Civ. P. .........................................................................................2, 23, 24

Rule 12(b)(1), Fed. R. Civ. P. ...........................................................................................1

Rule 12(c), Fed. R. Civ. P. ................................................................................................2

<u>**MISCELLANEOUS**</u>

2 *Weinstein's Federal Evidence* § 511.05 at 511-8.2 (2005) .........................................14

---

* Authorities chiefly relied upon are marked with an asterisk.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

|                                          |     |                              |
|------------------------------------------|-----|------------------------------|
|                                          | )   |                              |
| BROTHERHOOD OF LOCOMOTIVE ENGINEERS       | )   |                              |
| AND TRAINMEN,                            | )   |                              |
|                                          | )   |                              |
|                    *Plaintiff,*          | )   |                              |
|          v.                              | )   | Civil Action No. 1:05CV01188 |
|                                          | )   | Judge Richard W. Roberts     |
| NORFOLK SOUTHERN RAILWAY CO.             | )   |                              |
| and NORFOLK SOUTHERN CORP.,              | )   |                              |
|                                          | )   |                              |
|                    *Defendants.*         | )   |                              |

_____)

### DEFENDANTS' POST-HEARING MEMORANDUM IN OPPOSITION TO PLAINTIFF'S APPLICATION FOR A PRELIMINARY INJUNCTION

### INTRODUCTION

This is the post-hearing memorandum of defendants Norfolk Southern Railway Company ("NSR") and Norfolk Southern Corporation in opposition to the application for a preliminary injunction filed by plaintiff Brotherhood of Locomotive Engineers and Trainmen ("BLET"). This memorandum follows a full round of briefing and a subsequent evidentiary hearing, conducted on July 13 and August 30, 2005, in which BLET was given a full and fair opportunity to show why NSR should be enjoined from enforcing its no-solicitation policy pending final judgment in this case.

BLET has made no such showing. BLET's claim was deficient from the outset, and the scrutiny of a live hearing has only magnified and multiplied its defects. The Court has been given no valid basis for granting preliminary injunctive relief, and many reasons for denying it.

Several of those reasons are matters of law -- problems with BLET's legal theory that were apparent on the face of the Complaint. Defendants have moved the Court to dismiss

BLET's Complaint under Rule 12(b)(1), Fed. R. Civ. P., or in the alternative to grant judgment on the pleadings under Rule 12(c), Fed. R. Civ. P., for failure to state a claim upon which relief can be granted.  As we pointed out in our opening brief on that motion, BLET's case depends on the existence of a statutory right that has never been recognized under the Railway Labor Act ("RLA"); that is inconsistent with the National Mediation Board's ("NMB's") authoritative interpretation; and that would draw the Court into a policy-making role that it is neither empowered nor equipped to assume.  These issues have not yet been fully briefed.  BLET is expected to respond to the motion on October 4, 2005, and defendants then will have ten days to reply in support of their motion. In the circumstances, and in the interests of judicial economy, we are not repeating the same legal arguments here, beyond pointing out that they are every bit as dispositive of the request for preliminary relief.  To the extent necessary to protect the record in this case, we incorporate by reference the points and authorities presented in support of our Rule 12 motion.  But we would urge the Court first to consider (and grant) our dispositive motion, obviating further consideration of BLET's application.

        In any event, BLET's legal theory should be viewed more skeptically through the lens of a preliminary injunction request.  By command of the Norris-LaGuardia Act, NSR's policy cannot be enjoined without, *inter alia*, an explicit finding that the policy is unlawful.  Accordingly, even if the Court were inclined to reserve judgment on the viability of BLET's claim until defendants' dispositive motion is ripe for consideration, it could not grant a preliminary injunction without confronting and accepting BLET's unprecedented legal theory.  At this stage in the proceeding, the Court should be especially reluctant to wield its injunctive power.  Any one of defendants' multiple challenges to the Complaint more than justifies denial of the request for preliminary relief.

As a matter of fact, BLET has given the Court no reason to reach the disputed legal issues, because it has not made even the barest showing that the equities favor enjoining NSR's policy.  Under any standard, preliminary injunctive relief is an extraordinary remedy, available only where it is necessary to prevent irreparable harm and, additionally, where other parties will not be unduly harmed.

This is not such a case.  Indeed, it is not even a close case:  BLET offered *no evidence* that its ability to represent employees or to recruit members is adversely affected by NSR's enforcement of its no-solicitation policy, much less that it faces irreparable harm pending final judgment.  BLET had its staff counsel, Thomas C. Brennan, provide a declaration verifying the allegations of its Complaint, and, in cavalier disregard of its evidentiary undertaking, BLET offered Mr. Brennan's testimony, and nothing else, at the hearing on its application.   By Mr. Brennan's own admission, he is not involved in conducting or directing BLET's campaign, is not currently informed as to the campaign's progress, and based his testimony on what BLET considers to be privileged communications between Mr. Brennan and BLET officials and members who are largely unnamed.

Although Mr. Brennan made various assertions about the "chilling effects" of NSR's policy, it became clear at the hearing that these were nothing more than tautology:  BLET says that by banning on-property solicitation, NSR is interfering with it.  BLET offered no evidence that it would suffer actual harm, much less irreparable harm, if it were not granted access to NSR's property pending final judgment.  Indeed, for all the record shows, BLET's A-card campaign may be succeeding in spite of NSR's enforcement of its no-solicitation policy.

Far from testifying to actual harm, Mr. Brennan had nothing to say about the progress of the A-card campaign.  By BLET's account, the union officially launched its

campaign weeks after NSR announced that it would enforce its no-solicitation policy and notwithstanding the union's clear understanding that the policy was being enforced. BLET offered no evidence that on-property solicitation is critical or necessary to an effective A-card campaign or that the other methods the union employs -- holding "town hall" meetings, telephoning employees, direct mail, and using Internet-based campaign materials -- are somehow inadequate.

In the final analysis, there is one clear, objective, unequivocal measure of the success of an A-card campaign -- the number of cards collected. BLET tried to keep that matter out of the hearing by repeatedly objecting to cross-examination questions concerning the success of BLET's ongoing campaign. Ultimately, BLET's witness denied any knowledge of the A-card count or of the relative success or failure of BLET's campaign.

At that point in the hearing, the Court would have been more than justified in summarily denying BLET's application for failure of proof. BLET bears the burden of proving irreparable harm, and, at this stage in the proceeding, BLET has unique and unmatched access to the relevant facts. BLET's failure to present any evidence that the challenged policy is in fact irreparably interfering with its ability to attain representative status is reason alone for denying a preliminary injunction.

As it happened, the only evidence of the progress or success of BLET's A-card campaign was presented through NSR's witness, NSR Assistant Vice President-Labor Relations Harold R. Mobley, who related a recent conversation with a BLET official who is directly involved in BLET's campaign. According to that official, the General Chairman for the largest of BLET's three NSR committees, the union had obtained signed A-cards from more than fifty percent of the NSR train service employees on his territory. If that rate has been achieved

system-wide, BLET could proceed immediately to the NMB and, under the agency's established standards, initiate an election among NSR train service employees. Unquestionably, BLET is not suffering irreparable harm if, notwithstanding the challenged policy, it has succeeded in collecting sufficient A-cards to proceed to the next step in the selection process. Quite obviously, BLET cannot be permitted to avoid that conclusion by simply failing to offer any evidence on the point, resting its application on the testimony of a union official who is deliberately uninformed of the relevant facts.

Finally, there is the critical issue of harm to others. Even if the Court were persuaded that BLET or its members would suffer irreparable harm if NSR is permitted to enforce its policy pending final judgment, it could not grant preliminary injunctive relief without also finding that the harm to BLET outweighs any harm to others from issuance of the injunction.

The only evidence on this point was provided by defendants. As Mr. Mobley explained, NSR is enforcing its no-solicitation policy in the interests of operational safety and efficiency, and in keeping with its policy of strict neutrality in inter-union disputes. Mr. Mobley described the safety-sensitive work performed by train and engine service employees, the need for careful focus and attentiveness by employees working in and around trains, and the risk of catastrophic consequences when railroad employees lose focus on their work. In NSR's judgment, requiring the railroad to open its property to solicitation activities associated with the current representation dispute would pose an unwarranted and unacceptable risk to its operations -- and, accordingly, to the public interest in efficient and safe rail transportation.

BLET purports to be dismissive of NSR's concerns, but it has offered no evidence that would rebut NSR's evidentiary showing or otherwise permit the Court to second-guess

NSR's judgment.    Given the significant interests at stake, the Court should deny BLET's

application, even if it were persuaded that BLET would suffer some harm during the pendency of

this action.

In short, this is not a case for preliminary injunctive relief.    As we demonstrate

more fully in the following sections, BLET has made no record that would justify the Court in

issuing the extraordinary order BLET seeks.

## ARGUMENT

### THE REQUEST FOR A PRELIMINARY INJUNCTION SHOULD BE DENIED.

**I.    The Norris-LaGuardia Act Bars The Grant Of A Preliminary Injunction Unless The Court Makes The Findings Enumerated In That Statute.**

A preliminary injunction is an "extraordinary and drastic remedy" that should

issue only when the party seeking relief "*by a clear showing*, carries the burden of persuasion."

*Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (internal quotes and citation

omitted; emphasis in original); *accord Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004);

*Mylan Pharmaceuticals, Inc. v. Shalala*, 81 F. Supp.2d 30, 36 (D.D.C. 2000) (Roberts, J.).[1]    This

is all the more true in a case, like this one, that is subject to the Norris-LaGuardia Act, 29 U.S.C.

§§ 101 *et seq.* ("NLGA"), and its strong policy against the issuance of injunctions in cases

---

[1]    Moreover, as this Court has recognized, the power to issue a preliminary injunction should be especially "sparingly exercised," and a request for such relief reviewed "with even greater circumspection than usual," when, as in this case, the plaintiff seeks a "mandatory" injunction -- one that alters, rather than preserves, the status quo, *Mylan Pharmaceuticals*, 81 F. Supp.2d at 36 (internal quote and citation omitted).    *See LeBoeuf, Lamb, Green & Macrae LLP v. Abraham*, 180 F. Supp.2d 65, 70-71 (D.D.C. 2001) (Urbina, J.) ("when a party seeks an injunction to reverse policies that are already in place, 'the moving party must meet a higher standard than in the ordinary case by showing 'clearly' that he or she is entitled to relief or that 'extreme or very serious damage' will result from the denial of the injunction.'"; citations omitted).

"involving or growing out of a labor dispute," *id.* at § 101.  *E.g., Abrams v. Communications Workers of America*, 702 F. Supp. 920, 926 (D.D.C. 1988) (Lamberth, J.) (NLGA "calls for greater scrutiny and special safeguards in applying the remedy" of a preliminary injunction), *aff'd without opinion,* 884 F.2d 628 (D.C. Cir. 1989).[2]

         BLET rightly acknowledges that "[t]his is surely a labor dispute as defined by NLGA.  Hearing Tr. (8/30/05) at 143.  Consequently, BLET cannot obtain preliminary injunctive relief unless it presents evidence that would permit the Court to make the findings required by § 7 of NLGA, 29 U.S.C. § 107.  Indeed, this Court "has no *jurisdiction*" to grant an injunction "without adhering to the explicit terms of the Act."  *In re District No. 1–Pacific Coast District, Marine Engineers' Beneficial Ass'n*, 723 F.2d 70, 77 (D.C. Cir. 1983) (emphasis in original); *see also, e.g., KenAmerican Resources, Inc. v. United Mine Workers*, 911 F. Supp. 19, 22-23 (D.D.C. 1996) (Oberdorfer, J.).  Such "[s]trict adherence" to the NLGA's provisions furthers the "strong federal policy against the issuance of labor injunctions, except in very narrowly prescribed circumstances" that the statute embodies.  *In re District No. 1,* 723 F.2d at 76-77.   To obtain a preliminary injunction, therefore, BLET must establish, and the Court must find:   (a) "That unlawful acts have been threatened and will be committed unless restrained or have been committed and will be continued unless restrained . . ."; (b) "That substantial and irreparable injury to complainant's property will follow"; (c) "That as to each item of relief granted greater injury will be inflicted upon complainant by the denial of relief than will be inflicted upon

---

[2]        The NLGA applies to a union's request to enjoin employer conduct just as it does to an employer's action to enjoin a union.  *E.g. Niagara Hooker Employees Union v. Occidental Chemical Corp.*, 935 F.2d 1370, 1375 (2d Cir. 1991).

defendants by the granting of relief"; and (d) "That complainant has no adequate remedy at law." 29 U.S.C. § 107(a)-(d); *see id.* § 109.[3]

Alluding to *Brotherhood of Railroad Trainmen v. Chicago River & Indiana R.R.*, 353 U.S. 30 (1957), see Hearing Tr. (8/30/05) at 146-47, BLET asserts that the Court need not make § 7 findings because the NLGA must be "accommodated" to the RLA when the latter statute is violated. BLET is wrong. The accommodation required by *Chicago River* does not free a district court from the requirements of § 7; on the contrary, it directs the court to those requirements. What *Chicago River* actually says is that the general withdrawal of federal court jurisdiction to issue an injunction in a labor dispute found in NLGA § 4, 29 U.S.C. § 104, must yield (be "accommodated") when there is a violation of a specific command of the RLA. *See Chicago River*, 353 U.S. at 40-42. In the presence of such a statutory violation (and none exists in this case), a district court may have jurisdiction to issue an injunction, *but only if* the court complies with § 7. *See, e.g., In re District No. 1,* 723 F.2d at 77 (setting aside district court's entry of preliminary injunction where the court failed to adhere to the § 7 jurisdictional requirements); *District 17, United Mine Workers v. Apogee Coal Co.*, 13 F.3d 134, 136 (4th Cir. 1993) (same); *Int'l Union, UAW v. La Salle Machine Tool, Inc.*, 696 F.2d at 458 (same).

---

[3]     It is widely recognized that the fifth finding listed in § 7(e) -- "That the public officers charged with the duty to protect complainant's property are unable or unwilling to furnish adequate protection," 29 U.S.C. § 107(e) -- is "irrelevant where the harm is not of a kind that the police ordinarily prevent," *Tejidos de Coamo, Inc. v. Int'l Ladies' Garment Workers' Union*, 22 F.3d 8, 14 (1st Cir. 1994); *see, e.g , Int'l Union, UAW v. La Salle Machine Tool, Inc.*, 696 F.2d 452, 456 (6th Cir. 1982) (§ 7(e) "applies only to threatened damage to physical property and has no application here"); *Int'l Brotherhood of Electrical Workers System Council U-4 v. Florida Power & Light Co.*, 678 F. Supp. 257, 258 (S.D. Fla. 1987) (same); *Hospital for Joint Diseases & Medical Center v. Davis*, 1978 U.S. Dist. LEXIS 19560, op. at *10-11 (S.D.N.Y. 1978) (where injunction sought does not "directly involve the federal courts in a peacekeeping function normally reserved for state agencies, § 107(e) has no bearing").

## II.    BLET Has Not Shown That It Will Suffer Irreparable Injury If A Preliminary Injunction Is Denied.

To obtain a preliminary injunction, it would not be enough for BLET to show that NSR's no-solicitation policy is unlawful (which, as we explain in Part IV, below, BLET utterly has failed to do).   BLET must, in any event, show that a preliminary injunction is essential to prevent irreparable injury to BLET during the pendency of this lawsuit.   29 U.S.C. § 107(b); *Washington Metropolitan Area Transit Comm'n v. Holiday Tours*, 559 F.2d 841, 843 (D.C. Cir. 1977).   As this Court explained in denying requests for preliminary and permanent injunctive relief, because the plaintiff had failed to establish irreparable harm even though (unlike here) it had a meritorious claim:   a "finding of a statutory violation does not automatically require the court to issue an injunction."   *Mylan Pharmaceuticals v. Shalala,* 81 F. Supp.2d at 47; *see id.* at 42-43.   *Accord Abrams v. Communications Workers of America*, 702 F. Supp. at 926 ("The test for injunctive relief is not . . . whether a violation of a statute has occurred.   Rather, the test involves balancing, in order to 'accommodate the conflicting policies of our labor laws,' the harm resulting from the statutory violation with the basic anti-injunctive policy of the Norris-LaGuardia act" (citation omitted); denying a request for preliminary injunction even though plaintiff had a meritorious claim);   *see also, e.g., KenAmerican Resources, Inc. v. International Union, United Mine Workers of America*, 911 F. Supp. at 23 (plaintiffs do not satisfy NLGA requirements as they failed to establish irreparable injury); *National Football League Players' Ass'n v. National Football League*, 724 F. Supp. 1027, 1028 (D.D.C. 1989) (Robinson, C.J.) ("the record simply does not present the kind of irreparable harm" to plaintiffs required under the NLGA); *Carabillo v. Ullico, Inc. Pension Plan & Trust*, 355 F. Supp.2d 49, 53 (D.D.C. 2004)

(Leon, J.) ("if a party makes no showing of irreparable injury, the court may deny the motion for injunctive relief without considering the other factors"; internal quotes and citation omitted).[4]

BLET has not even begun to make the requisite showing of irreparable injury. RLA § 2 Fourth, by its terms, does not mention employee solicitation; rather, it protects the right of employees to organize and select a representative without carrier interference. According to BLET, NSR's policy is unlawful because the on-property solicitation ban assertedly interferes with the RLA § 2 Fourth right to organize.[5] The purpose of BLET's solicitation campaign is to collect enough A-cards to begin a representation proceeding at the NMB, with the ultimate aim of replacing UTU as the representative of NSR train service employees. (BLET also asserts it is interested in recruiting UTU members to join BLET, without regard to BLET's becoming the representative of train service employees.[6]) In order for BLET to obtain preliminary relief, it would have to present evidence that, *inter alia*, the inability of locomotive engineers to solicit on

_____

[4]    To justify preliminary relief, the injury must be "'certain and great . . . not theoretical,'" and of "such 'imminence' that there is a clear and present need for equitable relief to prevent irreparable harm." *Carabillo v. Ullico, Inc. Pension Plan & Trust*, 355 F. Supp.2d at 53-54 (quoting *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)).

[5]    As we explain in Part IV, below, RLA § 2 Fourth does not, in fact, confer on employees the rights that BLET claims, so the civil action fails on the merits -- an independent and sufficient reason for denying preliminary injunctive relief.

[6]    BLET's assertion is not true. As Mr. Brennan conceded, Hearing Tr. (8/30/05) at 33-34, the document BLET is seeking to circulate on NSR's property and have employees sign includes both standard A-card language (*i.e.,* authorizing BLET to initiate a representation case at the NMB) and an "Official Application" for BLET membership. The membership application states in underscored large print:  "Will not be processed until representation election is successfully completed!"  Mobley Decl. Exh. 8; Second Mobley Decl. Exh. 14; Hearing Tr. (8/30/05) at 105-07 (testimony of Harold Mobley). The evidence, in short, belies the assertion that BLET is concerned with any supposed interference with membership recruitment apart from its effort to displace UTU as the representative of train service employees. For purposes of the application for preliminary relief, however, the point is not critical, as BLET does not make a showing of irreparable injury in either connection.

NSR's property during the pendency of this lawsuit would irreparably compromise the right to organize that RLA § 2 Fourth protects and that engineers supposedly are seeking to exercise.

BLET does nothing of the sort. The only evidence BLET presents in support of its claim of irreparable injury is the testimony of Mr. Brennan, summarily recounting general statements that he says have been made to him by individual locomotive engineers and by other BLET officials. *See*, *e.g.,* Hearing Tr. (7/13/05) at 50-52, 55-58; Hearing Tr. (8/30/05) at 31-33, 48-49, 58-60. The sum total of this testimony is the following: (i) locomotive engineers are reluctant to solicit on NSR property, (ii) because doing so would run afoul of NSR's no-solicitation policy and might potentially result in discipline, (iii) with the effect that engineers refrain from soliciting on NSR's property.[7]

---

[7]    The essence of Mr. Brennan's testimony is captured in the following exchange with defendants' counsel (Hearing Tr. (8/30/05), at 59-60):

Q:    So what the employees that you're referring to are concerned about is that there's a policy that says they shall not conduct solicitation activities, including organizing, on the NSR property; isn't that right?

A:    Yes.

Q:    So they recognize there's a policy and they have to comply with it?

A:    Absolutely.

Q:    All right. . . . So your testimony that the A-Card campaign has been interfered with is premised on the fact that NSR has a policy prohibiting solicitation on the property and will enforce it?

A:    No, that's not entirely it. It's premised on the facts -- the facts, I should say, that -- I don't have the exact number, but it's between two and three dozen members have contacted me, including officers, and inquired, questioned, expressed concern about that policy: What should they tell the folks that are out there trying to solicit or recruit?

And I've told them they can't do it anymore.

Q;    Because there's a policy.

( continued … )

BLET's assertion that this testimony demonstrates irreparable injury is empty. The union's argument is both tautological and circular. Pointing out that a policy banning solicitation on the property may cause employees not to solicit on the property does not prove irreparable injury to the right to organize; it states a truism. As the D.C. Circuit has made clear, the real question is whether any inability, during the pendency of this lawsuit, to solicit on NSR's property because of NSR's policy would irreparably compromise the ability to organize protected by RLA § 2 Fourth. *See National Treasury Employees Union v. King*, 961 F.2d 240, 243-45 (D.C. Cir. 1992) (discussed below). And on that issue BLET provides no evidence of injury at all.

A simple (if stark) example illustrates the point. Under NMB rules, when, as here, a union seeks to become the representative of a craft or class that is already represented, the challenger union generally must submit A-cards from a majority (colloquially referred to as 50 percent plus one) of the craft or class in order to make the "showing of interest" needed to initiate the NMB representation process. 29 C.F.R. § 1203.2. If BLET in fact had already collected A-cards from, say, 75 percent of NSR's train service employees, then the existence of NSR's policy could not be found to be causing irreparable injury to RLA § 2 Fourth rights. In that event, *despite* the fact that engineers were not soliciting on NSR's property owing to NSR's policy, BLET would have fully succeeded in its A-card campaign; it could go to the NMB and initiate a representation proceeding. So, whatever limiting effect NSR's policy may have had on solicitation (and, indeed, regardless of the legality of the policy), the exercise of RLA § 2 Fourth

---

( … continued)

    A:    Because of this policy that suddenly appeared and that runs against -- runs counter to what had been standing practice on the railroad. That's essentially what it comes down to.

self-organization rights simply would not be *irreparably* injured absent entry of a preliminary injunction.

BLET offers no proof that its ability to succeed in its A-card campaign (or in the recruitment of new BLET members) would be irreparably injured if NSR's policy remained in effect until the resolution of this litigation. BLET presents no evidence that NSR's policy has prevented it from collecting enough A-cards to meet the NMB threshold. Indeed, BLET presents no evidence as to the effect of NSR's policy on the collection of A-cards at all. Mr. Brennan testified that he has had no responsibility in connection with the A-card campaign on NSR, Hearing Tr. (8/30/05) at 15, and that he does not know how many A-cards have been collected, or whether BLET has already collected A-cards from more than 50 percent of NSR's train service employees, *id.* at 74; *see also id.* at 48, 53-55, 70-72. BLET presents no evidence that it has been unable to meet some benchmark number of A-cards that it expected to have collected at this stage in the NSR campaign. Mr. Brennan testified that he was not aware of any such benchmark figure, or of BLET's failure to meet it. Hearing Tr. (8/30/05), at 72-73; *see id.* at 49. And BLET has not presented any evidence that it is faring worse in this A-card campaign than in other comparable campaigns. Mr. Brennan testified that BLET has not conducted an A-card campaign on any other large ("Class I") railroad in the last twenty years, and that "[t]here's no comparison that could be made between Class I's that I know of" as respects the progress of BLET's A-card campaign on NSR. Hearing Tr. (8/30/05) at 28-29. [8]

---

[8]    BLET's failure of proof is not excused by its assertion that A-card information is protected from disclosure as "proprietary and confidential information" (Hearing Tr. (8/30/05) at 16, lines 2-3) or a "trade secret" (*id.* at 18, lines 14-15). BLET rests its privilege claim on the NMB's policy of treating as confidential materials submitted in connection with a representation dispute and on the holding in *American Airlines, Inc. v. NMB*, 588 F.2d 863 (2d Cir. 1978). Hearing Tr. (8/30/05) at 16, lines 1-3; 18, lines 7-15; 46, lines 13-20. *American Airlines v. NMB*

( continued … )

- 13 -

In point of fact, the only evidence regarding the results of BLET's A-card campaign belies the union's claim of irreparable injury. The BLET General Chairman of the largest NSR BLET Committee has told NSR that he has already collected A-cards from 50 percent of the train service employees on the NSR territory for which he has responsibility, territory that encompasses slightly more than half of the total number of NSR train service employees. Hearing Tr. (8/30/05) at 103-04 (testimony of Harold Mobley).

Further, BLET provides no evidence that any supposed (but unproved) lack of progress in its A-card campaign is attributable to NSR's no-solicitation ban. Mr. Brennan acknowledges that NSR's policy does not prevent BLET from soliciting away from NSR's property. Hearing Tr. (7/13/05) at 63. BLET introduced no evidence that locomotive engineers cannot effectively engage in solicitation without the use of NSR property. Mr. Brennan did not

---

( ... continued)

holds that the NMB is not required, in response to a request under the Freedom of Information Act ("FOIA"), to disclose the number of A-cards filed by a union but may instead invoke the FOIA exemption for "commercial . . . information obtained from any person and privileged or confidential," 5 U.S.C. § 552(b)(4). Even if that case could be read as recognizing a generalized evidentiary privilege covering A-card information in the possession of a union (and it cannot, for it merely interprets FOIA), here any such privilege was lost when BLET filed this civil action and its application for a preliminary injunction, putting the success of its A-card drive directly at issue.

We described the doctrine of implied (or "at issue") waiver in a memorandum submitted and discussed at the hearing (Defendants' Memorandum Respecting Plaintiff's Waiver Of The Attorney-Client Privilege, August 30, 2005), with specific reference to BLET's assertion of the attorney-client privilege. The same waiver doctrine comes into play with respect to other asserted privileges, and unquestionably would apply in the circumstances of this case. *See, e.g.*, 2 *Weinstein's Federal Evidence* § 511.05 at 511-8.2 (2005) ("Initiating and maintaining a lawsuit may waive any privilege that applies to matters at issue in the case") (citing *Anderson v. Nixon*, 444 F. Supp. 1195, 1198-2000 (D.D.C. 1978) (Gesell, J.) (in initiating lawsuit, journalist waived privilege as to identity of confidential sources)); *Kalinoski v. Evans*, 377 F. Supp.2d 136, 137 (D.D.C. 2005) (Bates, J.) (plaintiff waives psychotherapist privilege when she places her mental state in issue); *Del Monte Fresh Produce Co. v. Dole Food Co.*, 148 F.Supp.2d 1322, 1324 (S.D. Fla. 2001) ("[b]y . . . placing the trade secrets at issue, Del Monte essentially has waived its right to assert the trade secret privilege").

testify that alternative means of reaching NSR train service employees -- for example, off-property town-hall meetings, mailings and phone calls to employee homes, or internet postings -- are somehow unavailable or ineffective or inadequate. To the contrary, Mr. Brennan stated that he understood that such methods have been used. Hearing Tr. (7/13/05) at 64. There is no evidence that BLET has found that these other methods have proved unsuccessful as a way to reach train service employees. Nor is there any evidence that on-property solicitation is more effective than other available methods.

Finally, and critically, BLET does not argue, much less establish with evidence, that immediate access to NSR's property -- as opposed to access obtained at the end of this lawsuit, in the unlikely event that BLET were to prevail -- is essential to its ability to succeed in its A-card campaign (or in the recruitment of new BLET members). BLET, that is, does not argue, or prove, that were the Court ultimately to rule that locomotive engineers should be allowed to solicit on (some part of) NSR's property, it would then be too late for BLET's campaign to succeed. The whole point of a preliminary injunction, however, is to prevent irreparable injury attributable to the delay in a court's rendering a final judgment on the merits. Accordingly, BLET simply fails to establish that there is any occasion for the Court to issue such an extraordinary remedy here.

Lacking any evidence of actual irreparable injury, BLET attempts to meet its burden by analogizing this case to a free speech claim under the first amendment. See Hearing Tr. (8/30/05) at 152-53 (argument of counsel for plaintiff). Evidently, BLET seeks to rely on the proposition that the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," *Elrod v. Burns*, 427 U.S. 347, 373 (1976), as "opportunities for speech," if suppressed, "are irretrievably lost," *City of Lakewood v. Plain*

- 15 -

*Dealer Publishing Co.*, 486 U.S. 750, 758 (1988).  According to BLET, a no-solicitation policy should be treated as a suppression of the right to free expression, with the effect that any application of the policy (indeed, even the supposed "chill" resulting from the policy's mere existence) supposedly constitutes per se irreparable injury.

BLET's contention is completely misconceived.  NSR is a private employer and therefore not subject to the strictures of the first amendment.  The Supreme Court long ago rejected the proposition that employee access to an employer's private property for purposes of engaging in union-related communications "must be measured in accord with the commands of the First Amendment."  *Hudgens v. NLRB*, 424 U.S. 507, 512 (1976) (employee right to picket on employer property).  The Court made clear that "the constitutional guarantee of free expression has no part to play" in such a case; rather, the "rights and liabilities of the parties . . . are dependent exclusively upon" the applicable labor statute.  *Id.* at 521.[9]  Moreover, BLET advances a false view of RLA § 2 Fourth.  If § 2 Fourth embraces a right to solicit on carrier property (and it does not), it would not be because the provision protects employee expression as an end in itself; the statutory language plainly tolerates no such interpretation.  Rather, it could only be because on-property solicitation serves an instrumental means in furthering the right to organize that RLA § 2 Fourth, by its terms, does protect.  So the special concerns reflected in the first amendment case law occasioned by the suppression of expression that is protected as an end in itself simply have no application to a no-solicitation policy governed by the RLA.

---

[9]       The employer in *Hudgens* was covered by the National Labor Relations Act, and the right of employees to access their employer's private property to engage in picketing was therefore governed by that statute.  We, of course, are not suggesting that NLRA principles apply here:  as we discuss in Part IV, they certainly do not; the RLA applies.  But *Hudgens'* *constitutional* ruling that the first amendment has no bearing on the employees' right of access to employer private property translates directly to this case, and undermines BLET's attempt to rely on first amendment principles here.

But beyond all this, BLET is simply wrong about the reach of the first amendment doctrine on which it apparently relies.  In *National Treasury Employees Union v. King*, the D.C. Circuit expressly rejected the proposition that denial of employee access to employer property for purposes of union solicitation inherently constitutes irreparable injury *even when* the first amendment is implicated because the employer is a federal agency.  961 F.2d at 244.  Rather, the court's treatment of irreparable injury directly comports with, and informs, our showing that BLET has not proven irreparable injury here.  The real question, according to the Court of Appeals, is whether the restriction on access would irreparably harm the union's ability to succeed in the activity -- *i.e.*, a representation campaign -- that is the "entire *raison d'etre* for its First Amendment exercise."  *Id.* at 243.

In *National Treasury Employees Union v. King*, a challenger union sought to distribute informational leaflets in a government complex in aid of its effort to replace the incumbent union as the representative of certain employees of the Social Security Administration.  Under the applicable federal labor relations statute, in order to compel a representation election, the union needed signatures from some 15,000 agency employees nationwide, and was required to file its election petition by November 1992.  The agency took the position that certain federal regulations did not allow it to issue a permit granting access to the challenger union to leaflet, and the permit was denied.  The union brought an unfair labor practice proceeding before the Federal Labor Relations Authority ("FLRA") challenging the  refusal to issue the permit.  And the union brought an action in federal district court, and sought preliminary injunctive relief, on the theory that the denial of the permit violated its first amendment rights of free speech.  The district court dismissed the union's civil action for failure to exhaust its administrative remedy at the FLRA.

- 17 -

On appeal, the union, relying on the *Elrod v. Burns* principle that we have quoted above, argued that it should not be required to exhaust its FLRA remedy "because it is continuously suffering irreparable injury to its First Amendment rights that cannot be remedied by any later agency recognition of its right to pamphleteer," including an "inability to make the necessary contacts with the largest core group of employees now." 961 F.2d at 244. The Court of Appeals rejected this argument, explaining:

> we are not persuaded that, standing alone, the normal administrative delay in pursuing its remedy with the FLRA will always rise to the level of irreparable injury as a matter of law. For example, if the deadline for signatures to force an election were November 1993 instead of November 1992, it would be difficult to see how the few months required to finish the administrative proceeding could produce any serious, let alone irreparable, injury.

*Id.* (footnote omitted).

The court, however, was concerned about the approaching November 1992 deadline. If the FLRA did not issue its decision in time for the union to distribute its information (assuming it was entitled to do so) and gather signatures before the deadline, then the union could suffer irreparable harm, because even if it ultimately prevailed "the purpose for its free speech exercise" would have been "practically eradicated." *Id.* at 245. Accordingly, the Court of Appeals required the union to exhaust its administrative remedies, but directed the district court to keep the case on its docket until June 30, 1992. If the FLRA had not acted by that date, the union could then renew its motion for injunctive relief. *Id.*

Unlike the union in *National Treasury Employees Union v. King,* BLET is not under any filing deadline. BLET can submit its application to the NMB, supported by an adequate showing of interest, whenever it chooses. As we have explained, BLET has presented no argument or evidence that if it is not able to solicit on NSR's property now, during the

pendency of this lawsuit, it would be prevented from going to the NMB later on, should the Court ultimately rule in its favor on the merits. Accordingly, BLET is in no danger of having the "purpose for" the engineers' asserted right to solicit "practically eradicated" in the absence of preliminary relief. Rather, this case is governed by the principle that "it would be difficult to see how the few months required to finish" this lawsuit could "produce any serious, let alone irreparable, injury."[10]

## III.   Issuance of A Preliminary Injunction Would Harm Defendants And The Public.

By contrast, the substantial harm to NSR and the public if a preliminary injunction issued would far outweigh any injury BLET might experience, a further reason to deny such relief. *See* 29 U.S.C. § 107(c); *Holiday Tours*, 559 F.2d at 843.

The unrebutted evidence amply demonstrates that NSR announced, and is enforcing, its ban against on-property solicitation in order to promote operational safety and efficiency, consistently with its policy of maintaining strict neutrality in union representation disputes. Almost as soon as NSR was advised of BLET's impending campaign to unseat UTU as the representative of NSR train service employees, NSR began receiving complaints about organizing activities by employees on both sides of the dispute. Even though BLET's campaign

---

[10]    Generally, the NMB does not accept A-cards that were signed more than a year before the representation application is filed. 29 C.F.R. § 1206.3. But nothing prevents the NMB from accepting older A-cards if the agency thinks that result appropriate -- and the NMB has determined to do just that in the past. *E.g., Wisconsin Central Ltd.*, 21 NMB 431, 446 (1994), 1994 NMB LEXIS 62, at **26; *Maine Central R.R.*, 18 NMB 413, 439 (1991), 1991 NMB LEXIS 33, at **41. Moreover, BLET's own testimony is that its solicitation campaign was not really launched until May 26, 2005, Hearing Tr. (8/30/05) at 68, and there is no evidence as to the dates on which the A-cards BLET has collected were signed, or the numbers that were collected at any given time. Any A-cards that were signed in late May 2005 would still be valid for nearly another eight months even under the NMB's standard rule, and more recently signed A-cards would be valid for a longer period. In all events, BLET has made no claim of irreparable injury on the basis of the age of its A-cards.

was in its formative stage, employees and union officials were already complaining about the contentious atmosphere the incipient campaign was creating in the field; that backers of one union were harassing supporters of the other; that one side was posting derogatory materials about the other; and that employees "were being distracted from their duties as conductors, trainmen and engineers because these things were occurring on the property," Hearing Tr. (8/30/05) at 119-20 (testimony of Harold Mobley); *see id.* at 94-95, 98-99, 119-22; Mobley Decl. ¶¶ 11-23. All of this reinforced NSR's judgment that permitting an organizational drive of the anticipated scope, intensity, duration, and importance as this one to play out on railroad property would produce substantial disruptive effects, and distract employees from their duties, in ways incompatible with NSR's vital interests in safe and efficient train operations. See Mobley Second Decl. ¶¶ 23-29.

NSR's concerns were underscored by the fact that train service employees, and locomotive engineers, work in safety-sensitive positions, subject to strict operating rules. It is essential that the employees working in and around trains not be distracted from their tasks; rather, they must be focused and attentive at all times in performing their work, and able to communicate and work effectively and cooperatively with one another. Whenever employees in these sorts of positions are distracted from the job at hand, a potentially unsafe condition, which might lead to catastrophic consequences, is created. See Hearing Tr. (8/30/05) at 122-24; Mobley Second Decl. ¶¶ 26-29.

Accordingly, on March 9, 2005, NSR notified officials of both unions that it would enforce its ban on all solicitation activities on its property, in order to minimize

operational disruptions and protect the safety and efficiency of its railroad operations.[11]   In

NSR's judgment, a uniform, blanket prohibition on all union solicitation was the only reasonable

approach in the circumstances.   Anything less would not have been practicable; would not

accomplish what was needed; and would be inconsistent with the ordinary workings of NSR's

rules.  NSR conducts its railroad operations 24 hours a day, seven days a week, and its operations

can be affected by conduct that occurs anywhere on its property.  NSR therefore applies its basic

rules of conduct to all employees on NSR property, whether or not they are on duty, and simply

adhered to that practice in this instance.  Indeed, any attempt to carve out exceptions to NSR's

uniform policy would be particularly unworkable, as train service employees and engineers are

subject to performing safety-sensitive duties at any moment while they are on-duty, and the areas

that these employees frequent (*e.g.,* locker rooms or parking areas) are integrated with and not

readily separable from work areas and train movements.  In addition, a uniform ban is the most

effective means by which NSR can maintain neutrality and avoid becoming entangled in disputes

between UTU and BLET over the conduct of their organizing campaigns.   And, since its

adoption, NSR's policy has in fact been successful in its intended goal; although campaign-

related incidents have inevitably occurred, these have been relatively few in number and entirely

manageable.  Hearing Tr. (8/30/05) at 97-101; Mobley Decl. ¶¶ 21-22; Mobley Second Decl.

¶¶ 30-47.

---

[11]      NSR had similarly announced a policy barring on-property union solicitation in May
2000, which was the last time that NSR had reason to anticipate a representation dispute between
two unions -- in that case, a possible effort by UTU to obtain an NMB determination that
engineers and trainmen were a single craft or class and ultimately a campaign by UTU to replace
BLET as the representative of locomotive engineers.   In view of the complaints NSR began
receiving in connection with BLET's current campaign, NSR decided to reaffirm the importance
of adhering to the no-solicitation policy, and of maintaining strict neutrality as between the
competing unions.  See Hearing Tr. (8/30/05) at 95-96; Mobley Second Decl. ¶ 22 & Exh. 24.

For its part, BLET tries to dismiss NSR's stated concerns, and suggest they somehow were not genuine.  But BLET offers no meaningful evidence that would contradict NSR's evidentiary showing, or that would permit the Court to second-guess NSR's judgment. At the hearing, BLET questioned the need for NSR to announce its policy when it did, because campaign-related activities had not yet generated any "dangerous situations" -- such as accidents, near-accidents, or incidents that had to be reported to the federal government.  Hearing Tr. (8/30/05) at 127.  But it is perverse to suggest that NSR should have waited until a tragic event had occurred before the railroad could ban on-property solicitation.  The whole point was to try to prevent these sorts of dangerous situations from happening -- and, in that, NSR's policy has been a total success.  Mobley Second Decl. ¶¶ 24-25.

BLET also suggested that the no-solicitation policy is unnecessary because the existing rule prohibiting use of company e-mail for union business, and the recognized right to discipline employees who engage in conduct unbecoming an employee, are sufficient.  Hearing Tr. (8/30/05) at 115, 128-29, 136-37.   But the undisputed testimony is that, in NSR's judgment, this is simply untrue:  existing rules are not adequate to respond to the variety of problems and situations that could be expected to arise from a large-scale, heated organizational campaign. Hearing Tr. (8/30/05) at 137.  The specific problems of misuse of company e-mail, or actual physical altercations, or like behavior, that might rise to the level of conduct unbecoming an employee, do not exhaust the universe of possibly disruptive and distracting actions that would be attendant upon on-property campaign activities.  BLET also suggest NSR's concern was suspect because "discussions" among employees over other issues -- like politics or religion -- could generate disagreements, and NSR had not sought to ban such discussions.  But the undisputed testimony is that NSR has not received any complaints from employees about those

other issues, nor have those matters generated the sort of divisiveness that is an inevitable consequence of the BLET campaign.  Hearing Tr. (8/30/05) at 132-33.  NSR cannot be faulted for adopting a policy directed at problems it actually faces, rather than those it does not.[12]

       Were an injunction to be entered, NSR would be required, at least in some measure, to host one of the most high-profile and, insofar as rail labor is concerned, consequential disputes in modern railroading history.  In NSR's judgment, such a result would open NSR to the disruptive consequences that its no-solicitation policy was designed to forestall -- and, in substantial measure, has succeeded in forestalling.  This, in turn, would pose an unwarranted and unacceptable risk to its train operations -- and, accordingly, to the public interest in efficient and safe rail transportation, and to the statutory objective of avoiding interruptions in commerce, *see* 45 U.S.C. § 151a.  Mobley Decl. ¶¶ 44-50.

---

[12]    Although NSR's no-solicitation policy is more than justified on the record in this case, it bears repeating that defendants assume no burden of persuasion at this stage in the civil action. *See, e.g., Cobell v. Norton*, 391 F.3d at 258 (on an application for a preliminary injunction, the moving party bears the burden of persuasion on all elements of the required showing).  Moreover, BLET cannot avoid its evidentiary burden by contending, as it does in its Complaint (at ¶¶ 11, 17, 19) and application (at 1, 8), that it was up to NSR, at the time that it announced its no-solicitation policy, to demonstrate some "special circumstances" that would make its policy "necessary to maintain production or discipline."  We responded to this assertion in connection with our Rule 12 motion, showing that it both reflects and discredits BLET's reliance on evidentiary presumptions established by the NLRB under the NLRA.  Defendants' Statement Of Points And Authorities In Support Of Their Motion To Dismiss Or, In The Alternative, For Judgment On The Pleadings, August 26, 2005, at 36.  The NLRB presumption that a no-solicitation rule unduly interferes with employee organizational rights has no legal force in the railroad industry and, even where applicable, imposes no requirement that an employer explain or justify its policy in advance of administrative adjudication.  If BLET defends its reliance on the NLRB presumption in its brief opposing defendants' Rule 12 motion, we will have more to say on the subject in our reply brief in support of that motion.  For present purposes, it is clear that BLET has not given the Court any reason to second-guess NSR's judgment about railroad safety, and that is reason enough for denying BLET's application.

**IV.    BLET Has Not Shown That NSR's No-Solicitation Policy Violates The RLA.**

Beyond all this, BLET's request for a preliminary injunction fails because the union cannot show, and the Court therefore cannot find, that NSR's no-solicitation policy actually violates the RLA. This is the finding that NLGA § 7(a) requires. It would not be enough for the Court merely to find that it is *likely* that, at trial, BLET would be able to prove that NSR's policy violates the RLA. As we have shown, the NLGA governs the grant of injunctive relief in cases involving a labor dispute. And that statute's requirement of a finding that "unlawful acts" have been (or will be) committed therefore displaces the familiar *Washington Metropolitan Area Transit Comm'n v. Holiday Tours*, 559 F.2d at 843, "likelihood of success" standard applicable in cases not involving a labor dispute.

We have previously shown in detail that BLET's legal claims are hopelessly defective, so that either this civil action must be dismissed for lack of jurisdiction, or judgment must be entered on the pleadings in favor of defendants. We will not repeat our arguments. They are fully set out in earlier briefs -- and we will reply in due course to any contentions BLET might advance in its opposition to our pending Rule 12 motion.

Here, we just briefly highlight the basic deficiencies in BLET's legal case. The fundamental fact is that NSR's policy does not violate any provision in the RLA, or deprive BLET of any rights it can vindicate in federal court. BLET's claim owes nothing at all to the RLA. Rather, the union's case is founded on presumptions and precepts developed by the NLRB under the NLRA. But the NLRA does not apply to the railroad industry, and the policies developed by the NLRB under it cannot properly be imported into the RLA. The RLA imposes its own standards regarding employee solicitation, as expressed in decisions of the NMB, and NSR's neutral no-solicitation policy is lawful under the RLA.

More specifically, BLET's claims fail for the following reasons:

1.      *RLA § 2 Fourth Does Not Confer On NSR Locomotive Engineers A Right To Assist NSR Train Service Employees In Choosing Their Collective Bargaining Representative.*  There is no substance in BLET's contention that NSR's no-solicitation policy abridges the supposed right of locomotive engineers under RLA § 2 Fourth to "assist" train service employees in selecting a collective bargaining representative -- specifically, to replace UTU, the incumbent train service representative, with BLET.  NSR's policy does not interfere with any processes that § 2 Fourth is intended to protect, or with any legally protected interest that BLET actually possesses:  Section 2 Fourth does not give engineers any right to assist train service employees in choosing between two existing unions.

Section 2 Fourth protects the self-organization rights of employees in a given craft or class to select a collective bargaining representative without carrier interference.  By its plain terms, the § 2 Fourth "assist in organizing clause" invoked by BLET confers rights only on the craft or class of employees that is itself involved in choosing a new representative.  It does not encompass, or confer any rights on, other employees, like NSR's locomotive engineers, whose representation is not at stake.

Further, in any event, the "assist in organizing" clause can come into play only if there are employees "organizing a labor organization," who can be assisted.  The provision therefore has no application here for the added reason that NSR's train service employees are not engaged in any such activity:  As Mr. Brennan acknowledged, Hearing Tr. (8/30/05) at 73,

NSR's train service employees are not trying to form a labor union; BLET is already in existence.  Engineers cannot "assist" in an activity that is  not occurring.[13]

  2.  *RLA § 2 Fourth Does Not Confer On Employees An Affirmative Right to Engage In Solicitation On A Carrier's Property.*  BLET's claims fail for the equally fundamental reason that NSR's no-solicitation policy does not violate any statutory command contained in the RLA.  BLET's challenge to NSR's policy is founded on the proposition that the RLA § 2 Fourth right to organize free from carrier interference carries with it an affirmative employee right to solicit on a carrier's property.  BLET provides no RLA authority in support of that proposition, nor could it; the proposition is false.

  BLET's claim is founded entirely on case law and principles that operate under a different statute, the NLRA.  But it is the RLA that applies here -- and, in particular, it is the body of case law addressing solicitation activities developed *by the NMB*, which has plenary and exclusive jurisdiction over representation disputes under the RLA, that sets the RLA standard and defines a railroad's obligations.  Those standards undermine BLET's claim.  The NMB's precedents establish that a carrier does not interfere with § 2 Fourth rights by banning employee solicitation on its property, so long as the restriction is uniform -- that is, does not favor one

---

[13]  BLET has wisely abandoned any further attempt to assert claims on behalf of NSR's train service employees, see Hearing Tr. (8/30/05) at 143 -- notwithstanding that such claims are at the core of BLET's Complaint.  BLET does not represent NSR's train service employees, UTU does.  BLET therefore lacks standing to assert any claims on behalf of those employees.  *See Adams v. Federal Express Corp.*, 547 F.2d 319, 322 (6th Cir. 1976).

  BLET likewise apparently no longer purports to assert any claim under RLA § 2 Eleventh (c) -- and for good reason.  The Complaint alleges no claim concerning that provision.  More-over, RLA § 2 Eleventh (c) performs a narrow function respecting the enforcement of union shop agreements that has no application to this case.  It does not confer on employees or unions the right to engage in the membership recruitment activities that BLET claims here.  And, in any event, the fact is that BLET's lawsuit is not about membership recruitment, but, rather, about BLET's campaign to collect A-cards in an effort to trigger a representation election with UTU.

union over another.  No court has ever disregarded the NMB decisional law and held instead that RLA § 2 Fourth gives employees the right to force a carrier to open its property to union solicitation activities.

NSR's policy is fully lawful under the NMB's long-established neutrality standard.  The undisputed evidence is that NSR's no-solicitation policy is uniform in coverage and is applied evenhandedly:  NSR equally takes actions with respect to supporters of BLET and supporters of UTU who violate the policy, when there is cause for doing so.  BLET offers no meaningful evidence that NSR has not implemented its policy uniformly, and does not seriously pursue any such allegation.

3. *The NLRA Standards On Employee Solicitation May Not Properly Be Imported Into the RLA.*   BLET well knows its challenge to NSR's no-solicitation policy would fail at the NMB.  So BLET brings this civil action, and request for preliminary relief, hoping to have the Court ignore the RLA and NMB decisional law, and instead evaluate NSR's policy under the different standards developed by the NLRB under the NLRA.  That approach is illegitimate.

First, it is inappropriate to resort to NLRA precepts in the face of authoritative, contrary RLA precedent -- the NMB case law on employee solicitation.  Further, the NLRB rules on solicitation and distribution are inextricably linked to the NLRA's language and administrative enforcement scheme, which materially differ from the RLA's.  Under the NLRA, disputes over solicitation are adjudicated as unfair labor practices in extensive fact-finding proceedings under the auspices of the NLRB.  The RLA, however, does not recognize the concept of an administrative unfair labor practice charge.  Instead, the NMB protects employees' § 2 Fourth

rights in the course of the exercise of its exclusive jurisdiction over disputes over the selection of employee representatives.

BLET's proposal that the district courts adjudicate disputes over solicitation as though they involved NLRA unfair labor practice charges and the courts were the NLRB is wholly misconceived because:  (i) it is in derogation of the special role of the NMB under the RLA; (ii) it is incompatible with the RLA's design to minimize judicial involvement in labor-management relations, as it would turn the courts into the formulators of labor policy and the micromanagers of carrier-employee relations; and (iii) it is beyond the institutional competence of the courts, which, unlike the NLRB, do not have a staff, are not an investigatory body, do not have decades of experience resolving complex labor relations matters, and are not a single body whose decisions can promote uniformity and regularity, but are 94 separate bodies.  It is well understood that the infeasibility and inappropriateness of the courts' assuming the role of a labor board is ground for rejecting the importation of NLRA principles into circumstances governed by the RLA.  *E.g., Air Line Pilots Ass'n v. Trans World Airlines, Inc.*, 729 F. Supp. 888, 890 (D.D.C. 1989) (Gesell, J.) (refusing to impose NLRA rules on disclosure of information as doing so would force the courts to assume a role comparable to that of the NLRB, which would be incompatible with the RLA scheme) (citing *Pacific Fruit Express v. Union Pacific R.R.*, 826 F.2d 920, 923 (9th Cir. 1987)).

Finally, even if the Court were to disregard these bedrock difficulties (which it should not do) and  undertake to become a labor board -- to conduct fact finding proceedings as though it were the NLRB, and to make labor policy -- then, as we have already shown, on the basis of the evidence presented, the Court would have to find that NSR has established that its no-solicitation policy is justified by operational needs and the demands of safety.

4.    *BLET's Claims Do Not Justify Judicial Intervention Under The Standards For Implying A Cause of Action Under RLA § 2 Fourth.*  Even if BLET's claims otherwise fell within § 2 Fourth (and they do not), the claims do not belong in federal court.   Section 2 Fourth does not contain an express cause of action, and BLET has not made the showing necessary to warrant recognition of an implied a cause of action under that provision.

Courts have recognized implied rights of action largely as a means of enforcing the RLA's exclusive administrative dispute resolution procedures.  Because RLA § 2 Fourth primarily addresses the "precertification rights and freedoms of unorganized employees," unionized employees may sue under that provision only in those very limited circumstances when there would otherwise be no means of enforcing the RLA's commands.  *See Trans World Airlines, Inc. v. Independent Federation of Flight Attendants*, 489 U.S. 226, 440-42 (1989).

BLET has not made the requisite showing.  Specifically, BLET has not alleged, much less shown, that NSR's no-solicitation policy is the product of anti-union animus; that enforcement of NSR's policy would leave NSR train service employees without a union or a labor agreement; or that the policy otherwise fundamentally undermines the RLA's processes.

Indeed, it is plain that BLET has not brought this lawsuit to vindicate statutory commands that would otherwise be unenforceable; rather, the union is seeking to *avoid* the exclusive NMB process.  The NMB routinely investigates and resolves allegations of carrier interference, including challenges to bans on employee solicitation, in the context of representation disputes.  The NMB has made clear that the requirement to maintain "laboratory conditions" (circumstances that are consistent with RLA § 2 Fourth's prohibition of carrier interference) attaches as soon as a carrier learns of a representation campaign, whether or not a union has yet made a "showing of interest" by submitting sufficient A-cards, or filed a representation applica-

tion.  And the NMB has resolved claims of carrier interference that are based on conduct during an A-card solicitation campaign.  Nothing would prohibit the NMB from choosing to entertain a representation application from BLET on the basis of a "showing of interest" different from the agency's typical A-card threshold, if the agency were persuaded this was appropriate in the circumstances.

To be sure, BLET is unlikely to establish carrier interference before the NMB, as that agency has never recognized an affirmative employee right to use carrier property for union solicitation.  But this is no justification for implying a cause of action under RLA § 2 Fourth.  To the contrary, it just confirms that BLET has no valid claim that any rights protected by that provision have been infringed.

## <u>CONCLUSION</u>

Plaintiff's application for a preliminary injunction should be denied.

Respectfully submitted,

*/s/ Jeffrey S. Berlin*

_____
Jeffrey S. Berlin (D.C. Bar #200048)
Krista L. Edwards (D.C. Bar #421537)
Mark E. Martin (D.C. Bar #373445)
SIDLEY AUSTIN BROWN & WOOD LLP
1501 K Street, N.W.
Washington, D.C.  20005
(202) 736-8178
jberlin@sidley.com
kedwards@sidley.com
mmartin@sidley.com

*Attorneys for Defendants Norfolk Southern Railway Company and Norfolk Southern Corporation*

October 4, 2005