# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| BROTHERHOOD OF LOCOMOTIVE ENGINEERS AND TRAINMEN, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 1:05cv01188 (RWR) |
| NORFOLK SOUTHERN RAILWAY CO. and NORFOLK SOUTHERN CORP., | ) ) ) | |
| Defendants. | ) ) ) | |

## PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR JUDGMENT ON THE PLEADINGS, AND POST-HEARING MEMORANDUM OF LAW IN SUPPORT OF PRELIMINARY INJUNCTIVE RELIEF

Pursuant to the Court's Order, Plaintiff Brotherhood of Engineers and Trainmen ("BLET") submits the following Opposition to Plaintiffs Norfolk Southern Railway Company and Norfolk Southern Corporation's (collectively "NSR" or "Carrier") dispositive motions, and Post-Preliminary Injunction Hearing Memorandum of Law in Support of Preliminary Injunctive Relief. In light of the comprehensive nature of this filing, many of the arguments made in opposition to the Carrier's dispositive motions and those made in support of the BLET's request for preliminary injunctive relief will necessarily overlap with arguments made in the BLET's pre-hearing submissions.

# <u>TABLE OF CONTENTS</u>

Page

STATEMENT OF THE CASE.......................................................................................1

ARGUMENT ...............................................................................................................5

I.    THIS COURT HAS SUBJECT MATTER JURISDICTION OVER THE
      CARRIER'S VIOLATION OF ITS EMPLOYEES' ORGANIZATIONAL
      RIGHTS GUARANTEED BY SECTION 2, THIRD AND FOURTH OF THE
      RAILWAY LABOR ACT.. ...................................................................................5

      A.    The BLET Has Standing to Assert the § 2, Fourth Rights of Its Engineer
            Members To Assist Trainmen In Changing Their Representative and/or
            Selecting the Labor Organization of Their Choice ...................................6

      B.    The BLET Has Standing To Assert the § 2, Third and Fourth Rights of Its
            Trainmen Members To Be Free of Interference, Influence or Coercion In
            Changing Their Representative and/or Selecting the Labor Organization of
            Their Choice...........................................................................................10

      C.    The BLET Has Standing To Assert the § 2, Fourth Rights of All Its
            Members, Whether They Are Engineers or Trainmen, Employed By the
            Carrier To Solicit Fellow Operating Employees Who Are Members of the
            UTU to Change Their Union Affiliation, As They Are Permitted To Do
            By § 2, Eleventh (c) of the RLA. ...........................................................12

II.   THE CARRIER'S MOTION FOR JUDGMENT ON THE PLEADINGS
      SHOULD BE DENIED BECAUSE A VIOLATION OF EMPLOYEES'
      ORGANIZATIONAL RIGHTS GUARANTEED BY § 2, THIRD AND
      FOURTH PRESENTS A COGNIZABLE CLAIM UNDER THE RLA. .........................15

      A.    The Carrier's Unconditional No-Solicitation Policy Unreasonably and
            Unlawfully Interferes With Its Employees' Organizational Rights
            Protected Under § 2, Third and Fourth of the RLA ...............................16

      B.    This Case Is Properly Before the Court, As the National Mediation Board
            Has No Authority to Adjudicate Violations of § 2, Third or Fourth of the
            RLA........................................................................................................20

      C.    Judicial Intervention Is Appropriate and Necessary To Protect Employees
            Organizational Rights Guaranteed Under § 2, Third and Fourth of the
            RLA........................................................................................................26

III.    THE CARRIER'S UNCONDITIONAL POLICY PROHIBITING ALL UNION SOLICITATION AND ORGANIZING ACTIVITIES BY EMPLOYEES ON ITS PROPERTY UNLAWFULLY INTERFERES WITH EMPLOYEES' RIGHT OF SELF-ORGANIZATION PROTECTED UNDER THE RAILWAY LABOR ACT, AND THEREFORE SHOULD BE ENJOINED. ....................................................31

    A.    The Requirements of the Norris-LaGuardia Act for Injunctive Relief Must Give Way In This Case Because They Would Undermine the Purposes of the Railway Labor Act. ........................................................................................31

    B.    Whether the Court Applies the Traditional Standards for Preliminary Injunctive Relief or the Heightened Requirements of the Norris-LaGuardia Act, a Preliminary Injunction Enjoining Enforcement of the Carrier's Overbroad No-Solicitation Policy Is Warranted.....................................................34

CONCLUSION...........................................................................................................................41

# TABLE OF AUTHORITIES

Page(s)

## *Cases*

Adams v. Federal Express Corp.[Federal Express I], 547 F.2d 319 (6th Cir. 1976)...............12, 21

*Adams v. Federal Express Corp. (Federal Express II],
        470 F. Supp. 1356 (W.D. Tenn. 1979)...................................................................... *passim*

Air Line Pilots Ass'n v. United Air Lines, 802 F.2d 886 (7th Cir. 1987) ......................................6

America West Airlines, Inc. v. NMB, 986 F.2d 1252 (9th Cir. 1992) ........................................21

*Arcamuzi v. Continental Airline, Inc., 891 F.2d 935 (1987)............................................... *passim*

Atlas Air, Inc. v. Air Line Pilots Ass'n, 232 F.3d 218 (D.C. Cir. 2000)...................................6, 17

*Beth Israel Hospital v. NLRB, 437 U.S. 483 (1978) ............................................................18, 35

Brady v. Trans World Airlines, Inc., 223 F. Supp. 361 (D. Del. 1963)........................................29

Brotherhood of Locomotive Engineers v. United States, 101 F.3d 718 (D.C. Cir. 1996).........6, 10

*Brotherhood of R.R. Trainmen v. Chicago River & Indiana R.R. Co., 353 U.S. 30 (1957).......32

Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co., 394 U.S. 369 (1969)..............17

Burlington Northern Ry. Co. v. Brotherhood of Maintenance of Way Employees,
        481 U.S. 429 (1987)...........................................................................................................28

*Central Hardware v. NLRB, 407 U.S. 539 (1972)..............................................................18, 36

Chicago & N.W. Ry. v. UTU, 402 U.S. 570 (1971)....................................................................27

Cityfed Fin. Corp. v. Office of Thrift Supervision, 58 F.3d 738 (D.C. Cir. 1995)........................35

District 17, United Mine Workers of Am. v. Apogee Coal Co., 13 F.3d 134 (4th Cir. 1993) ......33

Eastex, Inc. v. NLRB, 437 U.S. 556 (1978) ...............................................................................18

Felter v. Southern Pac. Co., 359 U.S. 326 (1959) .......................................................................13

Held v. American Airlines, 13 F. Supp. 2d 20 (D.D.C. 1998).......................................................31

Hunt v. Washington State Apple Advertising Comm'n, 432 U.S. 333 (1977).............................10

Independent Union of Flight Attendants v. Pan American World Airways, Inc.,
  789 F.2d 139 (2d Cir. 1986)..............................................................................31

International Ass'n. of Machinists v. Street, 367 U.S. 740 (1960)................................8

International Union, United Automobile, Aerospace, and Agricultural Implement Workers of
  Am. v. Brock, 477 U.S. 274 (1986).................................................................6, 10

Local 553, Transp. Workers Union of Am. v. Eastern Air Lines, Inc.,
  695 F.2d 668 (2d Cir. 1982)...........................................................................33

National R.R. Passenger Corp. v. United Transp. Union, 832 F. Supp. 7
  (D.D.C. 1993) ............................................................................................40

*NLRB v. Magnavox Co. of Tennessee, 415 U.S. 322 (1974) ...............................18, 36

Pennsylvania R.R. Co. v. Rychlik, 352 U.S. 480 (1957)............................................12

Railway & Steamship Clerks v. Delpro Co., 549 F. Supp 780 (D. Del. 1982) ..............7

Railway Employees' Dep't v. Hanson, 351 U.S. 225 (1956) .......................................30

Railway Labor Executive's Ass'n v. NMB, 29 F.3d 655 (D.C. Cir. 1994)...................20

*Republic Aviation Corp. v. NLRB, 324 U.S. 793 (1945).....................................18, 19

Roscello v. Southwest Airlines Co., 726 F.2d 217 (5th Cir. 1984) ..............................29

*Scott v. American Airlines, Inc., 488 F. Supp. 415 (E.D.N.Y. 1980) ................ passim

Southern Ry. Co. v. Brotherhood of Locomotive Firemen & Enginemen,
  337 F.2d 127 (D.C. Cir. 1964)..........................................................................32

Switchmen's Union v. National Mediation Bd., 320 U.S. 297 (1943)..........................20

Texas & N.O.R.R. v. Brotherhood of Ry. & S.S. Clerks, 281 U.S. 548 (1930)..........6, 15, 21

Trans World Airlines, Inc. v. Independent Fed'n of Flight Attendants,
  489 U.S. 426 (1989)................................................................................... passim

United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.,
  517 U.S. 544 (1996).....................................................................................6, 10

US Airways, Inc. v. National Mediation Bd., 177 F.3d 985 (D.C. Cir. 1999) ..............17

*Virginian R. Co. v. System Federation No. 40, 300 U.S. 515 (1937) ...................................22, 30

Warth v. Seldin, 422 U.S. 490 (1975)...........................................................................................11

Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc., 559 F.2d 841
    (D.C. Cir. 1977) ..................................................................................................32, 34, 35

## *Administrative Decisions*

American Airlines, 26 N.M.B. 412, 452 (1999) ...........................................................................26

Continental Airlines/Continental Express, 21 N.M.B. 229 (1994)...............................................21

*Express Airlines I, 28 N.M.B. 431 (2001)...................................................................................25

Metro-North Commuter R.R., 29 N.M.B. 458 (2002)...................................................................22

Northwest Airlines, 14 N.M.B. 49 (1986) ....................................................................................25

Northwest Airlines, Inc., 26 N.M.B. 269 (1999) ..........................................................................23

Pacific Southwest Airlines, 14 N.M.B. 303 (1987) ......................................................................25

Pan American World Airways, 7 N.M.B. 225 (1980) ...................................................................22

Trans World Airlines, 24 N.M.B. 141 (1997)...............................................................................24

United Air Lines, 22 N.M.B. 288 (1995).......................................................................................24

USAir, 8 N.M.B. 191 (1980) .........................................................................................................25

## *Statutes*

29 U.S.C. § 107............................................................................................................. *passim*
29 U.S.C. § 158(a) ...........................................................................................................17, 18
29 U.S.C. § 185................................................................................................................33
45 U.S.C. § 151, Fifth.......................................................................................................8
45 U.S.C. § 151, Sixth ......................................................................................................9
45 U.S.C. § 151a...............................................................................................................9, 32
45 U.S.C. § 152, Third .................................................................................................... *passim*
45 U.S.C. § 152, Fourth ................................................................................................... *passim*
45 U.S.C. § 152, Eleventh................................................................................................ *passim*
45 U.S.C. § 153, First ......................................................................................................13

## <u>STATEMENT OF THE CASE</u>

The BLET filed this case on June 14, 2005 on behalf of its members in response to the Carrier's promulgation of an overbroad no-solicitation policy that unconditionally prohibited all forms of union recruitment and/or organizing activities by employees on its property. Most of the BLET members employed by the Carrier are Engineers for whom the BLET has been certified by the National Mediation Board ("NMB") as the exclusive collective bargaining representative. However, there are also a significant number of Trainmen employed by the Carrier and represented by the United Transportation Union ("UTU"), who are nonetheless members of the BLET. (Tr.-I at 44-45; Tr.-II at 139-40)[1] The BLET is representing the interests of all its members who are employed by the Carrier, regardless of what job title they hold, in this lawsuit.

Lest there be any confusion, while the BLET certainly has an interest in the outcome of this case, it was filed solely to vindicate the organizational rights of its members, which are currently being interfered with by the Carrier's no-solicitation policy. The BLET is not asserting in this case that any rights it, as a labor organization, may possess have been violated by the Carrier's policy. Rather, the sole focus of the Court's inquiry is whether the Carrier's blanket no-solicitation policy coerces the BLET's members and/or interferes with their exercise of organizational rights secured by § 2, Third and Fourth of the Railway Labor Act ("RLA"), 45 U.S.C. § 152, Third and Fourth.

The Carrier's effort to cast this case as solely involving a representation dispute arising out of the BLET's efforts to replace the UTU as certified representative of the NSR's train

---

[1] References to the transcript of the July 13, 2005 preliminary injunction hearing in this matter will be denominated as "Tr.-I" followed by a number indicating the appropriate page(s) and references to the transcript of the August 30, 2005 hearing as "Tr.-II" (e.g., "Tr.-I 4-5" or "Tr.-II 115").

1

service employees (hereinafter "Trainmen") is an attempt to divert the Court's focus from the real issue before it – whether BLET members are being coerced or interfered with by the Carrier's no-solicitation policy in the exercise of their organizational rights. The BLET's efforts to become the representative of the Carrier's Trainmen, commonly referred to in the case as the "A-card campaign," presents merely one aspect of the panoply of organizational rights of BLET members protected by § 2, Fourth. Because the BLET is asserting the statutory rights of its members to be free of Carrier interference, influence or coercion in the excise of their organizational rights guaranteed under the RLA, and is not claiming in this litigation a right to conduct an A-card campaign without interference, the number of A-cards collected thus far is irrelevant. The statutory rights of the Carrier's employees are not dependent upon any actions being taken by the BLET and will endure whether there is an A-card campaign ongoing or not.

In analyzing this case, we submit, the Court's inquiry should focus on the following questions. Do BLET members, as RLA-covered employees of the Carrier, possess organizational rights? If so, do those rights encompass the right to communicate effectively with one another at the jobsite? If the answer is again affirmative, the question becomes whether the Carrier's no-solicitation policy interferes with that right.

As argued below, BLET members employed by the Carrier, whether they are Engineers or Trainmen, do possess organizational rights guaranteed by § 2, Third and Fourth of the RLA. And, those organizational rights necessarily encompass the right to effectively communicate with one another at the jobsite. The specific organizational rights of BLET members that are being adversely impacted and interfered with by the Carrier's no-solicitation policy are three-fold. First, Engineers, as RLA-covered employees of the Carrier, have the right to assist Trainmen in

changing their representative.  This right flows from the plain language of § 2, Fourth, which provides:

> Employees shall have the right to organize and bargain collectively through representatives of their own choosing. . . . No carrier, its officers, or agents shall deny or in any way question *the right of its employees to join, organize, or assist in organizing* the labor organization of their choice, and it shall be unlawful for any carrier to interfere in any way with the organization of its employees, . . . or to influence or coerce employees in an effort to induce them to join or remain or not to join or remain members of any labor organization . . . . (emphasis added)

While the assistance that Engineers provide to Trainmen in changing their representative may ultimately result in creating a representation dispute within the jurisdiction of the NMB, the A-card campaign has not progressed to that point and may never generate a dispute determinable by the NMB.  Certainly, interference by the Carrier in the form of a complete ban on all union solicitation during the nascent stages of organizing will ensure that no representation dispute is ever initiated at the NMB.

Second, Trainmen who are members of the BLET and thus maintain an associational tie with that Union, have the right to change their representative without interference, influence or coercion by the Carrier, under § 2, Third and Fourth of the RLA.[2]  Although this specific claim was not addressed in the BLET's pre-hearing submissions, the testimony at the hearing from both BLET Staff Counsel Thomas Brennan and NSR Assistant Vice President for Labor Relations Harold Mobley made clear that there were a significant number of Trainmen who are

---

[2] Section 2, Third, provides

> Representatives, for the purposes of this Act shall be designated by the respective parties without interference, influence, or coercion by either party over the designation of representatives by the other; and neither party shall in any way interfere with, influence, or coerce the other in its choice of representatives. Representatives of employees for the purposes of this Act need not be persons in the employ of the carrier, and no carrier shall, by interference, influence, or coercion seek in any manner to prevent the designation by its employees as their representatives of those who or which are not employees of the carrier.

members of the BLET, rather than the UTU. (Tr.-I at 44-45; Tr.-II at 139-40) Moreover, Mr. Mobley conceded that the only way Trainmen members of the BLET could be represented for collective bargaining purposes by the BLET instead of the UTU is to change their representative. (Tr.-II at 139-40) In light of these facts, the BLET has standing to assert the statutory the rights of its Trainmen members that are being interfered with by the Carrier's no-solicitation policy no less than it has standing to assert the rights of its Engineer members.

The final set of organizational rights adversely impacted and interfered with by the Carrier's policy concern the right of all BLET members, Engineers and Trainmen, to solicit UTU members, whether they are Engineers or Trainmen, to change their union affiliation. This right to solicit changes in membership is derived from a unique aspect of the RLA embodied in § 2, Eleventh (c), 45 U.S.C. § 152, Eleventh (c),[3] which permits operating employees, such as Engineers or Trainmen, to maintain membership in a labor organization other than the one that is the designated representative of the particular craft or class to which the employee belongs. To be clear, § 2, Eleventh (c) does not grant any substantive organizational rights to employees or prohibit Carrier interference with any organizational rights. However, where a carrier enacts a rule or policy that interferes with employees' ability to change their union affiliation, as permitted by § 2, Eleventh (c), or inhibits employees from joining the labor organization of their choice, that policy must be found unlawful under the explicit language of § 2, Fourth, which

---

[3] Section 2, Eleventh (c), provides in pertinent part:

> The requirement of membership in a labor organization in an agreement made pursuant to subparagraph (a) shall be satisfied, as to both a present or future employee in engine, train, yard, or hostling service, that is, an employee engaged in any of the services or capacities covered in § 3, first (h) of this act defining the jurisdictional scope of the first division of the National Railroad Adjustment Board, if said employee shall hold or acquire membership in any one of the labor organizations, national in scope, organized in accordance with this act and admitting to membership employees of a craft or class in any of said services.

prohibits carrier influence or coercion in an effort to induce employees "to join or remain or not to join or remain members of any labor organization." Notably, the solicitation of UTU members, whether they are Trainmen or Engineers, to drop their UTU membership and become members of the BLET will not generate a representation dispute because this form of solicitation by BLET members encourages UTU members to change their union affiliation, rather than urging them to select a different representative.

The right to solicit changes in membership exists wholly independent from any efforts to have Trainmen select a new representative and will endure whether there is an A-card campaign or not. Nevertheless, Mr. Mobley made clear that the Carrier's no-solicitation policy was intended to and, in fact, has ousted all forms of union solicitation from the property regardless of its objective. (Tr.-II at 137-83; Second Decl. of Mobley ¶ 18) That is why BLET members' right to solicit UTU members to change their union affiliation is at issue in this lawsuit.

## ARGUMENT

I. **THIS COURT HAS SUBJECT MATTER JURISDICTION OVER THE CARRIER'S VIOLATION OF ITS EMPLOYEES' ORGANIZATIONAL RIGHTS GUARANTEED BY SECTION 2, THIRD AND FOURTH OF THE RAILWAY LABOR ACT.**

In its motion to dismiss, the Carrier claims that this Court is without subject matter jurisdiction in this case because the BLET does not have standing to assert any claims of carrier interference, influence or coercion under § 2, Third and Fourth of the RLA on behalf of its BLET-represented Engineers. The Carrier asserts the BLET does not have standing to challenge its no-solicitation policy because Engineers do not possess any organizational rights that are being interfered with by the policy. As set forth below, this assertion has no merit because Engineers employed by the Carrier and represented by the BLET do in fact possess the right to "assist" their fellow employees, whether they are Trainmen or any other statutory employees of

the Carrier, in organizing the labor organization of their choice.  Thus, the BLET has standing to assert this right on behalf of its Engineer members.

Further, although it has not been briefed before the Court previously, the BLET has associational standing to assert the right of its Trainmen members to change their representative without interference, influence or coercion by the Carrier, regardless of the fact that they are represented for collective bargaining purposes by the UTU.  *See, e.g.,* United Food & Commercial Workers Union Local 751 v. Brown Group, Inc., 517 U.S. 544, 551-58 (1996)(holding that a union has associational standing to assert the rights of its members); International Union, United Automobile, Aerospace, and Agricultural Implement Workers of Am. v. Brock, 477 U.S. 274, 281-88 (1986)(same); Brotherhood of Locomotive Engineers v. United States, 101 F.3d 718, 724  (D.C. Cir. 1996)(same).  This associational standing also extends to the BLET's claim that all of its members employed by the Carrier, including Engineers and Trainmen, have a right to solicit fellow operating employees to change their union affiliation, as they are permitted to do by § 2, Eleventh (c) of the RLA.

> **A.  The BLET Has Standing to Assert the § 2, Fourth Rights of Its Engineer Members To Assist Trainmen In Changing Their Representative and/or Selecting the Labor Organization of Their Choice.**

Courts have consistently held that previously recognized or certified unions have standing to bring actions claiming interference with employees' right to organize under § 2, Third and Fourth of the RLA.  *See, e.g.*, Texas & N.O.R.R. v. Brotherhood of Ry. & S.S. Clerks, 281 U.S. 548 (1930) (affirming permanent injunction obtained by existing union forbidding carrier from interfering with represented employees' right to select representative and organize); Atlas Air, Inc. v. Air Line Pilots Ass'n, 232 F.3d 218 (D.C. Cir. 2000) (certified union permitted to pursue § 2, Third and Fourth claim against airline on behalf of its members); Air Line Pilots

6

Ass'n v. United Air Lines, 802 F.2d 886 (7th Cir. 1987) (same); Railway & Steamship Clerks v.

Delpro Co., 549 F. Supp 780 (D. Del. 1982) (holding certified union may not serve as class

representative to recover individual damages, but may sue for declaratory and injunctive relief).

Therefore, it does not appear that the Carrier is claiming the BLET would never have

standing to bring an action asserting the § 2, Third and Fourth rights of its Engineer members,

whom it is also certified to represent for collective bargaining purposes.  Rather, the Carrier

claims that Engineers have no organizational rights guaranteed under § 2, Third or Fourth that

are being interfered with by its no-solicitation policy.  Specifically, the Carrier argues that

Engineers cannot "assist" Trainmen "in organizing the labor organization of their choice"

because they are in a different craft or class.  This narrow view of employees' organizational

rights does violence to the statute because it ignores the statutory definition of "employee" and

treats the term "labor organization" as the equivalent of the term "representative."  The notion

that the BLET cannot be "organized" on the Carrier's property, apparently because it was

founded in 1863 and already represents Engineers, both disregards the history of the statute and

is nonsensical.  As explained below, the plain language of § 2, Fourth as well as the stated intent

of the RLA does not support such a reading.

Section 2, Fourth provides in pertinent part:

No carrier, its officers, or agents shall deny or in any way question the right of its
employees to join, organize, or assist in organiz*ing* the labor organization of their
choice, and it shall be unlawful for any carrier to interfere in any way with the
organization of its employees . . . .

Despite the clear import of this language in protecting any effort of employees to organize the

labor organization of their choice, the Carrier contends that its Trainmen employees are not

engaged in "organizing the labor organization of their choice" because the BLET is already in

existence.  Under its reading of § 2, Fourth, the Carrier would restrict the protection given to

employees in "organizing the labor organization of their choice" only to those situations where the labor organization the employees are organizing is not in existence. Under this reading, no protection is offered to employees in attempting to organize as members of the BLET, which has been in existence since 1863. This interpretation is illogical and ignores the broad protection of organizational rights that is contained in § 2, Fourth. After all, the "company union" problem that largely brought § 2, Fourth into being in 1934 was thought by Congress to require legislation designed to enable employees to express their free choice in being represented by and belonging to the standard rail organizations, which were in existence at the time of § 2, Fourth's enactment. *See* International Ass'n. of Machinists v. Street, 367 U.S. 740, 750 (1960).

The Carrier also asserts that its Engineer employees are not entitled to "assist" Trainmen in "organizing the labor organization of their choice" because they are in a different craft or class. The language of § 2, Fourth, however, plainly states, "No carrier, its officers, or agents shall deny or in any way question the right of its *employees* to join, organize, or assist in organiz*ing* the labor organization of their choice . . ." (emphasis added). The restriction that only employees in the same craft or class may "assist" fellow employees in "organizing the labor organization of their choice" does not exist. Moreover, the Carrier's argument ignores the definition of "employee" contained in § 1, Fifth of the RLA, 45 U.S.C. § 151, Fifth, which broadly includes "every person in the service of a carrier (subject to its continuing authority to supervise and direct the manner of rendition of his service) who performs any work defined as that of an employee or subordinate official . . . ."[4] The term "employees," as used in § 2, Fourth,

---

[4] The full text of § 1, Fifth reads:

> The term "employee" as used herein includes every person in the service of a carrier (subject to its continuing authority to supervise and direct the manner of rendition of his service) who performs any work defined as that of an employee or

by statutory definition refers to all employees of the Carrier regardless of which craft or class they belong.  Therefore, Engineers, as statutory "employees" of the Carrier, have the right to "assist" Trainmen, also statutory "employees" of the Carrier, in "organizing the labor organization of their choice."

Finally, in denying that Engineers have a § 2, Fourth right to assist Trainmen in organizing the labor organization of their choice, the Carrier would have the Court treat the term "labor organization" in § 2, Fourth as having the same meaning as "representative."  The problem with this reading is that the term "representative" is defined in § 1, Sixth of the RLA, 45 U.S.C. § 151, Sixth, as "any person or persons, labor union, organization, or corporation designated either by a carrier or group of carriers or by its or their employees, to act for it or them."  If Congress had intended to restrict the provision of § 2, Fourth, which protects the "employees'" right to "assist" other "employees" in "organizing the labor organization of their choice," to selection of a "representative," it would have done so.  Yet, did not.  The language was left intentionally broad because in the original 1926 Act there was complete freedom of association under the RLA, in that employees were free to join any labor organization they chose regardless of whether that labor organization was the majority representative of the employees' craft or class.  This principle was also incorporated in § 151a, which states in pertinent part, "The purposes of this chapter are . . . (2) to forbid any limitation upon freedom of association among

---

subordinate official in the orders of the Surface Transportation Board now in effect, and as the same may be amended or interpreted by orders hereafter entered by the Board pursuant to the authority which is hereby conferred upon it to enter orders amending or interpreting such existing orders: *Provided, however,* That no occupational classification made by order of the Surface Transportation Board shall be construed to define the crafts according to which railway employees may be organized by their voluntary action, nor shall the jurisdiction or powers of such employee organizations be regarded as in any way limited or defined by the provisions of this Act or by the orders of the Board.

employees or any denial, as condition of employment or otherwise, of the right of employees to

join a labor organization . . . ."  45 U.S.C. § 151a.

In light of the broad freedoms guaranteed to employees by § 2, Fourth, including the right

of employees "to join, organize, or assist in organiz*ing* the labor organization of their choice,"

the Carrier's myopic reading of the statute, which would restrict such right to only situations

where employees in particular craft or class are organizing a previously non-existent labor

organization, must be rejected.

> **B.    The BLET Has Standing To Assert the § 2, Third and Fourth Rights
> of Its Trainmen Members To Be Free of Interference, Influence or
> Coercion In Changing Their Representative and/or Selecting the
> Labor Organization of Their Choice.**

It is well established that a labor organization may have associational standing to sue on

behalf of its members.  *See, e.g.,* Brown Group, Inc., 517 U.S. at 551-58; Brock, 477 U.S. at 281-

88; BLE v. U.S., 101 F.3d at 724.  In Hunt v. Washington State Apple Advertising Comm'n, 432

U.S. 333, 343 (1977), the Supreme Court set forth the following three-prong associational

standing test:

> We have recognized that an association has standing to bring suit on behalf of its
> members when: (a) its members would otherwise have standing to sue in their
> own right; (b) the interests it seeks to protect are germane to the organization's
> purpose; and (c) neither the claim asserted nor the relief requested requires the
> participation of individual members in the lawsuit.

In the instant case, the undisputed facts adduced at the hearing and set forth in the First

Declaration of Harold Mobley establish that there are "numerous" Trainmen employed by the

Carrier who are members of the BLET, rather than the UTU. (First Decl of Mobley ¶ 9; Tr.-I at

44-45; Tr.-II at 139-40)  These Trainmen members of the BLET undeniably would have standing

to challenge the Carrier's no-solicitation policy on their own behalf under § 2, Third and Fourth

of the RLA.  *See*, *e.g.,* Arcamuzi v. Continental Airline, Inc., 891 F.2d 935 (1987); Scott v.

American Airlines, Inc., 488 F. Supp. 415 (E.D.N.Y. 1980); Adams v. Federal Express Corp.
[Federal Express II], 470 F. Supp. 1356 (W.D. Tenn. 1979).    Thus, the first element of
associational standing is satisfied.

It also cannot be seriously disputed that vindication of its members' organizational rights
is germane to the purpose of the BLET, thus satisfying the second element.  Finally, the BLET
asserts that the Carrier's no-solicitation policy is *per se* unlawful and the only relief sought in
this action is injunctive.  Therefore, neither the claim asserted nor the relief requested requires
participation of individual BLET Trainmen members in the lawsuit.  *See* Warth v. Seldin, 422
U.S. 490, 515 (1975)("if in a proper case the association seeks a declaration, injunction, or some
other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will
inure to the benefit of those members of the association actually injured.  Indeed, in all cases in
which we have expressly recognized standing in associations to represent their members, the
relief sought has been of this kind.")  Having satisfied all three prongs of the Supreme Court's
test for associational standing, the BLET may assert the rights of its Trainmen members in this
lawsuit.

As stated above, the BLET recognizes that the issue of the Carrier's policy interfering
with the § 2, Third and Fourth rights of Trainmen members of the BLET has not been briefed in
earlier submissions.   The Complaint in this matter, however, clearly states that the policy
interferes with the § 2, Third and Fourth rights of "NS employees" without ever limiting this
interference to any particular craft of employees.   (Compl. ¶¶ 2, 13, 18, 22, 23, 28, 31).
Furthermore, at the preliminary injunction hearing, counsel for the BLET made clear, "What we
are asserting is the rights, the organizational rights of our members, BLET members with who
we maintain the associational tie of membership." (Tr.-II at 143)  At the hearing, we agreed that

the BLET is not asserting the rights of non-member Trainmen, thinking that the Court's question was directed to the <u>Federal Express I</u> issue relating to the BLET's ability to assert the rights of non-member Trainmen represented by the UTU.[5]

      C.      **The BLET Has Standing To Assert the § 2, Fourth Rights of All Its Members, Whether They Are Engineers or Trainmen, Employed By the Carrier To Solicit Fellow Operating Employees Who Are Members of the UTU to Change Their Union Affiliation, As They Are Permitted To Do By § 2, Eleventh (c) of the RLA.**

The Carrier argues that § 2, Eleventh (c) of the RLA does not confer an enforceable right of BLET members to solicit UTU members, whether they are Trainmen or Engineers, to change their union affiliation and join the BLET. The problem with the Carrier's argument is that the BLET does not contend and has never claimed in this lawsuit that § 2, Eleventh (c) confers any enforceable organizational rights on employees who are adversely affected by the no-solicitation policy. Rather, it is undisputed that § 2, Eleventh (c) only provides operating employees with the ability to join a union other than the designated representative of the employees' craft to meet the problem of intercraft mobility in the rail industry. *See* <u>Pennsylvania R.R. Co. v. Rychlik</u>, 352 U.S. 480, 493 (1957). This is why operating employees are not free simply to change their union affiliation to whatever labor organization they choose, but "only in those unions which have

_____

[5] The Court of Appeals for Sixth Circuit's decision in <u>Adams v. Federal Express Corp. [Federal Express I]</u>, 547 F.2d 319 (6th Cir. 1976), does nothing to diminish the associational standing the BLET possess to sue on behalf of its Trainmen members. That case merely held that there is no implied right of action for an uncertified union to maintain a suit on behalf of employees it seeks to represent. <u>Id.</u> at 322. <u>Federal Express I</u> did not address the right of a union to sue on behalf of its members, or suggest that associational standing principles somehow become inapplicable to actions under § 2, Third and Fourth of the RLA.

already qualified under § 3, First of the Act, as electors of the union representatives on the National Railroad Adjustment Board."[6] Id. at 485.

Although § 2, Eleventh (c) does not confer explicit organizational rights on employees, the Supreme Court has identified this provision of the RLA as "an area that the Act leaves open for solicitation by rival organizations." Felter v. Southern Pac. Co., 359 U.S. 326, 337 (1959). The Supreme Court further explained that "organizational efforts" to have operating employees change their union affiliation exist in the rail industry and "are attended by persuading the recruit to drop his membership in his present union and terminate any checkoff of his wages in [the rival organization's] favor." Id. It is in pursuing these "organizational efforts" to have operating employees change their union affiliation that the Carrier's no-solicitation policy interferes with employees' organizational rights under § 2, Fourth of the RLA. In other words, § 2, Eleventh (c) merely enables employees to change their union affiliation if they so choose, while it is § 2, Fourth that makes it unlawful for a carrier to interfere with the affiliation choice that employees can make under § 2, Eleventh (c). The violation of law alleged in the BLET's Complaint is that the Carrier's policy violated § 2, Fourth, not § 2, Eleventh (c).

Specifically, the Carrier's no-solicitation policy violates the mandate contained in § 2, Fourth that "it shall be unlawful for any carrier . . . to influence or coerce employees in an effort to induce them to join or remain or not to join or remain members of any labor organization . . . ." It cannot seriously be denied that the Carrier's policy, which prohibits operating employees from speaking with each other about changing their union affiliation, coerces employees to remain members of their present labor organization or from joining another labor organization,

---

[6] The BLET and the UTU are labor organizations qualified under § 3, First of the RLA, as electors of the Union representatives on the National Railroad Adjustment Board. That is why, as pointed out by the Carrier, numerous Engineers are dues paying members of the UTU and numerous Trainmen are dues paying members of the BLET. First Decl. of Mobley ¶ 9.

despite their right to change union affiliation if they so desire. The fact that the Carrier goes so far as to discipline operating employees who speak to each other about changing union affiliation further reinforces the coercive nature, effect and intent of the Carrier's policy.

In previous filings, the Carrier claims without citation that there is no "foundation for holding that RLA § 2 Third or Fourth protects the right that is conferred by § Eleventh (c)." Defs.' Supp. Brief at 8 fn. 5. To the contrary, the foundation for such a holding is the plain language of § 2, Fourth. Regardless of the source of the right operating employees may exercise to change their union affiliation, § 2, Fourth makes it unlawful to coerce or influence employees "to join or remain or not to join or remain members of any labor organization." The Carrier's no-union solicitation policy coerces employees, including BLET-represented Engineers who are currently members of the UTU, from joining the BLET or not remaining members of the UTU. Therefore, the policy is a violation of the plain language of § 2, Fourth and unlawful.

Further, the right of BLET members to solicit UTU members to change their union affiliation, which is expressly preserved by § 2, Fourth, will not in and of itself give rise to a representation dispute because it does not involve a change of representative. Thus, the Carrier's argument that the instant case presents a representation dispute between the BLET and UTU has even less merit in this context than in the situations described above, involving assistance by Engineers to Trainmen to change their representative and the right of Trainmen members of the BLET to change their representative free of interference, influence or coercion by the Carrier, that could potentially result in a representation investigation by the NMB.

Finally, we turn to the Carrier's claim that this case has nothing to do with BLET members' solicitation of UTU members to change their union affiliation. To the contrary, Mr. Brennan testified that the effort to solicit UTU members to join the BLET, including Engineers

that have chosen to satisfy their union membership obligation by belonging to the UTU, is "an ongoing process that never stops." (Tr.-I at 25-27). He further explained:

> [T]he A-Card drive is an organized effort, if you will, to ultimately fulfill . . . it's an organized effort to get the 50 plus – 50 percent plus one to then carry out a representation vote. But the solicitation that we are speaking about a few moments ago is designed to acquire membership, to get people, and in some instances to shift from the UTU over to the BLE and to get new hires to choose the BLE over the UTU.

(Tr.-I at 27-28). Thus, while there may be a current A-card campaign ongoing, this is not mutually exclusive of the long-time solicitation of UTU members by BLET members to simply change their union affiliation without an attendant change in representative. And, the Carrier's misplaced reliance upon the special membership application, with attached A-card, created specifically for the NSR campaign does not change this fact because Mr. Brennan testified that document was not the BLET's normal membership application, which does not have an A-card attached or the qualification that it will not be processed until a representation election is completed. (Tr.-I at 59-62)

## II.    THE CARRIER'S MOTION FOR JUDGMENT ON THE PLEADINGS SHOULD BE DENIED BECAUSE A VIOLATION OF EMPLOYEES' ORGANIZATIONAL RIGHTS GUARANTEED BY § 2, THIRD AND FOURTH PRESENTS A COGNIZABLE CLAIM UNDER THE RLA.

On page 17 of its statement of points and authorities in support of its motion to dismiss, the Carrier states, "BLET's claims all reduce to the single proposition that, as matter of law, NSR's policy barring all union solicitation activity from its property violates the RLA." Insofar as the Carrier's no-solicitation policy interferes with the absolute right of its employees to select a representative and join, organize, or assist in organizing the labor organization of their choice free of carrier interference, influence or coercion under § 2, Third and Fourth of the RLA, the Carrier's characterization of this case is quite accurate. Actions by a carrier that in any way

interfere with the organizational rights of its employees guaranteed under § 2, Third and Fourth are strictly prohibited and may be enjoined by Federal courts. *See* Texas & N.O.R.R., 281 U.S. at 571; Arcamuzi, 819 F.2d at 937; Scott, 488 F. Supp. at 419; Federal Express II, 470 F. Supp. at 1363. Therefore, the issue before the Court is whether the Carrier's no-solicitation policy interferes with its employees' § 2, Third and Fourth rights. We submit, as a matter of law, that unconditional no-solicitation policies, such the one instituted by NSR, have uniformly been held to interfere with employees' organizational rights. And, for the Court to hold in this case that NSR's no-solicitation policy does not interfere with its employees organizational rights would fly in the face of no less than sixty years of Supreme Court precedent on this issue.

   A.   **The Carrier's Unconditional No-Solicitation Policy Unreasonably and Unlawfully Interferes With Its Employees' Organizational Rights Protected Under § 2, Third and Fourth of the RLA.**

   The § 2, Third and Fourth organizational rights of BLET members that are currently being adversely being impacted by the Carrier's no-solicitation policy are discussed at length above in Part I of this memorandum and need not be repeated here. The Carrier maintains, however, that there is nothing in the RLA that bars its no-solicitation policy. For this statement to be true, the Court must conclude that the no-solicitation policy in no way interferes with the organizational rights possessed by the Carrier's employees. Obviously, if the policy does interfere with organizational rights, then it is a violation of § 2, Third and Fourth and must be found unlawful. The Carrier also makes much of the fact that the are no prior cases holding that an unconditional no-solicitation policy is violative of employees' organizational rights under the RLA. At the same time, the Carrier is unable to identify a single case under the RLA, or under the National Labor Relations Act for that matter, that has held such a policy to be lawful.

Fortunately, the Court is not left to blindly try and discern whether the NSR's unconditional no-solicitation policy interferes or coerces employees in the exercise of their organizational rights because there are countless cases decided under the NLRA that hold such policies are presumptively unlawful. And, despite the Carrier's extensive efforts to persuade the Court that it should not examine or even take notice of the considerable body of federal labor law developed by the Supreme Court under the NLRA, courts often look to cases interpreting § 8(a) of the NLRA, 29 U.S.C. 158(a),[7] when construing the meaning and application of § 2, Third and Fourth of the RLA. *See, e.g.,* Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co., 394 U.S. 369, 383 (1969); Scott, 488 F. Supp at 419 (E.D.N.Y. 1980); Federal Express II, 470 F. Supp at 1363.

Indeed, the Supreme Court has held that "carefully drawn analogies from the federal common labor law developed under the NLRA may be helpful in deciding cases under the RLA." Trans World Airlines, Inc. v. Independent Fed'n of Flight Attendants, 489 U.S. 426, 432-34 (1989)(applying NLRA precedents to interpret RLA § 2, Fourth). Further, the Court of Appeals for the District of Columbia Circuit has repeatedly held that "the RLA's language prohibiting employer 'influence' of employees, 45 U.S.C. § 152, Third, Fourth, Ninth, while superficially *broader* than the NLRA's proscription of 'interfering with, restraining or coercing employees,' 29 U.S.C. § 158(a)(1), has been interpreted to mean pretty much the same thing." US Airways, Inc. v. National Mediation Bd., 177 F.3d 985, 991 (D.C. Cir. 1999)(emphasis

---

[7] In language similar to § 2, Third and Fourth of the RLA, § 8(a) of the NLRA, 29 U.S.C. § 158(a), provides in pertinent part:

> It shall be an unfair labor practice for an employer (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in Section 7 [the right to self-organization, to form, join, or assist labor organizations]; (2) to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it; . . ."

added); <u>Atlas Air, Inc. v. Air Line Pilots Ass'n</u>, 232 F.3d 218, 225 (D.C. Cir. 2000)(holding that while the RLA and NLRA "are not equivalent, we have interpreted the respective provisions barring undue employer influence of employees as meaning pretty much the same thing").   In light of the overwhelming precedent holding that courts may, and indeed should, look to NLRA precedent in interpreting § 2, Third and Fourth of the RLA, it is incomprehensible how the Carrier can claim that NLRA precedents should be ignored in this case because "the difference between the RLA and NLRA schemes are particularly stark . . . ." (Defs.' Mot. to Dismiss at 28) To the contrary, the protection of employees' organizational rights under § 2, Third and Fourth of the RLA and § 8(a)(1) of the NLRA is an area where the two statutes "mean pretty much the same thing."

Under the NLRA, it is well established that an employer's unconditional and unqualified policy prohibiting all union solicitation or organizing activities by employees on its property is presumptively unlawful, absent evidence that such a rule is necessary in order to maintain production or discipline.  *See* <u>Republic Aviation Corp. v. NLRB</u>, 324 U.S. 793, 798-99 (1945); <u>NLRB v. Magnavox Co. of Tennessee</u>, 415 U.S. 322, 324-25 (1974); <u>Eastex, Inc. v. NLRB</u>, 437 U.S. 556, 572-73 (1978); <u>Beth Israel Hospital v. NLRB</u>, 437 U.S. 483, 491 (1978).   These decisions are all premised upon the principle that the right of employees to self-organize without interference or coercion "necessarily encompasses the right effectively to communicate with one another regarding self-organization at the jobsite." <u>Beth Israel Hospital</u>, 437 U.S. at 491.   The importance of freedom of communication among employees to the free exercise of organizational rights is not limited to such rights guaranteed under the NLRA, *see* <u>Central Hardware v. NLRB</u>, 407 U.S. 539, 542-43 (1972)(holding that "organization rights are not viable in a vacuum; their effectiveness depends in some measure on the ability of employees to learn

the advantages and disadvantages of organization from others."), but is equally important to the rights of self-organization guaranteed by § 2, Third and Fourth of the RLA.

Relying upon Republic Aviation, and its progeny, the district court in Scott, 488 F. Supp at 420, held that a carrier's policy prohibiting the wearing of union insignia to be unlawful interference with employees' right to organize in violation of § 2, Third and Fourth of the RLA. Scott cited and relied heavily upon Federal Express II, 470 F. Supp at 1363, another case decided under the RLA, which in addressing a similar prohibition held, "employees have the right to visibly demonstrate their support or opposition to a particular bargaining representative absent some exceptional reason for curtailing such expressions." Although these cases dealt with prohibitions on the wearing of union insignia, they are instructive in assessing the lawfulness of the overbroad and unconditional prohibition on all union solicitation and organizing activities imposed by the NS on its employees. Where a carrier's policy interferes with employees' free choice of bargaining representative or freedom to join, organize, or assist in organizing the labor organization of their choice, such policies are unlawful and in violation of § 2, Third and Fourth of the RLA. Id. In fact, there is absolutely no difference between the carriers' interference with § 2, Third and Fourth rights in Scott and Federal Express II and the NSR's interference with its employees' § 2, Third and Fourth rights in this case.[8]

In this case, the Carrier's policy prohibits absolutely all communication, solicitation and other organizing activities among employees on its property, without exception as to the time, manner or location of the activities. In promulgating the policy, the Carrier did not cite to or

---

[8]  Despite the Carrier's insistence that the Court should disregard all cases decided under the NLRA, the common source for the decisions in Scott and Federal Express II, is Republic Aviation, 324 U.S. 793. It is the Supreme Court's holding in Republic Aviation, that the necessity of effective communication at the workplace to the exercise employees' organizational rights may not be interfered with absent legitimate safety or operational interests that must govern in this case.

offer any evidence of special circumstances that make the blanket prohibition on organizing activities necessary in order to maintain production or discipline.  Nor, as discussed in Part III of this memorandum, has it since provided any evidence that the policy is necessary in order to maintain production or discipline.  Under these circumstances, the policy is a *per se* violation of § 2, Third and Fourth of the RLA in that it unreasonably interferes with employees' right to designate their choice of representative and right to join, organize, or assist in organizing the labor organization of their choice.

   **B.    This Case Is Properly Before the Court, As the National Mediation Board Has No Authority to Adjudicate Violations of § 2, Third or Fourth of the RLA.**

   The Carrier argues that this case should not be decided by the Court, but rather should be deferred to the NMB.  The problem with the Carrier's position is that that neither the Carrier nor the NMB has the authority to initiate a representation investigation.  *See* Railway Labor Executive's Ass'n v. NMB, 29 F.3d 655, 665 (D.C. Cir. 1994).  "Congress left no ambiguity in § 2, Ninth: the Board may investigate a representation dispute *only* upon the request of employees involved in the dispute."  Id.  Only once the employees involved in a dispute have invoked the services of the NMB, may its mandate under § 2, Ninth of the RLA to "insure the choice of representatives by the employees without interference, influence or coercion exercised by the carrier," be implicated.

   Even then, however, the Supreme Court has made clear that the NMB's role under § 2, Ninth is very narrow.  Switchmen's Union v. National Mediation Bd., 320 U.S. 297, 302 (1943).  In explaining the NMB's narrow role under § 2, Ninth the Court held:

   The Mediation Board makes no "order."  And its only ultimate finding of fact is
   the certificate.  The function of the Board under § 2 Ninth is more the function of
   a referee.  To this decision of the referee Congress has added a command
   enforceable by judicial decree.  But the "command" is that "of the statute, not of

> the Board." . . . Under this Act Congress did not give the Board discretion to take
> or withhold action, to grant or deny relief. It gave it no enforcement functions. It
> was to find the fact and then cease. Congress prescribed the command.

Id. at 305.  Thus, the NMB's role in a representation dispute is limited by § 2, Ninth to investigating the dispute, administering an election where appropriate, and ensuring that employee free choice has been preserved.

Moreover, the NMB has no authority to adjudicate the violations of § 2, Third and Fourth that are alleged in this case.  See America West Airlines, Inc. v. NMB, 986 F.2d 1252, 1256-57 (9th Cir. 1992).  Indeed, the NMB itself has stated, "in the context of its investigations of representation disputes, the adjudication of violations of § 2, Fourth is not within the Board's authority conferred under § 2, Ninth."  Continental Airlines/Continental Express, 21 N.M.B. 229, 252 (1994).  Given the NMB's utter lack of authority to enforce § 2, Third and Fourth, that Agency is not the proper forum to vindicate the fundamental organizational rights of employees that are being interfered with by the Carrier's no-solicitation policy.  That is a matter within the jurisdiction of this Court.  See, e.g., Texas & N.O.R.R., 281 U.S. at 571; Arcamuzi, 819 F.2d at 937; Scott, 488 F. Supp. at 419; Federal Express II, 470 F. Supp. at 1363.

The Sixth Circuit Court of Appeals acknowledged this very fact in Federal Express I, 547 F.2d 319.  In that case, the individual plaintiffs were alleging that their § 2, Third and Fourth rights were violated by the carrier's threats, harassment, surveillance activities and selective discharges during the course of the Teamsters' organizing drive.  Id. at 320-21.  These charges are classic unfair labor practices under § 8(a) of the NLRA.  Recognizing as much, the Court of Appeals explained:

> Except for the fact that Federal Express is a common carrier subject to the
> Railway Labor Act, this proceeding would be within the exclusive jurisdiction of
> the National Labor Relations Board and not within the jurisdiction of a United
> States District Court. We are reluctant to impose upon a District Court duties

> analogous to those of the National Labor Relations Board under a different statute, which are best, resolved by an administrative agency rather than the judiciary. We would prefer to hold that the District Court has no jurisdiction and that exclusive jurisdiction is in the National Mediation Board. Unfortunately, Congress has not so provided with respect to those parts [§ 2, Third and Fourth] of the Railway Labor Act here involved. We are bound by compelling judicial precedent to hold that the District Court has jurisdiction.

Id. at 321 (citations omitted). The Sixth Circuit did not tell the plaintiffs in Federal Express I to go to the NMB, as the Carrier asks the Court to do in the case at bar, because with respect to violations of § 2, Third and Fourth, jurisdiction lies solely in the Federal courts. *See* Virginian R. Co. v. System Federation No. 40, 300 U.S. 515, 543 (1937)(holding that it is the duty of courts to enforce by appropriate decree the organizational rights guaranteed to employees under § 2, Third and Fourth). *See also* Pan American World Airways, 7 N.M.B. 225, 226 (1980)("For the courts to require the Mediation Board to transform itself into an adjudicative and prosecutorial agency like the N.L.R.B. . . . would distort the entire Congressional scheme.")

The Carrier mistakenly argues that even if the case is properly before the Court, that it should adhere to NMB precedent allegedly holding that a carrier's policy on employee solicitation cannot interfere with employees' organizational rights under the RLA, so long as the policy is applied evenhandedly as between supporters of competing unions. (Defs.' Mot. to Dismiss at 19-21) This argument is misleading. The BLET is not alleging that the Carrier is discriminatorily applying its no-solicitation policy. Thus, the Carrier's neutrality between the BLET and UTU is not at issue. Rather, the issue this Court must decide is whether the Carrier's blanket no-solicitation policy, which ousts all forms of union solicitation from the property, interferes with individual employees' organizational rights under § 2, Third and Fourth. Contrary to the Carrier's characterizations, this is not the issue or even discussed in a single NMB case it cites.

In <u>Metro-North Commuter R.R.</u>, 29 N.M.B. 458 (2002), the Brotherhood of Railroad Signalmen ("BRS") alleged election interference based on its claim that the Carrier was assisting the Association of Commuter Rail Employees ("ACRE") by paying ACRE representatives, who were also carrier employees, their full-time pay for representation activities, including the solicitation of signalmen to select ACRE as their representative.  Metro-North denied the allegation; it asserted that ACRE Union officials were not allowed "release time," which is time an "employee is released from duties of their position while under pay," to conduct union activities.  <u>Id.</u> at 465.  Under Metro-North's release time policy, employee union officials who are on release time are not permitted to engage in activities that are exclusively union business. <u>Id.</u>  Despite the policy, BSR alleged that "several of the principal collectors for A-cards for ACRE . . . did so while on company time."  <u>Id.</u> at 469.  Thus, the case did not involve a challenge by any party to Metro-North's no-solicitation policy, and the NMB undertook absolutely no analysis to determine whether the policy itself interfered with employees' choice of representative.  The single finding of the Board was that there was no favoritism shown to ACRE officials because there was no evidence that violations of the policy were committed by ACRE officials while on release time.  <u>Id</u>. at 472.  Therefore, the NSR's assertion on page 20 of Motion to Dismiss that the NMB rejected a "claim that a carrier's no-solicitation policy interfered with employees' choice of representatives" in <u>Metro-North</u> is false.

In <u>Northwest Airlines, Inc.</u>, 26 N.M.B. 269 (1999), both the International Association of Machinists ("IAM") and the Aircraft Mechanics Fraternal Association ("AMFA") claimed that the Northwest had supported its rival in the election.  The NMB found only that the "record in the case does not establish a 'pattern of support' by Northwest for AMFA, " and its investigation disclosed no bias in their policy and therefore no interference in the election.  <u>Id</u>. at 294  Notably,

the decision addressed only whether Northwest's policy was applied discriminatorily or with bias toward one organization. The Board never addressed whether a complete ban on solicitation from the carrier's property interfered with employees' organizational rights because no party made such an allegation. Hence, this case lends no support for NSR's position.

The carrier's no-solicitation policy featured in Trans World Airlines, 24 N.M.B. 141, 157-58 (1997), was facially valid, as it specifically stated, "Solicitation may be permitted during non-working time, such as breaks or lunch periods in non-working areas, such as lunch rooms and break rooms." Even so, the Board was not asked to and did not address whether the solicitation policy itself interfered with employees' rights, but only if it was applied evenly as between the competing labor organizations. Id. at 174-75. The discriminatory application of a facially valid policy is not at issue in the case at bar. Therefore, Trans World also lends no support for NSR's position.

Like the policy in Trans World, the carrier's solicitation policy mentioned in United Air Lines, 22 N.M.B. 288 (1995), was facially valid. The policy stated:

> A. No employee is allowed to solicit for any purpose during his own working time or during the working time of the employee being selected.
>
> B. No employee is permitted to distribute any literature in working areas at any time.
>
> . . .
>
> E. Employees are permitted to solicit and distribute union literature during non-working time (rest breaks, lunch periods and for one-half hour both before and after working time) only in those areas to which they normally have access in the course of performing their duties: [parking lots, cafeterias, and break rooms].

Id. at 294-95. Once again, the issue in the case was not whether the policy itself was valid because there was no challenge to the policy. Rather, the only issue put to the NMB and the only

issue it decided was whether the policy was evenly applied to the competing organizations.  Id. 351-17.

In Pacific Southwest Airlines, 14 N.M.B. 303, 322 (1987), the issue before the NMB did not even concern employees' solicitation on the carrier's property, but whether the carrier had allowed one organization's non-employee organizers access to solicit on its property, while denying access to the non-employee organizers of the rival organization.  There was no evidence in the case that employees themselves were prohibited from soliciting on the property.  In fact, the NMB made note in denying the allegations of election interference that "the letters, petitions, and telexes which circulated on PSA were generated by PSA employees, not management officials."  Id.  Thus, it appears that employees, rather than non-employee union organizers, were permitted to engage in organizing activities on the carrier's property.

Again, in Northwest Airlines, 14 N.M.B. 49, 55-56 (1986), the NMB was faced with the issue of whether one organization's representatives had been granted access to the carrier's property, while non-employee representatives of its rival had been denied the same access.  There was no discussion of employees being prohibited from engaging in union solicitation or recruitment on the carrier's property.  Therefore, it is unclear how this case supports the Carrier's assertions that the NMB has rejected "claims that a carrier's no-solicitation policy interfered with employees' choice of representatives."   Finally, like every other NMB case cited by NSR, USAir, 8 N.M.B. 191, 197 (1980), dealt only with whether the carrier had treated one organization more favorably than another.  In fact, there was no mention of a no-solicitation policy in the decision.

On the other hand, in Express Airlines I, 28 N.M.B. 431, 433 (2001), an allegation of election interference concerning application of a no-solicitation policy was presented to the

NMB by the Paper, Allied, Chemical and Energy Workers Union. PACE that claimed the carrier had improperly prohibited the solicitation and distribution of all PACE literature and threatened employees with termination for disturbing union literature. In dismissing the allegation, the NMB stated:

> There is . . .. insufficient evidence that the Carrier improperly prohibited solicitation. The Carrier had a uniform rule in the employee handbook which prohibited the posting of all written solicitations. **There is no evidence that the Carrier prevented PACE supporters from distributing literature in non-work areas on non-work time.**

Id. at 452-53 (emphasis added). Thus, the standard the NMB applied to determine whether the carrier's conduct toward union solicitation in <u>Express Airlines I</u> violated employees' organizational rights – that employees were permitted to solicit in non-work areas on non-work time – is the same standard the BLET submits should be applied in this case and that the Supreme Court has applied for sixty years. *See also* <u>American Airlines</u>, 26 N.M.B. 412, 452 (1999)(dismissing allegations of election interference concerning limits on the distribution of union literature because, *inter alia*, "while employees were prohibited from distributing literature in certain work areas at every location, they were permitted to do so in others.")

### C. Judicial Intervention Is Appropriate and Necessary To Protect Employees Organizational Rights Guaranteed Under § 2, Third and Fourth of the RLA.

The Carrier asserts that this case does not belong in Federal court because the BLET's claims do not satisfy the so-called "narrow circumstances" warranting judicial intervention under § 2, Third and Fourth of the RLA. (Defs. Mot. to Dismiss at 22) The Carrier bases this assertion primarily upon Justice O'Connor's statement in <u>Trans World Airlines, Inc. [TWA] v. Independent Fed'n of Flight Attendants</u>, 489 U.S. at 440, that that rights under § 2, Fourth of the RLA were viewed by the Court as "addressing primarily the pre-certification rights and freedoms

of unorganized employees."  The Carrier's reliance upon <u>TWA</u> is misplaced in the context of this case.

In <u>TWA</u>, the Supreme Court dealt with a carrier's ability, following exhaustion of the RLA's major dispute resolution procedures and the parties' release to self-help, to refuse displacement of permanent replacement workers and employees who crossed the union's picket line during a strike in favor of more senior returning strikers.  <u>Id.</u> at 428.  The case arose from the strike by TWA flight attendants in 1986.  <u>Id.</u> at 429.  The company hired replacement workers and notified the strikers that it would employ any who returned to work.  <u>Id.</u>  TWA also stated to its employees that any vacancies filled during the strike would remain effective after the strike. <u>Id.</u> at 430.  The union filed suit alleging that the carrier's decision to retain junior employees who crossed the picket line, rather than displacing them with more senior returning strikers constituted discrimination against employees based on their strike activity in violation of Section 2, Fourth.  489 U.S. at 439-40.

In evaluating the union's argument, there is no dispute that the Court did observe that rights under § 2, Fourth were viewed by the Court as "addressing primarily the pre-certification rights and freedoms of unorganized employees." <u>Id.</u> at 440.  The Court analyzed the applicability of § 2, Fourth, however, from the standpoint of the parties' having exhausted the major dispute resolution procedures of the RLA, not from a post-certification standpoint.  It noted:

> the RLA provides an exhaustively detailed procedural framework "to facilitate the voluntary settlement of major disputes." The effectiveness of these private dispute resolution procedures depends on the initial assurance that the employees' putative representative is not subject to control by the employer and on the subsequent assurance that neither party will be able to enlist the courts to further its own partisan ends.

<u>Id.</u> at 441.  The Court went on to cite Justice Brennan's dissent in <u>Chicago & N.W. Ry. v. UTU</u>, 402 U.S. 570, 596-97 (1971), for the proposition that after exhaustion of the major dispute

procedures of the Act, the RLA does not contemplate government intervention in favor of either party to compel agreement upon the other party's terms.  489 U.S. at 441.  It also cited Burlington Northern Ry. v. Brotherhood of Maintenance of Way Employees, 481 U.S. 429 (1987), for the proposition that the availability of self-help measures rather than judicial remedies may enhance the effectiveness of the RLA's major dispute resolution procedures.  Id. After reciting this case law dealing with the RLA's major dispute resolution procedures, the Court concluded that judicial intervention in "RLA procedures [is] limited to those cases where 'but for the general jurisdiction of the federal courts there would be no remedy to enforce the statutory commands which Congress had written into the Railway Labor Act.'" Id.

After recognizing these principles, the Court observed: "Here, TWA and the Union followed without interference the scheme of the RLA to unsuccessful conclusion and then turned to self-help." Id. at 442.  It also noted "we have more than once observed that, at this final stage of a labor dispute regulated by the RLA, 'the Act is wholly inexplicit as to the scope of allowable self-help.'" Id.  The Court then held that courts should hesitate to restrict allowable forms of self-help except where the employer's actions strike a fundamental blow to the union or the collective bargaining process.  Id. Applying this reasoning to the TWA dispute, it held that TWA's self-help action in adopting its policy for dealing with cross-over strikers did not violate § 2, Fourth, concluding "[n]either the RLA itself nor any analogies to the NLRA indicate that the crossover policy adopted by TWA *during the period of self-help* was unlawful." Id. at 443 (emphasis added).

As the above discussion reflects, the Court's analysis of § 2, Fourth in TWA focused on the application of § 2, Fourth to post-exhaustion, self-help activity.  The Court's limitations on judicial exercise of jurisdiction under § 2, Fourth to instances where only judicial intervention

can remedy violations of the Act and where the employer's activity is inherently destructive of the union or the collective bargaining process are properly understood to apply to self-help actions taken after unsuccessful exhaustion of the RLA's major dispute procedures. Accordingly, <u>TWA</u> provides no guidance for this Court's treatment of the BLET's § 2, Third and Fourth claims asserted on behalf of its members in the instant case since they do not involve actions occurring under the RLA's major dispute resolution procedures, much less following exhaustion of those procedures.

Even if this Court is inclined to apply <u>TWA</u> to the instant dispute, the Supreme Court noted in <u>TWA</u> that "we have understood judicial intervention in RLA procedures to be limited to those cases where 'but for the general jurisdiction of the federal courts there would be no remedy to enforce the statutory commands which Congress had written into the Railway Labor Act." <u>Id.</u> at 441. Here, employees who are being coerced and interfered with in the exercise of the organizational rights have no remedy before the Adjustment Board for the Carrier's violation of § 2, Third and Fourth since it has no jurisdiction over such statutory claims. <u>Roscello v. Southwest Airlines Co.</u>, 726 F.2d 217, 220 (5th Cir. 1984)(citations omitted). *See also* <u>Brady v. Trans World Airlines, Inc.</u>, 223 F. Supp. 361, 365 (D. Del. 1963), *aff'd*, 401 F.2d 87 ( 3rd Cir. 1968), in which the district court held, "And there can be no doubt that enforcement of 2 (Fourth) was also entrusted to the court, for no other agencies, least of all the Adjustment Boards, are either equipped or empowered to deal with conduct impairing the statutory right of employees to be free of coercion in choosing bargaining representatives." Nor, can the Carrier claim that this case should be resolved through collective bargaining because, as Mr. Mobley explained in ¶ 30 of his First Declaration, the Carrier's rules of conduct, including its no-solicitation policy, are not the subject of bargaining. Further, as explained above in Part II, B of

this filing, the NMB has no jurisdiction and no authority to adjudicate violations of § 2, Third or Fourth. Accordingly, no remedy is available to enforce § 2, Third and Fourth's commands but this Court's general jurisdiction. *See* <u>TWA</u>, 489 U.S. at 441; <u>Virginian Ry. Co.</u>, 300 U.S. at 543.

In any event, the Court in <u>TWA</u> indicated only that § 2, Fourth deals "primarily", not exclusively, with pre-certification activity. Section 2, Fourth also regulates carrier interaction with "representatives" after their designation by employees. For example, it separately prohibits carriers from interfering with their employees' organizational activity and carrier action that influences or coerces an employee to join or remain in a union. Obviously, an employee's right to either join or remain in a union can be exercised only if there is a labor organization representing his craft or class. Such a decision cannot be made "pre-certification."

The history of the 1934 amendments, which added § 2, Fourth and strengthened the language of § 2, Third to eliminate the company union challenge to the national rail labor organizations demonstrates that Congress was directing the strictures of § 2, Fourth to conduct by carriers, whether pre- or post-certification, that interfered with employees' representational freedom. The rail industry was almost wholly organized at the time the 1934 amendments were adopted. The issue presented by the standard rail unions was not a matter of organizing the unorganized, but of rival claims by company-sponsored unions to the national unions' status as employee representatives. The Supreme Court characterized the concern before Congress, not so much that employees were unorganized, but that employees were "effectively deprive[ed] of their right to bargain collectively" because carriers were recognizing company unions instead of the standard rail unions. <u>Railway Employees' Dep't v. Hanson</u>, 351 U.S. 225, 231 (1956), *quoting* S. Rep. No. 2262, 81st Cong., 2d Sess., p. 3. Collective bargaining, of course, occurs only where a representative is in place. Congress' intent to regulate post-certification conduct is

also evidenced by its refusal to exempt the national rail labor organizations from the prohibitions of § 2, Fourth.  Street, 367 U.S. at 752.

The post-certification obligations of a Carrier to refrain from coercing or interfering with employees' exercise of organizational rights were not a subject of the Supreme Court's decision in TWA.  Accordingly, any limitations placed on § 2, Fourth claims by that decision are not relevant to the instant dispute.  Furthermore, this Court has recognized that judicial intervention is appropriate when "the employers' conduct has 'been motivated by anti-union animus or . . . *an attempt to interfere with its employees choices of their collective bargaining representative*.'" Held v. American Airlines, 13 F. Supp. 2d 20, 26 (D.D.C. 1998)(emphasis added), *quoting* Independent Union of Flight Attendants v. Pan American World Airways, Inc., 789 F.2d 139, 142 (2d Cir. 1986).  In this case, the NSR's no-solicitation policy undeniably interferes with its employees' choices of their collective bargaining representative as well their right to join or not join or remain or not remain a member of any labor organization.  Therefore, judicial intervention is not only appropriate but also necessary.

III.  **THE CARRIER'S UNCONDITIONAL POLICY PROHIBITING ALL UNION SOLICITATION AND ORGANIZING ACTIVITIES BY EMPLOYEES ON ITS PROPERTY UNLAWFULLY INTERFERES WITH EMPLOYEES' RIGHT OF SELF-ORGANIZATION PROTECTED UNDER THE RAILWAY LABOR ACT, AND THEREFORE SHOULD BE ENJOINED.**

A.  **The Requirements of the Norris-LaGuardia Act for Injunctive Relief Must Give Way In This Case Because They Would Undermine the Purposes of the Railway Labor Act.**

There does not appear to be any dispute between the parties that preliminary "injunctive relief is available to protect employees' organizational rights under the RLA." Arcamuzi, 891 F.2d at 937, *citing* Texas & N.O.R.R., 281 U.S. at 571.  Rather than applying the traditional standards for the grant of preliminary injunctive relief found in Washington Metro. Area Transit

Comm'n v. Holiday Tours, Inc., 559 F.2d 841, 843 (D.C. Cir. 1977), and it progeny, however, the Carrier argues that the Court must adhere to the heightened requirements for injunctive relief found in § 7 of the Norris-LaGuardia Act, 29 U.S.C. § 107.

Specifically, the Carrier argues that the Court must dispense with the likelihood of success on the merits analysis and make a final determination that its no-solicitation policy actually violates of the RLA. This argument is intended to frustrate the Court's ability to protect the organizational rights of NSR employees and is without merit because it ignores the Supreme Court's admonition that "the Norris-LaGuardia Act cannot be read alone in matters dealing with railway labor disputes. There must be an accommodation of that statute and the Railway Labor Act so that the obvious purpose in the enactment of each is preserved." Brotherhood of R.R. Trainmen v. Chicago River & Indiana R.R. Co., 353 U.S. 30, 40 (1957). *See also* Southern Ry. Co. v. Brotherhood of Locomotive Firemen & Enginemen, 337 F.2d 127, 133 (D.C. Cir. 1964) (holding that Norris-LaGuardia does not prevent a Federal court from entering an injunction to enforce mandatory dispute resolution procedures of the RLA).

To discern Congress' purpose in enacting the RLA as it relates to the instant case, the Court need look no further than § 151a, "General Purposes," of the RLA, which states in pertinent part, "The purposes of this chapter are . . . (2) to forbid any limitation upon freedom of association among employees or any denial, as condition of employment or otherwise, of the right of employees to join a labor organization . . . ." 45 U.S.C. § 151a. "The Norris-LaGuardia Act, on the other hand, was designed primarily to protect working men in the exercise of organized, economic power, which is vital to collective bargaining. The Act aimed to correct existing abuses of the injunctive remedy in labor disputes." Chicago River 353 U.S. at 40-41. Generally, there should be no conflict between the two Acts given their common purpose in

protecting the organizational rights of working men and women.   Nevertheless, under the Supreme Court's accommodation doctrine, if the general provisions of § 7 of the Norris-LaGuardia Act interfere with or undermine the Court's ability to enforce the specific commands of the RLA that forbid any limitation upon freedom of association among employees, the Norris-LaGuardia Act must give way.   *Cf.* Local 553, Transp. Workers Union of Am. v. Eastern Air Lines, Inc., 695 F.2d 668, 678 (2d Cir. 1982) (holding that requirements of § 7(c) of the Norris-LaGuardia Act should not apply to injunctions designed to preserve status quo during major disputes under the RLA).

Turning to the case at bar, we submit that application of § 7(a) of the Norris-LaGuardia Act to the BLET's request for preliminary injunctive relief would undermine the absolute right of employees to select a representative and join, organize, or assist in organizing the labor organization of their choice free of carrier interference, as protected by § 2, Third and Fourth of the RLA.  Application of § 7(a) of Norris-LaGuardia would undermine the purposes of the RLA because requiring what amounts to final decision on the merits at the preliminary injunction stage allows a carrier to continue its interference with organizational rights, which can never be restored once lost, while dragging out the litigation process required for the court to make a final decision.  Notably, the Carrier fails to cite a single case decided under § 2, Third or Fourth of the RLA that applies § 7(a) of the Norris-LaGuardia Act to a request for preliminary injunctive relief.[9]

---

[9]   The Carrier relies on District 17, United Mine Workers of Am. v. Apogee Coal Co., 13 F.3d 134 (4th Cir. 1993), to support its argument that the Curt may not apply the general standards for granting preliminary injunctive relief in this case.  That case is inapposite because it involved a preliminary injunction issued to enforce an arbitration award, subject to § 301 of the Labor Management Relations Act, 29 U.S.C. § 185, a venue-jurisdiction provision that does not set forth substantive prohibitions or standards of conduct.  There was no statutory violation alleged.

On the other hand, in <u>Arcamuzi</u>, 891 F.2d at 938-39, the Court of Appeals for the Ninth Circuit reversed and remanded the denial of preliminary injunctive in a case seeking to enjoin a carrier from requiring returning strikers to take a polygraph because the district court had erred in applying the traditional preliminary injunction standards of likelihood of success on the merits and likelihood of irreparable harm.  Quite notably, the Court made no mention whatsoever of the Norris-LaGuardia Act.  Similarly, in <u>Scott</u>, 488 F. Supp. at 419, the district court entered a preliminary injunction enjoining the carrier's policy against wearing union pins.  In entering the preliminary injunction, the district court found that the carrier's conduct "appear[s] to be an unlawful interference in violation of . . . the Railway Labor Act."  <u>Id.</u>  Conspicuously absent from the decision to grant the preliminary injunction is any finding that the carrier had actually committed an unlawful act in violation of the RLA or any mention of the Norris-LaGuardia Act.

Therefore, the Court should proceed on the BLET's request for preliminary injunctive relief by applying the traditional standards found in <u>Holiday Tours</u>, 559 F.2d at 843, and its progeny.

> **B.    Whether the Court Applies the Traditional Standards for Preliminary Injunctive Relief or the Heightened Requirements of the Norris-LaGuardia Act, A Preliminary Injunction Enjoining Enforcement of the Carrier's Overbroad No-Solicitation Policy Is Warranted.**

On an application for a preliminary injunction, the district court must consider whether:

(1) the party seeking the injunction has a substantial likelihood of success on the merits;

(2) the party seeking the injunction will be irreparably injured if relief is withheld;

(3) an injunction will not substantially harm other parties; and

(4) an injunction would further the public interest.

---

Therefore, there was no need to accommodate § 7 of the Norris-LaGuardia Act to any other more specific statutory commands, such as those contained in § 2, Third and Fourth of the RLA.

Holiday Tours, 559 F.2d at 843.  The test is flexible, and "[i]f the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak." Cityfed Fin. Corp. v. Office of Thrift Supervision, 58 F.3d 738, 747 (D.C. Cir. 1995).

As discussed above, the Carrier's no-solicitation policy, which ousts all union organizing, recruitment and solicitation from its property, unquestionably interferes with its employees' organizational rights guaranteed by § 2, Third and Fourth of the RLA.  First, to "assist" Trainmen in "organizing the labor organization of their choice," as is their right under § 2, Fourth, Engineer members of the BLET necessarily must be permitted to communicate with Trainmen on the Carrier's property about a change in their representative.  The Supreme Court held no less when it stated in Beth Israel Hospital, 437 U.S. at 491, that the right of employees to self-organize without interference or coercion "necessarily encompasses the right effectively to communicate with one another regarding self-organization at the jobsite."  If Engineers are not permitted to even speak to Trainmen on the Carrier's property on threat of discipline, then they are being interfered with and coerced in the exercise of their rights under § 2, Fourth.

Equally compelling is the right of Trainmen members of the BLET to be free of NSR's interference, influence and coercion in their choice of representatives and in their right to organize the labor organization of their choice under § 2, Third and Fourth.  The Carrier has claimed throughout this lawsuit that the only employees who have a real stake in this litigation are Trainmen because it is in that group than an active organizing campaign is underway.  These employees, a significant number of whom are BLET members (Tr.-I at 44-45; Tr.-II at 139-40), possess an organizational right to communicate with one another and with other statutory employees of the Carrier about their selection of representative or decision to organize.  As the Supreme Court held in Central Hardware, 407 U.S. at 542-43, "organization rights are not viable

in a vacuum; their effectiveness depends in some measure on the ability of employees to learn the advantages and disadvantages of organization from others." The Carrier's no-solicitation policy denies Trainmen the right to learn the advantages and disadvantages of organization from others on the Carrier's property in violation of § 2, Third and Fourth.

Further, the Carrier's no-solicitation policy influences and coerces employees in their right to join or not to join or remain or not remain members of any labor organization in violation of § 2, Fourth. The no-solicitation policy is particularly coercive on the NSR's property because rail operating employees, such as Trainmen and Engineers, are permitted to satisfy their contractual union membership obligation by maintaining membership in a labor organization that is not their collective bargaining representative. In light of this option, effective communication concerning the advantages and disadvantages of being a member in one labor organization or another is essential to the employees' organizational rights. "The place of work is a place uniquely appropriate for dissemination of views concerning the bargaining representative and the various options open to the employees. So long as the distribution is by employees to employees and so long as the in-plant solicitation is on nonworking time, banning of that solicitation might seriously dilute" organizational rights. Magnavox, 415 U.S. at 325.

Of course, the right of employees to communicate with one another about self-organization at the jobsite is not absolute. Thus, in Scott, 488 F. Supp. at 418, a solicitation case decided under § 2, Third and Fourth of the RLA, the district court assessed the defendant carrier's claim that "the wearing of pins was a form of solicitation which provoked discussion and controversy over the pros and cons of unionism and this reflected upon the agents productivity, work habits and their customer relations." Weighed against the employees' organizational rights under § 2, Third and Fourth to "promote the TWU as their representative

and to urge their fellow agents to join," however, the district court found the carrier's claim of disruption to efficiency, safety and personal relations insufficient to justify the prohibition on solicitation.   Id. at 420.   Therefore, the district court granted the plaintiffs' motion for a preliminary injunction.

Similarly, in Federal Express II, 470 F. Supp. at 1362-63, another solicitation case decided under § 2, Third and Fourth of the RLA, the district court rejected the defendant carrier's claim that it was justified in prohibiting solicitation in the form of wearing a union pin because "such expression of support might be 'disruptive' or 'inflammatory.'"   After holding that § 2, Third and Fourth gave employees "the right to visibly demonstrate their support or opposition to a particular bargaining representative absent some exceptional reason for curtailing such expression, " the district court found the carrier had "not demonstrated that the wearing of Teamster buttons made its operation any less efficient and, despite Taylor's belief that the buttons were 'disruptive,' defendant has not demonstrated that any disciplinary problems were attributable to the buttons." Id.

In the instant case, NSR has not presented any evidence that its blanket prohibition on all union solicitation is necessary to maintain production or discipline.  Instead, the Carrier makes the same tired claims raised in both Scott and Federal Express II that organizing activities could be disruptive or inflammatory or employees could become "distracted."   But, Mr. Mobley conceded at the hearing that there have been no accidents or safety-related incidents as result of disagreements between employees over union representation.   (Tr.-II at 127)   He further conceded that he had no knowledge of union solicitation impeding a specific train operation. (Tr.-II at 130).  Further, prior to promulgating the no-solicitation policy, neither Mr. Mobley nor anyone on his staffed reviewed any NSR records from the last time there was a large scale

organizing drive on the property in 1989 to determine whether it had caused any operational failures or safety concerns. (Tr.-II 112-13)  In fact, the Carrier received the E.H. Harriman Memorial Gold medal "bestowed annually on the major railroad with the lowest rate of employee injuries" for 1989, despite the presence of a large scale organizing campaign that year and the absence of any evidence that the Carrier had prohibited union solicitation on its property during the campaign. (Tr.-II 130-31; First Decl. of Mobley ¶ 19).

Moreover, the Carrier has not attempted to prohibit all discussions on its property that have the potential to distract employees, such as those about gun control, politics, or religion, despite Mr. Mobley's admission that they could also cause employees to lose focus on their work. (Tr.-II 132)  It is only discussions about unions that have been banned from the property. Employees may espouse their views on abortion, but they are not allowed to speak their mind about the advantages and disadvantages of one labor organization over another.  This type of blatant coercion and interference with the organizational rights of employees is precisely what § 2, Third and Fourth prohibit.

The Carrier is sure to argue that it has demonstrated that disciplinary problems have arisen that are attributable to union solicitation on the property.  It even created a log purporting to document the various complaints and incidents that have been generated by union solicitation. (Mobley Decl. Ex. 10)  The problem with this argument is the log, as amended by Mobley's Third Declaration, only contains two alleged incidents that occurred prior to the promulgation of the Carrier's no-solicitation policy, the incident occurring on 2/27/05 and the unauthorized use of the Carrier's internal mail system on 3/05/05.  Id.  No rule against union solicitation was necessary to address these occurrences, however, because both of the alleged incidents were already prohibited under the Carrier's rule against unauthorized use of the internal mail system

and general conduct rules. (Tr.-II at 115, 128-29) And, although Mr. Mobley claimed that there were other prior incidents, the Carrier did not make a single written record of the alleged incidents (Tr.-II 121), thereby throwing into doubt the seriousness of these occurrences, as well as when and whether they actually took place.

As for the complaints following the promulgation of the no-solicitation rule on March 9, 2005, any assertion that these support the existence of the rule is self-serving and illogical. Certainly, the Carrier cannot bolster its claim that the no-solicitation policy is necessary in order to maintain discipline by citation to all the times the rule has been violated, for if there was no policy against solicitation there could not be any complaints over its violation. Moreover, the complaints leveled by the supporters of each organization are stimulated by the natural competing forces of employees exercising their organizational rights, and not because of some impact on efficiency or safety.

Mere speculation that employees could become distracted if they are permitted to discuss union organizing on the property is grossly insufficient to satisfy the Carrier's obligation to present evidence that its policy is necessary to maintain production or discipline. And, to be sure, the Carrier's justification for the no-solicitation is pure speculation, as Mr. Mobley indicated in ¶ 50 of his First Declaration: "Of course, I cannot warrant to the Court that specific operational or safety problems necessarily will flow from organizing activities or that permitting our employees to engage in union solicitation on NS' property will cause train accidents or employee injuries." If such conjecture were held to satisfy a carrier's burden in establishing the necessity of a blanket no-union solicitation policy, the right of employees to communicate regarding self-organization at the jobsite would be rendered as meaningless on every property as they are now on the NSR.

In light of the overwhelming legal precedent holding that blanket prohibitions on organizing activities by employees such the one at issue here constitute unlawful interference with employees' right of self-organization, and the Carrier's failure to demonstrate the necessity of the policy to maintain efficiency or discipline, the BLET's likelihood of success on the merits of this case is great.  In addition, there is more than sufficient evidence before the Court to support a finding that the Carrier's no-solicitation actually violates § 2, Third and Fourth of the RLA, thus satisfying § 7(a) of the Norris-LaGuardia Act, even if, contrary to overwhelming precedent, that provision is not accommodated with the more specific dictates of the RLA. Therefore, the first element the Court must consider in determining whether to grant the BLET the preliminary injunctive relief it seeks is satisfied.

Turning to the question of irreparable injury, where a likelihood of success on the merits has been established and there is no adequate remedy available at law, injunctive relief must be granted.  *See* National R.R. Passenger Corp. v. United Transp. Union, 832 F. Supp. 7, 11 (D.D.C. 1993).  In Arcamuzi, 891 F.2d at 938, the Court of Appeals found that coercive and inhibitory effects of a carrier's unlawful policy on employees' organizational rights secured by Section 2, Third and Fourth of the RLA cannot be remedied by money, and "[s]uch harm is irreparable." Here, employees' rights to communicate with one another about the advantages and disadvantages of one labor organization over another are being interfered with by the Carrier's blanket no-solicitation policy.  Employees' are also being coerced in their right to remain or not remain or join or not join the labor organization of their choice.  These organizational rights cannot be restored retroactively.  Therefore, the harm to employees in the form of interference with their § 2, Third and Fourth rights is not only imminent, but has already occurred, and unless

restrained by the Court will continue to the detriment of the right of employees to communicate effectively at the workplace about the pros and cons of unionization.

As for any possible harm suffered by the Carrier by issuance of a preliminary injunction, it is unclear how permitting employees to engage in union organizing activities would result in harm to the NSR. Certainly, the Carrier has not cited any legitimate concerns in its issuance of letters and notices setting forth the policy that would make the policy necessary. On the other hand, it is in the public interest to enjoin the Carrier's unlawful policy, as "[t]he RLA statutorily protects the right of association and expression in union activities from interference by employers. It is the duty of the courts to give effect to that purpose when called upon to do so." Arcamuzi, 819 F.2d 939.

## CONCLUSION

For the reasons stated above and in our earlier submissions, the Court should issue a preliminary injunction enjoining the Carrier from enforcing its unconditional policy prohibiting all union solicitation, recruitment and organizing activities by employees on its property. This Court has jurisdiction to enjoin the policy to protect employees' organizational rights under Section 2, Third and Fourth of the RLA, 45 U.S.C. § 152, Third and Fourth. Given the Carrier's violation of the RLA, the Norris-LaGuardia Act, 29 U.S.C. 101, *et seq.*, does not preclude issuance of the requested injunctive relief. Therefore, this Court may issue an order granting the requested relief against the defendants.

41

Dated: October 4, 2005                     Respectfully submitted,


                                           Roland P. Wilder, Jr. (D.C. Bar# 69609)
                                           Joshua D. McInerney (D.C. Bar# 479471)
                                           Baptiste & Wilder, P.C.
                                           1150 Connecticut Ave., N.W., Suite 500
                                           Washington, D.C. 20036
                                           (202) 223-0723
                                           (202) 223-9677 Fax
                                           rpwilderjr@bapwild.com
                                           jmcinerney@bapwild.com

                                           Attorneys for Plaintiff BLET