**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                                    )
BROTHERHOOD OF LOCOMOTIVE ENGINEERS                 )
AND TRAINMEN,                                        )
                                                    )
                              *Plaintiff,*           )
             v.                                      )   Civil Action No. 1:05CV01188
                                                    )   Judge Richard W. Roberts
NORFOLK SOUTHERN RAILWAY CO.                        )
and NORFOLK SOUTHERN CORP.,                         )
                                                    )
                              *Defendants.*          )
_____)


## DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF THEIR MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR JUDGMENT ON THE PLEADINGS

Jeffrey S. Berlin (D.C. Bar #200048)
Krista L. Edwards (D.C. Bar #421537)
Mark E. Martin (D.C. Bar #373445)
SIDLEY AUSTIN BROWN & WOOD LLP
1501 K Street, N.W.
Washington, D.C.  20005
(202) 736-8178
jberlin@sidley.com
kedwards@sidley.com
mmartin@sidley.com

*Attorneys for Defendants Norfolk Southern
Railway Company and Norfolk Southern
Corporation*

October 14, 2005

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................ ii

INTRODUCTION ..................................................................................................1

ARGUMENT ........................................................................................................4

I.      BLET Has Not Met Its Burden Of Establishing Subject Matter Jurisdiction......................4

II.     BLET Has Not Shown That The RLA Gives Employees An Affirmative
Right To Solicit On A Railroad's Property.........................................................9

III.    BLET Has Not Shown That Judicial Intervention Is Appropriate Under The
Standards For Implying A Cause of Action Under RLA §§ 2 Third And Fourth. ............21

CONCLUSION.....................................................................................................24

## TABLE OF AUTHORITIES

**Page**

### CASES

*Adams v. Federal Express Corp.*, 470 F. Supp. 1356 (W.D. Tenn. 1979) ....................................16

*Adams v. Federal Express Corp.*, 547 F.2d 319 (6th Cir. 1976) .......................................5, 6, 7, 18

*Air Line Pilots Ass'n v. Texas Int'l Airlines, Inc.*,
    656 F.2d 16 (2d Cir. 1981)..............................................................................................23

*\*Air Line Pilots Ass'n v. Trans World Airlines, Inc.*,
    729 F. Supp. 888 (D.D.C. 1989) ....................................................................................18, 19

*Air Line Pilots Ass'n v. United Air Lines, Inc.*, 802 F.2d 886
    (7th Cir. 1986)......................................................................................................................14

*\*Aircraft Mechanics Fraternal Ass'n v. United Airlines, Inc.*,
    406 F. Supp. 492 (N.D. Cal. 1976) ..........................................................................13, 17, 22

*American Train Dispatchers Ass'n v. Denver & Rio Grande Western R.R.*,
    614 F. Supp. 543 (D. Colo. 1985) .........................................................................14, 18

*Ass'n of Flight Attendants v. USAIR, Inc.*, 807 F. Supp. 827
    (D.D.C. 1992), .........................................................................................................21, 22

*Atlas Air, Inc. v. Air Line Pilots Ass'n*, 232 F.3d 218 (D.C. Cir. 2000) .........................................11

*Brady v. Trans World Airlines, Inc.*, 223 F. Supp. 361 (D. Del. 1963) ........................................22

*Brotherhood of Locomotive Engineers v. Kansas City Southern Ry.*,
    26 F.3d 787 (8th Cir. 1994) ...............................................................................................12

*Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101 (7th Cir. 1984)............................................8

*Commonwealth of Pennsylvania v. Pepsico, Inc.*, 836 F.2d 173 (3d Cir. 1988) ...........................8

*Dempsey v. Atchison, Topeka & Santa Fe Ry.*, 16 F.3d 832 (7th Cir. 1994)................................12

*Held v. Allied Pilots Ass'n*, 13 F. Supp. 2d 20 (D.D.C. 1998)......................................................21

*Horizon Air Industries, Inc. v. NMB*, 232 F.3d 1126 (9th Cir. 2000)............................................13

_____

*Authorities chiefly relied upon are marked with an asterisk.

## <u>TABLE OF AUTHORITIES (Cont'd)</u>

**<u>Page</u>**

<u>CASES (Cont'd)</u>

*ITT Industries, Inc. v NLRB*, 413 F.3d 64 (D.C. Cir. 2005)...........................................20

*NLRB v. Daylin, Inc.,* 496 F.2d 484 (6th Cir. 1974) ......................................................21

*Pacific Fruit Express v. Union Pacific R.R.,* 826 F.2d 920 (9th Cir. 1987)..................19

*Republic Aviation Corp. v. NLRB*, 324 U.S. 793 (1945) ........................................10, 11

*Roscello v. Southwest Airlines Co.*, 726 F.2d 217 (5th Cir. 1984) ................................22

*\*Ruby v. American Airlines, Inc.*, 323 F.2d 248 (2d Cir. 1963).................................. 17, 18, 22-23

*Scott v. American Airlines*, 488 F. Supp. 415 (E.D.N.Y. 1980) ...................................16

*Stanford Hospital & Clinics v. NLRB*, 325 F.3d 334 (D.C. Cir. 2003) ........................10

*Switchmen's Union of North America v. NMB*, 320 U.S. 297 (1943)............................13

*Texidor v. Ceresa*, 590 F.2d 357 (1st Cir. 1978) .........................................................18

*\*Trans World Airlines, Inc. v. Independent Federation of Flight Attendants*,
    489 U.S. 426 (1989)..............................................................................................12, 21, 22

*U.S. Airways, Inc. v. NMB*, 177 F.3d 985 (D.C. Cir. 1999).....................................11, 12

*United Transportation Union v. United States*, 987 F.2d 784 (D.C. Cir. 1993).....................13, 14

*Woodruff v. DiMario*, 197 F.R.D. 191 (D.D.C. 2000)....................................................8

<u>ADMINISTRATIVE DECISIONS</u>

*Daylin, Inc. Discount Division*, 198 N.L.R.B. 281 (1972), 1972 WL 5039 (N.L.R.B.)...............21

*Express Airlines I, Inc.,* 28 NMB 431 (2001), 2001 WL 702092 (N.M.B.)...........................15, 16

*Metro North Commuter R.R.*, 29 NMB 458 (2002) 2002 WL 31106336 (N.M.B.).....................15

*Northwest Airlines, Inc.*, 14 NMB 49 (1986), 1986 WL 21726 (N.M.B.)......................................13

---

\*Authorities chiefly relied upon are marked with an asterisk.

### TABLE OF AUTHORITIES (Cont'd)

**Page**

## ADMINISTRATIVE DECISIONS (Cont'd)

*Peyton Packing Co.*, 49 N.L.R.B. 828 (1943), 1943 WL 10225 (N.L.R.B.)................................20

*St. John's Hospital & School of Nursing, Inc.*, 222 N.L.R.B. 1150 (1976)
   1976 WL 7848 (N.L.R.B.)........................................................................................21

*Stoddard-Quirk Mfg. Co.*, 138 N.L.R.B. 615 (1962), 1962 WL 16389 (NLRB) .........................20

## STATUTES AND RULES

National Labor Relations Act, 29 U.S.C. §§ 151 *et seq* ........................................................ passim

   29 U.S.C. § 157................................................................................................10

   29 U.S.C. § 158................................................................................................10

   29 U.S.C. § 158(a) ............................................................................................11

*Railway Labor Act, 45 U.S.C. §§ 151 *et seq* .................................................................... passim

   45 U.S.C. § 152 Third....................................................................................... passim

   45 U.S.C. § 152 Fourth ..................................................................................... passim

   45 U.S.C. § 152 Ninth.........................................................................................13

   45 U.S.C. § 152 Eleventh (c) ..............................................................................9, 12

Rule 12, Fed. R. Civ. P. .........................................................................................2, 3

Rule 12(b)(1), Fed. R. Civ. P. .................................................................................4, 24

Rule 12(c), Fed. R. Civ. P..........................................................................................24

_____
*Authorities chiefly relied upon are marked with an asterisk.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

|  |  |
|---|---|
| BROTHERHOOD OF LOCOMOTIVE ENGINEERS AND TRAINMEN, | ) ) ) |
|  | ) |
| Plaintiff, | ) |
| v. | ) Civil Action No. 1:05CV01188 |
|  | ) Judge Richard W. Roberts |
| NORFOLK SOUTHERN RAILWAY CO. and NORFOLK SOUTHERN CORP., | ) ) |
|  | ) |
| Defendants. | ) |

_____

## DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF THEIR MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR JUDGMENT ON THE PLEADINGS

### INTRODUCTION

Each time it has tried to describe or defend its claim in this civil action, plaintiff Brotherhood of Locomotive Engineers and Trainmen ("BLET") has advanced a somewhat different version, moving farther from the facts out of which this case arose, yet no closer to a viable legal theory. In its Complaint against defendants Norfolk Southern Railway Company ("NSR") and Norfolk Southern Corporation, BLET purported to bring two separate claims -- Count I under § 2 Third of the Railway Labor Act ("RLA"), 45 U.S.C. § 152 Third, and Count II under RLA § 2 Fourth. BLET said that it was suing "in its own behalf and for and in the interests of all BLET-represented employees in the service of defendants" (Complaint ¶ 6) and that it was seeking injunctive relief in order to enforce "the rights of employees to organize and form a labor union to represent them" (¶ 2). The allegations of BLET's Complaint focused on NSR's announcement and enforcement of its no-solicitation policy beginning in March 2005 (¶¶ 11, 14, 15, 17, 19) and on BLET's initiation and conduct of its A-card campaign (¶¶ 12, 21,

22).  The Complaint identified United Transportation Union ("UTU") as the current representative of NSR trainmen (¶ 10); explained that BLET intends to "initiate a representation dispute among the trainmen" if "sufficient authorization cards are signed and collected" (¶ 21); alleged that UTU was encouraging its officials and members to report "union activity on the NS property by BLET members" and violations of the no-solicitation policy to UTU officials (¶ 20); and alleged that NSR's enforcement of its no-solicitation policy interferes "with employees' ability to solicit and receive authorization cards" (¶ 22) and with the rights of NSR employees to "designate their choice of representative" (¶ 28).

By the time that we filed our Rule 12 motion, BLET had disavowed any intention of enforcing the rights of NSR trainmen; had abandoned its reliance on § 2 Third; and had otherwise fundamentally recast its legal theory.  We briefed our motion accordingly, anticipating and responding to BLET's then-current formulations, in addition to the terms of the union's original Complaint.

BLET's opposition to the Rule 12 motion ("Opp.") rests on yet a further recasting of the union's complaint.  BLET now contends that it filed this case solely on behalf of BLET members employed by NSR (Opp. at 1) and that it is "not claiming in this litigation a right to conduct an A-card campaign without interference" (*id*. at 2).  BLET complains that defendants have illegitimately focused on BLET's attempt to replace UTU as the representative of NSR train service employees (Opp. at 1-2), when what is really at stake are employee rights that, according to BLET, must be enforced by this Court without regard to the conduct or success of BLET's A-card campaign.

The disconnect between BLET's complaint and its opposition brief is both a symptom and manifestation of the jurisdictional and legal deficiencies in BLET's case.  BLET

has been grasping for a theory of the case that would achieve an impossible reconciliation of the union's strategic objectives:  claiming sufficient interest in the enforcement of NSR's policy to maintain a claim in its own name; framing a dispute that is sufficiently grounded in employee representation rights to justify BLET's reliance on standards adopted by the National Labor Relations Board in enforcing representation rights under its governing statute; and, at all costs, avoiding the precedent and jurisdiction of the National Mediation Board ("NMB").[1]  As a matter of procedure, as we pointed out in our opening brief (Def. 8/26/05 Mem. at 14, citing cases), a plaintiff cannot amend its pleading through argument.  At this point, BLET's Complaint has become such a moving target that the Court would be justified in dismissing the case on procedural grounds, without considering whether any one of BLET's various reformulations would state a legally sufficient claim.

For all its reinventing, BLET has not articulated a single coherent and viable claim, much less three separate bases for relief, as it now contends.  None of the three approaches BLET now advances gets the union around the fundamental legal obstacles that we identified in our opening brief.  However its case is presented or described, BLET is seeking to establish a legal right that has never been recognized under the Railway Labor Act ("RLA"), in a forum that is ill-suited to such policy-based determinations, in circumstances that do not properly implicate the courts' narrow role in such matters.

---

[1]    In the process of recasting its case, BLET pretends that the parties' dispute is about more than on-property solicitation.  BLET goes so far as to suggest that, under NSR's policy, "Engineers are not permitted to even speak to Trainmen on the Carrier's property on threat of discipline" (Opp. at 35) and "discussions about unions" are "banned from the property" (*id*. at 38).  Such reckless characterizations have no place in responsible briefing of the issues.  As BLET well knows, BLET's policy bans solicitation, not mere "discussions about unions," much less other conversations between employees.  In all events, these assertions are not among the allegations of BLET's Complaint, which are the only ones that should be taken as true for purposes of our Rule 12 motion.

## ARGUMENT

### I.     BLET Has Not Met Its Burden Of Establishing Subject Matter Jurisdiction.

If BLET had not changed its version of the case yet again, we might have had nothing more to say by way of reply on the question of subject matter jurisdiction.  By the time we filed our opening brief, the issue had been addressed in a full round of briefing, beginning with our opposition to BLET's application for a preliminary injunction and including the supplemental briefs ordered by the Court on July 8, 2005, which were filed on  July 11, 2005, and July 12, 2005.   Accordingly, our opening brief not only invoked and explained the authorities in support of relief under Rule 12(b)(1), but anticipated BLET's opposition based on its recent contentions in support of its pending application.

In view of BLET's further recasting, however, we are using this opportunity to address the three "sets of organizational rights" BLET now purports to be enforcing, by reference to what are now familiar RLA principles.  In doing so, we underscore the essential connection between what have been framed in earlier briefing as "standing" or "jurisdictional" issues and the broader legal issue in this case.  This is a matter that BLET has, at best, over-looked.  In an effort to fix jurisdictional defects, BLET has advanced legal theories that have nothing to do with the facts out of which this case arose and that expose further defects in BLET's underlying approach.  It should go without saying that BLET cannot assert one set of interests to get through the courtroom door and invoke an entirely different one as a basis for relief.  Yet that is, in various respects, precisely what BLET is proposing to do.

We address each of BLET's three formulations in turn, largely by reference to the propositions that we set forth in our opening brief:

1.     First, BLET says that it intends to enforce the supposed right of NSR engineers to "assist Trainmen in changing their representative" (Opp. at 2-3).  This is a formula-

tion that BLET first put forward in its reply brief on its application for a preliminary injunction,

after we pointed out (citing *Adams v. Federal Express* Corp., 547 F.2d 319, 322 (6th Cir. 1976))

that BLET lacks standing to assert RLA §§ 2 Third and Fourth rights on behalf of NSR trainmen.

BLET's first reformulation enables it to distinguish *Adams v. Federal Express*,

but this comes at a high cost to BLET's underlying theory.  BLET's reliance on the "assist in

organizing" clause adds another dubious link to the chain of legal propositions that BLET must

sustain in order to survive the Rule 12 motion.  Before it could even reach the core legal issues in

this case -- concerning the existence and enforcement of an affirmative right to solicit on railroad

property -- the Court would have to accept the equally unprecedented proposition that use of the

phrase "assist in organizing the labor organization of their choice" extends the coverage of

§ 2 Fourth to employees outside the self-organizing craft or class, contrary to the express terms

of the adjacent statutory text and the established RLA framework.  See Def. 8/26/05 Mem. at 9-

11.[2]

---

[2]    There is no truth to BLET's contention that our interpretation of the "assist in organizing" clause unjustifiably "treats the term 'labor organization' as the equivalent of the term 'representative'" (Opp. at 7).  BLET has the matter backwards, as it is BLET's reading of the language, not ours, that would seem to substitute "representative" where the statute says "labor organization."  We argue that the "assist in organizing" clause protects the rights of employees to participate in the formation of a new labor union -- an entity that would be a "labor organization" under the statutory definition, whether or not it ever achieves certification as a "representative." As we have pointed out previously (Def. 8/26/05 Mem. at 11-12), BLET is not being "organized" as a "labor organization" -- that happened more than a century ago -- although it is seeking to become a "representative" (as to NSR train service employees).  In short, if anyone is failing to take account of the fact that a "labor organization," as opposed to a "representative," is the object of the "assist in organizing" clause, it is BLET.

Likewise, BLET only undercuts its interpretation by pointing out that § 2 Fourth was addressed to the "'company union' problem" (Opp. at 8).  Granting employees explicit rights to organize and assist in organizing a "labor organization of their choice" was entirely consistent with the statutory objective of giving employees alternatives to company-sponsored unions.  To the extent that "the standard rail organizations" already were in existence (*id.*), employees' rights to select those labor organizations as their RLA "representatives" were safeguarded by § 2 Third.

2.    BLET's second reformulation takes a sharp turn from the position it staked out in connection with its preliminary injunction request. In its July 8, 2005 Reply, BLET attempted to answer defendants' invocation of *Adams v. Federal Express* by insisting that its case is "solely about the Carrier's . . . no-solicitation policy, as that policy is currently being applied to BLET-represented Locomotive Engineers" (Pl. 7/8/05 Mem. at 1-2). BLET accused defendants of constructing a "straw man argument over whether the BLET has standing to sue to enforce the Section 2, Third and Fourth rights of Trainmen represented by the UTU" and asserted that defendants had "profoundly misconstrue[d] the thrust of the BLET's cause of action in this matter" (Pl. 7/8/05 Mem. at 10). BLET added that a decision sustaining its claim on behalf of engineers might "necessarily lead to the logical conclusion that the policy is equally unlawful as applied to Trainmen," but declared that "the Court is not being asked to draw that conclusion" and asserted that the possibility that BLET's case on behalf of engineers could have implications for train service employees does not "in any way diminish or affect the right of the BLET to sue on behalf of the Locomotive Engineers employees of the Carrier that it represents" (*id.*).

In abrupt reversal, BLET now says that it is suing to enforce the rights of NSR *trainmen* "who are members of the BLET and thus maintain an associational tie with that Union" to change their union representative. Opp. at 3. BLET rests this contention on the general prin-ciples of "associational standing" under which membership organizations, including labor unions, have been allowed in certain cases to assert legal rights on behalf of individual members, rather than in their own right. *Id.* at 10-12. We do not take issue with BLET's description of the associational standing doctrine itself. But BLET's assumption that this theory salvages its Complaint is just wrong. As we explained from the outset (Def. 6/29/05 Mem. at 11), *Adams v.*

*Federal Express* states the standard governing a union's standing to enforce §§ 2 Third and Fourth rights on behalf of employees it is seeking to represent -- holding, as BLET acknowledges (Opp. at 12 n.5), that an uncertified union has no right of action on behalf of employees that it is seeking to represent.  It is no answer that, as BLET notes (Opp. at 12 n.5), *Adams v. Federal Express* did not address the rights of an uncertified union to sue on behalf of its *members*.  The burden is on BLET to show why it should be permitted to invoke common law standing principles as a means of circumventing the narrower and more specific statutory standard applicable under the very statute BLET seeks to enforce.  Indeed, the rule of *Adams v. Federal Express* would have little meaning if a plaintiff union could evade its command by simply signing up as its union "members" one or more constituents of the targeted craft or class of employees.

BLET's attempt to invoke the rights of its train service members as a basis for proceeding in federal court is especially misconceived in the circumstances of this case.  What underlies this civil action is BLET's effort to replace another union as collective bargaining representative of all of NSR's train service employees -- a matter that falls squarely within the jurisdiction of the NMB.  It would be fundamentally inconsistent with the RLA scheme to permit BLET to employ nonstatutory standing principles in aid of its effort to bypass the statutory scheme by bringing a claim in federal court, rather than before the NMB.

In all events, BLET's belated reliance on associational standing must be rejected for the simple reason that BLET's Complaint does not on its face purport to include a claim on behalf of the union's members who work in train service -- and BLET has previously *insisted* that no such claim was intended.  As we pointed out above, the Complaint purports to state claims on behalf of BLET in its own right and all "BLET-represented employees in the service of defendants" (Complaint ¶ 6).  If other language in the Complaint created some doubt about the

scope of the claims, BLET decisively removed that doubt, repeatedly disavowing any intention

of suing on behalf of NSR train service employees.  We quoted one of those disavowals above,

and BLET has acknowledged another (Opp. at 11-12).  But perhaps the clearest and most defini-

tive of BLET's concessions on the point came in its response to UTU's motion to intervene.

Urging the Court to deny UTU's motion, BLET insisted that UTU, as the certified representative

of NSR train service employees, "does not have the right to intervene in this action because it has

no interest in the issue before the Court, *which is whether the Carrier's policy unlawfully inter-*

*feres with the organizational rights of BLET-represented Locomotive Engineers*."  Pl. 7/11/05

Mem. at 2 (emphasis added); *see also id.* at 4 ("the sole issue presently before the Court is the

lawfulness of the Carrier's blanket no union solicitation policy, as that policy is currently being

applied to the BLET-represented Locomotive Engineers").  Against this record, nothing that

BLET has said (or could say) by way of argument at this point would justify the Court's even

considering BLET's standing to represent NSR train service employees in this civil action, much

less its sustaining the Complaint on the basis of an unasserted claim on their behalf. [3]

    3.    Finally, BLET contends that it is entitled to proceed here in order to

enforce the rights of NSR employees who are BLET *members* (including UTU-represented

trainmen) to solicit UTU *members* (including BLET-represented engineers) to "drop their UTU

membership and become members of the BLET"  (Opp. at 5).  This is reminiscent of the position

that BLET first staked out in its reply in support of its application for a preliminary injunction

(Pl. 7/8/05 Mem. at 8-9)).  But at that time, BLET made a point of invoking this theory only on

---

[3]    *See Car Carriers, Inc. v. Ford Motor Co.,* 745 F.2d 1101, 1107 (7th Cir. 1984) (recog-
nizing as  "axiomatic" rule "that the complaint may not be amended by the briefs . . ."); *accord
Commonwealth of Pennsylvania v. Pepsico, Inc.,* 836 F.2d 173, 181 (3d Cir. 1988); *cf. Woodruff
v. DiMario,* 197 F.R.D. 191, 195 (D.D.C. 2000) (Urbina, J.) (request to amend complaint as part
of opposition to motion to dismiss is insufficient to constitute a motion to amend; citing cases).

behalf of NSR *engineers*, recognizing that it has no standing to assert rights on behalf of NSR *trainmen*. The union's broader reformulation reflects its new-found and (as addressed above) misconceived reliance on common law associational standing principles to circumvent RLA-based limitations.

In any case, claims based on a supposed right to change union membership confront additional -- and insurmountable -- legal obstacles on the merits. As we demonstrated in our opening brief (at 16, citing cases), the Supreme Court long ago foreclosed any argument that § 2 Eleventh (c) confers rights outside of the narrow situation it was intended to address. BLET concedes these authorities but insists that § 2 Eleventh (c) gives some added content to the § 2 Fourth right to "join" a labor organization that would justify the Court in enjoining NSR's no-solicitation policy as a violation of employees' § 2 Fourth rights. This is more than a stretch. The simple truth is that § 2 Fourth, whether alone or in combination with § 2 Eleventh (c), does not purport to guarantee employees a right to recruit union members on a carrier's property, and, by the same token, NSR's no-solicitation policy imposes no limitation whatsoever on employees' rights to "join" labor organizations. Moreover, as we address more fully in the next section, the justification BLET offers for reading a solicitation right into the statute for other purposes is not even arguably applicable in the case of union recruitment.

## II.    BLET Has Not Shown That The RLA Gives Employees An Affirmative Right To Solicit On A Railroad's Property.

In each of its various formulations and reformulations, BLET's case ultimately depends on the unsustainable proposition that railroad employees have an affirmative right to engage in on-property solicitation. We previously showed both that no such right has ever been recognized under RLA §§ 2 Third and Fourth, and that the governing NMB case law -- which establishes that the rights protected by these provisions are not infringed as long as a carrier's no-

solicitation policy is evenhandedly applied as between competing unions -- defeats a claim to any such right.  BLET has no meaningful response to our arguments.

Instead, BLET (*e.g.,* Opp. at 16-18) once more urges the Court to adopt the different principles that are applicable under the National Labor Relations Act ("NLRA"), and to transform itself into a labor board, functionally equivalent to the National Labor Relations Board ("NLRB").  BLET asserts (Opp. at 16) that the Court would somehow run afoul of sixty years of Supreme Court precedent assertedly construing NLRA §§ 7 and 8, 29 U.S.C. §§ 157 and 158, if it did not find that the language of RLA §§ 2 Third and Fourth requires the same result.  BLET is wrong.  The presumptions regarding employee solicitation that operate under the NLRA are not a product of the Supreme Court's independently construing the statutory language and finding in it various requirements.   To the contrary, the presumptions are a product of administrative decision-making by the NLRB. They reflect a policy judgment suitable to the industries the NLRA covers, which balances the right of self-organization protected by NLRA § 7, against "the undisputed right of employers to maintain discipline in their establishments," *Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 798 (1945).[4]  The rules on solicitation that operate under the RLA are similarly a product of administrative decision-making, by the NMB -- and they reflect a different policy judgment, suitable to the industries covered by the RLA.  BLET has no valid answer to this point, or to our showing more generally that it would be incorrect to import the NLRB's presumptions regarding employee solicitation.

---

[4]     *See Stanford Hospital & Clinics v. NLRB*, 325 F.3d 334, 338 (D.C. Cir. 2003)  (the "Supreme Court has allowed the [National Labor Relations] Board to implement these section 7 prescriptions by adopting a series of presumptions regarding restrictions on solicitation and distribution activities").

BLET (Opp. at 15-16) suggests in passing that the bare text of RLA §§ 2 Third and Fourth provides all the guidance necessary to support its claim. This is a frivolous contention. BLET notes that these provisions prohibit carrier interference with the right to organize, and suggests that NSR's no-solicitation policy therefore must obviously be unlawful "interference," because, by definition, the policy eliminates a particular avenue by which employees might otherwise obtain signatures on A-cards (or membership applications). But a policy that barred solicitation only during working hours, or only in work areas, would, by definition, likewise eliminate one otherwise available avenue for the pursuit of employee signatures on A-cards; and BLET itself concedes that such a no-solicitation policy would be valid -- it would not constitute "interference" with the right to organize that is protected by RLA §§ 2 Third and Fourth. So BLET plainly cannot support a claim of statutory violation simply by pointing to the word "interference." Rather, BLET would need to identify some source of law that vests railroad employees with an affirmative right to solicit on their employer's property, such that a ban on this sort of solicitation might violate the right to organize guaranteed by the RLA.[5]

BLET wrongly purports to find that source not in the RLA, but in the NLRB's presumptions regarding employee solicitation, noting (Opp. at 17) that courts sometimes look to NLRA case law for aid in resolving RLA questions.[6] BLET, however, ignores the Supreme

---

[5]    Indeed, *Republic Aviation Corp. v. NLRB* itself acknowledges that the question whether an employer's no-solicitation policy constitutes interference with employee rights of self-organization under the NLRA does not depend on the mere reading of the word "interference" as used in NLRA § 8(a), 29 U.S.C. § 158(a), but reflects a policy judgment, *made by the NLRB*. 324 U.S. at 797-98.

[6]    In fact, in *Atlas Air, Inc. v. Air Line Pilots Ass'n*, 232 F.3d 218 (D.C. Cir. 2000), cited by BLET (Opp. at 17), the Court of Appeals did *not* borrow NLRA authority; rather, the court readily found, under standard RLA principles, that the carrier's conduct violated RLA § 2 Fourth because it was the product of anti-union animus. 232 F.3d at 225-26. And *U.S. Airways, Inc. v. NMB*, 177 F.3d 985 (D.C. Cir. 1999), also cited by BLET (Opp. at 17), involved not an
( continued . . . )

Court's admonition that "the NLRA 'cannot be imported wholesale into the railway labor arena. Even rough analogies must be drawn circumspectly with due regard for the many differences between the statutory schemes,'" *Trans World Airlines, Inc. v. Independent Federation of Flight Attendants*, 489 U.S. 426, 439 (1989) ("*TWA v. IFFA*") (citation omitted) -- and this warning perfectly fits our case.[7]

Most fundamentally, in the face of the NMB's well-established rule that a no-solicitation policy is valid as long as the policy is neutral and evenhandedly applied, it would be inappropriate to resort to the different and contrary principles applied by the NLRB. *See, e.g., Brotherhood of Locomotive Engineers v. Kansas City Southern Ry.*, 26 F.3d 787, 795 (8th Cir. 1994) ("We will not find NLRA precedent persuasive, however, in the face of relevant RLA precedent"); *Dempsey v. Atchison, Topeka & Santa Fe Ry.*, 16 F.3d 832, 841 (7th Cir. 1994) (same).

BLET contends (Opp. at 21) that the NMB's decisional law is somehow not an authoritative interpretation of RLA §§ 2 Third and Fourth, because the NMB does not adjudicate challenges to a carrier's conduct as independent unfair labor practices, or issue "orders" holding that a carrier has "violated" these statutory provisions. This is an empty assertion; indeed, BLET has the logic backwards. The fact that Congress has not established an administrative unfair

---

( . . . continued)
interpretation of the RLA, but, rather, an interpretation of "the First Amendment, which applies to both the RLA and the NLRA." *Id.* at 991 n.4.

[7]     BLET does not point to any source of law in support of its claim of an affirmative right to solicit on carrier property in an attempt to get employees to change union membership, as permitted by RLA § 2 Eleventh (c). As we have pointed out previously, there is no parallel to § 2 Eleventh (c) under the NLRA, and the NLRB's rules on solicitation therefore do not recognize any right to engage in on-property union membership solicitation, independent of an effort to choose the collective bargaining representative.

labor practice adjudication mechanism is an affirmative statement as to how the RLA is supposed to operate, and how its guarantees are to be implemented. It is not an invitation to the federal courts to fill the supposed gap by mimicking a different statutory regime.

The NMB is specifically charged with protecting the RLA §§ 2 Third and Fourth rights of employees to organize, which it does by investigating allegations of carrier interference that are presented to it in the context of a dispute over the choice of employee representatives.[8] When the NMB sets aside an election, it is interpreting RLA §§ 2 Third and Fourth and ruling that the carrier's conduct constitutes interference within the meaning of those provisions; when it rejects an argument of carrier interference, it is ruling there is no such wrongful conduct. The NMB's determinations are no less authoritative as interpretations of the requirements of RLA §§ 2 Third and Fourth because they come in the context of a resolution of a representation dispute, rather than an independent adjudication of an unfair labor practice charge. To the contrary, the NMB's representation decisions are so authoritative that federal courts are "virtually forbidden" to review them, *United Transportation Union v. United States*, 987 F.2d 784, 789 (D.C. Cir. 1993) -- including, specifically, the NMB's rulings "regarding employer interference, influence, or coercion," *Horizon Air Industries, Inc. v. NMB*, 232 F.3d 1126, 1132 (9th Cir. 2000); *accord Aircraft Mechanics Fraternal Ass'n v. United Airlines, Inc.*, 406 F. Supp. 492, 503 n.11 (N.D. Cal. 1976) ("since the [National Mediation] board must insure a coercion-

---

[8]    *See, e.g.,* RLA § 2 Ninth (NMB is authorized and directed to ascertain and designate the representative "in such manner as shall insure the choice of representatives by the employees without interference, influence, or coercion exercised by the carrier"); *Switchmen's Union of North America v. NMB*, 320 U.S. 297, 300-01 (1943) (§ 2 Fourth right of employees to select a representative is "protected by § 2, Ninth which gives the Mediation Board the power to resolve controversies concerning it"); *Northwest Airlines, Inc.*, 14 NMB 49, 52 (1986), 1986 WL 21726 (N.M.B.), at **2 ("determination of the issues . . . in representation cases before the Board, is made in cognizance of and consistent with 45 U.S.C. § 152, Third, § 152, Fourth, and § 152, Ninth").

free election atmosphere, it usually makes a finding concerning illegal influence, which finding is binding on the courts"); *see American Train Dispatchers Ass'n v. Denver & Rio Grande Western R.R.*, 614 F. Supp. 543, 545 (D. Colo. 1985) ("It is up to the [National Mediation] Board to determine what level of involvement by the defendant [railroad] would amount to illegal interference, influence, or coercion").

Although NMB precedent is not formally binding on the Court in the context of this proceeding, it is "well-established that the NMB's interpretation of those provisions of the RLA over which it has responsibility is entitled to deference," *Air Line Pilots Ass'n v. United Air Lines, Inc.*, 802 F.2d 886, 912 n.8 (7th Cir. 1986), in furtherance of Congress' recognition of the agency's "special expertise to interpret the RLA" in the context of representation disputes, *United Transportation Union v. United States*, 987 F.2d at 789.

BLET is equally mistaken in contending that the NMB case law does not defeat the union's claim that employees have an affirmative right to solicit on carrier property. In substantial measure, the union's contention is just a variant of BLET's failed argument that because the NMB does not adjudicate claims of carrier interference as unfair labor practices, its decisions do not provide the standard for judging whether no-solicitation policies are consistent with the requirements of RLA §§ 2 Third and Fourth. Beyond that, BLET's belabored summary of NMB case law on no-solicitation policies (Opp. at 23-26) serves only to document our point that the NMB imposes a standard of carrier neutrality, nothing more (or less). BLET gains nothing by observing (Opp. at 22), as though it were a rebuttal to our argument, that the issue in all these cases was whether or not the carrier interfered with employees' §§ 2 Third and Fourth rights by failing to apply a no-solicitation policy evenhandedly, rather than whether those statutory provisions were "violated." In fact, the NMB consistently inquires whether or not a

carrier policy is evenhanded and neutral, precisely because, as the NMB sees it, that is the standard that RLA §§ 2 Third and Fourth imposes on carriers. And this standard undermines BLET's claims: it establishes that, in the context of a dispute between an incumbent and a challenger union, a carrier does not interfere with the RLA §§ 2 Third and Fourth right to organize by banning employee solicitation on its property, so long as the restriction is uniform – that is, does not favor one union over another.[9]

BLET (Opp. at 25-26) contends that *Express Airlines I, Inc.,* 28 NMB 431 (2001), 2001 WL 702092 (N.M.B.), somehow sets forth a different standard. It does not. In that case, the union (PACE), which was seeking to become the representative of an unorganized craft of employees, alleged that the carrier had interfered with employee rights by enforcing its policy banning the distribution of literature during working time, and the posting of literature on company bulletin boards. The NMB rejected the interference claim, explaining:

> There is insufficient evidence that the Carrier improperly prohibited solicitation. The Carrier had a uniform rule in the employee handbook which prohibited the posting of all written solicitations. There is no evidence that the Carrier prevented PACE supporters from distributing literature in non-work areas on non-work time. Furthermore, there is no

---

[9]     BLET's attack (Opp. at 23) on our discussion of *Metro North Commuter R.R.*, 29 NMB 458 (2002), 2002 WL 31106336 (N.M.B.), is entirely off-base, as it ignores what we actually said. In *Metro North*, the incumbent union representing the craft of signalmen argued that the carrier interfered with the signalmen's choice of representative by dominating the challenging union (ACRE), which already represented employees in other crafts. Our précis of the decision (Def. 8/26/05 Mem. at 20) -- "(carrier's evenhanded application of its no-solicitation policy belies allegation of carrier interference)" -- tracks exactly the pertinent part of the Board's reasoning. The NMB found that the carrier did not permit ACRE officials who had been granted paid release time to engage in activities (such as organizing) that are exclusively union business, and that the "Carrier has a no solicitation policy which prevents union organizing while on duty and while on the Carrier's property," which had been promulgated twice during the organizing campaign, and which was applied equally to all. The NMB rejected the argument that the carrier had shown favoritism to ACRE officials by allowing them to conduct organizing activities when on release time, supporting its conclusion by explaining that "the Carrier's memos regarding its no solicitation policy belie that claim." 29 NMB at 470.

evidence that the Carrier's posting prohibitions were applied unfairly to PACE. To the contrary, the record indicated that PACE was able to distribute literature to the employees.

28 NMB at 252-53. Contrary to BLET's assertions, the NMB was not here establishing some new standard or recognizing an affirmative employee right to solicit on carrier property. The Board was simply applying its usual neutrality principle to the facts, finding no carrier interference as the carrier had a uniform no-distribution policy and applied the policy evenhandedly, according to its own terms.

BLET (Opp. at 19-21) also relies on *Adams v. Federal Express Corp.*, 470 F. Supp. 1356 (W. D. Tenn. 1979), and *Scott v. American Airlines*, 488 F. Supp. 415 (E.D.N.Y. 1980), but to no avail. To begin with, these cases long predate the development of the substantial body of NMB case law that now firmly establishes the applicable standard under the RLA. Consequently, *Adams* and *Scott* would not be persuasive authority even if they could be understood to recognize an NLRA-based principle of employee access to carrier property at odds with current NMB case law. But, in fact, these cases are consistent with the NMB's neutrality standard. In *Adams*, the carrier's policy against wearing union insignia was part of an extensive anti-union campaign, including surveillance, interrogations, and discharges, aimed at preventing the union from becoming the representative of an unorganized craft of employees -- a product, that is, of anti-union animus, not a neutral and evenhanded rule. 470 F. Supp. at 1361, 1371. Similarly, in *Scott*, the carrier's policy against wearing union insignia was not uniform or evenhanded; it was directed only at employees seeking to unionize, while employees who were already unionized could wear union pins. 488 F. Supp. at 420.

Beyond this, resort to the NLRB rules on solicitation is unjustified because those rules are inextricably linked to the NLRA's language and administrative enforcement scheme, which materially differ from the RLA's. Most tellingly, under the NLRA, disputes over solicita-

- 16 -

tion are adjudicated before the NLRB as administrative unfair labor practices, a concept foreign to the RLA. According to BLET (Opp. at 20-22), this is a reason for the federal district courts themselves to adjudicate disputes over employee solicitation as though they involved NLRA unfair labor practice charges and the courts were the NLRB.

More than four decades ago, Judge Henry Friendly explained why the approach BLET now advances would turn the RLA on its head. In *Ruby v. American Airlines, Inc.*, 323 F.2d 248 (2d Cir. 1963), the incumbent union argued that certain action by the carrier -- offering economic inducements to get employees to desert the incumbent and support a newly formed union instead -- would constitute an unfair labor practice under the NLRA. And the union argued that because the RLA, unlike the NLRA, does not provide "for a full administrative hearing and determination, which would result in disqualifying a union found to have benefited from unlawful conduct by the employer, the federal courts should fill the supposed statutory vacuum," under the asserted authority of RLA § 2 Fourth. 323 F.2d at 254. Judge Friendly flatly rejected this argument as fundamentally incompatible with the RLA:

> But the claim that the courts should do under the Railway Labor Act what Congress directed the NLRB to do under the National Labor Relations Act not only flies in the face of the difference in the language and scheme of the two statutes but ignores the diverse problems to which they were addressed. . . . The special situation in the railroad industry, where strong unions and management had become used to dealing with each other, differed vitally from the host of problems at which the Wagner Act was aimed -- businesses of every size and description, many with a history of strong anti-union bias and with ample opportunity for strong-arm tactics. It was thus natural that the Wagner Act should stress administrative adjudication whereas the earlier Railway Labor Act relied primarily on mediation. For the courts to require the Mediation Board to transform itself into an adjudicative and prosecutorial agency like the N.L.R.B., or to impose themselves upon it would distort the entire Congressional scheme.

323 F.2d at 256. *Accord Aircraft Mechanics Fraternal Ass'n v. United Airlines, Inc.*, 406 F. Supp. at 502-03, 506-07.

- 17 -

Though BLET pretends otherwise (Opp. at 20), it is of no consequence that the union has not yet filed a representation application with the NMB. BLET's position does not depend on this point, and gains no more legitimacy because of it. To the contrary, BLET contends that the Court must step in by adopting the NLRB's rules on solicitation precisely because the NMB does not adjudicate claims of carrier interference as unfair labor practice charges. But this limitation on NMB authority is as true after an application is filed as before -- so BLET's rationale for the Court's adopting the NLRB rules would equally apply even if the union had already filed at the NMB. This merely confirms that BLET's argument is baseless, because it is accepted that it is improper for the courts, under the supposed authority of RLA §§ 2 Third and Fourth, to set themselves up as labor boards in potential conflict with the NMB. *Ruby v. American Airlines, Inc.*, 323 F.2d at 254-56; *Texidor v. Ceresa*, 590 F.2d 357, 359-61 (1st Cir. 1978); *American Train Dispatchers Ass'n v. Denver & Rio Grande Western R.R.*, 614 F. Supp. at 545 ("I also want to avoid the possibility of conflicting outcomes in this court and before the National Mediation Board. My decision is consistent with the policy of not interfering or frustrating the National Mediation Board's rule of insuring peaceful labor relations"); *Aircraft Mechanics Fraternal Ass'n v. United Airlines, Inc.*, 406 F. Supp. at 499-509.[10]

Judge Gesell similarly concluded that the infeasibility and impropriety of a district court's taking on the role of a labor board are compelling reasons to reject the importation of NLRA principles into circumstances governed by the RLA. *Air Line Pilots Ass'n v.*

---

[10]    Nothing in *Adams v. Federal Express Corp.*, 547 F.2d at 320-23, cited by BLET (Opp. at 21-22), is to the contrary. *Adams* concerned, among other things, employee discharges alleged to be the product of anti-union animus, in circumstances where the employees were not unionized. The NMB has no authority to reinstate employees or order back pay. In that limited context, judicial involvement might sometimes be appropriate as the only way to ensure that a remedy is available. But the *Adams* context has nothing to do with our case -- or with the impermissibility of importing NLRB principles on solicitation in the circumstances presented here.

*Trans World Airlines, Inc.*, 729 F. Supp. 888, 890 (D.D.C. 1989) (refusing to import NLRA rules on disclosure of information).  As he explained:

> Accordingly, this Court adopts and will follow the Ninth Circuit's conclusion that 'the extensive judicial intervention that court-ordered disclosure would require is inconsistent with the history and principles of the Railway Labor Act.'  *Pacific Fruit [Express v. Union Pacific R.R.]*, 826 F.2d [920, 923 (9th Cir. 1987)] . . . .
>
> Prior opinions on this issue have also noted that disclosure disputes under the NLRA are handled by a quasi-judicial panel, the National Labor Relations Board, and no comparable mandatory administrative body exists for RLA disputes. . . .  If federal courts create and seek to enforce a duty to disclose, they will be placed in the untenable position of supervising arbitration discovery disputes and becoming enmeshed in a process that Congress intended to be left in other hands.

729 F. Supp. at 890.[11]

BLET's suggestion that the Court adopt the NLRB rules on solicitation suffers from all the vices identified by Judge Friendly and Judge Gesell, and then some.  We laid these out in extensive detail in our opening brief (Def. 8/26/05 Mem. at 27-39).  BLET offers no response to these arguments.  Accordingly, no purpose would be served by repeating them; we just briefly highlight the key, unrebutted points:

In addition to being in derogation of the special role of the NMB, importing the NLRB presumptions would be incompatible with the RLA's design to minimize judicial involvement in labor-management relations.  BLET's approach would wrongly turn the federal courts into formulators of labor policy.  The NLRB's presumptions reflect that agency's applica-

---

[11]    *Accord Pacific Fruit*, 826 F.2d at 923 ("When the NLRA requires a party to disclose information, the courts' role in the process is limited to reviewing NLRB disclosure orders under a deferential standard.  . . .  Under the union's interpretation of the Railway Labor Act, on the other hand, the courts would be solely responsible for administering and enforcing pre-arbitration disclosure.  In the absence of clear evidence to the contrary, we are reluctant to assume that Congress intended to impose such a duty on the courts.").

tion of its specialized expertise and policy judgments to specific factual situations.[12]   Were district courts to assume this role under the RLA, they would be making policy judgments as to whether or not various types of restrictions on employee solicitation are consistent with the RLA guarantees.  But it is not the courts' role to create labor policy under the RLA, any more than it is under the NLRA.[13]   Further, the congressional goal of achieving regularity and uniformity by having a single administrative agency formulate and enforce labor policy would be lost under the RLA, if each of the 94 federal district courts took on the role of being its own labor board.

Nor do the district courts have the institutional competence to perform the function of the NLRB.  The courts, unlike the NLRA, do not have a staff, are not an investigatory body, and do not have decades of experience resolving complex labor matters.

Moreover, adopting the NLRB presumptions of solicitation and distribution would improperly turn the courts into micromanagers of a carrier's labor practices -- as a court would be required to conduct intensive factual inquiry to determine what the employer's policy is, how it is applied, and whether it runs afoul of a particular presumption, *and* whether the employer can rebut the presumption by showing that "special circumstances make the rule necessary in order to maintain production or discipline," *Peyton Packing Co.,* 49 NLRB 828, 843-44 (1943), 1943 WL 10225 (N.L.R.B.).

---

[12]     *E.g., Stoddard-Quirk Mfg. Co.*, 138 NLRB 615, 617 (1962), 1962 WL 16389 (NLRB) ("the formulation of generalized rules in this area must be undertaken with caution for, patently, differing fact situations call for differing accommodations").

[13]     *See, e.g., ITT Industries, Inc. v NLRB*, 413 F.3d 64, 76-77 (D.C. Cir. 2005) (courts give deference to NLRB's policy judgments so as to honor "the line we must not cross if we are to keep judicial review separate from the formulation of public policy").

And, notably, the NLRB has adopted *special* presumptions suitable to the distinctive working environments of particular industries.[14]  We submit that the unique nature of twenty-four-hour-a-day railroad operations, including the special safety concerns they create for the public and employees, as reflected in elaborate federal statutes and regulations governing railroad safety, would justify a different set of presumptions than would apply to other industries -- a quintessential policy judgment for a labor board, not a federal court.

### III.    BLET Has Not Shown That Judicial Intervention Is Appropriate Under The Standards For Implying A Cause of Action Under RLA §§ 2 Third And Fourth.

BLET's claims would not belong in federal court even if they otherwise had merit (which they do not).  Because RLA §§ 2 Third and Fourth primarily address "the precertification rights and freedoms of unorganized employees," *TWA v. IFFA*, 489 U.S. at 440, courts will imply a cause of action in favor of unionized employees under these provisions only in those limited circumstances when there would otherwise be no means of enforcing the RLA's commands -- circumstances that do not exist here.

BLET (Opp. at 27-29) devotes substantial time to explaining that *TWA v. IFFA* concerned the exercise of self-help following exhaustion of the RLA "major dispute" procedures for changing a labor agreement.  This is a smokescreen:   *TWA v. IFFA* is not limited to its particular facts.  To the contrary, courts regularly apply the *TWA v. IFFA* principles limiting judicial intervention in a wide variety of post-certification contexts.  *See, e.g., Held v. Allied Pilots Ass'n*, 13 F. Supp.2d 20, 25-26 (D.D.C. 1998) (collecting cases); *Association of Flight*

---

[14]    *See, e.g., St. John's Hospital & School of Nursing, Inc.*, 222 NLRB 1150 (1976), 1976 WL 7848 (N.L.R.B.) (hospitals may ban all solicitation in patient areas, even during nonworking time); *Daylin, Inc. Discount Division*, 198 NLRB 281 (1972), 1972 WL 5039 (N.L.R.B.) (retail establishment may ban solicitation in selling areas during nonworking time), *enforced, NLRB v. Daylin, Inc.*, 496 F.2d 484 (6th Cir. 1974).

*Attendants v. USAIR, Inc.*, 807 F. Supp. 827, 834 (D.D.C. 1992), *aff'd,* 24 F.3d 1432 (D.C. Cir. 1994).[15]

As we have shown (Def. 8/26/05 Mem. at 22-24), BLET does not begin to satisfy the narrow *TWA v. IFFA* standards.  In particular, BLET has not alleged that NSR's no-solicitation policy is the product of anti-union animus; that enforcement of NSR's policy would leave NSR train service employees without a union or a labor agreement; or that the policy otherwise fundamentally undermines the RLA's processes.

BLET's response (Opp. at 29-30) is to fall back on its contention that the Court must intervene because the NMB lacks authority to adjudicate violations of RLA §§ 2 Third and Fourth.  We showed in detail, in the preceding section, why this argument has no merit.[16]

BLET also relies on the fact that it has not yet filed an application with the NMB, but this adds nothing.  Judge Friendly disposed of a similar contention in *Ruby v. American*

---

[15]  BLET does not help itself by citing (Opp. at 29) *Roscello v. Southwest Airlines Co.*, 726 F.2d 217 (5th Cir. 1984), and *Brady v. Trans World Airlines, Inc.*, 223 F. Supp. 361 (D. Del. 1963), *aff'd,* 401 F.2d 87 (3d Cir. 1968).  These cases predate the Supreme Court's express direction in *TWA v. IFFA* that courts intervene sparingly in post-certification contexts.  Moreover, *Roscello* and *Brady* involve claims of wrongful discharge, in the case of *Roscello,* allegedly as the result of anti-union animus.  As we have noted (see n. 10, above) even if judicial intervention might be appropriate in such a context to ensure a remedy, this would have no bearing on the claims alleged by BLET in the very different context presented by this case.

[16]  Also see *Aircraft Mechanics Fraternal Ass'n v. United Airlines, Inc.*, 406 F. Supp. at 502-03, in which the court rejected an argument analogous to the one BLET advances here, explaining:

> While the National Mediation Board is not empowered to remedy "unfair labor practices" as such, Congress has given the Board a great deal of power to regulate such practices indirectly. . . .  Where such [coercive or interfering] practices are found by the Board to have tainted the designation or election process certification of the union benefiting from the taint can (and must) be withheld. . . . Certainly it cannot be said that the Board is  powerless to act, notwithstanding that the procedure under the National Labor Relations Act may be in some sense more direct.

*Airlines, Inc.*, rejecting the argument that judicial intervention was appropriate because the incumbent union had filed its lawsuit alleging a violation of RLA § 2 Fourth before the challenger union (Allied) filed an application with the NMB: "[I]t had become apparent, long before Allied's application to the Mediation Board, that this action was subject to the vice that it sought orders from a federal court that might frustrate ultimate determination by the agency to which Congress gave exclusive responsibility . . . ." 323 F.2d at 256; *see id.* at 254 ("It was obvious almost from the beginning of this action that it concerned the proper representation of American's pilots"). *See also Air Line Pilots Ass'n v. Texas Int'l Airlines, Inc.* 656 F.2d 16, 20-24 (2d Cir. 1981) (judicial intervention inappropriate where claim implicated a dispute over representation, even though no application had been filed with the NMB).

As we have shown (Def. 8/26/05 Mem. at 25-26), the NMB resolves claims of carrier interference that are based on conduct during an A-card solicitation campaign; and nothing would prohibit the NMB from entertaining a representation application from BLET on the basis of a "showing of interest" different from the agency's typical A-card threshold, if the NMB thought this was appropriate.

BLET acknowledges (Opp. at 22) that "it is not alleging that the Carrier is discriminatorily applying its no-solicitation policy," so the union effectively concedes that it could not establish carrier interference at the NMB. This just confirms that BLET has no valid claim that any rights protected by RLA §§ 2 Third and Fourth have been infringed. It is not a justification for this Court to intervene now by adopting the contrary principles developed by a different agency under a different statute.

## <u>CONCLUSION</u>

The Court should dismiss this civil action pursuant to Rule 12(b)(1), for lack of subject matter jurisdiction, or, in the alternative, should enter judgment on the pleadings pursuant to Rule 12(c), in favor of defendants.

Respectfully submitted,

*Jeffrey S. Berlin*

_____
Jeffrey S. Berlin (D.C. Bar #200048)
Krista L. Edwards (D.C. Bar #421537)
Mark E. Martin (D.C. Bar #373445)
SIDLEY AUSTIN BROWN & WOOD LLP
1501 K Street, N.W.
Washington, D.C.  20005
(202) 736-8178
jberlin@sidley.com
kedwards@sidley.com
mmartin@sidley.com

*Attorneys for Defendants Norfolk Southern Railway Company and Norfolk Southern Corporation*

October 14, 2005